**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **CHAD HOGAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No:. 2:05CV687** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CITY OF MONTGOMERY, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

**BRIEF IN SUPPORT OF DEFENDANTS COOK, CAULFIELD, AND GORDON'S
MOTION FOR SUMMARY JUDGMENT**

**COME NOW** Defendants Lieutenant Ronald Cook ("Cook"), Lieutenant William Caulfield ("Caulfield") and Canine Officer M.D. Gordon ("Gordon"), and hereby offer the following brief in support of their motion for summary judgment.

**NARRATIVE SUMMARY OF FACTS**

At approximately 10:30 p.m. on March 30, 2005, the Plaintiff Chad Hogan ("Hogan") met with three (3) men, and proceeded to the Break Room Pool Hall located on Northern Boulevard in Montgomery, Alabama. (Hogan Depo., pp. 30-31).   Hogan named two (2) of the men as Chris McBride ("McBride") and Courtney Smith ("Smith"), but allegedly could only recall the first name of the third man as Mario ("Mario"). (Hogan Depo., pp. 29-30).  After remaining at the pool hall for approximately one (1) hour, Hogan and the men left the pool hall and got back into their car to leave. (Hogan Depo., p. 32).  While allegedly waiting for the "rain to slack up," the four (4) men stopped in a nearby parking lot and proceeded to smoke marijuana and drink liquor. (Hogan Depo., p. 32). This parking lot was adjacent to Arnaud's Quality Meats, ("Arnaud's"). (Hogan Depo., p. 32;  Exh. 1, Photo of building and parking lot).

Defendant M.D. Gordon ("Gordon") is a Canine officer with the Montgomery Police Department ("MPD"). (Gordon Depo., p. 8). Gordon was on patrol this same night and responded to a burglar alarm call that had occurred at Arnaud's. (Gordon Depo., p. 22). The alarm at Arnaud's was triggered at approximately 11:58 p.m. (Exh. 2, Gordon Statement). The alarm was triggered by a motion sensor inside Arnaud's. (Pelham Depo., p. 44) Pursuant to normal protocol, Gordon turned his lights off when he pulled into Arnaud's parking lot. (Gordon Depo., p. 24). As Gordon pulled into the parking lot, he noticed the vehicle that Hogan and his accomplices were in, which was parked approximately twenty (20) to thirty (30) yards from Arnaud's building. (Gordon Depo., p. 31). Gordon also saw a black male standing outside of the car approximately halfway between the car and a window on the side of Arnaud's. (Gordon Depo., p. 29). Gordon noted that the black male was wearing dark pants and a gray or white T-shirt. (Gordon depo., p. 29). Gordon further noticed that the window was open. (Gordon Depo., p. 24). Gordon then witnessed the black male run back to the vehicle and get into the vehicle on the back passenger side. (Gordon Depo., pp. 29-30).

After Hogan got back into the vehicle, it drove away and pulled into a trailer park that was adjacent to the parking lot and immediately behind Arnaud's. (Gordon Depo., p. 33; Exh.1, Photo). Gordon followed the vehicle into the trailer park and initiated a stop by flashing his emergency lights. (Gordon Depo., p. 34). The vehicle initially stopped at this point, and Gordon exited his unit and began walking toward the stopped vehicle. However, the vehicle took off and fled before Gordon reached the stopped vehicle. (Gordon Depo., pp. 33-34).

Gordon got back into his unit and pursued the vehicle down Wares Ferry Road. (Gordon Depo., p. 37). Gordon further radioed dispatch and requested assistance from additional units. (Gordon Depo., p. 38). The vehicle then led Gordon on a high speed chase through a residential area for approximately five (5) to ten (10) minutes. (Gordon Depo., pp. 43-44). Eventually, Hogan and

2

his accomplices crashed the vehicle into a privacy fence in an individual's backyard. (Gordon Depo., p. 45). All four (4) suspects then jumped out of the car and fled on foot. (Gordon Depo., pp. 47-48). Hogan was unable to exit from the passenger side of the vehicle, as that side was crashed into the fence. (Gordon Depo., p. 46). Gordon intentionally kept his eye on Hogan as he exited the vehicle, as Gordon remembered that Hogan was the one who got back into the vehicle at Arnaud's. (Gordon Depo., p. 48). Gordon observed Hogan exit from the driver side backseat. (Gordon Depo., p. 46). Gordon and his dog Osko ("Osko") then exited the vehicle and pursued Hogan and one of his accomplices to a fence. (Gordon Depo., p. 48). Another of Hogan's accomplices turned to the right, and ran in another direction. (Gordon Depo., p. 48). Gordon did not see the fourth accomplice. (Gordon Depo., p. 49). Hogan and an accomplice jumped the fence, and Gordon held his spot at the point where they cleared the fence and called for additional backup. (Gordon depo. p. 50).

An additional canine unit arrived on the scene, and the officers began to track Hogan and his accomplices from the point where Hogan cleared the fence. (Gordon Depo., p. 50). Shortly after, Hogan was apprehended by a canine unit dog in a nearby residential backyard (Gordon Depo., p. 50). Contrary to Hogan's allegation that he was apprehended and bitten by Gordon's dog Osko, Hogan was actually apprehended by another dog under the supervision of Corporal Greg Mora ("Mora"). (Complaint, ¶¶ 14, 22;Gordon Depo., p. 51). Eventually, McBride and Smith were also apprehended. The fourth accomplice that Hogan would only identify as "Mario" got away, and was not apprehended. (Hogan Depo., p. 38). Hogan, McBride, and Smith were taken to the police station for further questioning. (Hogan Depo., p. 35). Subsequent to the apprehension, an inventory search of the suspects' vehicle was performed. (Gordon Depo., p. 69). During the inventory search, the following items were discovered in the car: **a 9mm handgun, a ski mask, and a flashlight**. (Exh. 3, Inventory Sheet).

