COPY

1            IN THE UNITED STATES DISTRICT COURT

2            FOR THE MIDDLE DISTRICT OF ALABAMA

3                    NORTHERN DIVISION

4

5

6    CHAD HOGAN,

7            Plaintiff,

8    vs.                          CIVIL ACTION AT LAW
                                  CASE NO. 2:05CV687
9    CITY OF MONTGOMERY, et al.,

10           Defendants.

11

12

13              * * * * * * * * * *

14

         DEPOSITION OF LEONARD KIRK PELHAM, taken
15
pursuant to stipulation and agreement before
16
Mallory N. McCutchin, Court Reporter and
17
Commissioner for the State of Alabama at Large,
18
in the Law Offices of Thomas, Mean, Gillis &
19
Seay, 3121 Zelda Court, Montgomery, Alabama, on
20
Monday, October 3, 2005, commencing at
21
approximately 1:09 p.m.
22
               * * * * * * * * * *
23

DEFENDANT'S
EXHIBIT
4

1    regarding particular detail.  But it might be

2    easier just to start out just by asking to

3    recite as best you can, what your first

4    memory is of that night and who you spoke to

5    and how the night developed from the moment

6    you first heard about the burglary call at

7    Arnaud Meats that night.  And just if you

8    would, just tell me everything you remember

9    about it.

10   A.   All right.  I was sitting at any computer

11        eating a taco.  The call went out -- or the

12        alarm went out to Arnaud's Quality Meats.  It

13        was storming real bad.  I didn't think

14        nothing of it.  The alarm had been going off

15        all night, other alarm.

16   Q.   Keep talking.  I'm listening.  I'm just going

17        to close these blinds.

18   A.   And a K-9 officer, Officer Gordon, got on the

19        radio, advised he was the first one -- or he

20        was the first one to respond to the scene.

21        Advised he saw a vehicle in the parking lot.

22        I can't remember what -- what kind of vehicle

23        it was -- with a few -- two or three black

1    males inside.  Stated he pulled into the

2    parking lot, and the vehicle drove off

3    down -- headed down Wares Ferry Road, I

4    believe, or they cut through the trailer park

5    behind the store, headed to Wares Ferry

6    Road.  He -- he -- he then advised he was

7    following the car, and there were a couple of

8    other units that said that they were en route

9    to the store.

10        And I believe the next unit on the scene

11    was Officer Fike or Officer Forbus.  I'm not

12    -- not to sure.  And they advised that the

13    window on the right side of the business had

14    been busted out.  At that time, Officer

15    Gordon gave his whereabouts and stated that I

16    believe he stated he was initiating a traffic

17    stop, and he got some other units with him to

18    assist him.  At that time, the vehicle was on

19    Wares Ferry Road, refusing to stop.  And that

20    ended up -- the vehicle he was pursuing ended

21    up, I believe, running into a fence or a tree

22    at Pelzer Avenue and Wareingwood Avenue.

23  Q.   Yes, sir.

1   A.   While all this unfolded, I about that time --

2        well, when the officer said that the window

3        had been busted out, I had left the police

4        department, started in that direction.

5   Q.   Let me stop you.  You talked to either

6        Officer Fike or Forbus on the radio before

7        you got to the scene; is that correct?

8   A.   No.  I heard them on the channel one radio

9        saying that the window had been busted out.

10  Q.   But you didn't speak with them at that point?

11  A.   But I didn't speak with them at that point.

12  Q.   I'm sorry.  Continue.

13  A.   Once I heard that, I got in my car.  Started

14       that way.  While I was on my way to the

15       business, that's when the -- the suspect

16       vehicle crashed into a -- a fence.

17         About that time -- not long after that,

18       I arrived at Arnaud's Quality Meat and made

19       contact with Officer Forbus and Fike.  And I

20       pulled up, just so happened to pull up on the

21       right side in front of the window, and walked

22       around to the front of the business.  Officer

23       Forbus and Fike had advised me that it didn't

1    look like anything had been -- been tampered

2    with.  Didn't look like anything had been

3    gone.  And they had already -- they had

4    requested a key holder to come out.  The

5    owner of the business to come out and verify

6    if -- if there had been anything missing or

7    if there had been a burglary.  At that time

8    Anthony Arnaud, the owner of Arnaud's Quality

9    Meat, pulled up; and I made contact with him,

10    and asked him to go into his store and

11    inventory it.  See if anything had been

12    missing.  He went inside, come back out and

13    told me that he left the window open, because

14    the window wasn't broken.  He left it broken

15    because the -- his air conditioner was broke

16    and he didn't want it to be real hot the next

17    morning.  Had something going on early the

18    next morning.  Some kind of breakfast or

19    something.  Didn't want it to be real hot so

20    he left the window open.  And nothing was

21    missing.  He said he had some cash laying on

22    the counter, it was still there.  He believed

23    nobody -- nobody had gotten in at that time.

