**CHAD HOGAN DEPOSITION**    CondenseIt!™    **MARCH 29, 2006**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DISTRICT

CHAD HOGAN,

    Plaintiff,

vs.        CASE NO. 2:05CV687

CITY OF MONTGOMERY, et al.,

    Defendants.

_____/

    The DEPOSITION OF CHAD HOGAN was taken

pursuant to notice before Sharon Meehan, as Court

Reporter and Notary Public in and for the State

of Alabama at Large, on the 29th day of March,

2006, at the Law Offices of Thomas, Means, Gillis

& Seay, P.C., located at 3121 Zelda Court,

Montgomery Alabama, commencing at approximately

9:11 P:11

---

Page 2

APPEARANCES

FOR THE PLAINTIFF:

J. LEWIS, LLC
Attorney at Law
Post Office Box 5059
Montgomery, Alabama 36104

By: Andy Nelms, Esquire

FOR THE DEFENDANTS:

KIMBERLY O. FEHL
Assistant City Attorney
103 South Perry Street
Montgomery, Alabama 36104
By: Kimberly O. Fehl, Esquire
FOR THE DEFENDANTS:
THOMAS, MEANS, GILLIS & SEAY, P.C.
Attorneys at Law
3121 Zelda Court
Montgomery, Alabama 36103
By: Christopher K. Whitehead, Esquire
FOR THE DEFENDANTS:

---

Page 3

MCPHILLIPS, SHINBAUM & GILL, LLP
Attorneys at Law
Post Office Box 64
Montgomery, Alabama 36101

By: James G. Bodin, Esquire

INDEX      PAGE

STIPULATION . . . . . . . . . . . . . . 5

EXAMINATION OF WITNESS

by Mr. Whitehead. . . . . . . . . . . . 6

by Mr. Bodin . . . . . . . . . . . . . 69

by Ms. Fehl . . . . . . . . . . . . . . 107

CERTIFICATE OF REPORTER . . . . . . . . 118

---

Page 4

INDEX OF EXHIBITS MARKED FOR IDENTIFICATION

Defendant's 1 (Plaintiff's Answers to

    Interrogatories)

Defendant's 2 (Complaint)

Defendant's 3 (Plaintiff's Answers to Defendant's

    Discovery Request)

Defendant's 4 (State of Alabama Complaint)

Defendant's 5 (Affidavit of Complainant Arnaud)

Defendant's 6 (Photos of C. McBride)

Defendant's 7 (3/31/05 Memo from J.S. Dunn

Page 5

to E.L. Johnson)

Defendant's 8 (3/31/05 Memo from N.B. Fitzpatrick to E.L. Johnson)

STIPULATION

IT IS HEREBY stipulated and agreed by and between counsel that the deposition of CHAD HOGAN may be taken before Sharon Meehan, Court Reporter and Commissioner for the State of Alabama at Large without the formality of a commission.

sworn to speak the truth, the whole truth, and nothing but the truth, was examined by counsel and testified as follows:

EXAMINATION

BY MR. WHITEHEAD:

Q. Mr. Hogan, let me get you to state your name for the record, please, sir.

A. Chad Lamar Hogan.

Q. Mr. Hogan, have you ever given a deposition before?

A. No.

Q. You've sat in on a few of these depositions that we have done in this case already, though, correct?

A. Yes.

Q. So you kind of understand what's going on. Basically, I'm just going to ask you a series of questions. And I'll ask that you just give me responses in exchange. Okay?

A. Okay.

Q. A few ground rules: In ordinary

Page 6

IT IS STIPULATED that all questions are deemed objected to and that a motion to strike is made as to all answers, which objections and motions to strike may be ruled upon at an appropriate time by the Court except that objections to the form of the questions shall be lodged at the time the questions are propounded to the witness.

IT IS FURTHER STIPULATED that the deponent, CHAD HOGAN, waives the reading and signing of transcript of deposition.

CHAD HOGAN

The witness, after having been first duly

Page 7

conversation, lots of times when people ask you a question that has a yes or no answer, human nature is to nod your head or shake your head. Obviously, we don't want you to do that here because she's got to take the testimony down. So if you could, give a yes or a no. Okay?

A. Okay.

Q. If I ask you any question that seems confusing or something like that that you don't understand, I have no problem repeating my question or rephrasing my question. So if you don't understand it, just let me know and I'll try to rephrase my question where you can understand.

A. Okay.

Q. If at any time you need a break, just let me know and I'll be happy to accommodate that as well. Okay?

A. Okay.

Q. I don't anticipate this will take that long but in case that comes up.

Your name is Chad Lamar Hogan; have you ever been known by any other names?

**CHAD HOGAN DEPOSITION**          Condenselt!™                    **MARCH 29, 2006**

Page 8

A. No.
Q. What's your date of birth?
A. 5/26/79.
Q. Were you born in Montgomery?
A. Yes.
Q. Mr. Hogan, I'm going to ask you a couple of questions that sound kind of silly; but it's just to get on the record that you're competent to give a deposition today. Okay?
A. Okay.
Q. Can you read and understand the English language?
A. Yes.
Q. Any difficulty writing?
A. No.
Q. Any problems comprehending what you read?
A. No.
Q. Have you taken any medications in the

Page 9

last twenty-four hours?
A. No.
Q. Report to anybody that you're feeling sick today?
A. No.
Q. Have any problems with your eyesight?
A. No.
Q. Any problems with your hearing?
A. No.
Q. Can you think of any reason why you wouldn't be able to fully participate in this deposition today?
A. No.
Q. Mr. Hogan, do you have a driver's license?
A. Yes.
Q. Is it issued by Alabama?
A. Yes.
Q. Do you know what your driver's license

Page 10

number is? If you've got it with you, you can take it out and look at it.
A. I've got it. It's 6990794.
Q. Have you ever had a driver's license issued by another state?
A. No.
Q. Has your driver's license ever been suspended or revoked?
A. No.
Q. Are you married?
A. Yes.
Q. What is your wife's name?
A. Danielle Hogan.
Q. How long have y'all been married, Mr. Hogan?
A. Eight years.
Q. Do you have any other marriages?
A. No.
Q. Do y'all have any children?

Page 11

A. No.
Q. What's your address, Mr. Hogan?
A. 1338 Karen Valley Place.
Q. Cameron Valley Place?
A. Karen.
Q. Karen Valley. Can you spell that for me, please?
A. K-A-R-E-N Valley.
Q. That's Montgomery?
A. Yes.
Q. What's the zip there, sir?
A. 36117.
Q. How long have you lived at that address?
A. Almost four years.
Q. Have you lived there with your wife?
A. Yes.
Q. Anybody else live there?
A. No.

**SHARON MEEHAN, COURT REPORTER (334)538-4044**          Page 8 - Page 11

CHAD HOGAN DEPOSITION     CondenseIt!™     MARCH 29, 2006

Page 12

Q. Besides your wife, do you have any other relatives that live in Alabama?

A. Yes.

Q. Tell me what other relatives you have that live in Alabama.

A. I have a brother, sister, my father.

Q. Is your mother still living?

A. No.

Q. Any aunts or uncles?

A. Yes.

Q. How many aunts or uncles do you have that are living?

A. Three aunts.

Q. How about uncles?

A. Uncles, four.

Q. How about cousins, first cousins. Just tell me as many as you can remember. You don't have to get this exactly right, just as many as you can remember off the top of your head.

Page 13

A. Yes.

Q. What's your sister's name?

A. Valencia Hogan.

Q. Does she live in Montgomery?

A. Yes.

Q. What's your dad's name?

A. Jamie Hogan, Junior.

Q. He lives in Montgomery?

A. Yes.

Q. You said you've got three aunts. Let's go through those real quick. Let me ask you first, do they all live in Montgomery?

A. One of them stay in Elmore County, Wetumpka.

Q. That's in the Montgomery area.

A. Yeah.

Q. Give me all three of their names.

A. Sophie King, Rosila (phonetic) King, Leslie King.

Q. Which aunt lives in Wetumpka?

A. Sophie.

Q. And you've got four uncles?

A. Uh-huh (indicating in the affirmative).

Page 14

A. Fifteen, sixteen, maybe more.

Q. Of those fifteen or sixteen, do they all live in Montgomery or the Montgomery area?

A. Montgomery and Wetumpka.

Q. Are they all over the age of nineteen?

A. I have some younger, too.

Q. Let's try to break it down like this: All your cousins, from what you can recall, live in either Montgomery or Wetumpka, correct?

A. Uh-huh (indicating in the affirmative).

Q. How many of those fifteen or sixteen that you recall are over the age of nineteen or are nineteen or older?

A. All of them are over nineteen, but I have some younger. I have a bunch of cousins, I mean.

Q. Let's do this. Give me your brother's name.

A. Stephon (phonetic) Hogan.

Q. Does he live in Montgomery?

Q. Tell me their names.

A. Harold King, Otis King, Willie C. King and Michael King.

Q. Do they all live in either Wetumpka or Montgomery?

A. All my uncles live in Montgomery.

Q. All right. I'm going to ask you about your wife. And, Mr. Hogan, you may have realized this in these depositions. The reason I ask this is we have got to make sure we don't have your cousin or your uncle or your brother-in-law or something on the jury. That's the reason we go through this. I'm not trying to pry into your family life.

Your wife, has she got any relatives that live in the Montgomery area?

A. No.

Q. Where is she from?

A. Detroit, Michigan.

Q. All right. Simple enough. Mr. Hogan,

Page 15

are you currently employed?

A. Yes.

Q. Where?

A. Wiley Sanders Truck Lines.

Q. How long have you worked with Wiley Sanders?

A. Almost two years.

Q. What do you do at Wiley Sanders?

A. Drive trucks.

Q. How long have you had a CDL, commercial driver's license?

A. Almost two years.

Q. You never drove a truck for anybody besides Wiley Sanders?

A. No, not CDL-wise.

Q. So you've been with them since 2004, correct?

A. Yes.

Q. Where did you work before Wiley

Page 16

Sanders?