After Gordon had left in pursuit of Hogan and his accomplices, Officer Forbus ("Forbus") was the first to arrive on the scene at Arnaud's. (Exh. 4, Forbus Affidavit).  When he arrived, Forbus noticed that the window on the side of the building was open, and that a flower pot had been knocked off the windowsill and had landed on the floor inside the building. (Exh. 4, Forbus Affidavit).  Forbus further noticed that there were three (3) or four (4) other items on the windowsill that appeared to have been pushed off to one side to allow entry into the building, and that there was water on the floor inside the building. (Exh. 4, Forbus Affidavit).

Hogan was charged that night with  Third Degree Burglary in violation of Ala. Code § 13A-7-7 (1975). (Exh. 5, District Court Complaint).   The burglary warrant was prepared by Detective Kirk Pelham ("Pelham"). (Pelham Depo., p. 54).  Pelham escorted Arnaud's owner, Anthony Arnaud ("Arnaud"), to the Warrant Clerk's office  to secure the warrant against Hogan.  (Pelham Depo., p. 54).  Pelham then took the warrant, executed  it, and transported Hogan to Montgomery County Jail. (Pelham Depo., p. 54).

Pelham was sitting at his desk on the night of these events when he heard a call about the burglar alarm over the radio. (Pelham Depo., p. 26).  Pelham then heard further radio traffic from officers on the scene at Arnaud's, and then left the station and proceeded to Arnaud's.  (Pelham Depo., p. 28).  While in route to the scene, Pelham heard over the radio that the vehicle that Hogan was in had crashed into the fence.  (Pelham Depo., p. 28).  Pelham arrived on the scene at Arnaud's, and was informed by Forbus that Arnaud had been contacted and was on his way to the scene. (Pelham Depo., p. 29).  According to Pelham, Arnaud arrived at the scene and informed Pelham that he had left the window open himself due to the air conditioner not working.  (Pelham Depo., p. 29).  Pelham further stated that Arnaud could not find anything that appeared to be missing. (Pelham Depo., p. 29).  Despite knowing all the facts regarding Hogan and his accomplices fleeing from the

4

police after being seen in the immediate vicinity of a building where a burglar alarm had just been triggered, **and without yet even knowing that a handgun, flashlight, and ski mask were found in the suspects' car**, Pelham radioed his supervisor at this point and informed him that "no burglary had occurred" simply because the owner allegedly left the window open and couldn't find anything missing. (Pelham Depo., p. 30).

Despite the fact that Pelham was the person who prepared, secured, and executed the warrant against Hogan, Pelham now alleges that the prosecution of Hogan was improper. Gordon freely admitted that he did not fully articulate everything he saw when he initially drafted his statement and that he subsequently made changes to the statement. (Gordon Depo., pp. 75-76). However, Pelham alleges that Gordon actually added elements to his statement submitted with the case file that Gordon did not actually see. Pelham alleges that Gordon drafted a series of statements, and that Gordon progressively added facts that he did not witness. Specifically, Pelham testified as follows:

> Q:    I'm going to stop you for a second. What did the first statement say as opposed to the second statement? What was the major difference between the two?
>
> A:    The first statement said I pulled into the parking lot, observed a vehicle which passenger - - I observed a vehicle in the parking lot. The passenger's door then closed and the vehicle drove off. The second statement said, I pulled in the parking lot, observed a vehicle, **and a black male standing outside the vehicle next to the window**, which was believed to be the point of entry. And that was the only two things that changed.

(Pelham Depo., pp. 38-39)(emphasis added). Pelham further testified that Gordon drafted an additional statement that added the following information:

> A:    ...[a]nd the third statement, I had pulled into the parking lot - - I had pulled into the parking lot and observed a vehicle in the parking lot with **a black male coming from the window - - coming from - - coming from the window of the business**, enter the vehicle and drive off. That was the only thing that changed there.

(Pelham Depo., pp. 39-40)(emphasis added). Pelham was either confused or being intentionally

misleading when he testified that any statement drafted by Gordon ever stated that a black male

"came from the window of the business." Specifically, the statement issued by Gordon that was

submitted as a part of the case file reads, in pertinent part, as follows:

> At 0006 hours unit 150 arrived at the business and observed a Lincoln Town car parked on the side of the business next to a side window and **observed a black male standing outside of the vehicle next to the window of the business where the alarm was received** (465 N.Eastern Blvd, Arnaulds Quality Meats).

(Exh. 2 , Gordon Statement)(emphasis added).   Clearly, the statement simply says that Gordon saw

a black male standing outside the vehicle next to the window.  Contrary to Pelham's allegation, the

statement never alleges that Gordon saw a black male coming from the window.

Pelham further alleged in his deposition that he believed that Arnaud was pressured by Lt.