1    I got on my radio, made contact with Sergeant

2    Johnson, with my supervisor, Lieutenant Cook,

3    let him know that there wasn't a burglary and

4    that the owner had left the window up.  And

5    he advised me to make contact with third-

6    shift sergeant, Sergeant Johnson, to let him

7    know that there was -- was no burglary.  So I

8    then called on my radio Sergeant Johnson and

9    let him know what the owner had told me, that

10    he had left the window open, and nothing was

11    missing, didn't think anybody got in.

12        At that time, Sergeant Johnson, he got

13    irate with me like I didn't want -- didn't

14    want to work the case.  Like I was trying to

15    push it off and didn't want to work it.

16    Said, you mean to tell me we got a -- we got

17    a dog bite and no burglary?  And I said,

18    Well, that's what the owner is advising me.

19    You know, he left the window open.  And it's

20    raining, you know, raining real hard.  If

21    anybody had got in, there would be foot

22    prints all over the place.  Didn't hear

23    anything back from him at that time.

38

1          other, or was this something over the walkie-
2          talkie or --
3     A.   They were -- it was over the I-Link, the
4          radios you can --
5     Q.   So you could hear the conversation that's
6          incoming?
7     A.   Right.  Kind of like a Nextel, you can --
8     Q.   I gotcha.  Okay.  Go ahead.
9     A.   At that time, Officer Gordon -- I mean, I'm
10         assuming Lieutenant Caulfield called Officer
11         Gordon because Officer Gordon said he was
12         going to do another statement.  He then typed
13         another statement.  Said that he had pulled
14         into the parking lot, observed a vehicle in
15         the parking lot, and a black male standing
16         next to the vehicle by the window, I believe.
17    Q.   I'm going to stop you for a second.  What did
18         the first statement say as opposed to the
19         second statement?  What was the major
20         difference between the two?
21    A.   The first statement said I pulled into the
22         parking lot, observed a vehicle which
23         passenger -- I observed a vehicle in the

1    parking lot.  The passenger's door then

2    closed and the vehicle drove off.  The second

3    statement said, I pulled in the parking lot,

4    observed a vehicle, and a black male standing

5    outside the vehicle next to the window, which

6    was believed to be the point of entry.  And

7    that was the only two things that changed.

8  Q.  All right.

9  A.  At that time, Officer Gordon gave me a

10    statement.  I read the statement.  And still,

11    the elements weren't there.  It was a small

12    twist getting closer to -- to the elements.

13    But it -- it wouldn't -- wouldn't support

14    burglary.

15        So then I called Lieutenant Cook, let

16    him know the statement, you know, the

17    elements still weren't there.  And -- and I'm

18    assuming he called Lieutenant Caulfield

19    then.  I -- I didn't hear that conversation.

20    However, he said that Officer Gordon was --

21    was going to come back and fix it.  So

22    Officer Gordon come back and did a third

23    statement.  And the third statement, I had

1    photographed him.  Got -- got some -- some

2    information on him as to address, where he

3    works, that type of thing.  And then I went

4    back to Mr. Arnaud.  I -- after I had

5    processed Mr. Hogan, I prepared the burglary

6    warrant.  And was getting ready to take

7    Mr. Arnaud down to the warrant clerk's office

8    to secure the warrant against Mr. Hogan.  And

9    at which time he said, listen.  Just show me

10   where to -- where to go and -- so I can get

11   out of here.  So I took him to the warrant

12   clerk's office.  He secured the warrant

13   against Mr. Hogan for burglary.

14        And after the warrant was finished, I

15   went down to the warrant clerk's office, got

16   the warrant, executed it, transported

17   Mr. Hogan to the county jail, and did my

18   daily activity report.  Whenever you arrest

19   somebody, just put the details of the -- what

20   happened and what you charged him where.

21   That's pretty much it.

22 Q.  All right.  You said earlier that Officer

23   Gordon typed out three separate statements.

1        Do you allege that he said anything false in

2        the statements?