A. Robert Henry Tile.

Q. How long did you work there?

A. About three years.

Q. Did you leave Robert Henry Tile to take the job with Wiley Sanders?

A. Yes.

Q. Mr. Hogan, I understand from your interrogatories you were incarcerated for a while. Is the job with Robert Henry Tile the first job you had once you got out of custody?

A. No. I worked with Schwan's Food and through Workforce temp service.

Q. Who was your supervisor at Wiley Sanders?

A. Neil.

Q. Neil who?

A. I don't know his last name.

Q. You don't know his last name?

Page 17

A. (Witness shakes head in the negative.)

Q. Mr. Hogan, did you finish high school?

A. No.

Q. Do you have a GED?

A. No.

Q. What's the highest grade you completed?

A. Ninth.

Q. Where did you finish ninth grade, what school?

A. Cloverdale.

Q. I'm assuming all schools you went to growing up were in the Montgomery area?

A. Yes.

Q. Montgomery public schools?

A. Yes.

Q. Did you go to truck driving school?

A. Yes.

Q. Where did you go to truck driving school?

Page 18

A. Trenholm JP Tech campus.

Q. Have you got any other kind of vocational degrees or anything like that?

A. No.

Q. Mr. Hogan, do you go to church?

A. Yes --

Q. Where --

A. -- sometime.

Q. -- do you go to church?

A. Freewill Baptist.

Q. Are you a member of any kind of civic or social organizations?

A. No.

MR. WHITEHEAD: Have you got some stickers?

THE REPORTER: Do you want me to mark them?

MR. WHITEHEAD: I'll mark.

(Defendant's Exhibit Number 1 was

Page 19

marked for identification and is attached to this deposition.)

Q. Mr. Hogan, I'm going to hand you a document that we have marked as Defendant's Exhibit 1. And this is the interrogatory responses that you or your attorney served back to us.

Let me ask you first to take a second to look over that document and ask if you recognize it.

A. Yes.

Q. I'm going to draw your attention to the second page, interrogatory number five. The interrogatory states: Have you ever been arrested other than the incident made the basis of this lawsuit? If so, please state the -- that's supposed to be the date of the arrest, the charge and the final disposition of said charge. You said, in 1998, you were convicted

Page 20

anything after the parole was finished?

A. No.

Q. What were the details of that charge? Were you involved with someone else in that or was it just you? Did you have any co-defendants?

A. I was involved with someone else.

Q. How many co-defendants were involved in that?

A. Three.

Q. Who were they?

A. Alvin Woods, Terrell Motley or something like that.

MR. NELMS: You said Motley?

THE WITNESS: Yes.

A. And Joe. I don't know his last name.

Q. Who were y'all convicted of robbing?

A. A convenience store on the north side of Montgomery called Jack's Stop and Shop.

Q. Was there a gun involved in that?

A. Yes.

Q. What kind of gun?

Page 21

with robbery and served a two-year sentence in the Department of Corrections, Montgomery County, Alabama.

In 1998 when you were convicted, what were you convicted of; robbery first, robbery second? What was the exact charge you were convicted of?

A. Robbery first.

Q. What was your sentence?

A. Two years.

Q. Did you serve two years or was it like a split sentence?

A. No. It was just a two-year sentence.

Q. The judge sentenced you to two years straight?

A. Yes.

Q. And you served the full two years?

A. I served a year and nine months, then parole for three months.

Q. So you served three months of parole afterwards?

A. Yes.

Q. Did you have any probation to serve

A. I'm not sure.

Q. Was it a handgun?

A. Yes, a handgun.

Q. Was it a nine millimeter?

A. No.

Q. It was not a nine millimeter?

A. No.

MR. NELMS: I'm sorry. Is that no, you don't know or no, it was not a nine millimeter?

Q. It was no, it was not a nine millimeter, wasn't it?

A. I don't know the exact kind of gun, but I don't think it was a nine millimeter.

Q. Of the three of you, who was alleged to have gone in the store; one of you, two of you, all three of you?

A. Joe and Terrell.

Q. So Joe and Terrell --

Page 22

A. Yes.

Q. -- went in the store?

A. Yes.

Q. And am I to understand you and Alvin Woods stayed in the car?

A. Yes.

Q. Did either Joe or Terrell wear anything to disguise themselves, a mask or stocking over their head or anything like that when they went inside?

A. Yes.

Q. What did they wear, a ski mask?

A. Yes.

Q. Did you plead guilty or were you convicted in a jury trial on this?

A. I pled guilty.

Q. You also state in your response that: In 2005, I was charged with harassment by a Montgomery police officer; and I paid a fine

Page 23

(reading).

Were you convicted in 2005 of harassment?

A. I pled guilty and the judge sentenced me to thirty days, suspended twenty-five. I served five and paid the fine.

Q. What was that second part again? I'm sorry. I misunderstood you. You said the judge sentenced you to thirty days?

A. Thirty days, suspended twenty-five. I served five and paid the fine.

Q. So you served five days. He suspended it, and you only had to serve five days in jail, correct?

A. Say that again.

Q. Okay. Scratch everything.

In regard to this harassment charge in 2005 -- tell me if I'm correct in what I'm understanding you to say. Okay?

Page 24

My understanding is, you pled guilty and the judge sentenced you to thirty days, suspended that sentence and ordered you to serve five days.

A. Yes.

Q. Okay. And then you also had to pay a fine?

A. Yes.

Q. Were you placed on any kind of probation as well after that?

A. No.

Q. When was that in 2005?

A. I don't remember the exact date.

Q. Can you remember what month it was?

A. No.

Q. What were the circumstances of that charge?

A. Me and my wife, we got into an argument. And she called the police. By the

Page 25

time they had got there, she had left. And they came to the door, came on the porch. And they asked where she was. And I told them that she was gone.

And they asked could they search the house. I told them, I said, well, she is gone; ain't no reason you need to search the house.

And so they started wrestling me down. They wrestled me down, sprayed me with mace and searched the house and carried me to jail.

Q. Were you alleged to have hit either a police officer or your wife in connection with that charge?

A. No.

Q. You said they wrestled you down to the ground?

A. Yes.

Q. Why did they have to wrestle you down to the ground?

Page 27

MR. NELMS: Object to the form.

Q. You can answer.

A. They was like -- I was standing up on the porch. And they was, like, trying to get in the house. I said, ain't no reason for you to go in the house; she ain't here.

When they wrestled me down, I braced myself. And that's when they wrestled me down and sprayed with the mace.

Q. Did you refuse to let them enter the house?

A. Yeah.

Q. Is that why they grabbed you and tried to use physical force with you at that point?

A. Uh-huh (indicating in the affirmative).

Q. You said your wife called the police. What did she tell the police?

Did she tell them that you had hit her or that you had threatened her? What did she tell them?

A. I don't know exactly what she told them.

fire on the exact month. I'm just trying to get a general idea if it happened early in the year or late in the year.

A. Yeah, it happened early in the year.

Q. It happened after --

A. Yeah, it happened after the first harassment.

Q. And the first harassment was also in 2005, correct?

A. Yes.

Q. So both these incidents happened in 2005?

A. Uh-huh (indicating in the affirmative).

Q. And they both happened fairly early in the year; am I understanding you correctly?

A. Yes.

Q. The second incident, you said you and your wife got into a fight, correct?

A. Yes.

Page 26

Q. Was the harassment charge in connection with your interaction with the police or your interaction with your wife?

A. With my interaction with the police.

Q. The next sentence says: I was charged with domestic violence this year in Montgomery County and attended an anger management class (reading).

Is that a separate incident?

A. Yes.

Q. Tell me what happened on that.

A. Me and my wife, we got into it, got into a fight. And she called the police, and they arrested me. And -- no, she went down there and signed the warrant. And then they came and arrested me. And I was sent to anger management.

Q. This happened after the last incident we just spoke of; is that correct?

A. Yes.

Q. Do you remember what month that happened in, or can you estimate what month it happened in? I'm not holding your feet to the

Page 28

Q. Did you get into a physical fight or a verbal argument?

A. Physical.

Q. Were you alleged to have hit her?

A. Yes.

Q. Was she alleged to have hit you?

A. Yes.

Q. Were both of y'all charged or just you?

A. Just me.

Q. Did you have to serve any jail time as a result of that charge?

A. I served five days.

Q. Just so I can understand you, twice in 2005, you got to serve five days in jail?

A. Yes.

Q. Did you have to serve any probation after that?

A. No, just the anger management.

Q. Mr. Hogan, have you ever filed for

Page 29

bankruptcy before?

A. No.

Q. Mr. Hogan, I want to ask you now about basically just what happened the night -- I believe it was March 30th was the night that this whole incident happened that makes the basis of this lawsuit.

Before we begin, I want to clarify one thing. From what I understand, you were in the car that night with three other people; is that correct.

MR. NELMS: Object to the form.

A. Yes.

Q. One of them's name was Chris McBride; is that correct?

A. Yes.

Q. One of them's name is Courtney Smith; is that correct?

A. Correct.

Page 30

Q. Who was the other person?

A. Mario.

Q. What's Mario's last name?

A. I don't really know him.

Q. Mr. Hogan, I'm going to ask you some specific questions; but just in general, I want you to tell me in as much detail as you can everything you remember that happened that night beginning from the first time you ever saw either Chris McBride, Courtney Smith or Mario.

MR. NELMS: Object to the form.

Q. Okay.

A. I had just gotten in from work. I got a call from Chris McBride.

Q. What time was that roughly?

A. Somewhere around between ten thirty --

Q. At night?

A. Yes. And he asked if I wanted to shoot any pool. I told him yeah. So we met up around

Page 31

by Jackson Street and went over to The Break Room.