William Caulfield ("Caulfield") to sign an arrest warrant on Hogan. (Pelham Depo., p. 92). However,

Arnaud completely refuted this allegation in his deposition.  Specifically, Arnaud testified that he

was simply told by the MPD on the scene that **if** he wanted to press charges, he would need to go

downtown to the police station. (Arnaud Depo., p. 30).  Arnaud voluntarily chose to go downtown.

(Arnaud Depo., p. 30).  Despite incessant, repeated questioning on the subject by Plaintiff's counsel,

Arnaud adamantly denied that he was ever pressured by anyone at the MPD to sign the warrant

against Hogan.  Specifically, Hogan testified as follows:

> Q:    Did you ever tell anyone with the Montgomery Police Department on March the 31st or April - - the morning - - early morning of April the 1st that you did not wish to press charges?
>
> A:    No, sir.
>
> Q:    Did you tell anybody that you were in a hurry, you wanted to go home?
>
> A:    Huh-uh.
>
> Q:    Is that a no?

6

A:     No, sir.

Q:     Okay.  And you - - I asked you earlier.  Did anyone with the Montgomery Police Department pressure you to file a warrant?

A:     No, sir.

Q:     Nobody did at all?

A:     All they said was that they had - - when they got there, there was a guy that was walking away from the building, got in a car, and took off.  And they started chasing him.  And when I got there, he said they had caught one and the other one was down the drainage canal and they had found a ski mask and a pistol in the car.

(Arnaud Depo., pp. 38-39).

Pelham subsequently filed a complaint about this incident with his supervisor.  (Exh. 6, Pelham Claim, ¶ 9).  Approximately one (1) month later, Pelham resigned from the MPD. (Exh. 6, Pelham Claim, ¶ 18).  Ten (10) days later, Pelham filed a verified claim against the City of Montgomery alleging "retaliation" in relation to the Hogan incident demanding the sum of $250,000.00 (two hundred and fifty thousand dollars).  (Exh. 6, Pelham Claim, final paragraph). Pelham currently has a similar lawsuit pending in the Circuit Court of Montgomery County, Case No. CV-05-3116.

It was disclosed on January 19, 2006, that Pelham was represented initially by Hogan's current counsel "for a considerable time" in relation to this same matter.  (Exh. 7, Letter from Plaintiff's Counsel). In fact, Hogan's attorney had previously objected to the Defendants' discovery requests regarding the Plaintiff's sources of information and the content of conversations with Pelham **on the basis of attorney-client privilege and work product**.[1]   (Exh. 8, Plaintiff's

---

[1]Plaintiff's counsel has subsequently indicated that he would attempt to obtain a waiver from Pelham in order to facilitate responses to the discovery requests.  To date, no responses have been received.

Responses to Discovery Requests)  However, during Pelham's deposition three (3) months earlier, Pelham responded as follows when questioned about any contact that he or his counsel may have had with Hogan:

> Q:    Has anybody representing you communicated with Chad Hogan in any way since March 30th, 2005?
>
> A:    Not that I know of.

(Pelham Depo., p. 121).  Despite the fact that his former counsel was sitting at the table only a few feet away, obviously as counsel for Chad Hogan, Pelham denied that he had any knowledge that any attorney that had represented him had communicated with Hogan.

Hogan was convicted in 1998 of First Degree Robbery, and served nearly two (2) years in prison.  (Hogan Depo., p. 19).  Hogan and three (3) co-defendants were convicted of robbing a convenience store with a handgun. (Hogan Depo., p. 21).  **Hogan further admitted that a ski mask was worn during the commission of this crime**. (Hogan Depo., p. 22).  Hogan's accomplice, Smith, was also convicted of First Degree Robbery in 1995. (Exh. 9, AAOC Record of Conviction). Hogan's accomplice, McBride, is currently serving time in a federal prison in Mississippi on federal gun charges.  (Hogan Depo., p. 44).   It is unknown whether the mysterious accomplice known only as "Mario" has any felony convictions.

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgement as a matter of law." The moving party bears the initial burden of showing no genuine issue of material fact and that he is entitled to judgment as a matter of law.  *See Clark v. Coats & Clark, Inc.*; 929 F. 2d 604, 608 (11th Cir. 1991) *Adickes v. S.H. Kress & Co.,* 398 U.S. 144,

157 (1970). Once the moving party has met his burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. *See also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

A dispute is genuine "if the evidence is such that a reasonable jury would return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Id.* at 249. And while the facts must be viewed in the light most favorable to the party opposing summary judgment, this means no more than that "the party opposing a summary judgment motion is to be given the benefit of all *reasonable* doubts and inferences in determining whether a genuine issue exists that justifies proceeding to trial." See 10 C. Wright & A. Miller, Federal Practice & Procedure § 2725, p. 510 (1973) (emphasis added).

## ARGUMENT

## I.    THE PLAINTIFF'S COMMON LAW MALICIOUS PROSECUTION CLAIMS ARE DUE TO BE DISMISSED WITH PREJUDICE.

### A.    The Plaintiff's Arrest and Prosecution Was Based Upon Probable Cause

Hogan attempts to bring a common law malicious prosecution claim against Cook, Caulfield and Gordon based on his arrest and prosecution which was subsequent to the incidents in question. This claim must fail. Malicious prosecution actions are disfavored in the law for the very reason that "'anyone who has reasonable cause to believe that there is reasonable cause for legal redress and protection has a lawful right to seek such redress without risk of being sued and having to respond in damages for seeking successfully to enforce his rights.'" *Alabama Power Co. v. Neighbors.*, 402 So. 2d 958, 962 (Ala. 1981) (quoting *Birwood Paper Co. v. Damsky*, 229 So. 2d 514 (Ala. 1969)).