3    A.   After the first one, yes.

4    Q.   What do you say was false?

5    A.   Well, on the -- and I have a copy of the

6        tape -- the tape, our dispatch tape.  When he

7        pulled into the parking lot, you know, he

8        said just what he saw see.  150, I believe is

9        his unit number.  150, I'm pulling into the

10       parking lot.  There's a vehicle in the

11       parking lot.  Subject just closed the door of

12       the vehicle, drove off.  That's just what he

13       saw.

14           And I knew then before I got to the

15       business, based on what he saw, we were

16       either going to have to get a confession out

17       of Mr. Hogan or his friends or some kind of

18       property missing from the business.  Or, you

19       know, maybe an identifiable witness.

20   Q.   On the tape transcript, did he say that's all

21       I saw or --

22   A.   He said --

23   Q.   -- did he simply say I saw someone getting in

1   the car?

2  A. He said 150, I -- I'm pulling into the

3    parking lot of the business now.  There's

4    a -- I observed a blue or a -- the vehicle.

5    I forgot the description.  I observed the

6    passenger side door close and the vehicle is

7    now leaving heading towards wherever.

8      You know, had he said -- it could have

9    been a different story had he said 150, I'm

10   pulling into the parking lot; there's black

11   male subject coming from the window or, you

12   know, standing outside the vehicle.

13  Q. Is it possible that he could have seen that,

14    just not informed dispatch of it?

15      MR. NELMS:  Object to the form.

16      MS. CONNER:  You can answer.

17  A. I guess anything's possible.

18  Q. Okay.  Go ahead.

19  A. I mean -- I mean, I could have -- I mean,

20    either way -- either way Mr. Hogan was

21    getting charged with burglary.  I mean

22    that -- you know, I'm -- I'm a two-year

23    veteran of the police department.  You know,

1     wrote his final statement?  I believe you

2     said you helped draft a warrant and had to

3     take it down to the warrant clerk; is that

4     right?

5  A.  Right.

6  Q.  And then you transported Mr. Hogan to the

7     county --

8  A.  Right.

9  Q.  -- county jail?

10  A.  Well, in -- in between there, I'd walked

11     around to Lieutenant Cook's office, showed

12     him the final statement and, you know, talked

13     about how I didn't feel comfortable with it.

14     And, you know, who do I charge.  Like I said,

15     we normally charge -- we would, had it been a

16     normal case, we would have charged all of

17     them.  However, the objective was to charge

18     the guy that was bitten?

19  Q.  What happened the next day --

20         MR. NELMS:  Object to the form.

21  Q.  -- regarding this incident?

22  A.  The -- of course, it was what they call late

23     car, so I was third shift -- late car, third

1    shift detective.  So the next day, when I --

2    when I got home about seven o'clock, I guess,

3    that morning, maybe a little later, maybe a

4    little earlier, I was in the bed.  My -- one

5    my sergeants, Sergeant Tatum, calls me on the

6    phone.  And I asked -- he said, why in the

7    hell didn't you charge all them guys with the

8    burglary?  And he's jumping down my throat

9    about it because he had read my -- read my

10   daily activity report, you know, what

11   happened.  And I told him, you know, exactly

12   what happened.  And he said, Well, hang on

13   Kirk.  This -- this is serious.  Let me go

14   around to Randy Jones' office, which is

15   property lieutenant.  So they -- he transfers

16   the call to Randy's office and they got me on

17   speaker phone.  Sergeant Tatum says well,

18   tell me -- tell me exactly what happened,

19   now.  And I told him, you know, what happened

20   the night before.  And they said they would

21   take care of it.  And I went back to bed.

22          MR. WHITEHEAD:  Okay.  Let's take a

23               short break just a second.

1        you were speaking with him?

2   A.   Possibly Frank Koscho, another detective.

3   Q.   On how many different occasions?

4   A.   One, if any.

5   Q.   That one conversation that Mr. Koscho was

6        present on, what was said during that

7        conversation?

8   A.   Well -- and I'm not sure he was.  But it

9        was -- if -- if it was, I want to say he was

10       in there when I -- I want to say he was in

11       there when I was trying to get Mr. Arnaud to

12       sign a denial of prosecution form.  Meaning

13       he go home, Mr. Hogan go home, the whole

14       thing be done with.

15   Q.   Did you -- is this a form you fill out?  What

16       is the denial of prosecution form?