Q. Whose car were y'all in?

A. Mario's.

Q. Did you take your car out that night at all?

A. Yeah, I had my car parked at the drop where I keep my truck.

Q. And they came and picked you up there?

A. No. I drove over to Jackson Street.

Q. It was at somebody's house you left the car at Jackson Street?

A. I just left it on the side of the road in front of someone's house.

Q. Where is Jackson Street? I'm sorry, I don't know where it is.

A. Jackson Street is right off High Street.

Q. What area of Montgomery are we talking about? Is it fairly close to the pool hall or is it a ways off?

A. It's a ways off.

Q. That's good enough. Go ahead.

A. Okay. So we went over to the pool hall, shot pool.

Q. How long were y'all at the pool hall would you say?

A. We were there -- I guess I'd say about maybe -- I don't know the exact time.

Q. That's all right. I'm asking just for an estimate, best estimate, not holding you to anything.

A. Maybe an hour.

Q. And y'all all left Jackson Street in Mario's car, correct?

A. Yes.

Q. So after you left the pool hall, what did you do then?

A. It was raining pretty hard, so we had pulled the -- it's like a loan service, like

Page 32

Nationwide or something. We pulled over there in the parking lot. And we were sitting in the parking lot, waiting for the rain to slack up.

While we were sitting there in the parking lot, Mario had pull out a sack of weed and started rolling it. And we all had poured something to drink. So we were sitting there. They were smoking a weed. I was drinking some liquor.

And while we were sitting there, Arnaud had pulled up to the store. Well, I guess that was Arnaud.

Q. What kind of car was it?

A. It was an SUV.

Q. A black SUV?

A. Black or blue, something like that.

Q. Dark colored SUV?

A. Yes.

Q. All right.

A. So we were sitting there, waiting for the rain to slack up. And he had pulled up in front of the store, pulled up in front of the store and sat there a while. Then he backed out

Page 33

and went around to the back and stopped there. Then he went back around to the front, stopped, parked. He went in to the store. And he came back out and left. And by that time, we was getting ready -- after he left, we decided to leave.

So instead of Mario going out toward the street, he go toward the trailer park. And by that time, we was inside the trailer park, the K-9 unit had pulled up behind us. And so when the K-9 pulled up behind us, we were steady driving. Well, he was steady driving. We got back to almost the back of the trailer park and he hit his flasher lights. We was behind the trailer park then.

So Mario was, like, he had warrants and stuff; and he wasn't about to go to jail, so he pulled off. So while he pulled off, the K-9 unit was behind us. So we came out the trailer park,

Page 34

came onto Wares Ferry Road, went going toward the Atlanta Highway.

So while we was going toward the Atlanta Highway, I was, like, man, stop, man. Stop. He was, like, no, man, I can't go to jail. So he turned off on two streets, two or three streets and crashed the car.

By that time, I jumped out of the car. And we all fled on feet.

Q. Then what happened?

A. And I had -- on the side of the drainage ditch I was, like, in the bushes, hid and the K-9 dog came down. I came out the bushes with my hands up. And the K-9 -- somebody yelled something on the other side of the drainage ditch. I don't know what they said; but by the time they said that, the dude unleashed the dog.

So I started running, jumped the fence. Well, I jumped on the fence. The dog

Page 35

grabbed my leg. So I jumped over the fence. I tried to jump another fence. By that time, the dog grabbed me. And the police apprehended me.

Q. Then what happened?

A. Then we went down to answer questions.

Q. Who questioned you?

A. Detective Pelham.

Q. Did anybody else question you besides Detective Pelham?

A. I don't know who it was. Somebody else did.

Q. How many people questioned you that night?

A. Two as far as I can remember.

Q. One of them was Detective Pelham and another?

A. Yes.

Q. But you remember Detective Pelham's name, but you don't remember the other person's

Page 36

name?

MR. NELMS: Object to form.

A. No.

Q. What did Detective Pelham ask you?

A. He asked me what we were doing in the parking lot. I told him we had just left The Break Room and we was waiting for the rain to slack up; while we was waiting for the rain to slack up, that the other guys had something to smoke and we all had something to drink.

And he asked me who broke in the store -- who broke in the meat shop. I was, like, ain't nobody break in the meat shop. We all was in the car. We never did get out the car. He was, like, well, the K-9 unit, he -- he was filming the whole thing; and he got it all on tape. I said, well, if he was filming the whole thing and got it on tape, he would know that we didn't get out the car.

Page 37

And he was asking about the gun. He said whose gun. I was, like, what gun. Because at the time, I didn't know there was a gun in the car. And he was, like, there was a gun in the car. I said, I don't know; it ain't mine.

Q. Did he ask anything else?

A. He asked me why I ran from the police. I told him that Mario had warrants and that I was scared by the time we had wrecked the car.

Q. So your testimony is you told Detective Pelham that your reason for fleeing in the car was that Mario had warrants?

A. Well, I was in the back seat.

Q. I'm just asking what was told to Detective Pelham.

A. That's the reason Mario fled the scene. And after he had that wreck, I had that panic, I mean.

Q. I understand what you're saying there,

Page 38

but my question is: You're telling me that when Detective Pelham asked why did the car flee, no matter who was driving or whose decision it was, why did the car flee, that you told him the car fled because Mario had warrants and it was Mario's decision?

A. Yes.

Q. That's what you told Detective Pelham?

A. Yes, he had warrants and we had -- well, they had been smoking weed.

Q. You said you were questioned by another detective as well, correct?

A. Yes.

Q. What did that detective ask you?

A. Pretty much all the same thing.

Q. Any different questions at all?

A. Not that I can recall.

Q. How many times did Detective Pelham come in and question you that evening?

A. Twice.

Page 38

Q. How long was he in there questioning you the first time?

A. I don't know the exact time.

Q. Roughly, more than fifteen minutes, more than five minutes? Was it between five and fifteen minutes? Is that fair to say?

A. It's possible.

Q. Was he in there longer the first time or the second time?

A. The first time.

Q. Did he separate all four of you?

A. Well, three of us got caught. Mario, he got away.

Q. Did they separate all three of you then?

A. Well, the only person at the time -- me and Chris McBride was down there; and Courtney Smith, he was in the drainage ditch. And last time I seen Chris McBride was when we got out the car. So I didn't ever get to see him at the police station. So he separated all of us.

Q. Back to when you were in the parking lot at -- in the parking lot between the pool

Page 39

hall and Arnaud's Meats --

A. Uh-huh (indicating in the affirmative).

Q. -- how close was the car parked to the building? When I say building, I mean Arnaud's Meats.

A. Probably about forty yards.

Q. When the K-9 unit pulled in, where were y'all parked, still in the same place?

A. No. When the K-9 unit pulled in, we was in the truck then.

Q. You had already moved before the K-9 ever pulled in?

A. We had already moved. We was leaving.

Q. But you recognized that as a police officer?

A. I didn't, but Mario did. I was sitting in the back seat. I didn't know who was behind us. And that's when he said K-9 was behind us.

MR. NELMS: You asked him when did the K-9 unit pull into the parking lot. And his

Page 40

response was basically when he became aware that the K-9 unit was back there. He didn't answer your question exactly. I mean, you asked him a specific question, when did the K-9 unit enter the parking lot. What he responded to was when he became aware of it.

MR. WHITEHEAD: Let the record reflect that. I understand.

Q. You can only testify to what you were aware of, correct?

A. Yes.

Q. So in other words, the K-9 unit may have pulled in before you became aware of it; fair to say?

A. I mean, when he pulled in, we wasn't in the parking lot. We had left the parking lot.

Q. Did you see the car pull into the parking lot?

In other words -- let me give you a

Page 41

hypothetical. It may explain it better. I may see an unmarked police car pull into a parking lot. It may be another thirty seconds before I become aware it is a police vehicle, but I did see the vehicle come into the parking lot.

My question is: Did you actually see the vehicle pull in the parking lot and then subsequently realize it was a --

A. No.

Q. -- police vehicle?

A. I didn't see the vehicle pull in parking lot.

Q. So you don't know when the vehicle pulled it in?

A. Whenever he did -- whenever he pulled in, we was already out the parking lot.

Q. But you don't know when he came in, so how can you say that?

A. Because we had left the parking lot.

Page 42

Q. You didn't see the K-9 unit pull into the parking lot, correct?

A. Correct.

MR. WHITEHEAD: Let's take a break for just a second, okay?

MR. NELMS: Sure.

(Brief break taken.)

Q. (by Mr. Whitehead) Mr. Hogan, have you spoken -- have you ever spoken with Anthony Arnaud?

A. No.

Q. Since March 30th, 2005, which was the night all of this happened, have you spoken with Mr. McBride, Mr. Smith or Mario?

A. A few times. I haven't spoken to Mario, but I have spoken with the other ones.

Q. Had you ever met Mario before this night?

A. Maybe once or twice.

Page 43

Q. Where does Mario live?

A. I don't exactly know, but I think he stays in Smiley Court.

Q. You said earlier that you left your car parked on -- was it Jackson Street?

A. Jackson Street was like the main street that I just named, but the actual street was Sharp Street.

Q. So you left your car parked on Sharp Street?

A. Yes.

Q. Was it parked in front of somebody's house on the street?

A. Yes.

Q. Whose house was it parked in front of?

A. No one lived there.

Q. How did you come to choose that location to leave your car?

A. That's where we are hanging all the

Page 44

time.

Q. Y'all just hang out in front of an abandoned house?

A. No. I know someone that stays on that street.

Q. Who do you know that stays on that street?

A. His name is Albert Davis.

Q. He lives on what street?

A. Sharp Street.

Q. And Sharp Street is where you left your car parked?

A. Yes.

Q. How far down Sharp Street does Albert Davis live?

A. He stays all the way down at the back of the street.

Q. How many houses down would it be where you parked your car?

Page 45

A. Almost directly across.

Q. So across the street?

A. Not exactly across but across the street.

Q. Could you throw a rock and hit Albert Davis' yard from where your car was parked?

MR. NELMS: Object to the form.

A. Yeah.

Q. Now, Mr. McBride was charged with felony gun possession charges as a result of that night, wasn't he?

A. I don't know if he was charged with that particular gun charge or -- but he had a previous gun charge. So I don't know if they actually charged him with a gun that night.