The elements of a malicious prosecution claim are (1) the initiation of a judicial proceeding, (2) a lack of probable cause, (3) malice, (4) termination of the action in favor of the party against whom the judicial proceeding was initiated, and (5) resulting damage. *See eg., Kmart, Inc. v. Asaro*; 751 So. 2d 513, 515-16 (Ala.Civ.App. 1999); *Montgomery v. City of Montgomery*, 732 So. 2d 305 (Ala.Civ.App. 1999). Hogan was charged with Third Degree Burglary in violation of Ala. Code § 13A-7-7 (1975), which holds that "A person commits the crime of burglary in the third degree if he knowingly enters or remains unlawfully in a building with intent to commit a crime therein." Hogan's charges were conclusively based upon probable cause, no matter whose "version" of the events the Court might consider.

Officer Gordon responded to a burglar alarm call at approximately midnight. When Gordon arrived on the scene, he saw a car parked in the parking lot twenty (20) to thirty (30) yards from the building where the alarm had been triggered. Gordon further saw a black male standing outside the car, and saw the black male get into the car on the back passenger side, and watched the car drive away into a nearby trailer park. Gordon then took the reasonable action of flashing his lights to effectuate a stop of the vehicle to investigate further. The vehicle stopped long enough for Gordon to get out of the car and then took off at a high rate of speed. Gordon took the reasonable action of pursuing the vehicle and radioing for assistance. High on marijuana and drunk on liquor, Hogan and his accomplices then led the MPD on a high speed chase on a rainy night through a residential neighborhood.

Predictably, the fleeing vehicle crashed into a fence in the backyard of individual's home. Unrelenting, Hogan and his accomplices jumped out of the vehicle and fled further on foot, climbing through residential backyards. Gordon and other officers then took the reasonable action of releasing trained canine unit dogs to track down Hogan and his accomplices to ensure that the innocent owners

of the backyards that Hogan was climbing through at midnight were not hurt. Hogan was ultimately apprehended, and identified by Gordon by both his location from entering and exiting the car and his clothing. When Forbus arrived on the scene, he saw clear evidence of entry into the building. During a standard and lawful inventory search of the vehicle, **a 9mm handgun, and ski mask, and a flashlight were discovered in the car**.

The only "dispute" of fact seems to be whether Gordon actually saw a black male standing outside the vehicle. Even without considering whether Gordon had seen Hogan outside the car, the remaining facts still establish probable cause to believe that Hogan was involved in a burglary. In fact, the very facts that Hogan states in ¶ 14 of the Complaint establish probable cause. This paragraph reads as follows:

> On March 31, 2005, at approximately 11:58 PM, at Arnaud's Quality Meats on Eastern Boulevard, Montgomery, Alabama, a burglar alarm call was received by the Montgomery Police Department. In response to the alarm, a Montgomery Police Department canine unit was dispatched. The canine unit was operated by Officer J.M. Gordon. Upon arriving on the scene, Officer Gordon observed an automobile leave from a parking lot some distance from Arnaud's Quality Meats. He also observed an open window at Arnaud's Quality Meats. The subject automobile was occupied by four black males. Plaintiff, Chad Hogan, was a backseat passenger of the subject automobile. Officer Gordon called for back-up assistance. Officer Gordon followed the subject automobile. When other police officers arrived at Arnaud's Quality Meats they, too, observed an open window at the business, but no other signs of a burglary or other illegal entry. Officer Gordon and the other officers now supporting Officer Gordon were informed by radio that Arnaud's Quality Meats has been burglarized. At this time, officers following the subject automobile activated their emergency equipment in an effort to effect arrest. The driver of the subject vehicle refused to stop and a chase ensued. After several minutes, the automobile crashed into a fence at the corner of Wareingwood and Pelzer Streets within the City of Montgomery. By the time of the crash, over fifteen officers were in pursuit.

These facts alone establish probable cause. Essentially, Hogan contends that the probable cause in this case was partly based upon Gordon fabricating evidence, i.e. by stating that he saw Hogan outside the car next to the window. However, Hogan must show not only that Gordon's final statement contained a fabrication, but also that the final statement could not establish probable

cause <u>without the alleged fabrication</u>.  In *Hill v. McIntyre*, 884 F.2d 271 (6th Cir. 1989), the Sixth

Circuit noted that a  malicious prosecution claim could not stand unless the plaintiff could show that

the remaining content of a statement or affidavit, absent the alleged fabrication, failed to establish

probable cause.  In so ruling, the court cited *Franks v. Delaware*, 438 U.S. 154 (1978), and held as

follows:

> This standard originates in *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667
> (1978), a suppression case in which the Supreme Court defined the Fourth Amendment's
> guarantee in the context of search warrants issued on the basis of false affidavits: only if 'a
> false statement [was made] knowingly and intentionally, or with reckless disregard for the
> truth' **and if,** '**with the affidavit's false material set to one side, the affidavit's remaining
> content is insufficient to establish probable cause**,' is there a constitutional violation under
> the Fourth Amendment. *Id.* at 155-56, 98 S.Ct. at 2676.