17   A.   It's a form -- it's pretyped and you just,

18       you know, it says I -- there's a blank

19       spot you put your name -- am aware that this

20       such and such crime was committed and I don't

21       want to prosecute Chad Hogan, pretty much.

22   Q.   And you filled one of those out and --

23   A.   No, I did not.  I think I had one, and Mr.

68

1         Arnaud at that time -- I think we -- I read

2         it to him.  And that's when he told me that

3         there had -- a crime of, you know, burglary

4         didn't happen.  He didn't want to sign it

5         because it's -- it said something like -- I

6         can't remember how it's worded but I, Anthony

7         Arnaud, knowing that the crime of burglary

8         was committed at my business and this subject

9         is in custody.  I do not wish to prosecute.

10        He said that there was no burglary.  There's

11        no crime been committed.  He just wanted to

12        go home.

13   Q.  So he refused to sign the statement?

14   A.  I didn't push it on him.  He -- yeah, pretty

15        much, yeah.

16   Q.  Mr. Pelham, do you contend that any of your

17        supervisors ever ordered you to secure a

18        warrant against Chad Hogan?

19   A.  Yeah.

20   Q.  Tell me which ones and tell me how so.

21   A.  Well, I only have one that -- that when

22        Lieutenant Cook gave me an order to work the

23        case, which everything in working a case is

92

1          in the Montgomery County Detention Facility.

2          As to your first sentence that the owner of

3          the business was -- had been talked to by

4          Lieutenant Caulfield, how do you know that

5          Lieutenant Caulfield talked to Mr. Arnaud?

6    A.    He had told me.  When I was around in

7          Lieutenant Cook's office, when I had made my

8          way back around to Mr. Arnaud he had told

9          me -- he -- Mr. Arnaud was sitting in one of

10         the supervisor's office, and all the K-9

11         officers were -- there's two desks out in the

12         hallway and the chairs, and that's where they

13         kind of all hang around when they're

14         waiting.  When I come back around from

15         Lieutenant Cook's office, they were all in

16         that area.  And he said that he was talking

17         with -- he didn't know his name, I don't

18         think.  But he said your lieutenant, which it

19         was Lieutenant Caulfield -- my direct

20         lieutenant was Cook, but he was speaking of

21         Lieutenant Caulfield.

22   Q.    How do you know he was speaking of Lieutenant

23         Caulfield?

1       you a document that's been marked as

2       Defendant's Exhibit #3.  And that, I believe,

3       is the affidavit that was signed by

4       Mr. Arnaud in connection with the arrest

5       warrant.  I've got two other documents that

6       I'm going to mark as Defendant's Exhibit #5

7       and Defendant's Exhibit #6.  Ask you to look

8       at those and see if you recognize those.

9    A.   Yes.

10   Q.   Okay.  Can you tell me what #5 and #6 are

11       real quick?

12   A.   The warrant of arrest and the complaint that

13       goes along with the affidavit?

14   Q.   Okay.  As to Exhibits #3, #5, and #6, did you

15       prepare each of those documents?

16   A.   Yes, I did.

17   Q.   Okay.  Are there any false statements in

18       those documents that you prepared?

19   A.   Yes.

20   Q.   Can you tell me what are false statements in

21       those documents?

22   A.   The defendant did knowingly --

23   Q.   Tell me which document you're referring to as

1          we go, too, please, sir.

2     A.   Document #3.

3     Q.   Okay.  Which one is #3.  I confuse myself.

4     A.   Affidavit.

5          MS. CONNER:  Affidavit.

6     Q.   All right.  On #3.  I'm sorry.  I was --

7     A.   The details of offense.

8     Q.   Okay.  And just for the record, tell me

9          specifically what statement you're saying is

10         a false statement.

11    A.   The defendant did knowingly enter or remain

12         unlawfully in the building of.

13    Q.   Okay.  Anything improper on Exhibit #5, or

14         are there any false statements on Exhibit #5?

15    A.   Knowingly enter or remain in the building of

16         another, his name, with intent to commit a

17         crime therein, theft of property.

18    Q.   Okay.  Exhibit #6, warrant of arrest.

19    A.   Fact that he was charged with the burglary.

20    Q.   Well, he was charged with the burglary,

21         wasn't he?

22    A.   Right.  That's what I'm saying.  The -- the

23         charge, I mean, the whole warrants.

115

1    Q.   Okay.  So you're saying that you knowingly

2         prepared documents to effectuate an arrest

3         that had false statements in them?