Q. Is Mr. McBride in prison right now?

A. Yes.

Q. Is he in state prison or federal prison?

A. Federal.

Q. How long has he been in federal prison?

A. Since August.

Q. How much time was he sentenced to serve?

A. Twenty-one months.

Q. Do you know where he's serving his time?

A. Somewhere in Mississippi.

Q. How about Mr. Smith; have you spoken with him at all since that night?

A. Yes.

Q. How many times have you spoken with Mr. Smith?

A. Maybe twice.

Q. Have y'all talked about what happened that night?

A. No.

Q. When did you last speak with Mr. Smith?

A. Maybe a few weeks ago.

Q. How did you run into him?

A. I was riding through and went by his house.

Q. Where does he live?

A. Lake Street.

Page 46

Q. You didn't discuss what happened that night at all?

A. No.

Q. You said y'all have spoken twice; when was the other time you saw him?

A. Probably a few days after the incident.

Q. How did you come to see him that day?

A. Over there in that area.

Q. You were in the neighborhood?

A. Yeah.

Q. And y'all didn't discuss the -- these incidents that time either?

A. Well, he told me that -- that he wasn't charged with no burglary and that he was in the drainage ditch.

Q. Tell you anything else?

A. That's about it.

(Defendant's Exhibit Number 2 was marked for identification and is attached to this

Page 47

deposition.)

Q. Mr. Hogan, I'm going to hand you a document we're going to mark as Defendant's Exhibit 2. And this is a copy of the complaint that you filed in this case. I'm going to ask you first if you recognize this document.

A. Yes.

Q. Did you get a chance to review it before it was filed?

A. (No audible response.)

Q. Did you hear my question, Mr. Hogan?

A. Did I get a chance to review it?

Q. Yes. Did you review the document before it was filed?

A. (No audible response.)

Q. Mr. Hogan, I just want to make sure you understand my question because I don't understand why you have to read it to understand and answer the question that was asked you. You said that

Page 48

you recognized the document.

My question is: Did you review the document before it was filed?

A. Yes.

Q. Do you contend that this lawsuit that you filed is truthful and accurate, this complaint?

A. Yes.

Q. I want to draw your attention to paragraph fourteen of your complaint. It's going to be on the following page, what I'm going to ask you about, the last part of --

MR. NELMS: Turn the page one time.

Q. The last two sentences of paragraph fourteen state: At the time of the crash, K-9 Officer J. M. Gordon released his dog. Chad Hogan was injured when he was severely bitten by the animal several times. (Reading.)

Do you see that?

Page 49

A. Uh-huh (indicating in the affirmative).

Q. How do you know that it was Officer Gordon's dog that bit you?

A. It wasn't Officer Gordon's dog that bit me.

Q. What?

A. Officer Gordon's dog didn't bite me.

Q. So this statement that you've made in your sworn complaint is not truthful?

MR. NELMS: Object to form.

A. I was bitten by the dog beside the drainage ditch.

Q. So this statement that you made in your complaint is false, correct?

MR. NELMS: Object to form.

A. I was bitten by the dog but --

Q. I understand. My question is: Is the statement that you make in this complaint about Officer Gordon's dog biting you, is that a false

CHAD HOGAN DEPOSITION              CondenseIt!™                      MARCH 29, 2006

Page 50

statement?
    MR. NELMS: Object to the form.
    Q. That's a yes or no question,
Mr. Hogan.
    A. Yes.
    Q. Mr. Hogan, you have alleged as part of
your lawsuit that Officer Gordon basically lied
in his statements about what he saw that night,
correct?
    A. Correct.
    Q. Would you agree that Officer Gordon
would not have any motive to lie about what
happened if it wasn't even his dog that bit you?
    MR. NELMS: Object to the form.
    A. Say that again.
    Q. Would you agree that Officer Gordon
would not have any motive to lie about what
happened if it wasn't even his dog that bit you?
    A. Well, he ended up lying.

Page 51

    A. Because we didn't -- we didn't go in
the store.
    Q. How do you know that Anthony Arnaud had
said no burglary had taken place? How do you
know what Anthony Arnaud said to anyone?
    MR. NELMS: Object to form.
    A. Through my lawyer's investigation.
    Q. You don't have any personal knowledge
yourself of that, correct?
    A. No.
    Q. Next page, paragraph eighteen, starting
with the second sentence: After learning that no
crime had been committed, Lieutenant William
Caulfield, K-9 Commander, proclaimed that the
investigating officers needed to make up
something to justify the dog bite (reading).
    What evidence do you base that
statement on?
    A. My lawyer's investigation.
    Q. You don't have any personal knowledge
of that either, correct?
    A. No.

Page 52

    Q. My question is: Would you agree that
Office Gordon would not have any motive, any
reason to lie about what happened that night if
it wasn't even his dog that bit you?
    A. He ended up lying.
    Q. Would he have any reason to lie,
though?
    A. Yeah.
    Q. What reason would he have to lie?
    MR. NELMS: Object to form.
    A. Looking out for other officers.
    Q. I'm going to direct your attention to
paragraph seventeen. Opening sentence says:
Arnaud, having previously asserted that no
burglary had taken place, nevertheless signed a
complaint against Hogan at the insistence of the
defendants or one or more of them (reading).
    Do you see that?
    A. Uh-huh (indicating in the affirmative).
    Q. What do you base that statement on;
that Anthony Arnaud previously asserted that no
burglary had taken place?

    Q. When you say your lawyer's
investigation, what part of your lawyer's
investigation?
    MR. NELMS: Object to the form.
Instruct him not to answer. Don't answer
the question.
    Q. What evidence do you have to support
it? If your lawyer's investigation has uncovered
some evidence that you intend to offer to prove
that statement right there, I'm asking what
evidence that is. I don't care how you got it.
And I don't want to know about how your lawyer's
employees or how your lawyer conducted the
investigation.
    But I'm asking: If you have some
evidence that you intend to offer, no matter how
you got it, to support that statement, please
tell me what it is.
    MR. NELMS: If you have any evidence,

Page 53

tell him what it is. If you do not, you do not.

A. I don't.

Q. Mr. Hogan, do you contend that Officer Gordon did anything wrong by turning his lights on and trying to investigate whether you and your friends knew anything about the burglary?

MR. NELMS: Object to the form.

A. No.

Q. Do you agree that it was wrong to run from the police after they tried to effectuate a proper stop?

MR. NELMS: Object to the form.

A. Yeah.

Q. Do you agree that the car you were in led the police on a high-speed chase?

A. Yes.

Q. Do you agree that this occurred in a residential area?

Page 54

A. Yes.

Q. Do you agree that somebody could have easily been hurt or killed during this?

MR. NELMS: Object to the form.

A. Yes.

Q. And the car you were in eventually wrecked in somebody's back yard, did it not?

A. Yes, it did.

Q. Did it do any damage to their property?

A. It went through the fence.

Q. It tore the fence up?

A. Yeah.

Q. Did it tear anything else up that you know of?

A. No.

Q. Have you ever gone back and checked with the homeowner to see?

A. No.

Q. Ever offer any money to pay the owner

Page 55

to fix the damage?

A. No.

Q. Do you have any idea how the damage was repaired?

A. No.

Q. Do you feel like you've got any responsibility on that?

MR. NELMS: Object to the form.

A. I wasn't driving the car.

Q. Is that a no?

A. That's a no.

Q. Do you know if anybody that lived in the home was injured as a result of crashing in the fence?

A. Not to my knowledge.

Q. Did you ever ask?

A. No.

Q. What would y'all have done if the car y'all were in had hit and killed somebody while

Page 56

y'all were going down the road?

MR. NELMS: Object to the form.

A. I mean, I would feel bad.

Q. Would you have stopped or would you have kept on going?

MR. NELMS: Object to the form.

A. I wasn't driving the car.

Q. Would you have told the person driving the car to stop?

MR. NELMS: Object to the form.

A. I told him to stop.

Q. You did?

MR. NELMS: Object to the form.

Q. You did tell him to stop?

A. Yeah.

Q. Well, why did you run on foot once the car stopped?

MR. NELMS: Object to the form, asked and answered.

Page 58

MR. WHITEHEAD: No, I don't think it has been.

Q. Would you please answer the question?

MR. NELMS: The record will speak for itself. He stated that he was --

MR. WHITEHEAD: I don't need you to repeat what his testimony is and coach him on his testimony. I've asked the question.

Q. You can answer it or not.

MR. WHITEHEAD: If you say the record speaks for itself, we'll certify the question. Please don't put words into your client's mouth.

MR. NELMS: Certify the question, please. And I'm going to instruct the client not to answer the question because I believe Mr. Whitehead is being harassing at this point in time.

I understand the question to be why did you run from the police when the car stopped.

Q. (by Mr. Whitehead) If you told Mario to stop while y'all were in the middle of the chase, why did you run once the car stopped?

MR. NELMS: Object to the form.

A. Because I was scared and had panicked.

Q. You what now?

A. I got scared and panicked.

Q. You got scared and panicked?

A. (Witness nods head in the affirmative.)

Q. Do you admit you were wrong in running, though?

A. Yeah.

Q. You're aware that a handgun, a flashlight and a ski mask was found in the car, correct?

A. Yes.

Q. Were you aware that any of those items were in the car?

A. No.

Page 57

MR. WHITEHEAD: And I don't believe we have an answer to that question yet. If my memory serves me incorrectly, I apologize. But I genuinely, in my mind, am not sitting here thinking I have an answer to that question. But if you want to instruct your client not to answer, but, I mean, the question is on the table.

MR. NELMS: Okay. I'm instructing you not to answer. You've already answered that question.

MR. BODIN: I don't think that's been answered.

MR. WHITEHEAD: Kim, do you think that's been answered?

MS. FEHL: I don't recall.

MR. NELMS: I'm going to ask the court reporter to go back and find it then.

MR. BODIN: Well, why don't she look for that. And, Andy, you've got a phone call. And we'll take a break.

(Brief break taken.)

(Off-the-record discussion.)

Page 59

Q. You told the police you didn't know about them?

A. Yes.

Q. Do you think the police were justified in being skeptical in believing you on that, given the circumstances?

A. Yes.

Q. Where were those items found in the car, in the front seat or back seat or under the seat?

A. I don't know.

Q. Mr. Hogan, do you admit it would be reasonable to suspect somebody of burglary if they were found in possession of all three of these items at one time --

MR. NELMS: Object to the form.

Q. -- being a flashlight, a ski mask and a handgun?

MR. NELMS: Object to the form.