*Hill* at 275.   Even if this Court sets the information regarding seeing Hogan outside next to the

window to the side, the remaining contents of Gordon's final statement still establish probable cause

as a matter of law.  Accordingly, Hogan's claim for malicious prosecution is due to be dismissed.

### B.    The Issue of Probable Cause Is a Question of Law in this Case

It is well settled in Alabama that when the facts regarding the existence of probable cause are

not in dispute, then the issue of probable cause is a question of law for the court. *Lee v. Minute Stop*,

*Inc.,* 874 So.2d 505, 511 (Ala. 2003).  Probable cause is defined as a reasonable ground for

suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man

in the belief that the person accused is guilty of the offense charged.  *See Hunter v. Bryant*, 502 U.S.

224, 228 (1991)(quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). That standard is clearly met under

the admitted facts of this case.  In the instant case, Hogan himself admits that he was in a car that

was parked next to a building at midnight where a burglar alarm was triggered by an internal motion

sensor.  This is a reasonable ground for suspicion.  Hogan admits that he and his accomplices fled

on a high speed chase when the police attempted to stop them and question them further. This is an

<u>extraordinarily</u> high ground for suspicion.  He admits that he and his accomplices further fled on foot after wrecking their car into a fence in an individual's backyard.  This is another <u>extraordinarily</u> high ground for suspicion. Hogan cannot dispute Forbus' testimony that a flower pot was knocked off the windowsill and was lying on the floor inside Arnuad's, that other items on the windowsill appeared to have been pushed aside to allow entry, and that there was water on the floor inside the building. This is another <u>extraordinarily</u> high ground for suspicion. **Hogan admits that a 9mm handgun, a flashlight, and a ski mask were found in the car**.  This is a <u>**shockingly**</u> high ground for suspicion. Although Hogan predictably denied that he had any knowledge of these items being in the car, Hogan himself stated the following as to whether the police should have believed him:

> Q:  Were you aware that any of those items were in the car?
>
> A:  No.
>
> Q:  You told the police you didn't know about them?
>
> A:  Yes.
>
> Q:  Do you think the police were justified in being skeptical in believing you on that, given the circumstances?
>
> A:  Yes.

(Hogan Depo., pp. 58-59).   Hogan further admitted that he could not state any alternative reasons outside intent to commit a burglary that a person might be found with these three items in their possession.

> Q:  Can you give me some alternative reason why somebody might be in possession of all three of those at one time, being a ski mask, a handgun and a flashlight?
>
>       MR. NELMS:   Object to the form.
>
> A:  No.

(Hogan Depo., p. 60).  When adding all of these undisputed rational grounds for suspicion together,

13

this Court can only conclude as a matter of law that the grounds amount to circumstances sufficiently strong in themselves to warrant a cautious man in the belief that Hogan was guilty of Burglary. Accordingly, the Plaintiff's claim is due to be dismissed.

## II.   THE PLAINTIFF'S ABUSE OF PROCESS CLAIMS ARE DUE TO BE DISMISSED WITH PREJUDICE.

Hogan further makes a claim for Abuse of Process against Gordon, Caulfield, and Cook. Hogan characterizes this claim as "Malicious Prosecution, or in the Alternative, Abuse of Process". (See Plaintiff's Complaint). It should first be noted that Abuse of Process is not a "lesser included tort" of Malicious Prosecution. Instead, it is a wholly different cause of action which has wholly separate elements. One of the most instructive cases on point on this issue is *Shoney's, Inc. v. Barnett*, 773 So.2d 1015 (Ala.Civ. App. 1999). In this case, the court specifically noted that Abuse of Process concerns the wrongful <u>use</u> of process <u>after</u> the process has been issued, whereas Malicious Prosecution is concerned with the wrongful issuance of process itself. *Shoney's* at 1024.

In fact, the Alabama Supreme Court has noted that "the legitimacy or illegitimacy of the issuance of process is <u>irrelevant</u> in an abuse of process case." *C.C. & J., Inc. v. Hagood*, 711 So.2d 947, 951 (Ala. 1998)(emphasis added). The court further noted that "[w]rongful activity designed to create a claim goes to the initiation of process, not to its later use." *Id.* At 951. The only activity Hogan refers to is evidence fabrication allegedly committed **before** the process was issued against him, i.e. the complaint filed in District Court. Hogan offers no evidence of any wrongful activity committed by the Defendants **after** the process was issued against him. Furthermore, Hogan must show that the Defendants used the process for a purpose for which it was not designed. *Shoney's* at 1025. Simply using the Defendants testimony or statements against Hogan after the issuance of process does not constitute a "wrongful use of process," even if Hogan alleges that the testimony or statements were perjured. *Shoney's* at 1025.

Finally, it should be noted that there is no evidence that the Defendants took <u>any</u> action related to Hogan <u>after</u> the process had been issued. As Hogan properly points out in his Complaint, Hogan's charges were presented to the Grand Jury, and he was not indicted. The prosecution of a criminal case before the Grand Jury is by law the duty of and within the sole purview of the Office of the District Attorney for the respective judicial circuit. *See* Ala. Const. Art. VI, §167; Ala. Const. Amendment 226. Furthermore, Hogan does not allege that any further action has been taken on the charges since the Grand Jury chose not to indict him. Accordingly, Hogan cannot show that the Defendants wrongfully used the process after the process was issued, and his claim for Abuse of Process must therefore be denied.