4    A.   Well, the documents are already prepared.

5         They're pretyped. I just go in and click

6         burglary third, affidavit, put in Mr. Hogan's

7         information.  Mr. Arnaud, that's when I take

8         him to the warrant clerk's office and he

9         secures a warrant.

10   Q.   Okay.  On Defendant's Exhibit #3, you said

11        the statement, The defendant did knowingly

12        enter or remain unlawfully in a building.

13        And you said that's a fault statement?

14   A.   Right.

15   Q.   You typed that statement on this form, did

16        you not?

17   A.   No.  It's pretyped.  I put in 425 North

18        Eastern Boulevard, Montgomery, 36106,

19        Arnaud's Quality Meat.

20   Q.   What else did you put in on this document?

21   A.   That's it.

22   Q.   You put in a charge on this document?

23   A.   I put in 425 North Eastern Boulevard.  Charge

1              is already there.  You double click it on the

2              computer, and it prints it out for you.  You

3              put in Chad Lamar Hogan, 425 North Eastern

4              Boulevard, Montgomery, Alabama.

5     Q.    Did you know what this document was going to

6              say before you had it printed out?

7     A.    Yes, I did.

8     Q.    And you printed it out with the purpose of

9              Mr. Arnaud signing it?

10    A.    Yes, I did.

11    Q.    Okay.  Mr. Pelham, you stated earlier, I

12             believe that you had been a police officer

13             for -- you were a police officer for a little

14             over two years, is that correct?

15    A.    Right.  Yes.

16    Q.    Did you ever have problems articulating full

17             detail in your reports?

18    A.    No, I did not.

19    Q.    You never had to go back and redo a report?

20    A.    No, I did not.

21    Q.    Ever seen anybody besides this incident where

22             somebody had to go back and redo a report

23             because they didn't put enough detail in it?

133

1          he held?

2      A.  In the auto -- auto -- one of them was in the

3          auto theft office.

4      Q.  Okay.  And number three?

5      A.  Was in the holding cell in the main -- in the

6          general property office.

7      Q.  And where is your office located?

8      A.  In the general property office.

9      Q.  Okay.  Okay.  You said you had several

10         conversations with suspect number two and

11         three, correct?

12     A.  They are -- the -- other than Mr. Hogan?

13     Q.  Right.

14     A.  Yeah.  Yes.

15     Q.  You also said that, I believe if I recall,

16         that when you -- you heard the call come in

17         for Officer Gordon when he arrived at

18         Arnaud's.  And, I believe, did you say you'd

19         read the transcript of that radio dispatch or

20         that radio report?

21     A.  That -- that I have the tape, the audio.

22     Q.  Okay.  Okay.  And you said that you knew at

23         that point you were going to need a

134

1       confession or something based on what he had

2       said over the radio.  You said that earlier

3       in your deposition?

4  A.    I know that -- right.  I know that I will

5       need either a confession from the suspects or

6       property in the suspects' car, or something

7       that would link them to going inside the

8       business.

9  Q.    Okay.  Exactly, if you can just tell me --

10      and I think Mr. Whitehead touched on this,

11      but just for my clarification, what elements

12      do you look for to secure a burglary warrant?

13  A.   Number one, you've got to enter the business

14      or the house, you know, with -- with the

15      intent to take something.

16  Q.   So you have to have a confession to have

17      probable cause that somebody intended to

18      enter?

19  A.   No.

20           MR. NELMS:  Object to the form

21  Q.   Okay.  What do you look for to secure a

22      burglary warrant?  What actions?

23  A.   Look for evidence that somebody burglarized

135

1   the business.  Evidence that the -- that the

2   business was entered, you know.  Don't have

3   to have anything stolen from the business to

4   have a burglary, but you do have to have some

5   kind of entry, prove there was entry made.

6 Q. Have you ever charged anybody with attempted

7   burglary?

8 A. I think once or twice.

9 Q. And what kind of evidence did you look for,

10   for that?

11 A. Same.  You know, intent to -- I think there

12   was a time where somebody had kicked a door

13   in and an officer pulled up before the

14   burglary could happen.  I don't know.

15   Burglary tools, evidence of pry marks on the

16   door.

17 Q. Okay.

18 A. Some type of evidence.

19 Q. Okay.  Then you said that when you were

20   referring -- and I can't remember the exhibit

21   numbers.  It was the warrant and affidavit.

22   I believe Mr. Whitehead was just asking you

23   what on those documents was false.  And you