A. No.

Q. Can you give me some alternative reasons why somebody might be in possession of all three of those at one time, being a ski mask, a handgun and a flashlight?

MR. NELMS: Object to the form.

A. No.

MR. NELMS: Have you got any substantive questions you can ask?

MR. WHITEHEAD: Can you ditch the sarcasm at the door? I mean, that's real professional, Andy. Do you want to insult me and call me a jerk or something now, too?

MR. NELMS: You're asking him --

MR. WHITEHEAD: And I'll ask whatever questions I want to. It's my deposition.

MR. NELMS: -- a long string of questions that are asking him to speculate.

MR. WHITEHEAD: Anything else?

MR. NELMS: Go at it.

MR. WHITEHEAD: Thank you. And let me state for the record, seeing as how a handgun, a ski mask and a flashlight was found in the car and that's part of why we're trying to establish probable cause, I'm asking, if that didn't establish probable cause, tell me why it didn't. Give me alternative reasons why those three might be in there. So I think that is substantive, but thanks for commenting.

Q. (Mr. Whitehead continuing) Mr. Hogan, I'm understanding you were not on any type of probation or parole at the time this happened; is that correct?

A. Correct.

Q. How many times have you spoken with Kirk Pelham since the night this happened?

A. Never.

Q. You haven't spoken with him a single time?

A. No.

Q. Have you ever spoken with Roianne Conner or any other person you believe to be Kirk Pelham's attorney or employee of his attorney --

MR. NELMS: Object to the form.

Q. -- about the incidents that happened that night?

A. No.

Q. You were charged with burglary at the conclusion that night, correct?

A. Yes.

Q. Did you ever speak to a lawyer about your criminal charges before they were presented to the grand jury?

A. Yes.

Q. Let me say something. I don't want to know about any conversation. I'm just asking who

you spoke to. Don't tell me anything that you said to that lawyer or he said to you. Okay?

A. (Witness nods head in the affirmative.)

Q. Who did you speak to?

A. Dan Hamm.

Q. Dan Hamm?

A. Yes.

Q. When did you first consult a lawyer about pursuing a civil case?

A. When I found out that the other guys was not charged with burglary.

Q. How did you know to contact Mr. Lewis and Mr. Nelms?

A. He was asking me -- investigating the Pelham incident. And I told him that I was wrongfully charged with burglary; could he represent me.

Q. So they contacted you as a witness in that matter?

A. Yes.

Page 63

Q. Are you aware that Kirk Pelham has a lawsuit pending against the City of Montgomery right now?

A. Yes.

Q. How did you become aware of that?

A. When I found out about what had happen to him.

Q. But how did you know he had a lawsuit pending against the City of Montgomery? Who told you that?

A. My lawyer.

Q. Mr. Hogan, let's go back to Exhibit 1, which is your interrogatories. It's that right there (indicating). On the last page, or the next to the last page -- excuse me -- interrogatory number thirteen, I asked you:

In paragraph twenty-six of the complaint, you allege that the City of Montgomery has and maintains a policy, practice or custom by which the city seeks to charge with a crime all persons injured in encounters with police officers employed by the city whether or not there is probable cause to believe that a crime

Page 64

has been committed. Please describe in detail all evidence you have to support that such a policy, practice or custom exists (reading).

You responded: The fact that you wrongfully arrested me without probably (sic) cause shows that there is a policy, practice or custom exists (reading).

My question: Is your incident, the incident that happened to you, your sole basis for alleging that they have a policy or practice or custom? Do you know of any other incidents similar to yours that have happened?

A. No.

Q. Do you know anyone with personal knowledge within the Montgomery Police Department or that has personal knowledge associated with the Montgomery Police Department that such a policy, practice or custom exists?

A. No.

Q. Number fourteen asks you to state the

Page 65

total amount of monetary loss which you allege you incurred in the complaint and to provide an itemized detail.

Your response was that you had to post a bond and lost one day of work and that you had no way of knowing the amount of money you would have made at work that day.

Let me ask you first: How much was your bond?

A. A thousand dollars.

Q. A thousand dollars?

A. (Witness nods head in the affirmative.)

Q. Did you go through a bail bondsman to post that or how did you post that bond?

A. A bail bondsman.

Q. What did the bondsman charge you on that?

A. I think it's ten percent.

Q. So a hundred dollars?

Page 66

A. A hundred dollars, yeah.

Q. You said you have no way of knowing the amount of money you would have made at work that day. How are you paid? By the load or by the hour, or how are you paid?

A. Load and miles.

Q. Do you tend to have -- to make more money during certain parts of the year more than others?

A. Not really.

Q. It's fairly steady throughout the year?

A. Yeah.

Q. On a typical day, how much money do you make?

A. A typical day -- well, it all depends on the load and the trip, how many miles a trip requires.

Q. I'm just trying to see if we can get a range on this. Do you ever make more than --

Page 67

what's the most you typically make in a day?

A. Over a hundred dollars.

Q. What's the least you typically make in a day, fifty?

A. No.

Q. Have you ever made less than fifty?

A. No, I've never made less than fifty.

Q. Have you ever made less than seventy?

A. No.

Q. Do you ever make less than eighty?

A. No.

Q. Do you ever make less than a hundred?

A. No.

Q. Do you ever make less than a hundred fifty?

A. Yes.

Q. Do you ever make more than a hundred fifty?

A. Yes.

Page 68

Q. Ever make more than two hundred?

A. No, I don't think so.

Q. I'm just -- based on what we just discussed there, would it be fair to say your typical pay range is somewhere between a hundred and twenty-five to a hundred and seventy-five dollars a day?

A. It's possible.

Q. Mr. Hogan, I forgot to ask. Your wife, Danielle Hogan, where does she work?

A. Wares Ferry Elementary.

Q. What does she do at Wares Ferry Elementary?

A. School counselor.

Q. How long --

A. I mean -- not Wares Ferry. I mean Brewbaker.

Q. Brewbaker. Did she used to work at Wares Ferry?

Page 69

A. No.

Q. How long has she been at Brewbaker?

A. She has been there almost a year.

Q. Where did she work before that?

A. Peterson Elementary.

Q. A counselor there as well?

A. Yes.

Q. How long was she at Peterson Elementary?

A. About three years or something, four years, somewhere around there.

Q. Where did she go to school? I mean, college.

A. Alabama State.

Q. When did she finish at ASU?

A. She -- the last time, 2000.

Q. 2000?

A. Yeah.

Q. Has she ever worked at any other

schools besides Brewbaker and Peterson?

A. No.

Q. What is her maiden name?

A. Sanders.

Q. You said she is from Detroit?

A. Yes.

Q. How did she end up down here?

A. School.

Q. So she lived in Detroit until she started at Alabama State?

A. Yes.

Q. She has no family of any type down here other than you?

A. No.

MR. WHITEHEAD: Mr. Hogan, Ms. Fehl and Mr. Bodin may have a few questions; but that's all I have. Thank you.

MR. BODIN: My name is Jim Bodin. I represent Mr. Arnaud, who is named as a defendant. A few questions.

EXAMINATION

BY MR. BODIN:

Q. You testified earlier that you were --

Page 70

you had a robbery conviction for a robbery at a convenience store, correct?

A. Yes.

Q. Was that store open at the time of the robbery?

A. Yes.

Q. Was money taken from the store?

A. Yes.

Q. How much?

A. I'm not sure.

Q. You testified about a robbery, one conviction, and the harassment convictions. On both charges were you arrested by the Montgomery City Police?

A. Yes. No. For the robbery, the county.

Q. Robbery was the county?

A. Yes.

Q. And during the harassment charge, you testified that you were -- is this correct -- you were maced and wrestled to the floor?

A. Yes.

Page 71

Q. Was that done by Montgomery City Police Officers?

A. Yes.

Q. For the harassment charge, you served time in the Montgomery City Jail?

A. Yes.

Q. On the night of this incident, what were you drinking at the pool hall?

A. We didn't have anything to drink inside the pool hall.

Q. What were you drinking in the car?

A. Vodka.

Q. Did you purchase that?

A. No. Chris, he brought it with him.

Q. Were you drinking out of a bottle?

A. No. A cup.

Q. How many drinks did you have before the police arrived?

A. One.

Page 72

Q. And you testified earlier that the others in the car were smoking marijuana?

A. Yes.

Q. Were all three others smoking marijuana?

A. Yes.

Q. Were you in the car while they were smoking marijuana?

A. Yes.

Q. Were the others drinking?

A. Yes.

Q. Were they drinking vodka, also?

A. Yes.

Q. At the time of the incident, did you know that Mr. McBride had a felony warrant out on him?

A. Yes.

Q. How did you know --

A. What? A felony warrant?

Page 73

Q. Did you know that he had a warrant out for his arrest?

A. No.

Q. Did you know that this guy, Mario, had warrants out for his arrest?

A. Yes. He said he did.

Q. Who had brought the marijuana?

A. Mario.

Q. Do you know if Mario has ever been arrested?

A. I don't know.

Q. You testified earlier he lives on Lake Street?

A. No, not Mario.

Q. Who lives on Lake Street?

A. Courtney Smith.

Q. Do you know where Mario lives?

A. Smiley Court.

Q. Do you know where he works?

Page 74

A. No.

Q. Do you know what he does for a living?

A. No.

Q. You testified earlier that when the car pulled away from the area of the store, you said stop.

A. Uh-huh (indicating in the affirmative).

Q. Is that right?

A. (Witness nods head in the affirmative.)

Q. Do you remember where you were when you said -- where was the car situated when you said stop?

A. Wares Ferry Road.

Q. Were y'all traveling at that time?

A. Yes.

Q. How far were you from the store approximately when you said stop? You said you were on Wares Ferry. How far were you from the business, Arnaud's business?

Page 75

A. A good piece, I mean.

Q. Who did you tell to stop?

A. Mario.

Q. What was his reaction?

A. He got warrants; he ain't fixing to go to jail.

Q. You testified earlier that after you had left -- you got out of the car, correct?

A. Uh-huh (indicating in the affirmative).

Q. The car stopped, it hit the fence, it stopped, right?

A. Yes.

Q. And you ran?

A. Yes.

Q. How far did you run from the car when you were hiding in the bushes?

MR. NELMS: Object to the form.