### III.    DEFENDANTS COOK, CAULFIELD AND GORDON ARE ENTITLED TO DISCRETIONARY FUNCTION IMMUNITY.

Ala. Code § 6-5-338(a) (1975) provides that "every [law enforcement] officer . . . shall have immunity from tort liability arising out of [his] conduct in performance of any discretionary function within the line and scope of [his] law enforcement duties." *See* Ala. Code § 6-5-338 (1975). Even negligent acts of a police officer are within the purview of this section.

"Discretionary functions were defined as those in which there are no hard and fast rules as to the course of conduct that one must or must not take and those acts requiring an exercise in judgment and choice involving what is just and proper under the circumstances." *Ex parte City of Gadsden*, 781 So. 2d 936, 938 (Ala. 2000). Ala. Code § 15-10-3(a)(4) (1975) allows an officer to arrest a person without a warrant, on any day and at any time when the officer has reasonable cause to believe that the person arrested has committed a felony, although it may afterwards appear that a felony had not in fact been committed.

Generally, arrests and attempted arrests are classified as discretionary functions. *Telfare v. City of Huntsville*, 841 So. 2d 1222 (Ala. 2002). Alabama case law has clearly established that

15

discretionary function immunity shields police officers who make an arrest based on probable cause or an arrest warrant even if the person arrested is ultimately acquitted. *See Moore v. Crocker*, 2002 WL 539002 (Ala. April 12, 2002).

Furthermore, the Alabama Supreme Court has adopted the more lenient "arguable probable cause" standard relating to arrests in the case of *Borders v. Huntsville*, 2003 WL 21715993 (Ala. July 25, 2003). This standard gives rise to immunity "when an officer makes an arrest lacking probable cause if officers of reasonable competence in the same circumstances and with the same knowledge would disagree as to whether probable cause existed." *See Borders*. Thus, even an arrest made without probable cause may be subject to immunity provided that reasonably competent officers would have acted similarly.

The Defendants will refrain from again reciting the litany of evidence that was available to support the arrest and prosecution of Hogan. It is sufficient to state at this point in the brief that probable cause existed as a matter of law. Even if this Court were to somehow determine that probable cause did not exist, there was certainly arguable probable cause to effectuate Hogan's arrest and prosecution.

Based on the foregoing, pursuant to clearly established Alabama case law, Gordon, Cook, and Caulfield are entitled to discretionary function immunity against all of Plaintiff's claims because the Plaintiff has failed to allege specific facts about the named Defendants that would overcome their entitlement to discretionary function immunity. Simply stated the facts are as follows: Hogan was in the immediate vicinity of a triggered burglar alarm at midnight; he fled the scene in a car and later on foot after a police officer made a lawful and reasonable attempt to stop and question him; there was evidence on the scene that entry had been made through the window; and a gun, ski mask, and flashlight were subsequently found in the car. Hogan has failed to allege a single fact that would overcome the Defendants' entitlement to immunity, and his claims are due to be dismissed.

16

IV.    **THE PLAINTIFF'S 42 U.S.C. § 1983 CLAIMS FOR FALSE ARREST ARE DUE TO BE DISMISSED WITH PREJUDICE.**

Hogan has asserted a claim for false arrest under §1983 against Gordon, Cook, and Caulfield. This claim must fail.   The Eleventh Circuit has clearly held that in order to establish a False Arrest claim under §1983, a claimant must "meet the elements of common law false imprisonment and establish that the imprisonment resulted in a violation of due process rights under the Fourteenth Amendment." *Ortega v. Christian*, 85 F.3d 1521, 1526 (11th. Cir.1996)(citations omitted). "To prove a § 1983 claim for false arrest, **a plaintiff must demonstrate the absence of probable cause**.  The existence or absence of probable cause can be determined as a matter of law from the facts." *See Sullivan v. City of Pembroke Pines*, 2006 WL 63959, p. 2 (11th. Cir. 2006)(citations omitted) (emphasis added).  Accordingly, Hogan must demonstrate that he was unlawfully arrested without probable cause. As shown extensively in the preceding sections, the Defendants had probable cause as a matter of law to arrest Hogan.  Accordingly, Hogan's claim for false arrest under § 1983 is due to be dismissed.

V.    **PLAINTIFF'S CLAIMS FOR 42 U.S.C. § 1983 MALICIOUS PROSECUTION AND ABUSE OF PROCESS CLAIMS ARE DUE TO BE DISMISSED.**

A.    **The Plaintiff Cannot Establish a § 1983 Claim for Malicious Prosecution**

Hogan acknowledges in ¶ 49 of the Complaint that the Eleventh Circuit specifically held in *Kingsland v. City of Miami*, 382 F.3d 1220 (11th Cir. 2004) that a claim for malicious prosecution under § 1983 cannot be maintained under a "continuing seizure" theory.  Specifically, *Kingsland* held that a plaintiff in a §1983 malicious prosecution must show the common law elements of a malicious prosecution claim, and must also show that there was a seizure without probable cause in violation of the Fourth Amendment. *Kingsland* at 1235.   The court further held that the existence of or lack of probable cause in a § 1983 malicious prosecution claim is measured as of the time that the arraignment is commenced, not during the time of the preceding arrest.  *Kingsland* at 1235.