A. Maybe --

Q. Was it a football field, a half a

Page 76

football field, how many yards?

A. Maybe somewhere -- estimate of maybe sixty yards.

Q. Why did you leave out of the bushes?

A. The K-9 dog was coming. I got out the bushes, holding my hands up. But the other man across the drainage ditch, he yelled something. By the time he did that, he loosened the dog so I took off running.

Q. Was it dark?

A. Yes.

Q. So the officer with the K-9 dog was on the other side of the ditch?

A. No. He was on the side of the ditch that I was on.

Q. Did he flash his light at you? Did he see you?

A. No.

Q. Did he holler something at you?

A. No. I was in the bushes. When I seen him come closer, I jumped out the bushes.

Q. Did you tell him anything?

A. No, I don't think so.

Q. So at that point, he released the dog?

A. Yes.

Q. What happened at that point?

A. I ran and jumped on one fence, and the dog grabbed my legs. I jumped over the fence and I got up on another fence. And he grabbed my leg again and pulled me down. By that time, the officer had got me.

Q. He pulled the dog off of you?

A. Yes.

Q. At that time, you were placed under arrest?

A. Yes.

Q. What were you wearing at the time?

A. I was wearing black pants and a tan shirt, light brown shirt.

Q. I'm going to show you what was sent to me as your discovery responses.

MR. BODIN: And just mark that whatever the next exhibit is.

MR. WHITEHEAD: I think we're up

Page 77

three.
(Defendant's Exhibit 3 was marked for identification purposes and is attached.)
Q. Have you looked through that? Tell me if that's your discovery responses to Mr. Arnaud's discovery request.
A. (Witness complies.)
Q. Why don't you flip through to about the sixth or seventh page and tell me if that's your signature. Keep going.
A. (Witness complies.)
Q. Is that your signature at the top?
A. Yes.
Q. It says Chad Hogan?
A. Yes.
Q. Is that your discovery responses?
A. Yes.
Q. Look at response number six. I think it's on the third page.

Page 78

A. (Witness complies.)
Q. It says your response is: Defendant prosecuted plaintiff without any knowledge or belief that plaintiff had committed a crime (reading).
Do you read that?
A. Uh-huh (indicating in the affirmative).
Q. What defendant are you referring to? Are you referring to Defendant Arnaud?
A. Yes.
Q. Do you know what the police officers told Mr. Arnaud following your arrest?
A. No.
Q. Or at the store?
A. No.
Q. Did you ever overhear any conversation -- did you ever hear Mr. Arnaud speak?
A. No.

Page 79

Q. Did you ever hear any conversation between Mr. Arnaud and any other police officers --
A. No.
Q. -- or anyone with the City of Montgomery?
A. No.
Q. Do you know -- with your personal knowledge, do you know of anything that the police officers actually told Mr. Arnaud had happened?
A. No.
Q. Now, when you were at the scene, I think you testified you were -- the car was parked forty yards from the business, Mr. Arnaud's business?
A. Yes.
Q. Did you ever see Mr. Arnaud at that scene?

Page 80

A. Yes.
Q. When?
A. When he came here and parked in front of it, and he drove around it. He came in the back and stopped. And he drove back to the front, parked in front of the business and got out and went inside.
Q. When was this?
A. When we were in the parking lot.
Q. Do you know what time this was?
A. No.
Q. This was before the police had come on the scene?
A. Yes.
Q. Do you know what Mr. Arnaud was doing?
A. No, I don't know what he was doing.
Q. What was the time frame between -- how do you know it was Mr. Arnaud you saw?
A. I was just assuming that was him.

Page 81

Q. Can you describe him if you remember?

A. He's tall, look like Iraqi or something.

Q. Why do you say an Iraqi? An Iraqi?

A. Yes. I mean, someone, like, from the Middle East or something like that.

Q. Did he have a hat on?

A. I don't remember.

Q. What was he driving?

A. A black or dark color SUV.

Q. Have you ever seen Mr. Arnaud before?

A. No.

MR. NELMS: Before that night?

MR. BODIN: Yeah.

Q. At any time?

A. Before that night? No.

MR. NELMS: He just testified he saw a person he believes was Arnaud.

Q. Had you see him before that night, the

Page 82

Q. Where did you go at that point?

A. That's when the driver of the car, Mario, went into the trailer park.

Q. So this was immediately right after the person pulled up in front of the business, that person left, driving the dark SUV. And then y'all pulled off --

A. Yes.

Q. -- immediately thereafter, and then the chase ensued; am I correct?

A. Correct.

Q. Were you ever taken back to the store --

A. No.

Q. -- after your arrest?

You were taken downtown, correct?

A. Correct.

MR. NELMS: Does downtown mean police station?

MR. BODIN: Correct.

Q. Was it Court Street?

A. I don't know. I guess.

Q. I'm not trying to confuse you. I mean,

Page 83

person you assumed to be Mr. Arnaud?

A. No.

Q. Have you seen Mr. Arnaud since this incident?

A. No.

Q. So you see this guy drive up at the business and y'all are parked in the parking lot. You're assuming this is the owner, correct?

A. Correct.

Q. And what happened after the SUV had pulled up to the business? Did the person get out of the vehicle?

A. No. As he pulled up to the business, he stopped in front of the business, sat there awhile, rode around back, stopped there and pulled back in front of the business and went inside and came back out and left.

Q. Now, how long did it take from that point to the time when you were first confronted by the police officer?

A. After he had left, we left.

after the arrest, you were taken to the police station?

A. Yeah.

Q. They never took you back to the store where somebody could identify you, et cetera?

A. No.

Q. And you never met Mr. Arnaud?

A. Never met him.

Q. Now, do you know what officers Mr. Arnaud spoke to at his business?

A. No.

Q. Do you know what officers Mr. Arnaud spoke with at the police station?

A. No.

Q. Do you know the substance of any conversation that Mr. Arnaud had with the police?

A. No.

Q. So I believe it would be your testimony that you've never spoken to Mr. Arnaud?

Page 84

A. Never spoken with him.

Q. To your knowledge, did Mr. Arnaud tell the police any facts or something that you allege is not true?

A. I don't know what exactly he told the police, but he signed a warrant saying that I had broken into his store.

Q. That wasn't my question.

Do you have any personal knowledge that Mr. Arnaud told the police anything that was not true?

A. I don't know what he told the police.

Q. Look at -- in the back of your discovery, I believe there is a statement from an Officer Hogan. I'm sorry. Excuse me. Officer Gordon.

MR. WHITEHEAD: That's the statement from Gordon.

MR. NELMS: I'm dying to go to the

Page 85

bathroom.

(Brief break taken.)

Q. Let me show you a document.

MR. BODIN: Which one are we on?

THE REPORTER: Four.

MR. WHITEHEAD: Yeah, this will be four.

Q. It will be number four.

(Defendant's Exhibit 4 was marked for identification and is attached to this deposition.)

Q. It's the complaint in this case.

THE WITNESS: Do you need this?

MR. WHITEHEAD: Yeah.

MR. BODIN: Let me just keep going. Affidavit will be five.

(Defendant's Exhibit Number 5 was marked for identification and is attached to this deposition.)

Page 86

Q. That complaint, do you know who prepared that complaint?

A. No.

Q. Same question for the affidavit; do you know if Mr. Arnaud had typed that information on the complaint and affidavit?

MR. NELMS: If you know.

A. What did you say? Did I -- no.

Q. Your answer is no?

A. Yeah, no.

MR. BODIN: This will be six.

(Defendant's Exhibit Number 6 was marked for identification and is attached to this deposition.)

Q. Is that a photograph of Mr. McBride?

A. Yes.

Q. Now, look through this statement. This is a statement, dated March 31st -- well, both statements, dated March 31st, one from Officer

Page 87

Fitzpatrick and another from Officer Dunn. You can read through them to yourself.

Do you disagree with any information listed in either of those two statements?

A. What was the question now?

Q. Do you disagree with any information in -- which statement are you reading now?

A. At the bottom?

Q. No. Whose statement is that you're --

MR. NELMS: Johnson. Oh, I'm sorry. Fitzpatrick.

Q. Do you disagree with anything Officer Fitzpatrick put in his statement, dated March 31st, 2005?

A. Do I disagree with any of it?

Q. Yes.

A. No.

Q. Is there anything that's in that statement that you think is incorrect?

Page 89

MR. NELMS: Object to the form.

A. I don't know. I wasn't with him when they got him.

Q. That's my question, is to read the statement. And to your personal knowledge -- I understand you may not know or be able to verify every fact in this statement. But after reading this statement, do you have any personal knowledge that anything that the officer put in this statement is incorrect?

MR. NELMS: And just for the record, you're on Exhibit 8 now.

MR. BODIN: Fitzpatrick.

A. I wouldn't know.

Q. Your answer is I don't know?

A. Yeah. I wasn't there. I mean, I wasn't -- when the Officer Fitzpatrick arrested him, I wasn't beside him.

Q. How about the next statement?

MR. NELMS: We're going backwards. The

I'm not going to mark that as an exhibit.

MR. NELMS: You already marked it as three. It's part of that composite.

Q. Can you read through Officer Gordon's statement, dated March 31st, 2005?

A. (Witness complies.)

Q. Do you have any -- take your time. I'm not trying to rush you.

Do you disagree with anything or any facts that Officer Gordon alleges in that statement?

A. The top part.

Q. Can you just read what you disagree with? Read it out loud, what you disagree with. I'm trying to move this along.

A. He arrived at the business, observed a Lincoln Towncar parked on the side of the business and observed a black male standing outside of the vehicle (reading).

He didn't observe that.

Page 88

next one is seven. And that's the Dunn statement.

Can you answer his question?

A. I wasn't there.

Q. Is your answer I don't know to that one, also?

A. Yeah.

MR. NELMS: I believe he said he wasn't there.

MR. BODIN: My question is does he disagree with any of those facts.

Q. If you have any personal knowledge.

A. I don't know what Officer Dunn -- I mean, I wasn't there when Officer Dunn arrested Chris McBride. I wasn't in the area.