Hogan admits in ¶ 48 of the Complaint that his claim for malicious prosecution under § 1983 is based upon a "continuing seizure" theory on the basis that he was out on bond following his release from jail.   Hogan acknowledges in ¶ 49 that *Kingsland* precludes his claim, but concludes by stating that the assertion of his § 1983 claim for malicious prosecution is "intended to challenge Eleventh Circuit precedent."   Hogan further urges the adoption of Justice Ginsburg's concurring opinion in *Albright v. Oliver*, 510 U.S. 266 (1994).  In *Kingsland*, the Eleventh Circuit specifically considered  Justice Ginsburg's opinion in *Albright*, and declined to adopt it.  *Kingsland* at 1235-1236.

Obviously, this Court is bound by the decisions of the Eleventh Circuit.  In light of the fact that Hogan admits that the Eleventh Circuit has already ruled that a claim such as this cannot be maintained, his claim is due to be dismissed by this Court.  If Hogan wishes to challenge a two (2) year old decision of the Eleventh Circuit, then an appeal to that court would be the proper method for doing so.

Even if Hogan's claim were allowed to proceed under a "continuing seizure theory," his § 1983 claim for malicious prosecution would still fail.  As clearly established in the preceding sections, Hogan cannot establish a common law claim for malicious prosecution due to the existence of probable cause.  Accordingly, his §1983 claim for malicious prosecution fails as well.

**B.      The Plaintiff Cannot Establish a § 1983 Claim for Abuse of Process**

As a "fall back" position, Hogan sets forth a § 1983 claim for Abuse of Process.  Obviously, Hogan's claim must fail for the primary reason that he cannot establish the common law elements of Abuse of Process.  As set forth above, Hogan must show that the Defendants wrongfully used the process issued against Hogan, i.e. the complaint filed in District Court, <u>after</u> the process was issued. Furthermore, Hogan must show that the Defendants used the process for a purpose for which it was not designed. Because Hogan cannot cite any wrongful activity on the part of the Defendants after

the process was issued, his claim must fail.

Furthermore, Hogan simply states the Defendants committed the tort of Abuse of Process while acting under color of law to support his § 1983 claim. Specifically, Hogan argues in ¶ 50 of the Complaint as follows:

> In any event, Hogan has articulated a *prima facie* case of abuse of process within the § 1983 context by stating that the defendants were State actors acting under color of law, that they had an ulterior purpose, that in furtherance of that ulterior purpose they caused the improper use of rightfully issued process, that they did so with malice, and that they lacked probable cause.

Hogan must show that the activity of the Defendants not only amounted to abuse of process under color of law, but he must also show that the Defendants' activity resulted in a constitutional deprivation. Hogan cites no constitutional deprivation of any sort in regard to his § 1983 claim for Abuse of Process. In *Beker Phosphate Corp. v. Muirhead,* 581 F.2d 1187 (5th Cir. 1978), the former Fifth Circuit held that claims which simply cite abuse of process while acting under color of law are insufficient to support a claim under § 1983. Specifically, the court held as follows:

> Of course, litigiousness which gives rise to a common law tort action for misuse of legal procedure may be so egregious as to constitute a violation of Section 1983 as well, if the tort-feasor, under color of state law, subjects the tort-victim to a deprivation of Constitutional dimension. It follows, however, that conduct which merely engenders common law tort liability, without infringing on Constitutionally protected interests, is not a sufficient basis to support a cause of action under Section 1983. Section 1983 simply does not provide a remedy for mere common law torts, even though committed under color of state law.

*Id*. at 1189(citations omitted). Because Hogan fails to cite any violation of his constitutional rights regarding his §1983 claim for Abuse of Process, his claim is due to be denied.

## VI.    DEFENDANTS GORDON, COOK AND CAULFIELD ARE ENTITLED TO QUALIFIED IMMUNITY.

Even if the Plaintiff could show a violation of a constitutional right, Defendants Gordon, Cook and Caulfield would still be entitled to qualified immunity. Under this doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages

insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).[2] "[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *See Anderson v. Creighton*., 483 U.S. 635, 640 (1987). An officer is entitled to fair warning that what he is doing is a violation of a clearly established right. *See Hope v. Pelzer*, 536 U.S. 730 (2002). The standard is an objective one, *Harlow* at 818, and therefore does not include an inquiry into the officers' subjective intent or beliefs. *See Anderson* at 639. In sum, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *See Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In determining whether qualified immunity exists with respect to the Plaintiff's claims, the issue is not probable cause in fact but "arguable" probable cause. *See Montoute v. Carr*, 114 F.3d 181, 184 (11th Cir. 1997). Actual probable cause is not necessary for an arrest to be objectively reasonable. Because only arguable probable cause is needed, "the inquiry is not whether probable cause actually existed, but instead whether an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed." *Id.* "Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (internal quotation marks omitted). Indeed, "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and ... in such cases those officials ... should not be held personally liable." *See Anderson* at 641; *see also Tillman v. Coley*, 886 F.2d 317 (11th Cir. 1989) (recognizing that an

---

[2]It is undisputed the City Defendants' only connection to the incident made the basis of the Complaint was in their capacity as law enforcement personnel.

officer who effects an arrest without probable cause may be protected by qualified immunity).

In the instant case, as shown above, it has been conclusively established that the officers had probable cause to believe that Hogan had committed a burglary. Even if this Court finds they did not have actual probable cause, they certainly had arguable probable cause for the reasons illustrated above. In addition, Hogan cannot show that causing an individual to be arrested based on the reasonable information that was available to the Defendants is a violation of a clearly established constitutional right. Hogan has failed to allege any facts that would overcome the Defendants' Gordon, Cook, and Caulfield's entitlement to qualified immunity. Thus, these claims are due to be dismissed.