Q. So you don't have any personal facts or personal knowledge to dispute anything that he said there?

A. Talking about Dunn?

Q. Yes.

A. No.

Q. All right. Look at Officer Gordon's statement. I believe that's in the discovery.

Page 90

Q. Why not?

A. Because when he came, we was in the trailer park.

Q. So you disagree with that statement?

A. Yes.

Q. Anything else?

A. Pulled into the parking lot, the subject entered the vehicle and the vehicle pulled away from the building (reading).

Q. And you disagree with that statement?

A. Yes.

Q. Anything else?

A. The unit then followed the vehicle into the trailer park, initiated a traffic stop (reading).

We was already in the trailer park when -- I mean, almost at the back of the trailer park when he put his flashers on.

Q. You said he. How did you know the

**Page 91**

person behind you was Officer Gordon?

A. I later came to find out that.

Q. From who?

A. My lawyer's investigation.

Q. So you didn't actually see the person that was behind you?

A. No.

Q. What kind of vehicle was it?

A. K-9 unit.

Q. Was it marked as a K-9 unit? Was it like a dark SUV or what was it?

A. Yeah, it was a dark SUV.

Q. Do you remember what make and model?

A. Square body.

Q. I'm sorry I interrupted you. Is there anything else in the statements you disagree with?

A. No.

Q. Now, do you have any reason to believe

**Page 92**

that Officer Gordon didn't relay these facts to Mr. Arnaud on the night of?

A. I don't know what he did.

Q. Okay. Now, if Officer Gordon told these facts to Mr. Arnaud, why would Mr. Arnaud have any reason to believe that this was not true?

MR. NELMS: Object to the form.

A. You said -- would you repeat the question?

Q. If Officer Gordon or one of the officers told Mr. Arnaud that this has occurred, would Mr. Arnaud have any reason to believe that this didn't happen?

MR. NELMS: Object to the form.

A. The part about --

Q. The part you disagree with. You said you disagree. And you stated for the record that you disagreed with his statement. Okay?

**Page 93**

A. Uh-huh (indicating in the affirmative).

Q. I'm assuming you think he wasn't telling the truth; am I right?

A. Which one?

Q. Officer Gordon.

A. Correct.

Q. So if these facts were relayed to Mr. Arnaud on the night of, why would he have any reason to your knowledge not to believe that this happened?

A. Because later on, I found that he -- he found out that it wasn't -- I mean, I found out during my lawyer's investigation that he said that wasn't no burglary.

Q. Mr. Arnaud said that?

A. Yes.

Q. Who did he tell that to?

A. The officer that was at the scene of the -- Detective Pelham.

**Page 94**

Q. Well, on the night of, if Mr. Arnaud was told that these things happened, why shouldn't he have believed that at the time?

MR. NELMS: Object to the form.

A. Because he arrived at the business.

Q. He what?

A. Because he arrived at the business afterwards.

Q. Okay. What would have alerted him at the time he arrived at the business that a burglary didn't occur?

MR. NELMS: Object to the form.

A. Because he said it.

Q. It's your testimony you believe Mr. Arnaud said a burglary didn't occur?

A. Yes.

Q. Even though he was not there at the time that this burglary allegedly occurred?

A. Correct.

Page 96

Q. Have you ever personally spoken to Officer Pelham about any conversations he had with Mr. Arnaud?

A. No.

Q. Now, look at number eight of your discovery responses.

A. (Witness complies.)

MR. NELMS: Interrogatories?

MR. BODIN: Number eight, yes.

A. (Witness complies.)

Q. Can you read that response?

A. My response?

Q. Yes.

A. Plaintiff is under the belief that Montgomery Police Department officers persuaded defendant to sign a warrant (reading).

Q. So is it your opinion that the police officers persuaded Mr. Arnaud to sign your arrest warrant?

---

MR. NELMS: Object to the form.

Q. And is it your testimony that he told this to Officer Pelham?

A. I don't know who he told it to.

Q. Now, based on what -- let's just assume what Mr. Arnaud was told that night happened based on what these officers put in their statements. Why should Mr. Arnaud not believe you were trying to go in through that window?

MR. NELMS: Object to the form. Answer the question.

A. Repeat it again.

Q. Based on the officer's statement, let's assume that this was told to Mr. Arnaud. Why should Mr. Arnaud believe that you were not trying to enter in through that window?

MR. NELMS: Object to the form.

A. I mean, he came to the business afterwards and observed that nothing was missing. I mean, that's reasonable enough.

Q. So if nothing was missing, he should have assumed the burglary didn't take place?

MR. NELMS: Object to the form.

Page 95

A. Yes.

Q. So in order to have to burglary, something has to be taken?

MR. NELMS: Object to the form.

A. Not actually. I mean, I wasn't seen no where outside the car. I mean --

Q. I understand you believe that. But Officer Gordon had a different opinion. How do you know that Officer Gordon didn't tell Mr. Arnaud these things and Mr. Arnaud took them for truthful? Do you have any knowledge why he shouldn't have?

MR. NELMS: Object to the form. He's asking how do you know.

A. I don't know.

Q. Now, within your personal knowledge on the night of, do you know that Mr. Arnaud -- did he have any knowledge that these officers weren't telling the truth?

A. No, he didn't have no knowledge.

MR. NELMS: Object to the form.

Page 97

A. Yes.

Q. And how do you know this?

A. Because he knew nothing was missing from the business, and he had officers saying that he saw this and saw that.

Q. What officers?

A. Officer Gordon.

Q. So did any other officers persuade Mr. Arnaud?

A. I don't know.

Q. Now, do you have any knowledge why Mr. Arnaud would sign a warrant if he knew you were not in his store or wasn't attempting to enter his store?

A. Say that again.

Q. Do you have any knowledge why Mr. Arnaud may sign a warrant if he knew you were not in his store or wasn't attempting to enter his store?

Page 98

MR. NELMS: Object to the form.

A. No.

Q. And I think you testified earlier that you believed it was Officer Gordon who persuaded Mr. Arnaud to sign the warrant?

A. Well, he's the one who said he seen me standing by the vehicle and seen me dashing from the vehicle -- dashing from the business. So it's a possibility.

Q. And you think -- you contend that that was a lie, correct?

A. Yes.

Q. You contend that Officer Gordon lied?

A. Yes.

Q. Do you believe that Officer Gordon lied to Mr. Arnaud about what happened?

A. Yes.

Q. And he lied to Mr. Arnaud about what he saw?

Page 99

A. Yes.

Q. Now, on the night of, when they were relaying this information to Mr. Arnaud, do you have any personal knowledge on why would Mr. Arnaud know that they were not telling the truth?

A. No, I don't have no personal knowledge.

Q. Is it reasonable to believe that if these officers presented this information that you contend were lies to Mr. Arnaud, he could have assumed the burglary took place?

MR. NELMS: Object to form.

A. Yeah.

Q. Do you have any personal knowledge that Mr. Arnaud knew the information that the police gave him was incorrect but signed the warrant anyway?

A. No.

Q. Do you have any personal knowledge that

Page 100

Mr. Arnaud conspired with these officers to charge you?

A. No.

Q. And that second part of that question -- well, withdraw.

Do you have any personal knowledge that Mr. Arnaud made up any facts about that night that were untrue?

A. I don't remember what kind of facts he could have made.

Q. What damages are you claiming -- what monetary damages are you claiming in this lawsuit against Mr. Arnaud?

MR. NELMS: Object to form.

A. He knew that a burglary did not take place at the business. He signed the warrant stating that a burglary did take place. And I got bit by the dog.

Q. Now, was Mr. Arnaud there when you were

bit by the dog?

A. No.

Q. Did he have any control over the dog or those officers?

A. No.

Q. How is he liable for a dog bite?

A. I don't know how he's liable for the dog bite.

Q. Are you going to claim in court that Mr. Arnaud is liable for damages for your dog bite?

MR. NELMS: Object to form.

A. No.

Q. Did you have any charges at Baptist Hospital when you went there?

A. Well, I had to purchase medicine.

Q. Now, are you going to claim that Mr. Arnaud is liable for these charges?

A. No.

Q. And I'm trying to understand here -- if you're alleging that what these officers said in their statements or possibly said to Mr. Arnaud

Page 101

was untrue, how would you reason that Mr. Arnaud wouldn't have received these same facts and just be able to decipher that it never happened?

MR. NELMS: Object to the form.

A. He came to the business and the -- to see was anything missing. It wasn't.

Q. Are you aware that a burglary can happen and nothing can be missing from the premises?

MR. NELMS: Object to the form.

A. Yeah. I didn't burglarize it, though.

Q. I understand that. I'm asking you about what Mr. Arnaud knew that night.

MR. NELMS: Is that a question?

Q. Do you have a monetary amount that you're claiming from Mr. Arnaud in this case?

A. No.

MR. NELMS: Object to the extent that the deponent understands the legal meaning of monetary amount.

Q. Are you claiming -- at trial, what are you going to claim that Mr. Arnaud owes you as

Page 102

your damages?

A. Bail money for being placed under arrest for a burglary.

Q. Anything else?

A. Embarrassment.

Q. Do you have a monetary amount for that?

A. No.

Q. A few more questions. Look at the complaint.

MR. BODIN: Do you have a copy of that, Andy?

MR. WHITEHEAD: When you say the complaint, do you mean the lawsuit?

MR. BODIN: Yes.

MR. WHITEHEAD: That's Exhibit 2, I think.

Q. Look at number seventeen of your complaint.

A. (Witness complies.)

Page 103

Q. Let me ask you this question before I get into that. Were you in the back seat of the car?

A. Yes.

Q. Who was with you in the back seat?

A. Chris McBride.

Q. And who was in the front seat passenger?

A. Passenger? Front seat passenger?

Q. Yes.

A. Courtney Smith.

Q. When the police officer first pulled up at the scene, what was said in the car at that time --

MR. NELMS: Object to form.