## VII.    THE PLAINTIFF'S CLAIMS FOR CONSPIRACY UNDER 42 U.S.C.§ 1985 ARE DUE TO BE DISMISSED.

Hogan further brings a claim for conspiracy under 42 U.S.C. § 1985 against Defendants Gordon, Cook, and Caulfield. Although this statute has three (3) distinct and separate subsections which prohibit different types of conspiracies, Hogan fails to identify which subsection he is proceeding under. Subsection One (1) of 42 U.S.C. § 1985 prohibits conspiracy to prevent a duly authorized person from holding office under the United States, or discharging their duties. This would not be applicable. Subsection Two (2) of 42 U.S.C. § 1985 prohibits the intimidation or harassment of witnesses that might testify in federal court. This would not be applicable. The only subsection that might seem remotely applicable would be Subsection Three (3), which prohibits conspiracy to deprive persons of rights or privileges. However, clearly established precedent demonstrates that Hogan lacks standing to bring this action.

42 U.S.C. § 1985(3) is commonly referred to as the Ku Klux Klan Act of 1871. See *Childree v. UAP/GA AG CHEM, Inc.*, 92 F.3d 1140 (11th Cir. 1996). The Eleventh Circuit, along with several other circuits, has repeatedly held that § 1985(3) requires a showing of racial animus, or perhaps

otherwise class based discriminatory animus, which would be violative of the equal protection clause on the part of the conspirators. See *Lucero v. Operation Rescue*, 954 F.2d 624, 627 (11th Cir. 1992). In fact, the Eleventh Circuit has repeatedly declined to apply §1985(3) to any context outside of racial discrimination; See *Lucero* at 628 (declining to apply § 1985(3) to women seeking abortions as a class); *McClellan v. Mississippi Power & Light Co.*, 545 F.2d 919, 933 (declining to apply § 1985(3) to bankrupts as a class); *Childree* at 1147 (declining to apply § 1985(3) to whistleblowers as a class).

Hogan does not allege that the Defendants conspired against him on the basis of race, or any other class based animus which might be remotely applicable. A race claim would not be plausible, as three (3) of the five (5) police officers named as defendants are black.. Furthermore, Hogan does not allege discrimination as a motive on the part of any Defendant. To the contrary, Hogan specifically alleges that the "**motivation for the violation of Hogan's rights was to escape potential liability on the part of the City of Montgomery and the officers for the injuries caused to Hogan by Gordon's dog**." (Complaint, ¶ 22)(emphasis added). Because Hogan cannot cite any evidence of racial or class based animus on the part of the Defendants, his claim must fail.

## VIII. THE PLAINTIFF'S CLAIMS FOR FAILURE TO PREVENT VIOLATIONS UNDER 42 U.S.C. § 1986 ARE DUE TO BE DISMISSED.

Hogan further brings a claim against Defendants Cook and Caulfield under § 1986 for failure to prevent violations. This claim must also fail. The Eleventh Circuit has clearly held that claims under 42 U.S.C. § 1986 are derivative of conspiracy claims brought under 42 U.S.C. § 1985. See *Park v. City of Atlanta*, 120 F.3d 1157, 1160 (11th Cir. 1997). In other words, "§ 1986 only provides a cause of action in the existence of a § 1985(3) conspiracy...". *Park* at 1160. As set forth in the preceding section, Hogan cannot establish a § 1985(3) conspiracy because he cannot show a discriminatory animus on the part of any of the named Defendants. Because Hogan cannot establish

a § 1985 conspiracy, he also cannot establish a derivative § 1986 claim for failure to prevent violations. Therefore, his claim is due to be dismissed.

## **CONCLUSION**

Defendants respectfully request this Honorable Court to dismiss Plaintiff's complaint with prejudice in its entirety.

Respectfully submitted this 14th day of July, 2006.

Respectfully Submitted,

/s/ Christopher K. Whitehead
**H. LEWIS GILLIS**
**CHRISTOPHER K. WHITEHEAD**
**RAMADANAH M. SALAAM**

**OF COUNSEL:**
**THOMAS, MEANS, GILLIS & SEAY, P.C.**
3121 Zelda Court (36106)
P.O. Box 5058
Montgomery, Alabama 36103
(334) 270-1033 (phone)
(334) 260-9396 (fax)

<u>**CERTIFICATE OF SERVICE**</u>

      I hereby certify that a copy of the foregoing has been served upon the following through this Court's electronic filing/notification system and United States mail on this the 14th day of July, 2006.

Jay Lewis, Esq.                         James G. Bodin, Jr., Esq.
Keith Anderson Nelms, Esq.         **McPhillips, Shinbaum L.L.P.**
**Law Offices of Jay Lewis, LLC**     P.O. Box 64
P.O. Box 5059                   Montgomery, AL 36101-0064
Montgomery, AL 36103-5059     (334) 262-1911
334-263-7733                   (334) 263-2321
Fax: 334-832-4390

Walter Byars, Esq.
Kimberly O. Fehl, Esq.
**Montgomery City Attorney's Office**
P.O. Box 1111
Montgomery, AL 36101-1111
334-241-2050                  /s/ Christopher K. Whitehead
Fax: 334-241-2310           **OF COUNSEL**