Q. -- between you four?

A. That a K-9 was behind us.

Q. Who said that?

A. Mario.

Page 104

Q. And then what did everybody respond to that, if at all?

A. I had asked him if he had a license and insurance.

Q. Did they still have marijuana in the car at that time or had that been smoked?

A. Yeah, he still had some.

Q. Then what was said?

A. He said that he had warrants.

Q. Then what did you tell him?

A. After he said warrants, I don't -- I can't recall telling him that.

Q. At that point, did you tell him to stop, you wanted to get out?

A. That was when we went on Wares Ferry Road.

Q. My question was, at the time when the K-9 officer first pulled up.

A. No.

Page 105

Q. He said, I have warrants?

A. Yes.

Q. Mario? Then he took off?

A. He said he had warrants and he wasn't fixing to go to jail.

Q. Did anyone else respond to him?

A. No.

Q. Did anyone ask to get out?

A. No.

Q. Is it a four-door car?

A. Yes.

Q. Let's get back to the complaint, number seventeen. It says: Arnaud, having previously asserted that no burglary had taken place (reading).

I think your testimony earlier was that he had said this to Officer Pelham, you assume?

A. Uh-huh (indicating in the affirmative).

Q. You had never overheard this, correct?

---

A. Correct.

Q. And in your opinion, you think Mr. Arnaud knew in his mind that you didn't burglarize his store but signed the warrant anyway?

A. Yes.

Q. And that is based on what in your opinion?

A. Him arriving at the store, realizing that nothing was taken.

Q. Nothing was taken?

A. Yes.

Q. Anything else?

A. (Witness shakes head in the negative.)

Q. Is that a no?

A. No.

MR. BODIN: I may have a few more follow-up questions on his discovery; but if I come back to that, it will only be a few questions. I'm going to let Kim start.

MS. FEHL: Mr. Hogan, I'm Kim Fehl. I

---

Page 106

A. Correct.

Q. Then he never -- in quotes: Nevertheless signed the complaint against Hogan at the insistence of the defendants, one or more of them (reading).

You don't know specifically what defendant had insisted that Mr. Arnaud sign a complaint; is that correct?

A. No.

Q. Do you know of any purpose that Mr. Arnaud had in signing this warrant against you other than charging you?

A. No.

MR. NELMS: Object to the form.

Q. Do you know if Mr. Arnaud had any ill will against you at all?

A. No.

Q. You didn't know Mr. Arnaud and he didn't know you prior to this, correct?

---

Page 107

represent the city, Chief Baylor and Major West in this case.

EXAMINATION

BY MS. FEHL:

Q. You had mentioned earlier that you had talked to Detective Pelham and to another detective at police headquarters when they took you down there; is that correct?

A. Correct.

Q. Okay. Can you describe that detective to me?

A. Short, medium built, white. That's probably about it.

Q. Did he have hair?

A. Yes.

Q. Did you ever talk to Chief Baylor or Major West?

A. No, I don't think so.

Q. Have you talked to either one of them since that night up until today?

A. No.

Q. And in your responses, you said that you were in an Alabama correctional facility and

---

Page 108

then you served a two-year sentence in the
Department of Corrections, Montgomery County.
What physical place were you actually doing your
time, your sentence?
　A. I was at Elmore Correctional Facility,
Loxley work release, and Atmore work release.
　Q. So you didn't do two years in the
county detention facility; you were actually in
an Alabama correctional facility?
　A. Yes.
　Q. Now, you said that you gotten in about
ten thirty that night and you had gotten home for
work; is that correct?
　A. I had a ride in Montgomery from work.
　Q. You said it was about ten thirty?
　A. Yes.
　Q. Who did you say called you, Chris or
Courtney?
　A. Chris.

Page 109

　Q. How do you know Chris?
　A. From -- my cousin went to school with
him.
　Q. Which cousin?
　A. Kwananis (phonetic) King.
　Q. Kwananis King? Does he live in
Montgomery?
　A. Yes.
　Q. How do you know Courtney?
　A. We lived in the same neighborhood once.
　Q. Where was that?
　A. Hudson Street.
　Q. How old is Chris?
　A. Twenty-six, twenty-seven, something.
　Q. How old is Courtney?
　A. Somewhere around in that age bracket.
　Q. How do you know Mario?
　A. I met him through Courtney.
　Q. Through your cousin?

Page 110

　A. No. Courtney.
　Q. Through Courtney?
　A. Yeah.
　Q. How old is Mario?
　A. I'm not sure.
　Q. How many times have you been around
Mario?
　A. Maybe twice.
　Q. And that was one of them?
　A. Yes.
　Q. Have you been with him since that night
or had you been with him one other time before
that night?
　A. One other time before that night.
　Q. You said that you live on Karen Valley?
　A. Yes.
　Q. That's 36117, so is that in east
Montgomery?
　A. Yes.

Page 111

　Q. And where is Lake Street?
　A. Lake Street is off High Street.
　Q. And what -- why did y'all decide to
meet at Sharp Street on North Jackson?
　A. That's where he was headed.
　Q. Who was headed?
　A. Chris.
　Q. So did this -- did you say Mr. Davis
lived there on Sharp Street?
　A. Yes.
　Q. Did he go with y'all?
　A. No.
　Q. Did you meet at his house?
　A. No.
　Q. You just met on the street and parked
your car and got in Mario's car?
　A. Yes.
　Q. Was that Mario's Lincoln?
　A. Yes.

CHAD HOGAN DEPOSITION          Condenselt!™                    MARCH 29, 2006

Page 112

Q. Was Courtney with Mario at that point?

A. Yes.

Q. Okay. So you and Chris left your cars there?

A. Uh-huh (indicating in the affirmative).

Q. And then got in the car with Courtney and Mario; is that what happened?

A. Yes.

Q. So y'all left there and you said you went to the breakers pool room?

A. The Break Room.

Q. The Break Room? Now, where is that?

A. It's on the Eastern Boulevard.

Q. Where on the Eastern Boulevard?

A. On the service road that runs beside Arnaud's Meat Shop.

Q. So did you park at Arnaud's and go to The Break Room or did you park in front of The Break Room?

Page 113

A. Yes.

Q. Never got on the boulevard?

A. No.

Q. And then you said y'all were sitting at Arnaud's. And then you went into the trailer park. Who decided to go into the trailer park?

A. Mario was driving.

Q. Did y'all discuss going into the trailer park?

A. No.

Q. He just turned into the trailer park?

A. Yes.

Q. Did he go on the other side of Arnaud's and turn into the trailer park or just cut through between those two buildings?

A. The side -- the area that we was parked against, he just turned and went through the trailer park.

Q. Did he ever stop in the trailer park at anybody's house?

A. No. He stopped behind the trailer park.

Q. Behind the trailer park?

A. In front of The Break Room.

Q. Okay. When you were at The Break Room, how long did y'all stay at the pool hall?

A. Approximately an hour. I'm not sure.

Q. Did you shoot pool?

A. Yes.

Q. One game, two games?

A. Two games.

Q. And then you got in your car at The Break Room?

A. Yes.

Q. Then went down to Arnaud's?

A. When we got in the car, pulled out the parking lot, it started raining heavy. He couldn't see, so he pulled in the area where Arnaud's Meat is.

Q. So it didn't start raining heavy until you got in the car?

A. Yes.

Q. So you pulled right off?

Page 114

A. Yeah, when the K-9 was on us.

Q. But were you still in the trailer park; you were just behind it --

A. Yeah.

Q. -- at the back of it?

A. Uh-huh (indicating in the affirmative).

Q. What did you do then when you stopped? Did anybody get out?

A. No.

Q. How long did you sit there?

A. Probably a second.

Q. And then what did you do?

A. He drove out the trailer park.

Q. What were y'all talking about?

A. Where?

Q. While you were sitting there in the back.

A. Nothing.

Q. Did y'all not talk in the car at all while you were in there --

Page 115

A. Yeah. He said that --

Q. Other than his conversation about his warrants.

A. No.

Q. Who pays you? Who do you get your W-2 from? Do you get a W-2?

A. Yeah, from Wiley Sanders.

Q. So you're paid based on your loads and your miles and all, but Wiley Sanders keeps up with it, calculates it.

Do they issue you a check?

A. Yes.

Q. Do you have an amount in medical damages that you know that you've incurred over this?

A. No.

Q. Do you know if Mario has got any brothers or sisters?

A. I don't know.

Page 116

Q. You said earlier when you were talking to -- answering some questions from Mr. Whitehead, you said when you found out about Kirk Pelham. What do you know about Kirk Pelham?

MR. NELMS: Object to the form.

Q. What do you know about Kirk Pelham's lawsuit?

A. Not a whole lot.

Q. Who told you?

A. My lawyer.

Q. What do you know?

A. That he filed a lawsuit.

Q. Is that all you know?

A. Yeah.

Q. You don't know any of the facts of why he filed?

A. Other than seeing on the news that he was attacked by one of the officers.

Q. Are there -- any of the documents that

Page 117

you've supplied in discovery, did Kirk Pelham give you any of those documents?

A. No, he didn't give me anything.

Q. Do you know if your lawyer got anything from him?

A. I'm not sure.

Q. So your complaint is based on your lawyer's investigation; is that what you've testified to?

A. My complaint is based on the wrongful arrest.

Q. Okay. Did you ever see Kirk Pelham on the scene that night?

A. Other than the detective --

Q. Yes.

A. That's it.

Q. Do you know if he ever went to the scene?

A. No.

Page 118

MS. FEHL: That's all.

MR. BODIN: I don't have any more questions.

MR. WHITEHEAD: That's it.

(The foregoing deposition of CHAD HOGAN was concluded at 11:43 a.m., March 29, 2006.)

CERTIFICATE OF REPORTER

STATE OF ALABAMA       )
COUNTY OF MONTGOMERY  )

I, SHARON MEEHAN, a Court Reporter and

Notary Public in and for the State of Alabama at Large, hereby certify that pursuant to notice, there came before me at the date, time and place stated in the caption hereof, CHAD HOGAN, who was first duly sworn to speak the truth and that the foregoing constitutes a full, true and accurate transcription of the testimony given by said witness.

I FURTHER CERTIFY that I am a disinterested party to this action and am neither kin nor counsel to any of the parties hereto.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 27th day of April, 2006.

SHARON MEEHAN, as Court Reporter
and Notary Public in and for the
State of Alabama at Large
My Commission Expires 1/21/2007