# In The Matter Of:

*Chad Hogan v.*
*City of Montgomery, et al.*

---

*M. D. Gordon*
*February 9, 2006*

---

*Pruitt & Davis, L.L.C.*
*800 South McDonough Street, Suite 201*
*Montgomery, Alabama  36104*
*Phone 334-262-3376*
*Fax 334-262-3305*

Original File gordon.txt, Pages 1-109

**Word Index included with this Min-U-Script®**

Chad Hogan v.
City of Montgomery, et al.

M. D. Gordon
February 9, 2006

---

Page 1

[1]            IN UNITED STATES DISTRICT COURT
[2]         FOR THE MIDDLE DISTRICT OF ALABAMA
[3]                   NORTHERN DIVISION
[4]
[5]  CHAD HOGAN,
[6]             Plaintiff,
[7]  vs.                          CIVIL ACTION NO.
[8]                              2:05CV-687-F
[9]  CITY OF MONTGOMERY, et al.,
[10]            Defendants.
[11]
[12]
[13]               *   *   *   *   *
[14]
[15]
[16]
[17]         DEPOSITION OF M. D. GORDON,
[18]  taken pursuant to notice and stipulation on behalf of the
[19]  Plaintiff, in the Law Offices of Thomas, Means, Gillis &
[20]  Seay, P.C., 3121 Zelda Court, Montgomery, Alabama, before
[21]  Angela Fulmer, Certified Shorthand Reporter and Notary
[22]  Public in and for the State of Alabama at Large, on
[23]  February 9, 2006, commencing at 9 a.m.

---

Page 2

[1]                   APPEARANCES
[2]
[3]  FOR THE PLAINTIFF:
[4]
                ANDERSON K. NELMS, ESQUIRE
[5]             JAY LEWIS, ESQUIRE
                Law Offices of Jay Lewis, L.L.C.
[6]             847 S. McDonough Street
                Montgomery, Alabama  36104
[7]
[8]  FOR THE DEFENDANTS:
[9]
                H. LEWIS GILLIS, ESQUIRE
[10]            CHRISTOPHER K. WHITEHEAD, ESQUIRE
                RAMADANAH M. SALAAM, ESQUIRE
[11]            Thomas, Means, Gillis & Seay, P.C.
                3121 Zelda Court
[12]            Montgomery, Alabama  36106
[13]
                MICHAEL D. BOYLE, ESQUIRE
[14]            City of Montgomery
                103 No. Perry Street
[15]            Montgomery, Alabama  36104
[16]
[17]  ALSO PRESENT:
[18]            Ron Cook
                Billy Caulfield
                Chad Hogan
[19]
[20]
[21]
[22]
[23]

---

Page 3

[1]                   STIPULATIONS
[2]          It is stipulated and agreed by and between
[3]  counsel representing the parties that the deposition of
[4]  M. D. GORDON may be taken before Angela Fulmer, Certified
[5]  Shorthand Reporter and Notary Public in and for the State
[6]  of Alabama at Large, without the formality of a
[7]  commission; and all formality with respect to other
[8]  procedural requirements is waived; that objections to
[9]  questions, other than objections as to the form of the
[10]  questions need not be made at this time, but may be
[11]  reserved for a ruling at such time as the deposition may
[12]  be offered in evidence or used for any other purpose by
[13]  either party as provided by the Federal Rules of Civil
[14]  Procedure.
[15]          It is further stipulated and agreed by and
[16]  between the parties hereto and the witness, that the
[17]  signature of the witness to this deposition is hereby
[18]  waived
[19]
[20]
[21]
[22]
[23]               *   *   *   *

---

Page 4

[1]                     INDEX
[2]
[3]  EXAMINATION                              PAGE
[4]      BY MR. NELMS:                          5
[5]
[6]  EXHIBITS                                 PAGE
[7]  PX1 I&O, arrest report, statements        95
[8]  PX2 interrogatories                       98
[9]  PX3 drawing                              107
[10]
[11]  CERTIFIED QUESTIONS                      PAGE
[12]  Lines 19-21                               85
[13]  Lines 1-3                                101
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]

---

Chad Hogan v.
City of Montgomery, et al.

M. D. Gordon
February 9, 2006

---

**Page 5**

[1] M. D. GORDON, of lawful age,
[2] having been first duly sworn, testified as follows:
[3]     **EXAMINATION**
[4] BY MR. NELMS:
[5]     **MR. NELMS:** Usual stipulations?
[6]     **MR. WHITEHEAD:** Yeah.
[7] **Q.** Okay, sir. By the way, I noted that the notice of
[8]     deposition said Jim Gordon.
[9] **A.** I think J. M. or something.
[10] **Q.** Yeah. I wanted to make sure I've got the right guy.
[11]     State your full name for the Record.
[12] **A.** Marquedric Dante Gordon.
[13] **Q.** And do you have -- and you're a member of the
[14]     Montgomery Police Department?
[15] **A.** Correct.
[16] **Q.** And were you a member of the Montgomery Police
[17]     Department in March of 2005?
[18] **A.** Correct.
[19] **Q.** And do you have a number assigned to you as an
[20]     officer?
[21] **A.** I do.
[22] **Q.** And what is your number?
[23] **A.** It's -- right now it's 149. But then it was 150.

---

**Page 6**

[1] **Q.** 150?
[2] **A.** Uh-huh.
[3] **Q.** Okay. And are you the officer that made the arrest
[4]     of Chad Hogan in --
[5] **A.** Yes, sir.
[6] **Q.** Okay. We had a J. M. Gordon and then I dictated to
[7]     the secretary and she put Jim Gordon and neither was
[8]     right. How about that?
[9] **A.** I don't even think we have a J. M. at the police
[10]     department.
[11] **Q.** All right. But you got served with the lawsuit?
[12] **A.** Right.
[13] **Q.** Okay. And you are the proper defendant?
[14] **A.** Right.
[15]     **MR. GILLIS:** Objection.
[16]     **MR. NELMS:** I'll agree with your
[17]     objection.
[18]     **MR. WHITEHEAD:** Yeah.
[19] **Q.** All right. How long have you been with the police
[20]     force?
[21] **A.** April 18, 2002 is my hire date.
[22] **Q.** Okay. And what's your date of birth?
[23] **A.** February 9, 1982 is my birth date.

---

**Page 7**

[1] **Q.** Okay. And did you attend the police academy?
[2] **A.** Yes.
[3] **Q.** Which one?
[4] **A.** Montgomery Police Academy.
[5] **Q.** Okay. And did you graduate?
[6] **A.** I did.
[7] **Q.** All right. Are you post certified?
[8] **A.** I am.
[9] **Q.** Okay. And when did you graduate?
[10] **A.** August -- I want to say August 12, '02.
[11] **Q.** All right. And when did you receive your post
[12]     certification?
[13] **A.** August 12th. My graduation date.
[14] **Q.** All right. And during your post training, what
[15]     classes, generally, did you take?
[16] **A.** We took plenty.
[17] **Q.** Well, let me tell you -- are you aware that there is
[18]     a basic level, an advanced level, and an executive
[19]     level of training for post certification?
[20] **A.** Well, I -- I don't know what the Montgomery Police
[21]     standards would be. I don't know if it's basic or
[22]     advanced or what it would be. But whatever their
[23]     standards are, that's what I took. I'm not sure

---

**Page 8**

[1]     exactly what it is.
[2] **Q.** Okay. So is it fair to say you completed the basic?
[3] **A.** Correct.
[4] **Q.** Okay. Have you been back for any other training for
[5]     any further post certification?
[6] **A.** I take -- yeah. I take classes. We have classes
[7]     all the time that we go back and -- refresher
[8]     courses or -- just classes for just additional
[9]     training.
[10] **Q.** Are you maintain -- are you required to maintain
[11]     certain --
[12] **A.** Hours.
[13] **Q.** -- credit hours?
[14] **A.** Right.
[15] **Q.** On an annual basis?
[16] **A.** Correct.
[17] **Q.** Okay. I also note that you have on your lapel that
[18]     you're a K-9 officer.
[19] **A.** Correct.
[20] **Q.** Okay. Do you have any special training to be a --
[21] **A.** Correct.
[22] **Q.** Okay. Tell me about that special training.
[23] **A.** Well, when you transfer to the K-9 unit, you're

---

Page 9

[1] assigned a dog. Yourself and your partner, your
[2] dog, you have to go through a bonding process first.
[3] Once you -- once you bond with your partner, if he
[4] doesn't have his obedience in him, it's up to you to
[5] teach him his obedience. If the dog is trained on
[6] his obedience, you have to learn the commands to
[7] give to your dog. After the obedience, you train
[8] him how to apprehend, how to track, and how to
[9] search, and all that good stuff.
[10] **Q.** Okay. And were you a K-9 officer on March 31, 2005?
[11] **A.** Correct.
[12] **Q.** Okay. And were you working on March 31, 2005?
[13] **A.** Correct.
[14] **Q.** Okay. Tell me what shift you were working.
[15] **A.** Third shift.
[16] **Q.** Third shift?
[17] **A.** Uh-huh.
[18] **Q.** And what hours are those?
[19] **A.** Eleven to seven.
[20] **Q.** Eleven at night to seven in the morning?
[21] **A.** Seven in the morning, yes.
[22] **Q.** Okay. It's kind of hard for her to -- if we talk
[23] over each other. So I'll ask, and, then, if you

Page 10

[1] would, please, you just answer. And, by the way, I
[2] didn't say this in the very beginning. But if I ask
[3] a question that you don't understand for any reason,
[4] it's more than appropriate for you to say, sir, I
[5] don't understand the question, and I'll --
[6] **A.** Okay.
[7] **Q.** -- try to rephrase it. I'm really bad about asking
[8] complicated questions or compound questions. Also,
[9] if at any time during the course of this deposition
[10] you wish to take a break, you're more than welcomed
[11] to take break. Just say, I need a break, and we'll
[12] take a break.
[13] **A.** Okay.
[14] **Q.** And if you need to confer with your counsel, that's
[15] fine, too. There's no problem with that.
[16]    And were you assigned to a special division or
[17] a group within the Montgomery Police Department that
[18] night of March 31, 2005
[19] **A.** Just the K-9 unit.
[20] **Q.** Okay. Is the K-9 unit separate from other units in
[21] the Montgomery Police Department?
[22] **A.** It's a part of patrol. But we have our own
[23] division.

Page 11

[1] **Q.** Okay. So it's a division within patrol division?
[2] **A.** Correct.
[3] **Q.** Okay. And how many K-9 officers were there on the
[4] streets of Montgomery March 31, 2005, if you --
[5] **A.** I do not recall.
[6] **Q.** Okay. On a typical third shift night like March 31,
[7] 2005, how many K-9 officers would there be on the
[8] street?
[9] **A.** Well, we have a total of -- I want to say eleven.
[10] That's with the supervisors. I don't know if anyone
[11] was off. It depends on people's off days. But a
[12] typical night, I would say at least five or six.
[13] **Q.** Okay. And there are three shifts per
[14] twenty-four-hour period; correct?
[15] **A.** Correct. Not for K-9, though.
[16] **Q.** Okay.
[17] **A.** We're only -- at the time, we were doing a second
[18] and a third shift. No first shift.
[19] **Q.** Okay. What hours are first shift?
[20] **A.** First shift is --
[21] **Q.** Seven --
[22] **A.** Seven until three I think.
[23] **Q.** Okay. On the night of March 31, 2005, if you can

Page 12

[1] recall -- first of all, do you know what day of week
[2] that was?
[3] **A.** Wednesday or Thursday. I'm not sure.
[4] **Q.** Okay. Were you in uniform?
[5] **A.** Correct.
[6] **Q.** Okay. And were you assigned a patrol car that
[7] night?
[8] **A.** A black Chevy Blazer.
[9] **Q.** Okay. Is it marked?
[10] **A.** It's not marked, but I have blue lights and sirens
[11] in it.
[12] **Q.** Okay. But it has no decals on the side that say --
[13] **A.** During that time, I had a sticker in the back window
[14] that had police K-9. And I also have a blue
[15] municipal tag on the back of it.
[16] **Q.** Okay. Otherwise, are there any markings on that
[17] vehicle to indicate that it belongs to the
[18] Montgomery Police Department?
[19] **A.** I have antennas on the top. My lights can be seen
[20] from the outside of the vehicle. So, yeah, it
[21] stands out as a police vehicle. The windows are all
[22] blacked out and everything in the back.
[23] **Q.** Okay. Now -- I'm sorry. You said it was a

Chad Hogan v.
City of Montgomery, et al.

M. D. Gordon
February 9, 2006

Page 13

[1]     Suburban?
[2]  A.  No.  I want to say a Chevy Blazer.
[3]  Q.  Blue?
[4]  A.  That's what I was driving that night, yeah.
[5]  Q.  Okay.  Do you know what year?
[6]  A.  Ninety -- it was a ninety something.  I don't know.
[7]  Q.  Okay.  Late nineties?
[8]  A.  Late nineties, yeah.
[9]  Q.  Okay.  Do you know why it is that you're driving
[10]     basically an unmarked vehicle?
[11]  A.  That's just the vehicle --
[12]         MR. WHITEHEAD:  Object to the form.  Go
[13]     ahead.
[14]  A.  Those were the vehicles we were assigned.
[15]  Q.  Okay.  Are all K-9 officers assigned unmarked
[16]     vehicles?
[17]  A.  Correct.
[18]         MR. WHITEHEAD:  Object to the form.
[19]  Q.  Okay.  As a matter of fact, there's a K-9 manual
[20]     that you're given as a K-9 officer, is there not?
[21]  A.  Correct.
[22]  Q.  And it indicates that K-9 officers are given
[23]     unmarked vehicles, does it not?

Page 14

[1]  A.  Correct.
[2]  Q.  Okay.  So you considered the vehicle that you were
[3]     operating that night to be unmarked; is that
[4]     correct?
[5]         MR. WHITEHEAD:  Object to the form.
[6]  A.  It was unmarked, correct.  But -- I mean, it had the
[7]     markings that I explained earlier on it.
[8]  Q.  Okay.
[9]  A.  The antennas and the tinted windows and the blue
[10]     lights.
[11]  Q.  All right.  What are the typical duties of a K-9
[12]     officer working third shift?
[13]  A.  K-9, our main duties are to assist patrol in
[14]     apprehending.  Our main goal is to apprehend
[15]     felonies -- felons and also assist patrols on
[16]     alarms.
[17]  Q.  Okay.
[18]  A.  And felonies would be robberies, burglaries,
[19]     anything like that.
[20]  Q.  Okay.  And do you have a recollection of being
[21]     dispatched to Arnaud's Quality Meats on the Eastern
[22]     Boulevard on March 31, 2005?
[23]  A.  Correct.

Page 15

[1]  Q.  Okay.  And how did you get dispatched to Arnaud's
[2]     Quality Meats?
[3]  A.  I was assisting patrol on a call.  Which, initially,
[4]     dispatch patrol is always -- a K-9 unit is a back-up
[5]     unit to an alarm.  I don't remember what unit it
[6]     was.  But I was the back-up unit on that call.
[7]  Q.  Okay.  Back-up unit to whom?
[8]  A.  Patrol.
[9]  Q.  Okay.  And anyone in particular on patrol?
[10]  A.  I was just on that side of town, so I assisted
[11]     patrol.
[12]  Q.  You were the closest?
[13]  A.  Correct.
[14]  Q.  Okay.
[15]  A.  I think I was assigned to east side that night.
[16]  Q.  Okay.  During your post training, did you receive
[17]     training in radio operations and communications?
[18]  A.  Correct.
[19]  Q.  Okay.  And is there a certain protocol that is to be
[20]     used by officers in and during their communications
[21]     over the radio?
[22]         MR. WHITEHEAD:  Object to the form.
[23]  A.  It depends.  What -- could you just ask the question

Page 16

[1]     another way.  What do you mean by that?
[2]  Q.  Sure.  Is there a certain procedure that you're
[3]     taught when using radio communications with, say,
[4]     dispatch?
[5]  A.  Correct.
[6]  Q.  Okay.  And are you, during your post training,
[7]     taught certain codes for different events or alleged
[8]     crimes?
[9]  A.  Correct.
[10]  Q.  Okay.  And are you taught to use those codes in your
[11]     communications with dispatch?
[12]  A.  Correct.
[13]  Q.  Okay.  Did you receive from dispatch any code in
[14]     regard or reference to Arnaud's Meat that night?
[15]  A.  I did.
[16]  Q.  Okay.  And, by the way, if I'm not specific as to
[17]     time and date, generally, I'm always going to be
[18]     referring to the events of March 31, 2005.
[19]  A.  Okay.
[20]  Q.  All right.  And I know that it happened late at
[21]     night and maybe some of the events rolled over into
[22]     the next day, which would have been April the 1st I
[23]     believe --

Chad Hogan v.
City of Montgomery, et al.

M. D. Gordon
February 9, 2006

Page 17

[1] **A.** Okay.

[2] **Q.** -- 2005. You were telling me earlier that you have

[3] a dog actually assigned to you; is that correct?

[4] **A.** Correct.

[5] **Q.** Okay. Is the dog that you had on March the 31st the

[6] same dog you have today?

[7] **A.** It is.

[8] **Q.** Okay. And what's that dog's name? Or do you --

[9] **A.** Osko. O-S-K-O.

[10] **Q.** O-S-K-O. And what type of dog is that?

[11] **A.** He's a German Shepherd.

[12] **Q.** German Shepherd. All right. Male?

[13] **A.** Uh-huh.

[14] **Q.** How old is Osko today?

[15] **A.** I want to say he's five.

[16] **Q.** Five. And you've had him for how long?

[17] **A.** I've been in K-9 now for, say, two and a half

[18] years. I've had him since then.

[19] **Q.** And he came to you with a certain degree of

[20] training; right?

[21] **A.** Correct.

[22] **Q.** Okay. Was Osko doing fieldwork? Was he doing work

[23] with another police officer before he was assigned

Page 18

[1] to you?

[2] **A.** Yes, sir.

[3] **Q.** Okay. Was he actually doing K-9 patrol before he

[4] was assigned to you?

[5] **A.** Yes.

[6] **Q.** Okay. Who was your immediate supervisor the night

[7] in question?

[8] **A.** Lieutenant Billy Caulfield.

[9] **Q.** Caulfield?

[10] **A.** Uh-huh.

[11] **Q.** Okay.

[12] **A.** C-A-U-L-F-I-E-L-D.

[13] **Q.** You say he was a lieutenant then?

[14] **A.** Yes.

[15] **Q.** Okay. Did you have -- and your rank at the time was

[16] what?

[17] **A.** A police officer.

[18] **Q.** Okay. Did you have any kind of supervisor between

[19] Lieutenant Caulfield and yourself at the time?

[20] **A.** I mean, I have -- everyone else in the unit are

[21] corporals. Before we -- I mean, that's the chain of

[22] command. Corporal -- our sergeant was on military

[23] leave, so he wasn't there. And then the lieutenant.

Page 19

[1] **Q.** Okay. So you --

[2] **A.** My next -- my next immediate supervisor would have

[3] been Corporal M-A-R-A -- M-O-R-A. I'm sorry.

[4] **Q.** Mora?

[5] **A.** Uh-huh. Mora. He's a senior corporal.

[6] **Q.** I mean -- I'm asking this question, because I really

[7] just don't understand because I'm not a police

[8] officer. But that night -- let's say if you had to

[9] take a break or you needed permission to go for your

[10] meal break or something like that, who would you

[11] report to? Would you have to ask for permission, or

[12] do you do that on your own or what?

[13] **A.** To take a meal break? No. I just get on the radio

[14] and take my meal break.

[15] **Q.** What if you needed --

[16] **A.** I'll let dispatch know that I'm about to take my

[17] lunch break.

[18] **Q.** Okay. What if you needed permission to do something

[19] else? Would you go directly to Caulfield, or would

[20] you go to Mora first?

[21] **A.** It'd depend on the circumstance that I needed.

[22] **Q.** Can you give me an example of when you would

[23] go to Mora rather than Caulfield?

Page 20

[1] **A.** Just -- you give me a situation and I'll tell you

[2] who I would have gone to.

[3] **Q.** Your wife called on the phone and there's an

[4] emergency at the house and she needs you for ten

[5] minutes?

[6] **A.** I'd probably let Lieutenant Caulfield know the

[7] circumstances on that.

[8] **Q.** Okay. You're riding down the road in the Blazer and

[9] you get a flat tire, what do you do?

[10] **A.** I would take that upon myself and change it.

[11] **Q.** Okay. Well, can you name any circumstance where you

[12] would have to get permission from Corporal Mora

[13] first?

[14] **A.** Well -- I mean, if anything happened -- an incident

[15] or something like that happened, I'll notify him and

[16] let him know as far as going up the chain on

[17] something.

[18] **Q.** Okay. Regarding the radio procedures and the codes

[19] that you would use, what would -- if you received a

[20] burglary call from dispatch --

[21] **A.** Uh-huh.

[22] **Q.** Well, first of all, does the call just go out

[23] generally and then you as a police officer know that

Chad Hogan v.
City of Montgomery, et al.

M. D. Gordon
February 9, 2006

Page 21

[1]    you're in that area and then you respond to
[2]    dispatch? Or does dispatch actually call you and
[3]    say, you're there, I need you to go?
[4] A.  Patrol, she would do that. But us, we just -- like
[5]    I said, we back up units. If we're in area, we get
[6]    en route to the call.
[7] Q.  Okay. And what's the code for a burglary?
[8] A.  It's an 11.
[9] Q.  An 11. Okay. So when you get a call for, let's
[10]   say, a burglary, and you're arriving at the address
[11]   in question --
[12] A. Uh-huh.
[13] Q.  -- what by way of radio protocol are you supposed to
[14]   do once you get there?
[15] A.  I can either press a button on my computer and it'll
[16]   show me -- that I've arrived, or I can get on the
[17]   radio and tell her that I'm 10-17. 10-17 is the
[18]   code.
[19] Q.  10-17 means you've arrived on the scene?
[20] A.  Correct.
[21] Q.  Okay. How is -- and, again, back on March 31, 2005,
[22]   how was Osko kept in your Blazer? Is he by your
[23]   side? Is he in the back?

Page 22

[1] A.  He's free roam in my truck. He can -- everywhere I
[2]    go in my truck he can go.
[3] Q.  Okay.
[4] A.  He's not -- there's no divider or anything in it.
[5]    He can -- I mean, he can go all around the truck if
[6]    he wants to.
[7] Q.  Okay. Is he kept on a leash at all times?
[8] A.  Not in the truck, no.
[9] Q.  Okay. When outside the truck, do you put him on a
[10]   leash or...
[11] A.  It depends on -- I mean, why he's out of the truck.
[12]   It just depends.
[13] Q.  Okay. On the night in question, were -- was anyone
[14]   else with you in your vehicle?
[15] A.  Myself and my partner.
[16] Q.  Okay. And your partner is Osko?
[17] A.  Correct.
[18] Q.  Okay. And did you receive a call from dispatch
[19]   regarding Arnaud's Meats?
[20] A.  Correct.
[21] Q.  All right.
[22] A.  I assisted patrol on the call.
[23] Q.  Okay. So the call didn't come directly to you?

Page 23

[1] A.  No.
[2] Q.  Okay. So was the call -- to whom?
[3] A.  To patrol.
[4] Q.  Okay. Just patrol generally?
[5] A.  Right.
[6] Q.  Okay. And you responded?
[7] A.  Right.
[8] Q.  Okay. And was it a Code 11?
[9] A.  Right.
[10] Q.  Okay. And tell me what you did in response to the
[11]   dispatch call for Code 11.
[12] A.  I got on the radio, used my unit number, 150, at the
[13]   time. I told her that I would be en route. I don't
[14]   know where I was coming from. I can't remember.
[15]   And I got en route to the call. And I proceeded to
[16]   the business.
[17] Q.  Okay. And when you arrived at the business, what's
[18]   the -- first of all, what was the weather like?
[19] A.  It had been raining. During the time -- I don't
[20]   know if it was raining when I was en route to the
[21]   call or not. That night it had been raining all
[22]   night. Just a wet night.
[23] Q.  Okay. And when you arrived at the scene, what's the

Page 24

[1]    -- when you arrived at Arnaud Meats, what's the
[2]    first thing you saw?
[3] A.  When I pulled into the business, my normal protocol
[4]    would be, my training in the academy, you pull into
[5]    an alarm, you turn your lights off. That way if
[6]    suspects, or suspect, are there they can't see you
[7]    coming in. I pulled off of the boulevard on to the
[8]    service road. I don't know the exact name of the
[9]    service -- it may be the Northern Boulevard. It's
[10]   just a service road on the side. I turned my lights
[11]   off. I noticed a vehicle parked in the parking lot
[12]   and an unknown subject running back to the vehicle
[13]   and get into the vehicle -- into the back seat of
[14]   the vehicle. The vehicle pulled off. I continued
[15]   to go to the building. I looked over, and I saw the
[16]   window unsecured. At the time, I didn't know if it
[17]   was busted or just raised or what it was. I
[18]   immediately followed the car.
[19] Q.  Okay. I'd asked you what was the first thing you
[20]   saw. So the first --
[21] A.  The car was the first thing I noticed.
[22] Q.  You noticed the car --
[23] A.  Correct.

Chad Hogan v.
City of Montgomery, et al.

M. D. Gordon<br>February 9, 2006

Page 25

[1] Q. -- before you noticed the window?
[2] A. Correct. Because I hadn't made it to the business.
[3] Q. Okay. And what kind of car was it?
[4] A. It was a -- don't get me wrong, it's been a while.
[5]    I want to say a Lincoln Town Car.
[6] Q. Do you know what year?
[7] A. No. I can't remember it.
[8] Q. Do you remember the color?
[9] A. I want to say white. I can't remember exactly,
[10]    though.
[11] Q. White?
[12] A. I want to say white. I can't remember.
[13] Q. Okay. Definitely a lighter color?
[14]         MR. WHITEHEAD: Object to the form.
[15] A. Correct.
[16] Q. Okay. You got a Code 11. Is there a specific code
[17]    for a business alarm going off?
[18] A. It's an 11 Bravo.
[19] Q. An 11 Bravo?
[20] A. Bravo.
[21] Q. Okay. And does that indicate whether or not it's a
[22]    silent or audible alarm?
[23] A. No.

Page 26

[1] Q. Okay. When you drove up, were you able to hear any
[2]    kind of alarm going off?
[3] A. Yes.
[4] Q. You were? Okay. And do you have any idea how long
[5]    that alarm had been going off?
[6] A. No. Dispatch didn't -- I mean, we -- we don't ever
[7]    know that.
[8] Q. Okay. From the time that you received the Code 11
[9]    from dispatch until you arrived at Arnaud's Meats,
[10]    how much time do you think lapsed?
[11] A. I want to say maybe three to five minutes at the
[12]    most.
[13] Q. Three to five minutes?
[14] A. It didn't take that long.
[15] Q. Okay. And you --
[16] A. But we'll just say no more than ten minutes. We'll
[17]    just put it that way for the Record.
[18] Q. Okay. That's fine. I mean, if you don't know, you
[19]    just don't know.
[20]         And you don't remember exactly where you were
[21]    when you -- when you received the call from
[22]    dispatch?
[23] A. I can't recall exactly where I was coming from. no.

Page 27

[1] Q. Okay. Which direction was the Town Car facing? Let
[2]    me -- we're talking about the parking lot next to
[3]    Arnaud's Meats; right?
[4] A. Yes, sir.
[5] Q. All right. As a matter of fact, why don't we draw
[6]    ourself a diagram.
[7] A. Okay.
[8] Q. Draw -- you know, and I understand everybody --
[9]    nobody's a perfect artist, but -- and nobody's going
[10]    to hold you to the art of scale. But, if you would,
[11]    just draw Arnaud's Meats for me --
[12] A. (Witness complies).
[13] Q. -- and where the window that was open or broken
[14]    was.
[15] A. The window would be on the side right there.
[16] Q. And then the Eastern Boulevard and the service
[17]    road.
[18] A. That would be the service road.
[19]         MR. WHITEHEAD: Yeah. Let's label this
[20]    stuff a little. Write Arnaud's up top and
[21]    window where the star is.
[22] Q. And Wares Ferry.
[23] A. (Witness complies).

Page 28

[1] Q. Okay. And -- I believe that's correct. And from
[2]    which direction did you come when you were
[3]    dispatched for the call?
[4] A. I was coming in off of this way turning in right
[5]    there.
[6] Q. Okay. So you were coming off of Wares Ferry?
[7] A. I was -- no. I was coming off the Eastern
[8]    Boulevard -- well, the Northern Boulevard. If
[9]    that's the way going back south, I was coming in
[10]    way.
[11] Q. So you --
[12] A. I was coming in that way. And I was getting over --
[13]    I was in the turning lane to turn into the business.
[14] Q. Yes, sir.
[15] A. And I turned in that way.
[16] Q. All right. And -- so you turned in on the side
[17]    nearest the window?
[18] A. Correct.
[19] Q. Okay. And where was -- I'm going to say Lincoln
[20]    Town Car. Even though I understand you weren't
[21]    absolutely sure it was a Lincoln Town Car.
[22] A. The car was parked, I would say, about right there
[23]    facing -- the arrow is pointing the way the car was

Chad Hogan v.
City of Montgomery, et al.

M. D. Gordon
February 9, 2006

Page 29

[1] facing.

[2] **Q.** Okay. And where exactly was this suspect that you
[3] saw?

[4] **A.** Okay. When I was turning in, I'd say about maybe
[5] there.

[6] **Q.** Approximately halfway in between the car and Arnaud
[7] Meats?

[8] **A.** Right. Coming from that direction.

[9] **Q.** Do you want to label that suspect?

[10] **A.** (Witness complies).

[11] **Q.** Okay. And approximately where were you when you
[12] could first hear the alarm?

[13] **A.** Well, when I drove up to the business, when the car
[14] pulled off, that's when I heard the alarm. When I
[15] was coming up to the business.

[16] **Q.** Okay. Describe for me the individual that you saw
[17] walking away from the window.

[18] **A.** It was an unknown black male with dark pants and a
[19] -- it was either a gray or white T-shirt.

[20] **Q.** Okay. Was it this gentlemen here (indicating)?

[21] **A.** Correct.

[22] **Q.** And you're one hundred percent positive that it was
[23] this gentleman here?

Page 30

[1] **A.** Correct.

[2] **Q.** Okay.

[3]     **MR. NELMS:** And I'm pointing at
[4]     Mr. Hogan.

[5] **Q.** Can you tell me, then, what the suspect did?

[6] **A.** Okay. As I said earlier, he ran back to the vehicle
[7] and got into the back passenger side of the car.

[8] **Q.** Back right?

[9] **A.** Passenger, right. Back passenger side.

[10] **Q.** Okay. And did you have -- you said earlier that
[11] you're trained when you come upon a Code 11 you keep
[12] your lights off -- your emergency lights off?

[13] **A.** My headlights and everything.

[14] **Q.** Everything?

[15] **A.** Right.

[16] **Q.** Okay. Did there come a point in time when you
[17] turned your lights on?

[18] **A.** Right. When the car left the business, I turned my
[19] lights on then, because I knew I was going to try to
[20] stop the car.

[21] **Q.** Okay. What was the approximate distance for, let's
[22] say, the front bumper of this car and the side here
[23] on the northern end of Arnaud's Meat in feet, if you

Page 31

[1] can tell me?

[2] **A.** In feet?

[3]     **MR. WHITEHEAD:** Object to the form.

[4] **A.** Yeah. I don't know the exact -- I'm sorry.

[5] **Q.** Is there another unit of measurement that you prefer
[6] to use. Maybe --

[7] **A.** I'd say maybe from there to there (indicating) -- we
[8] can use a football field. I'd say maybe thirty
[9] yards, if that.

[10] **Q.** Okay.

[11] **A.** Twenty, thirty yards.

[12] **Q.** Okay. And you said you couldn't remember as you
[13] were driving to Arnaud's Meats what the weather was
[14] like. Can you remember what the weather was like as
[15] you were actually driving up into the parking lot at
[16] Arnaud's Meats?

[17] **A.** It -- I know it wasn't raining. It was wet.

[18] **Q.** Okay. And do you remember the time?

[19] **A.** No.

[20] **Q.** Okay. Can you recall whether or not it was before
[21] or after midnight?

[22] **A.** I don't recall.

[23] **Q.** Okay. Did you make any radio call back to dispatch

Page 32

[1] when you arrived on the scene?

[2] **A.** I don't recall that either. I don't -- I don't know
[3] if other units were on the radio. I don't know if I
[4] got -- I can't remember.

[5] **Q.** Okay. Did you maybe call 10-17?

[6] **A.** I don't know if I got it on the radio or if I did it
[7] on my computer.

[8] **Q.** Did you at any point in time indicate that
[9] you -- after you arrived on the scene, that you saw
[10] the car?

[11] **A.** I can't recall if I immediately said that, because I
[12] was trying to keep watch on the car. And -- I know
[13] when I -- when I attempted to stop the car after the
[14] car left the area, I did get on the radio because I
[15] called for more units to come assist me.

[16] **Q.** Okay. Do you recall when you first made a call to
[17] dispatch in reference to Arnaud's Meats or the
[18] suspect?

[19] **A.** I don't recall.

[20] **Q.** Okay. And did you make -- okay. So the first thing
[21] that you can recall doing as far as radio
[22] communications is calling for backup?

[23] **A.** Correct.

Chad Hogan v.
City of Montgomery, et al.

M. D. Gordon
February 9, 2006

---

**Page 33**

[1] **Q.** Okay. And what exactly did you say, if you recall?

[2] **MR. WHITEHEAD:** Object to the form.

[3] **A.** I don't know exactly what I said, but I advised them

[4] what I had. I told them I had a vehicle that left

[5] the business. I was approaching the vehicle and the

[6] vehicle fled. I asked for more units to come

[7] assist -- come and assist me. I don't know if I

[8] said it that way or not.

[9] **Q.** Okay. Well, let's talk about it for just a second.

[10] Now, you said that the vehicle fled. Using the

[11] little diagram that we've made here --

[12] **A.** Okay.

[13] **Q.** -- tell me --

[14] **A.** Here's the trailer park. I just -- the trailer park

[15] is all this right here (indicating). The vehicle

[16] pulled out, and they pulled right about there.

[17] That's going to be my vehicle. I'll label it SV for

[18] suspect vehicle.

[19] **Q.** Okay.

[20] **A.** And PV for police vehicle.

[21] **Q.** Okay.

[22] **A.** About right there, that's where I stopped them. I

[23] exited my vehicle. I got about maybe right there to

---

**Page 34**

[1] theirs. They immediately fled the area.

[2] **Q.** Okay. So you pulled in along behind them. Did you

[3] initiate your emergency lights?

[4] **A.** That's when I initiated my emergency lights, and

[5] they -- they pulled over and stopped.

[6] **Q.** Okay. Did you, at this time -- is this still in the

[7] parking lot, or do you consider this still in the

[8] parking --

[9] **A.** I ran out of room on the paper. No. It's -- it's

[10] in the trailer park behind the store. It's a

[11] trailer park behind the store. And whatever street

[12] that is in the -- I don't know. I think -- I want

[13] to say Barberry (phonetic) maybe. Barberry Street

[14] or Barberry Drive.

[15] **Q.** Okay.

[16] **A.** I'm not sure.

[17] **Q.** Well -- I'm familiar with the parking lot. I assume

[18] you're familiar with the parking lot. It's a big

[19] parking lot.

[20] **A.** Correct.

[21] **Q.** I mean, like the type you would see in front of a

[22] Bruno's or something.

[23] **A.** Yeah.

---

**Page 35**

[1] **Q.** I mean, it's pretty expansive. That's my

[2] characterization.

[3] So were you -- let's see. That would be to the

[4] west is where the trailer park is; right?

[5] **A.** Right. West, yeah.

[6] **Q.** If you can --

[7] **A.** To the west of the boulevard, yeah. Right.

[8] **Q.** If you can --

[9] **A.** Uh-huh.

[10] **Q.** -- considering that entire -- that entire parking

[11] lot -- and I'll guess it's several acres. How deep

[12] into the parking lot were you at this time when you

[13] attempted to initiate the stop?

[14] **A.** I'm -- I want to say the street's Barberry.

[15] **Q.** Yes, sir.

[16] **A.** Wherever Barberry is in there. I don't know. Like

[17] I said, I was watching the car. I don't know how

[18] many streets I went over and up and all that stuff.

[19] I don't know.

[20] **Q.** So you actually had left the parking lot and were on

[21] the surface streets in the trailer park when you

[22] initiated the stop?

[23] **A.** We're in the trailer park, right.

---

**Page 36**

[1] **Q.** Okay. Which direction are you headed once you're in

[2] the trailer park, and when you attempt to initiate

[3] the stop for the first time?

[4] **A.** That's why I have the car facing that way.

[5] **Q.** All right. So you were facing north?

[6] **A.** Right.

[7] **Q.** All right. So you had turned onto one of the

[8] streets inside the trailer park heading north when

[9] you attempted to stop them?

[10] **A.** When they stopped.

[11] **Q.** Okay. And they came to a stop?

[12] **A.** Right.

[13] **Q.** Okay. Were you able to have visual contact with any

[14] of the suspects at the time?

[15] **A.** No. Like I said, I was approaching the vehicle. I

[16] never made it up to the vehicle when the vehicle

[17] fled.

[18] **Q.** Were you able to count the number of people in the

[19] car?

[20] **A.** Not at that time, no.

[21] **Q.** Okay. Did you have any idea -- for instance, did

[22] you know there was more than one?

[23] **A.** I knew it was more than one, right. Because the guy

---

Chad Hogan v.
City of Montgomery, et al.

M. D. Gordon
February 9, 2006

---

**Page 37**

[1]   I saw get back in got in the back seat. So it had
[2]   to be more than one.
[3]   **Q.** Okay. And which direction did they go after --
[4]   **A.** After that they -- it's another street that runs
[5]   back up. They were coming back this way. Coming
[6]   back towards the business. And they made that --
[7]   that would be a left. And they came back out and we
[8]   went around the business onto Wares Ferry Road.
[9]   **Q.** All right. So they went back around, hit the
[10]  service road --
[11]  **A.** Yeah. Well, I -- I don't know -- I don't think we
[12]  came all the way out to the service road. If you
[13]  know the parking lot, the big lot goes all the way
[14]  back out.
[15]  **Q.** Yeah.
[16]  **A.** So they went -- I know we did pass -- I'm sorry. We
[17]  passed the business and went back around front and
[18]  went back around and went out to Wares Ferry.
[19]  **Q.** Okay. And when you hit Wares Ferry Road, which
[20]  direction of travel did you take?
[21]  **A.** We were going this way (indicating).
[22]  **Q.** West. Which is towards town?
[23]  **A.** Right.

---

**Page 38**

[1]   **Q.** Okay. And tell me about any radio communications
[2]   that you had that you were -- can recall from when
[3]   you attempted to initiate the stop until you hit
[4]   Wares Ferry Road?
[5]   **A.** When I attempted to initiate the stop, I told her
[6]   what I had. When they pulled off, that's when I --
[7]   I know I got on radio. I told her I had a vehicle
[8]   that just pulled off from me. I asked for more
[9]   units to come and assist me. I knew right then they
[10]  were -- they were going to refuse to stop. We got
[11]  onto Wares Ferry Road, I asked for a unit. I gave
[12]  her my location, and I told her the speed and where
[13]  we were going. And, at that time, other units got
[14]  on the radio and let her know that they were en
[15]  route to back me up.
[16]  **Q.** Okay. Regarding the -- you said there's two forms
[17]  of communication that you can have. One is through
[18]  dispatch on your radio, and the other is through
[19]  your in-car computer system?
[20]  **A.** Correct.
[21]  **Q.** Okay. And you said you can reach down and press a
[22]  button; right?
[23]  **A.** Right.

---

**Page 39**

[1]   **Q.** Okay. If you know, if you made such a
[2]   communication -- and, I believe, you said already
[3]   you don't recall. That's right?
[4]   **A.** Correct.
[5]   **Q.** Is that communication through your in-car computer
[6]   recorded in any way?
[7]   **A.** I'm not sure.
[8]   **Q.** Okay.
[9]   **A.** It's not -- it's not an actual communication type
[10]  deal. It's just I press a button and it will show
[11]  me 10-17 or 10-08 or what -- I mean, it's not a
[12]  conversation.
[13]  **Q.** I understand.
[14]  **A.** I can't -- I can't talk to the computer and tell it
[15]  what I want it to tell the dispatcher, no.
[16]  **Q.** But you press a function key?
[17]  **A.** Right.
[18]  **Q.** And that information, whatever --
[19]  **A.** It's sent to her. And it will show her that I'm
[20]  there, right.
[21]  **Q.** At dispatch?
[22]  **A.** Right.
[23]  **Q.** Okay. Regarding this lawsuit, other than

---

**Page 40**

[1]   conversations that you've had with your counsel,
[2]   your legal counsel --
[3]   **A.** Uh-huh.
[4]   **Q.** -- since the night of the incident --
[5]   **A.** Uh-huh.
[6]   **Q.** -- have you talked to any other person about the
[7]   facts surrounding the arrest of Chad Hogan?
[8]   **A.** What do you mean, any other person? I mean, besides
[9]   counsel? I've talked to internal affairs.
[10]        **MR. WHITEHEAD:** Let me tell you this, too.
[11]  Any conversation that you had with the other
[12]  defendants while we were all here together --
[13]        **THE WITNESS:** Right.
[14]        **MR. WHITEHEAD:** Because I represent all of
[15]  you. Don't even talk about anything about
[16]  that.
[17]        **THE WITNESS:** Right.
[18]  **A.** Besides that, no. Besides with my counsel and the
[19]  other defendants, no.
[20]  **Q.** (By Mr. Nelms) Okay. And I believe you said that
[21]  Lieutenant Caulfield is a supervisor?
[22]  **A.** Correct.
[23]  **Q.** He's also a defendant; correct?

---

Chad Hogan v.
City of Montgomery, et al.

M. D. Gordon
February 9, 2006

---

Page 41

[1] **A.** Correct.

[2] **Q.** Okay. So have you had meetings with your lawyers
[3]    where Lieutenant Caulfield was present?

[4]    **MR. WHITEHEAD:** Object to the form. And
[5]    don't answer that. That's the -- anything that
[6]    we did is going to be privileged about
[7]    meetings we had or details that who was
[8]    present.

[9] **Q.** Without telling me the subject matter that was
[10]    discussed, have you had any meetings with your
[11]    counsel where Lieutenant Caulfield was present?

[12]    **MR. WHITEHEAD:** You can answer that.

[13] **A.** Yes.

[14] **Q.** How many?

[15] **A.** I don't know. I don't recall.

[16] **Q.** More than one?

[17] **A.** Yes.

[18] **Q.** Less than six?

[19] **A.** Probably less than six, yes, sir.

[20] **Q.** Okay.

[21] **A.** I don't recall. I mean, I don't know the exact
[22]    number.

[23] **Q.** Okay. Was Chief Baylor at any of those meetings?

---

Page 42

[1] **A.** No.

[2]    **MR. WHITEHEAD:** Stop. This is -- how many
[3]    meetings I've had with my client is just as
[4]    privileged as what the substance of the
[5]    conversation was. If you disagree, so be it.
[6]    But I'm going to instruct him not to answer any
[7]    more questions about how many meetings we had,
[8]    or who was at the meetings, or anything like
[9]    that. It's privileged. I'm going to instruct
[10]    him not to answer any further questions on
[11]    that?

[12] **Q.** Are you going to answer the question?

[13] **A.** No.

[14] **Q.** Did you ever have any conversation with Lieutenant
[15]    Caulfield outside the presence of your counsel in
[16]    regard to any matters related to Chad Hogan?

[17] **A.** No. Not that I can recall, no.

[18] **Q.** Okay. Any conversations with Lieutenant Caulfield
[19]    on the night of March the 31st in regard to the
[20]    arrest of Chad Hogan?

[21] **A.** Correct. He's my supervisor.

[22] **Q.** So you did have a conversation with him that night?

[23] **A.** That night, yes.

---

Page 43

[1] **Q.** Okay. Tell me about the substance of those -- that
[2]    conversation.

[3] **A.** I mean, I had to tell him what I had. I mean, he
[4]    knew -- he was listening to the radio. And I kept
[5]    him up to date on the circumstances of the arrest
[6]    and everything.

[7] **Q.** Okay. What would he have heard on the radio?

[8]    **MR. WHITEHEAD:** Object to the form.

[9] **A.** He would have heard the radio traffic. He's
[10]    assigned the same radio I am. So all radio traffic
[11]    that I can hear, he can hear, also.

[12] **Q.** Okay. Now, I believe you said that you turned on to
[13]    Wares Ferry Road and headed towards downtown, which
[14]    we believe is west; is that correct?

[15] **A.** Yes.

[16] **Q.** Okay. Pick up from there and tell me what
[17]    happened.

[18] **A.** As I said, I requested more units to come assist
[19]    me. I want to say the pursuit may have lasted maybe
[20]    five minutes. Ten minutes at the most.

[21] **Q.** Okay.

[22] **A.** I don't know the exact name of the streets they
[23]    turned on to. But the vehicle eventually wrecked.

---

Page 44

[1] **Q.** Okay. What, were they traveling at a high rate of
[2]    speed?

[3] **A.** Yes, sir.

[4] **Q.** Okay. Did they run any stop signs?

[5] **A.** Yes, sir.

[6] **Q.** Okay.

[7] **A.** Well, there's no stop signs on Wares Ferry Road.

[8] **Q.** All right.

[9] **A.** In the neighborhood, I don't recall. I don't know
[10]    if they ran any stop signs or not.

[11] **Q.** Okay. On Wares Ferry Road did they run any traffic
[12]    lights?

[13] **A.** There's no traffic lights --

[14] **Q.** Okay.

[15] **A.** -- in the area that we were traveling.

[16] **Q.** All right. But they did travel at a high rate of
[17]    speed?

[18] **A.** Correct.

[19] **Q.** All right. Did they exceed the speed limit at any
[20]    time?

[21] **A.** Correct.

[22] **Q.** Okay. Did they cross over the center line at any
[23]    time?

---

Chad Hogan v.
City of Montgomery, et al.

M. D. Gordon
February 9, 2006

Page 45

[1] **A.** I can't recall that. I don't know.

[2] **Q.** Okay. Did they fail to use turn signals at any

[3] time?

[4] **A.** Correct.

[5] **Q.** Okay. Do you recall exactly where the wreck

[6] occurred?

[7] **A.** That's what I said. I can't remember the street

[8] names.

[9] **Q.** Okay. If I told you the report said Warenwood,

[10] would that refresh your recollection?

[11] **A.** If that's what my report says, yes, sir.

[12] **Q.** Okay. Well, not what your report says, but what do

[13] you remember? Do you remember it being Warenwood?

[14] **A.** That's what I'm telling you. I can't remember the

[15] street name.

[16] **Q.** Okay. That's fine. Well, tell me about the wreck.

[17] I mean, exactly how it occurred, if you know.

[18] **A.** Well, the vehicle wrecked into someone's privacy

[19] fence in their backyard. The passenger side of the

[20] vehicle was up against the fence. And the occupants

[21] of the vehicle immediately bailed from the vehicle.

[22] Two exited the front driver's side, because they

[23] couldn't get out of the passenger's side. And the

Page 46

[1] one in the back seat, he exited the rear seat of the

[2] vehicle -- rear driver's side door.

[3] **Q.** Okay. And did he -- was that Mr. Hogan?

[4] **A.** Correct.

[5] **Q.** Okay. So if I'm understanding you right, he

[6] exited -- he was on the left rear side or the

[7] driver's side in the rear of the vehicle. But he

[8] exited on the passenger's side; is that correct?

[9] **A.** Say that again.

[10] **Q.** Mr. Hogan was in the back seat; is that correct?

[11] **A.** Right.

[12] **Q.** Okay. Did he exit from the driver's side or the

[13] passenger's side?

[14] **A.** The driver's side.

[15] **Q.** He was able to --

[16] **A.** The back seat. He couldn't get out of the

[17] passenger's side, because they wrecked into a fence.

[18] **Q.** Oh, okay. I'm sorry. I misunderstood you. I

[19] thought it was the driver's side that was on the --

[20] **A.** No. The passenger's side.

[21] **Q.** Oh, I'm sorry. Okay.

[22] How close behind the Lincoln Town Car were you

[23] when it had the accident?

Page 47

[1] **A.** When it wrecked -- maybe thirty yards when it

[2] wrecked.

[3] **Q.** Okay. And tell me, to the best of your

[4] recollection, exactly what you did after the wreck.

[5] **A.** After the wreck, when they bailed -- the driver, the

[6] passenger, and the rear occupant of the vehicle

[7] bailed. I jumped out of the vehicle as well. And I

[8] chased them by foot to a fence -- another fence in

[9] the backyard.

[10] **Q.** Let me interrupt you. Where did you park or come to

[11] rest?

[12] **A.** The car went in the backyard and hit the fence, and

[13] I stayed on the street, whatever street it was.

[14] **Q.** Okay. And you jumped out of your car?

[15] **A.** Uh-huh.

[16] **Q.** Your vehicle?

[17] **A.** Uh-huh.

[18] **Q.** Osko went with you?

[19] **A.** Correct.

[20] **Q.** All right. Was he leashed or unleashed?

[21] **A.** He was unleashed.

[22] **Q.** Okay. And you proceeded to go after the fleeing

[23] suspect?

Page 48

[1] **A.** Correct.

[2] **Q.** Okay. And pick up from there.

[3] **A.** Okay. I kept my eye on the back passenger, because

[4] I knew he was the one that got in the vehicle. The

[5] two font people exited first. The back guy, he was

[6] the last one out. I chased him to the fence. The

[7] front guy went over the fence first and he went down

[8] into -- there was a drainage ditch over there. The

[9] other guy, he went to the right. And the last guy

[10] -- when we were running to the fence, before he can

[11] get over -- myself and my partner, we were pretty

[12] close to him. That's when he turned and he

[13] screamed. I don't know if it was in fear or what it

[14] was, but he turned -- turned and yelled (indicating

[15] sound) and he proceeded over the fence and he went

[16] to the left.

[17] **Q.** Okay. Which one of these individuals was Mr. Hogan?

[18] **A.** That -- the last one.

[19] **Q.** Okay. And just -- I'm going to ask you, please, if

[20] you'll just use Mr. Hogan's name so we'll be able to

[21] identify which --

[22] **A.** Okay. That's fine.

[23] **Q.** -- one we're talking about. And I'm really mostly

---

Pruitt & Davis, L.L.C.                    Min-U-Script®                    (12) Page 45 - Page 48

Chad Hogan v.
City of Montgomery, et al.

M. D. Gordon
February 9, 2006

Page 49

[1]     concerned about Mr. Hogan. The other suspects are
[2]     not that important to me.
[3]  **A.** That's fine.
[4]  **Q.** But the other suspects left the area?
[5]  **A.** All three attempted to leave the area, but all three
[6]     went opposite directions.
[7]  **Q.** All right.
[8]  **A.** Right.
[9]  **Q.** Now, were there four people total?
[10]  **A.** I only saw three.
[11]  **Q.** Okay.
[12]  **A.** I only pursued three on foot.
[13]  **Q.** Okay. And that includes Mr. Hogan?
[14]  **A.** Correct.
[15]  **Q.** So it was Mr. Hogan --
[16]  **A.** Mr. Hogan was the third -- the last subject to get
[17]     over the fence.
[18]  **Q.** All right. And tell me about your pursuit of
[19]     Mr. Hogan.
[20]  **A.** Okay. When I got to the fence, as I stated,
[21]     Mr. Hogan, he turned around and he yelled -- he
[22]     yelled. Like I said, I don't know if it was at my
[23]     dog or in fear. He went left. I immediately held

Page 50

[1]     my spot, which I'm trained to do. And I called for
[2]     other units to get in the area. Some more K-9 units
[3]     got in the area. And the spot that I last saw the
[4]     subject run is where we began to track.
[5]  **Q.** Okay. Then that happened?
[6]  **A.** The track started, and Mr. Hogan was apprehended in
[7]     a backyard not far from where I last saw him.
[8]  **Q.** Okay. Are you leaving anything out?
[9]  **A.** No.
[10]  **Q.** Okay. How is it that Mr. Hogan came to be
[11]     apprehended?
[12]  **A.** He was apprehended by a K-9 --
[13]  **Q.** Okay.
[14]  **A.** By a K-9 dog.
[15]  **Q.** Osko got him?
[16]  **A.** Not Osko. It was another dog --
[17]  **Q.** Okay.
[18]  **A.** -- that apprehended Mr. Hogan.
[19]  **Q.** All right. Was there another K-9 unit in the area?
[20]  **A.** That's what I said. I held my spot, and I called
[21]     for another K-9 unit to come and assist on the
[22]     track. Due to it been raining and due to multiple
[23]     suspects, we used two dogs. We did a dual track

Page 51

[1]     that night.
[2]  **Q.** Okay.
[3]  **A.** And he was apprehended by another dog. Greg is the
[4]     one that apprehended Mr. Hogan.
[5]  **Q.** The dog's name is Greg?
[6]  **A.** Greg, right.
[7]  **Q.** G-R-E-G?
[8]  **A.** Right.
[9]  **Q.** And who is the officer?
[10]  **A.** Corporal Mora. M-O-R-A.
[11]  **Q.** Okay. And do you know exactly where it is that
[12]     Mr. Hogan was apprehended?
[13]  **A.** No. Not exactly, no.
[14]  **Q.** Okay. Do you have, at the time, a video camera in
[15]     your unit?
[16]  **A.** No.
[17]  **Q.** Okay. At the time, did Corporal Mora have a video
[18]     camera in his unit?
[19]  **A.** No.
[20]  **Q.** Do you know who Kirk Pelham is?
[21]  **A.** He was a detective, yes, sir.
[22]  **Q.** Do you have any idea as to whether or not Kirk
[23]     Pelham had a video camera in his vehicle?

Page 52

[1]  **A.** I don't know.
[2]  **Q.** You don't know? Okay. Have you had an opportunity
[3]     to see any videotape related in any way to the
[4]     arrest of Chad Hogan?
[5]  **A.** No.
[6]  **Q.** Okay. Have you had an opportunity to listen to any
[7]     audiotape of radio transmissions related to the
[8]     arrest of Chad Hogan?
[9]  **A.** No.
[10]  **Q.** All right. Tell me about any radio transmissions
[11]     that you recall that night after you called dispatch
[12]     informing them that you had -- that there had been a
[13]     wreck and that the suspects were on foot.
[14]  **A.** I mean, there were several. Like I said, I called
[15]     for more units to come in the area and assist me.
[16]     We let them know that K-9 was on the ground so they
[17]     can stay off and they won't accidentally get bit by
[18]     one of our dogs. When the subject was in custody,
[19]     I'd -- I wasn't the one that apprehended him, so I
[20]     wasn't the one to say that he was in custody over
[21]     the radio. I mean, I can't recall everything that I
[22]     said on the radio that night.
[23]  **Q.** I understand. I'm just asking you to tell me what

Chad Hogan v.
City of Montgomery, et al.

M. D. Gordon
February 9, 2006

---

Page 53

[1] you can recall.
[2] A. After that -- I mean, it was just general traffic.
[3] Just normal radio traffic.
[4] Q. Okay. Well, tell me about what you recall from the
[5] general radio traffic that you heard.
[6]         MR. WHITEHEAD: Object to the form.
[7] A. I mean, I advised them what we had. I told them
[8] what we were doing. When we got done, we got off
[9] the ground. I can't -- I mean, I can't recall
[10] anything that I said. I can't remember, you know,
[11] everything that I said that night.
[12] Q. Okay. I understand, Officer. I -- I'm not asking
[13] what you said over the radio -- what transmissions
[14] you issued over the radio. I'm asking what you can
[15] recall --
[16] A. Hearing on the radio?
[17]         MR. WHITEHEAD: Object to the form.
[18] Q. Yes.
[19] A. Now, that -- no, I can't. It's just -- we have a
[20] hundred or so people talking on the radio. I
[21] can't -- I don't know.
[22] Q. Okay. Anything specific to the Code 11 or the
[23] arrest of Chad Hogan?

---

Page 54

[1]         MR. WHITEHEAD: Object to the form.
[2] A. I remember him saying that we -- we had a confirmed
[3] burglary. I remembered hearing that.
[4] Q. Who said that?
[5] A. I can't recall who said it.
[6] Q. But someone said you had a confirmed burglary?
[7] A. Yes. They said that the window -- at the time, they
[8] said the window was forced.
[9] Q. Okay.
[10] A. I don't know who said it, but someone said that.
[11] Q. All right.
[12] A. I mean, that's basically it. What I recall hearing.
[13] Q. All right. Do you have an understanding as to who
[14] said that?
[15]         MR. WHITEHEAD: Object to the form.
[16] A. No, I don't know. That's what I just said. I don't
[17] know who said it.
[18] Q. I mean, would it be the officer on the scene, or
[19] would it have been --
[20] A. More than -- if someone said the window was
[21] forced --
[22]         MR. WHITEHEAD: Object to the form.
[23] A. -- it was someone on the scene, yes, sir.

---

Page 55

[1] Q. Okay.
[2]         MR. NELMS: What's the basis for your
[3] objection? This last one.
[4]         MR. WHITEHEAD: Do what, now?
[5]         MR. NELMS: I'm asking you what the basis
[6] for you objection is.
[7]         MR. WHITEHEAD: Because I think it was
[8] confusing and speculative as to who said what
[9] on the radio. He -- once he said he didn't
[10] know. Asked and answered and speculative.
[11]         MR. NELMS: All right.
[12] Q. Without speculating, is it likely that it was the
[13] officer on the scene at Arnaud's Quality Meats?
[14] A. Possibly.
[15]         MR. WHITEHEAD: Object to the form. Same
[16] objection.
[17] Q. Do you know a Lieutenant Randy Jones?
[18] A. Yes.
[19] Q. Okay. And who is Lieutenant Jones?
[20] A. At the time, he -- I think he's retired now. At the
[21] time, he was a commander in detective division.
[22] Q. Okay. Was a supervisor of yours?
[23] A. No.

---

Page 56

[1] Q. Okay. But in the chain of command, he was a
[2] superior officer?
[3] A. Correct.
[4] Q. Okay. Have you had an opportunity to talk to
[5] Lieutenant Jones at any time about the arrest of
[6] Chad Hogan?
[7] A. No.
[8] Q. Have you talked to Lieutenant Jones at any time
[9] about what you recall or saw as you were there at
[10] Arnaud's?
[11] A. I never talked to Lieutenant Jones.
[12] Q. Okay. Who is Major West?
[13] A. He's Lieutenant Jones' boss.
[14] Q. Okay.
[15] A. He's the commander.
[16] Q. All right. Have you, since March 31, 2005, had a
[17] conversation with Major West regarding the events
[18] surrounding the arrest of Chad Hogan?
[19] A. No.
[20] Q. Okay. Who is Sergeant Tatum?
[21] A. He's a supervisor in the detective division.
[22] Q. Okay. Have you had any conversations with Sergeant
[23] Tatum since March 31, 2005 regarding the arrest of

---

Page 57

[1] Chad Hogan?

[2] A. No.

[3] MR. NELMS: Give me just a second.

[4] (Brief recess.)

[5] Q. When you were driving up on the scene at Arnaud's

[6] Quality Meats, did you have -- you said it was -- it

[7] had been raining, but you don't think it was raining

[8] at the time.

[9] A. Right.

[10] Q. Okay. And the streets were wet?

[11] A. Right.

[12] Q. Okay. And you had your lights off --

[13] A. Right.

[14] Q. -- as you drove up at Arnaud's Quality Meats?

[15] Where exactly were you when you turned your

[16] lights off?

[17] A. I was turning off of the boulevard.

[18] Q. Okay. So you were, like, in that median area that

[19] you --

[20] A. In the general area where I could see the business,

[21] right.

[22] Q. Okay. And is that -- to the best that you remember,

[23] that night was the parking lot lit?

Page 58

[1] A. I can't recall.

[2] Q. Okay. Do you have a civilian radio in your

[3] vehicle? Or that night did you have a civilian

[4] radio in your vehicle?

[5] A. What do you mean?

[6] Q. I mean a regular am/fm radio?

[7] A. Yes, sir.

[8] Q. Did you have it on or off?

[9] A. I can't remember.

[10] Q. Okay. Do you -- do you patrol with your civilian

[11] radio on at times?

[12] A. Sometimes. It depends on what's on the radio.

[13] Q. Okay. When you drove up to Arnaud's Meats, did you

[14] have your windows rolled up or rolled down?

[15] A. I can't remember that either.

[16] Q. Okay. Where were you when -- I believe you said

[17] earlier that you could hear the alarm going off from

[18] the business; is that correct?

[19] A. When I drove to the business, yes, I heard it.

[20] Q. Where approximately were you in reference to the

[21] building when you first heard the alarm?

[22] A. Maybe about twenty to thirty feet from it.

[23] Q. Okay.

Page 59

[1] A. When I was driving past it.

[2] Q. Okay. And you don't recall whether your windows

[3] were up or down at the time?

[4] A. If I heard the alarm, my window was down.

[5] Q. Down?

[6] A. Yes.

[7] Q. Okay. What did it sound like?

[8] A. It sounded like a burglar alarm.

[9] Q. Was it a chirping sound?

[10] A. I can't recall that.

[11] Q. Okay. You are familiar with the different sounds

[12] that alarms could make?

[13] A. Yes, sir.

[14] Q. Some of them make a shrieking sound. Some of them

[15] make a ringing sound. Some of them make a whistling

[16] sound. You can't recall --

[17] A. I can't recall, no.

[18] Q. -- or describe in any way?

[19] A. No.

[20] Q. Okay. If you were to make a call in to dispatch

[21] while you were in the proximity of Arnaud's Meats,

[22] to the best of your knowledge, would that radio

[23] communication have picked up the sound of the alarm

Page 60

[1] going off?

[2] A. It depends on -- if I would have been where I was

[3] when I heard it, yes, sir.

[4] Q. Okay. When you first made your call to report that

[5] you were 10-17, do you believe you were close enough

[6] to Arnaud's Meats that the alarm could have been

[7] picked up on your dispatch transmission?

[8] A. I can't remember.

[9] Q. Okay. Can't remember.

[10] You stated earlier that you and Osko stayed at

[11] the scene of the accident as the suspects fled; is

[12] that correct?

[13] A. No.

[14] Q. Okay. Help me out. You -- after the accident, you

[15] said you were taught to hold your ground.

[16] A. The last spot I saw him, right.

[17] Q. Oh, okay.

[18] A. Which was when he hopped the fence.

[19] Q. All right. So you were standing at the fence?

[20] A. Right.

[21] Q. Okay. Where was that in relation to the car --

[22] excuse me -- the suspect's car?

[23] A. The -- it was in the -- all of it's in the

Chad Hogan v.
City of Montgomery, et al.

M. D. Gordon
February 9, 2006

Page 61

[1]    backyard. It's just a -- I mean, I don't know
[2]    exact -- how far away it was.
[3]  **Q.** So you were in some residential backyard?
[4]  **A.** It's just a regular -- right.
[5]  **Q.** Okay.
[6]  **A.** It's just a regular residential neighborhood.
[7]  **Q.** When you leave your vehicle -- well, that night when
[8]    you left your vehicle, you and Osko, do you have a
[9]    portable radio that you have with you?
[10]  **A.** Yes, sir.
[11]  **Q.** Okay. And I've seen them on your -- shoulder mics,
[12]    things like that?
[13]  **A.** Yes, sir.
[14]  **Q.** Is that what you had?
[15]  **A.** I don't know if I had my shoulder mic or if I just
[16]    had it like this (indicating).
[17]  **Q.** And that's just like a phone-style radio with an
[18]    antenna on it?
[19]  **A.** Yes.
[20]  **Q.** It's hand-held.
[21]    So you were able to have radio transmission
[22]    with dispatch after you left your vehicle?
[23]  **A.** Yes, sir.

Page 62

[1]  **Q.** Okay. And at the same time, were you able to hear
[2]    dispatch after you left your vehicle?
[3]  **A.** Yes, sir.
[4]  **Q.** Okay. And, generally, were you able to hear radio
[5]    transmissions?
[6]  **A.** Yes.
[7]  **Q.** Okay. And you stated earlier that you heard someone
[8]    state that, in fact, there was a burglary?
[9]  **A.** I stated that someone stated that there were -- was
[10]    a forced window -- a forced window, right.
[11]  **Q.** Okay.
[12]  **A.** I remember hearing that, yes, sir.
[13]  **Q.** Okay. And you don't recall who?
[14]  **A.** No.
[15]  **Q.** Okay. Do you recall that night -- do you recognize
[16]    -- excuse me. Scratch that. Do you recognize the
[17]    voice of Kirk Pelham over the radio?
[18]  **A.** I probably would have, yes.
[19]  **Q.** Okay. Do you recall that night hearing any radio
[20]    transmissions from Kirk Pelham in relation to
[21]    Arnaud's Quality Meats?
[22]  **A.** I can't recall.
[23]  **Q.** Okay. Do you recall anyone stating that there was

Page 63

[1]    not a burglary at Arnaud's Quality Meats?
[2]  **A.** No. I never heard that.
[3]  **Q.** You never heard that?
[4]  **A.** No.
[5]  **Q.** Okay. After you were at the fence and you were
[6]    standing your -- holding your ground, I believe
[7]    Osko's with you the whole time; right?
[8]  **A.** Right.
[9]  **Q.** Okay. How long did you stay there at that position?
[10]  **A.** It wasn't long before some more units got there with
[11]    me.
[12]  **Q.** Okay. A matter of minutes?
[13]  **A.** Yeah.
[14]  **Q.** Okay. And then what happened?
[15]  **A.** And then we started the track.
[16]  **Q.** All right. And how long did that take,
[17]    approximately?
[18]  **A.** The track? I don't recall. I can't remember
[19]    exactly.
[20]  **Q.** Were you ultimately successful in apprehending the
[21]    suspects?
[22]  **A.** Correct. At the end of the -- yeah. After
[23]    everything was said and done, yes, sir.

Page 64

[1]  **Q.** Okay. After your backup showed up and you began to
[2]    track, a period of time lapsed. What were you doing
[3]    during this period of time?
[4]  **A.** I was just watching the area.
[5]  **Q.** Okay. Were you securing the wreck scene?
[6]  **A.** I was -- no. There was another officer securing the
[7]    wreck scene. I was securing the area where I saw
[8]    the suspects.
[9]  **Q.** Okay. What's involved in securing the area?
[10]  **A.** I was basically just -- officer safety. Just making
[11]    sure that they're not going to come back and do
[12]    anything to me.
[13]  **Q.** Okay. How long did that last?
[14]  **A.** A matter of minutes.
[15]  **Q.** All right. And what -- you stopped at some point in
[16]    time securing that area. What -- why did you stop
[17]    securing that area?
[18]  **A.** When the other units got there, that's when I
[19]    stopped securing it. I mean --
[20]  **Q.** Okay. So then what did you do?
[21]  **A.** We continued on with the track.
[22]  **Q.** Okay. Where did you go specifically?
[23]  **A.** We went left.

Chad Hogan v.
City of Montgomery, et al.

M. D. Gordon
February 9, 2006

**Page 65**

[1]  **Q.**  All right.  Is that back into the street?

[2]  **A.**  Back into the neighborhood.

[3]  **Q.**  All right.  And did you continue to search the
[4]      neighborhood?

[5]  **A.**  Yes.

[6]  **Q.**  Okay.  Were you able to apprehend any of the
[7]      suspects yourself?

[8]  **A.**  Me?  No.

[9]  **Q.**  Okay.  Fill in the blank for me.  You're searching
[10]     for the suspects.  Then what happens?

[11] **A.**  The suspects were apprehended.  I don't know how
[12]     many were apprehended during that time.  I know
[13]     Mr. Hogan was.  We just searched the area -- I mean,
[14]     looking for the suspects.

[15] **Q.**  Okay.  And then you -- did you go back on patrol?

[16] **A.**  That night?

[17] **Q.**  Yes.

[18] **A.**  No.  When I got done, I went to headquarters.

[19] **Q.**  Okay.  Well, you're on third shift; right?

[20] **A.**  Right.

[21] **Q.**  And it starts at eleven o'clock?

[22] **A.**  Right.

[23] **Q.**  Okay.

**Page 66**

[1]  **A.**  That day I was working second shift.

[2]  **Q.**  Oh, that day you were working second shift?

[3]  **A.**  Right.

[4]  **Q.**  Oh, okay.  And remind me again.  That's from
[5]      three --

[6]  **A.**  Well, we had a second shift -- I want to say seven
[7]      until three.  Those were the hours that we were
[8]      working.

[9]  **Q.**  Okay.  Seven at night until three --

[10] **A.**  Seven until four -- yeah.

[11] **Q.**  Okay.  So you did not go back on patrol that night?

[12] **A.**  No.

[13] **Q.**  All right.  What did you do?

[14] **A.**  Went to headquarters.  Before I went to
[15]     headquarters, I got -- I got the property out of the
[16]     car that I was instructed to get out of the car and
[17]     took it to headquarters with me.

[18] **Q.**  Okay.  Well, did anyone instruct you to come back to
[19]     headquarters?

[20] **A.**  I mean, I just know I had to go back and type
[21]     statements.

[22] **Q.**  Okay.

[23] **A.**  But Detective Pelham instructed me to get the

**Page 67**

[1]      property out of the car and bring it to
[2]      headquarters, yes.

[3]  **Q.**  Okay.  Detective Pelham instructed you to get the
[4]      property out of the suspect's car and take it to
[5]      headquarters?

[6]  **A.**  Right.

[7]  **Q.**  Okay.  And you did not go back on patrol after
[8]      that?

[9]  **A.**  No.

[10] **Q.**  Okay.  You stayed at headquarters?

[11] **A.**  I did my statements at headquarters.  I -- yeah.  I
[12]     didn't stay at headquarters, no.

[13] **Q.**  Okay.  You -- where did you go?

[14] **A.**  After I left headquarters?

[15] **Q.**  Yeah.

[16] **A.**  I went to the kennel and put my partner up and I
[17]     went home.

[18] **Q.**  Okay.  What time did you leave headquarters?

[19] **A.**  I don't know.  I don't know what time it was.

[20] **Q.**  Was it a normal shift hour?

[21] **A.**  I can't recall.

[22] **Q.**  Okay.  Do you have a sign-in or sign-out log that
[23]     you have to fill out every day?

**Page 68**

[1]  **A.**  You mean like clocking in and clocking out?

[2]  **Q.**  Yes, sir.

[3]  **A.**  No.

[4]  **Q.**  Okay.  But is there a sign-in or sign-out sheet?

[5]  **A.**  No.

[6]  **Q.**  Okay.  When you go off duty, do you have to report
[7]      to dispatch that you're off duty?

[8]  **A.**  No.

[9]  **Q.**  Okay.  How does someone know when you're off duty?

[10] **A.**  I mean, it's -- it's just routine.  They know what
[11]     time we get off.

[12] **Q.**  Okay.  Where's the kennel?

[13] **A.**  It's off of Ripley Street.

[14] **Q.**  All right.  How far is it from headquarters?

[15] **A.**  A couple minutes away.

[16] **Q.**  Is it --

[17] **A.**  Less than five minutes away.

[18] **Q.**  Okay.  When you pulled up on the scene at Arnaud's
[19]     Quality Meats -- I may have asked you this.  I can't
[20]     remember what your answer is.  The suspect's car,
[21]     you said from the diagram, was facing Arnaud's
[22]     Meats?

[23] **A.**  Right.

Chad Hogan v.
City of Montgomery, et al.

M. D. Gordon
February 9, 2006

---

Page 69

[1] **Q.** Okay. And you said that the suspect that you saw,
[2] that you believe was Chad Hogan, was in the parking
[3] lot area between Arnaud's Meats and the front of the
[4] suspect's car?
[5] **A.** Right.
[6] **Q.** Okay. Were the lights on on the suspect's car at
[7] that time?
[8] **A.** I can't recall that.
[9] **Q.** Okay. And after the suspect's car crashed --
[10] wrecked and it was up against the fence, did -- I
[11] understand you to say that Mr. Hogan climbed the
[12] fence?
[13] **A.** Not the fence that they wrecked. The fence in the
[14] backyard.
[15] **Q.** Okay. Did you go over the fence, too?
[16] **A.** Like I said, I held my spot until I got back up
[17] there, and then we went over the fence.
[18] **Q.** Okay. So you did go over the fence?
[19] **A.** Eventually, yes, sir.
[20] **Q.** Okay. What did you do with the property that --
[21] well, first of all, describe the property that you
[22] collected?
[23] **A.** It was a gun, a ski mask, a magazine for the gun,

---

Page 70

[1] screwdrivers. I can't recall everything else. But
[2] I remember those items.
[3] **Q.** What kind of gun was it?
[4] **A.** I can't remember that exact...
[5] **Q.** Okay. Can you remember whether it was a revolver or
[6] a semiautomatic?
[7] **A.** I think it was a semiautomatic. It wasn't a
[8] revolver.
[9] **Q.** Do you recall the caliber?
[10] **A.** No.
[11] **Q.** Okay. Did you have an opportunity to ascertain who
[12] the gun belonged to?
[13] **A.** I think patrol did that. I didn't.
[14] **Q.** Have you come to learn who the gun belonged
[15] to?
[16] **A.** No.
[17] **MR. WHITEHEAD:** Object to the form.
[18] **Q.** Okay. You got back to headquarters with the
[19] property. What did you do next?
[20] **A.** I went upstairs to the detective division, which is
[21] on the second floor. I walked in, and I began to do
[22] my statement. I put the property where they told me
[23] to put it, and I went to do my statement.

---

Page 71

[1] **Q.** Okay. And what did you put in your statement?
[2] **A.** I put the -- what I saw when I pulled into the
[3] business and what happened there afterwards.
[4] **Q.** Okay. Can you remember with some specificity
[5] exactly what you put in the statement?
[6] **A.** I just put the details that I told you earlier. And
[7] I just put everything else that happened afterwards.
[8] **Q.** Okay. And what did you do with the statement after
[9] you drafted it -- well, let me -- let me ask you
[10] another question real quick.
[11] **A.** Uh-huh.
[12] **Q.** Did you hand write it?
[13] **A.** Typed it.
[14] **Q.** Typed it?
[15] **A.** Uh-huh.
[16] **Q.** Is it on a computer?
[17] **A.** It is.
[18] **Q.** All right. Is it -- did you do it in a word
[19] processing program?
[20] **A.** It was -- the format was already up on the screen.
[21] I don't know if it's Microsoft Word or what it is.
[22] I don't know.
[23] **Q.** So is it a form and you just punch in what you need

---

Page 72

[1] to punch in in different areas?
[2] **A.** Right.
[3] **Q.** Okay. And is it in the style of a memo, like, from
[4] me to you regarding this subject and then a --
[5] **A.** Right.
[6] **Q.** Okay. And who was it to?
[7] **A.** To Lieutenant Caulfield.
[8] **Q.** Okay. Why does it go to Lieutenant Caulfield?
[9] **A.** He's my supervisor.
[10] **Q.** Okay. And after you drafted that statement, what
[11] did you do with it?
[12] **A.** I gave it to Detective Pelham.
[13] **Q.** Pelham. Okay. And then you went home for the
[14] night?
[15] **A.** No.
[16] **Q.** Okay. Then what happened?
[17] **A.** He told me to go down and impound the property that
[18] I had brought upstairs.
[19] **Q.** Did you do that?
[20] **A.** I did.
[21] **Q.** Okay. Then what did you do?
[22] **A.** While impounding the property -- I impounded the
[23] property and then I went back up -- while I

---

Chad Hogan v.
City of Montgomery, et al.

M. D. Gordon
February 9, 2006

Page 73

[1]     impounded the property, I had a conversation with
[2]     Lieutenant Caulfield over the radio where I was just
[3]     told to be sure that I do my statement and I state
[4]     all the facts in my statement.
[5]  Q. But you'd already done it?
[6]  A. Right.
[7]  Q. And -- so you told him you'd already done it?
[8]          MR. WHITEHEAD: Object to the form.
[9]  A. Well, I -- he didn't know that I had already done
[10]    it. He just called and told me to be sure that I do
[11]    my statement and be sure that I state all the facts
[12]    in my statement.
[13] Q. Okay.
[14] A. And I told him that I would.
[15] Q. You told him that you would?
[16] A. I told him that I would.
[17] Q. You told -- you didn't tell him that you already
[18]    had?
[19] A. Or that I had -- that I would -- that I had.
[20] Q. Okay. So you told him that you had?
[21] A. Right.
[22] Q. Okay. And did he ask to see it?
[23] A. No. He wasn't there. He was going to get a copy of

Page 74

[1]     it eventually. He knew that.
[2]  Q. Okay. When you finished doing the report, did you
[3]     hand deliver it to Lieutenant Caulfield?
[4]  A. Which report?
[5]  Q. The report --
[6]  A. The statement?
[7]  Q. Yes.
[8]  A. Yes, sir.
[9]  Q. And after you finished the report or the statement
[10]    that you made, did you hand deliver it to Lieutenant
[11]    Caulfield?
[12] A. Eventually, yes.
[13] Q. Okay.
[14] A. After I had left headquarters, yes, I did. I took
[15]    it to him.
[16] Q. Where was he?
[17] A. He was at the kennel.
[18] Q. Oh, okay.
[19] A. In his office.
[20] Q. Okay. I see.
[21]        So you went to impound the property?
[22] A. Uh-huh.
[23] Q. And you got the call from Lieutenant Caulfield

Page 75

[1]     reminding you to do your statement?
[2]  A. Uh-huh.
[3]  Q. And you told him you already had?
[4]  A. Uh-huh.
[5]          MR. WHITEHEAD: Object to the form.
[6]  Q. I believe you said you already had?
[7]  A. I told him I -- yes.
[8]  Q. Okay. Then what happened?
[9]  A. Then I went back upstairs to turn the property
[10]    receipt or the paperwork back over to the
[11]    detectives. I went back in the room to proofread my
[12]    statement again, because I still had it on the
[13]    computer. I never took it off of the screen on the
[14]    computer. I went back up, and I went back over my
[15]    statement and proofread it. And I saw where I did
[16]    need to -- I guess, it -- I was -- it wasn't
[17]    articulated. It was articulated, but it wasn't
[18]    articulated to the fact of their understanding. I
[19]    just made it more understanding as far as where I
[20]    saw -- what I saw and where I saw it.
[21] Q. Who's Lieutenant Ron Cook?
[22] A. He was Pelham's supervisor. He's a commander
[23]    upstairs.

Page 76

[1]  Q. Did you have any conversations with Mr. Cook that
[2]     night?
[3]  A. Yeah. I talked to him that night.
[4]  Q. What did you talk to him about?
[5]  A. I can't recall what I talked to him about.
[6]  Q. Was it in reference to the statement that you gave?
[7]  A. I gave him the other statement. He was the one that
[8]     received it. But I don't think it was directly
[9]     referenced to the statement. I remember him telling
[10]    me good job on what I had done. And we talked about
[11]    the incident that happened.
[12] Q. What specifically did you talk about regarding the
[13]    incident?
[14] A. I can't recall that either.
[15] Q. Did Cook ever say anything about Pelham complaining
[16]    that there was no burglary?
[17] A. No. Not to me.
[18] Q. Okay. Did Ron Cook ever ask you to redraft your
[19]    statement?
[20] A. No.
[21] Q. Okay. So you say that you went back. And, in fact,
[22]    you did add some information that you had failed to
[23]    articulate the first time in your statement?

Chad Hogan v.
City of Montgomery, et al.

M. D. Gordon
February 9, 2006

Page 77

[1] **A.** Right.

[2] **Q.** Okay. And did anybody suggest that you add this

[3]  information, or did you do it on your own?

[4] **A.** I did it on my own.

[5] **Q.** Okay. And what specifically did you add in your

[6]  statement that you had not put in the first time?

[7] **A.** I think I put specifically where the guy was when I

[8]  pulled into the business and which direction he was

[9]  seen coming from.

[10] **Q.** Okay. Anything else?

[11] **A.** No.

[12] **Q.** Okay. And you turned your amended statement in then

[13]  to Lieutenant Caulfield?

[14] **A.** I made -- the copy of it. The amended one that I --

[15]  I made copies and I gave the original to Lieutenant

[16]  Cook.

[17] **Q.** Okay.

[18] **A.** I think Pelham was interviewing a suspect at that

[19]  time.

[20] **Q.** Okay. Just so I understand. You drafted your

[21]  statement. Then you went to the property room.

[22]  Then you came back from property with a receipt.

[23]  You submitted the receipt. And then you recalled

Page 78

[1]  that you wanted to add detailed --

[2] **A.** I went back into the -- I never closed my computer

[3]  out.

[4] **Q.** Okay.

[5] **A.** I still had my statement on the screen. I just went

[6]  back and I read over it --

[7] **Q.** Okay.

[8] **A.** -- like any normal person would do. Proofread it.

[9] **Q.** Sure. Did you print it before you made the

[10]  amendment?

[11] **A.** Yes. That was the first one I gave them before I

[12]  went down to impound the property. That's the one

[13]  that I printed.

[14] **Q.** Okay. So you drafted your statement?

[15] **A.** Uh-huh.

[16] **Q.** And you printed it?

[17] **A.** Uh-huh.

[18] **Q.** And you gave it to Cook?

[19] **A.** Gave it to Pelham.

[20] **Q.** Pelham?

[21] **A.** Uh-huh.

[22] **Q.** All right. And then you went to property?

[23] **A.** I went to the desk in impound property.

Page 79

[1] **Q.** All right. Then you got a receipt?

[2] **A.** Uh-huh.

[3] **Q.** And then you brought the receipt back?

[4] **A.** Uh-huh.

[5] **Q.** And you gave the receipt to who?

[6] **A.** To -- I don't know who I gave the receipt to. I

[7]  don't know. I can't recall.

[8] **Q.** Would it go to detectives?

[9] **A.** It stayed up there, yes.

[10] **Q.** You say you took Osko down to the kennel?

[11] **A.** After everything, yes.

[12] **Q.** Okay. And I guess that's something you do after

[13]  every shift; right?

[14] **A.** Right.

[15] **Q.** Does the -- you're the only officer that uses Osko

[16]  as a partner?

[17] **A.** Right.

[18] **Q.** Okay. And do you recall where you went after you

[19]  dropped Osko off at the kennel?

[20] **A.** I dropped him off, I turned my statement in to

[21]  Lieutenant Caulfield, and I went home.

[22] **Q.** Okay. Do you recall what time you got home?

[23] **A.** I can't remember, no.

Page 80

[1] **Q.** Was it a normal time after your shift?

[2] **A.** It was -- yeah. When I was working those hours,

[3]  yes, sir.

[4] **Q.** Okay. And forgive me if you've said already, but

[5]  did you have a conversation with Caulfield after you

[6]  turned Osko in at the kennel about the statement?

[7] **A.** I gave him my statement. He told me good job and

[8]  I'll see you tomorrow.

[9] **Q.** Okay. And before you turned the statement in, did

[10]  you have any conversations at all with Caulfield

[11]  about what was going to be put in the statement?

[12] **A.** No.

[13] **Q.** Okay.

[14]  (Brief interruption.)

[15]  **MR. NELMS:** Excuse me just one second.

[16] **Q.** Did you ever meet Anthony Arnaud?

[17] **A.** I met him at the zoo when we had zoo weekend. But,

[18]  no, not that night, no.

[19] **Q.** So you know who he is?

[20] **A.** Yeah. Now I do, yes, sir.

[21] **Q.** How did you -- so you met him at the zoo after the

[22]  incident?

[23] **A.** Right.

Chad Hogan v.
City of Montgomery, et al.

M. D. Gordon
February 9, 2006

---

Page 81

[1] **Q.** Did you know him by sight?
[2] **A.** Now I do. Then I didn't, no.
[3] **Q.** Did you see him the night of the incident?
[4] **A.** No.
[5] **Q.** At all?
[6] **A.** I don't recall seeing him, no.
[7] **Q.** I mean, when I say at all -- I mean, when you're at
[8]   Arnaud's Quality Meats or at headquarters or...
[9] **A.** Not that I recall.
[10] **Q.** Okay. Had you ever seen him before March 31st?
[11] **A.** No, not that I recall.
[12] **Q.** When you saw him at the zoo, how did you know that
[13]   he was Anthony Arnaud?
[14] **A.** He introduced himself.
[15] **Q.** He came up and introduced himself to you?
[16] **A.** To the K-9 unit.
[17] **Q.** Okay. Were you in uniform?
[18] **A.** Yes.
[19] **Q.** Okay. Did you have a conversation with him at the
[20]   zoo?
[21] **A.** Like I said, he introduced himself.
[22] **Q.** Anything else?
[23] **A.** No.

---

Page 82

[1] **Q.** He didn't talk about the lawsuit at all?
[2] **A.** No. During that time, there were no -- there was no
[3]   lawsuit.
[4] **Q.** Did you talk about the subject matter of the arrest?
[5] **A.** No.
[6] **Q.** Did you have any conversation with him at all about
[7]   the incidence of March 31st?
[8] **A.** Not that I can recall.
[9] **Q.** Okay. I'm sorry. Did I ask you who Everett Johnson
[10]   is?
[11] **A.** No you didn't.
[12] **Q.** Do you know who Everett Johnson is?
[13] **A.** At the time, he was a third shift supervisor --
[14]   patrol supervisor.
[15] **Q.** Sergeant?
[16] **A.** Uh-huh.
[17] **Q.** Did you have any conversations with him on the night
[18]   of March 31st?
[19] **A.** I can't recall.
[20] **Q.** Did you have an opportunity to hear Sergeant
[21]   Everett Johnson's voice on the radio the night of
[22]   the incident?
[23] **A.** I'm pretty sure I didn't.

---

Page 83

[1] **Q.** Okay. You stated earlier that you heard someone
[2]   confirm over the radio that there was -- and don't
[3]   let me put words in your mouth, because I think
[4]   we've talked about this twice already -- that there
[5]   was, in fact, a burglary?
[6] **A.** There was a forced window.
[7] **Q.** Forced window?
[8] **A.** Uh-huh.
[9] **Q.** Okay. Could that have been Sergeant Johnson?
[10] **A.** It could have been. I mean, I don't know.
[11] **Q.** Okay. To the best of your knowledge, was he one of
[12]   the police officers on the scene at Arnaud's Meats?
[13] **A.** I can't remember. I never went back to the scene.
[14] **Q.** Okay. Have you ever been interviewed by anyone with
[15]   internal affairs regarding the incidence of March
[16]   31st regarding Chad Hogan?
[17]   **MR. BOYLE:** I'm going to object. He can
[18]   answer as far as if he gave a statement or
[19]   whether or not there was -- there was an
[20]   investigation done. But just the general
[21]   interview questions or anything like that is
[22]   going to be word product and we're going to
[23]   object.

---

Page 84

[1]   **MR. WHITEHEAD:** And I concur on that
[2]   objection.
[3] **Q.** My question was, have you talked to anyone from
[4]   internal affairs regarding the incidence, or the
[5]   incident, of March 31st involving Chad Hogan and the
[6]   arrest of Chad Hogan?
[7]   **MR. WHITEHEAD:** You can answer that
[8]   question.
[9] **A.** Yes.
[10] **Q.** I'm going to ask you a question and their going to
[11]   object. Okay. So hold your answer.
[12]   Can you tell me what you discussed with the
[13]   internal affairs investigator?
[14]   **MR. WHITEHEAD:** And I'm going to instruct
[15]   -- instruct the client not to answer that
[16]   question on the basis of word product and
[17]   attorney/client privilege.
[18]   **MR. BOYLE:** I'm arguing the same thing for
[19]   the City of Montgomery. The IA investigation
[20]   was done at the request of the legal
[21]   department in anticipation of litigation. So
[22]   it's word product.
[23] **Q.** (By Mr. Nelms) What date, if you can recall, did

---

Chad Hogan v.
City of Montgomery, et al.

M. D. Gordon
February 9, 2006

**Page 85**

[1] you have the conversation with an individual from
[2] internal affairs?
[3]       **MR. WHITEHEAD:** You can answer that
[4]       question if you can remember.
[5] **A.** I don't recall the date.
[6] **Q.** Okay. Can you recall the distance or length in time
[7]       from March 31, 2005 that it was that you had this
[8]       conversation with someone from internal affairs?
[9]       **MR. WHITEHEAD:** You can answer that.
[10] **A.** I can't recall that either.
[11] **Q.** Okay. Was it before or after you were served with
[12]       this lawsuit that brings us here today?
[13]       **MR. WHITEHEAD:** You can answer.
[14] **A.** It was before.
[15] **Q.** Before?
[16] **A.** Uh-huh.
[17] **Q.** Okay.
[18]       **MR. NELMS:** I would like to certify the
[19]       question, what was the substance of the
[20]       conversation that Officer Gordon had with the
[21]       internal affairs investigator?
[22]       **MR. WHITEHEAD:** Duly noted.
[23]       **MR. NELMS:** And it's my understanding that

**Page 86**

[1]       the officer has been instructed not to answer
[2]       that question; is that correct?
[3]       **MR. WHITEHEAD:** That is correct.
[4]       **MR. NELMS:** Okay.
[5] **Q.** (By Mr. Nelms) Did you -- have you ever had more
[6]       than one conversation with internal affairs
[7]       investigators?
[8]       **MR. WHITEHEAD:** You can answer that.
[9] **A.** I have.
[10] **Q.** Okay. Tell me how many conversations you've had
[11]       with internal affairs investigators.
[12]       **MR. WHITEHEAD:** You can answer that.
[13] **A.** I can't recall that.
[14] **Q.** Was it less than five?
[15] **A.** Yes.
[16] **Q.** Was it more than two?
[17] **A.** I don't know. Probably.
[18] **Q.** Okay. The first conversation you had with internal
[19]       affairs was before you were served with this
[20]       lawsuit. Have you had any conversations with
[21]       internal affairs after you were served with this
[22]       lawsuit?
[23]       **MR. WHITEHEAD:** You can answer that.

**Page 87**

[1] **A.** No.
[2]       **MR. NELMS:** Off the Record.
[3]       (Off-the-Record discussion.)
[4] **Q.** Do you know Mike Trotter?
[5] **A.** Yes.
[6] **Q.** Okay. How do you know Mike Trotter?
[7] **A.** He's an internal affairs investigator.
[8] **Q.** Okay. As a result of anything that happened
[9]       regarding the arrest of Chad Hogan, have you been
[10]       disciplined in any way by the Montgomery Police
[11]       Department?
[12] **A.** No.
[13] **Q.** Okay. Since March 31, 2005, have you been given a
[14]       promotion?
[15] **A.** Yes.
[16] **Q.** All right. And how have you been promoted?
[17] **A.** I will be promoted to corporal on -- tomorrow.
[18] **Q.** Tomorrow?
[19] **A.** Uh-huh.
[20] **Q.** Okay. Congratulations.
[21] **A.** Thank you.
[22] **Q.** Does that include a raise in pay?
[23] **A.** Yes, sir.

**Page 88**

[1] **Q.** Okay. Other than this promotion to corporal, have
[2]       you had any other formal promotion or pay increase
[3]       since March 31, 2005?
[4] **A.** I can't remember.
[5] **Q.** You can't remember?
[6] **A.** No. I -- I mean, I can't recall that. I don't
[7]       know.
[8] **Q.** Okay. Have -- can you recall having any increase in
[9]       pay?
[10] **A.** I have. But I don't know if it was before or after
[11]       the incident.
[12] **Q.** Okay. The promotion to corporal, did you have to
[13]       take some examination in order to become a corporal?
[14] **A.** You do.
[15] **Q.** And I believe you stated earlier, you're the only
[16]       K-9 officer that is not a corporal?
[17] **A.** There's two of us, actually.
[18] **Q.** Okay. And I believe you said that corporal Mora
[19]       actually arrested Chad Hogan; is that correct?
[20] **A.** He actually apprehended him, correct.
[21] **Q.** Okay. To the best of your knowledge, did he write a
[22]       statement about the arrest?
[23] **A.** I'm pretty sure he did.

Chad Hogan v.
City of Montgomery, et al.

M. D. Gordon
February 9, 2006

---

**Page 89**

[1] **Q.** Okay. Did Lieutenant Caulfield ever come up to
[2]   headquarters while you were at headquarters on the
[3]   night of the incident?
[4] **A.** I think he was there before I was there.
[5] **Q.** Okay. Did you ever have an opportunity to see him
[6]   actually at headquarters?
[7] **A.** Yes, sir.
[8] **Q.** Okay. And this was while -- after the incident
[9]   while you were at headquarters?
[10] **A.** Right.
[11] **Q.** Okay. And, obviously, before you turned in your
[12]   report to him at the kennel.
[13] **A.** Right.
[14] **Q.** Okay. Did you have an opportunity to talk to him
[15]   during that window of time where you were both at
[16]   headquarters together?
[17] **A.** It was -- if so, it was a brief conversation. It
[18]   would be a, that a boy, good job.
[19] **Q.** Okay. Any specifics you can remember about that
[20]   conversation?
[21] **A.** No.
[22] **Q.** Okay. Do you remember there being an incident at
[23]   Alabama State University involving a K-9 officer and

---

**Page 90**

[1]   his dog?
[2] **A.** Correct.
[3] **Q.** Do you remember the date of that incident?
[4] **A.** I do not.
[5] **Q.** Do you recall whether or not it was before or after
[6]   March 31, 2005?
[7] **A.** It was before.
[8] **Q.** Okay. Months, weeks, days? Can you tell me?
[9] **A.** I can't remember. Maybe weeks.
[10] **Q.** Okay.
[11] **A.** Maybe months. I don't know.
[12] **Q.** Okay. Do you know whether or not there was
[13]   allegation that the bite at Alabama State University
[14]   was unlawful?
[15] **A.** Yes.
[16] **Q.** Okay. And, in fact, was there an allegation that
[17]   the bite at Alabama State University was unlawful?
[18] **A.** Yes.
[19] **Q.** Had there been discussion among the K-9 officers of
[20]   the event at Alabama State University?
[21] **A.** What do you mean?
[22] **Q.** Did you ever talk to any of your fellow K-9 officers
[23]   about the circumstances of the event regarding the

---

**Page 91**

[1]   bite at Alabama State University?
[2] **A.** I mean, everybody -- after a bite, we all talk about
[3]   it, you know, good jobs and everything like that.
[4] **Q.** Okay. Well, who did you talk to about the event at
[5]   Alabama State University?
[6] **A.** I'm pretty sure I talked to everybody about it.
[7] **Q.** Did you talk to Lieutenant Caulfield about it?
[8] **A.** He's my supervisor.
[9] **Q.** Okay. Did you talk to Corporal Mora about it?
[10] **A.** Yes.
[11] **Q.** Okay. Who was the K-9 officer in charge of the dog
[12]   that did the biting at ASU?
[13] **A.** It was myself.
[14] **Q.** Okay. And why don't you tell me the circumstances
[15]   surrounding that event?
[16]     **MR. WHITEHEAD:** That's fine.
[17] **A.** I mean, we got called to assist ASU police. They
[18]   had some subjects that were attempting to break-in
[19]   to an ATM machine and a snack machine. The subjects
[20]   fled and crossed Carter Hill Road onto another
[21]   street, and they hid in the area. One subject
[22]   supposedly had on handcuffs. I think it was three
[23]   of them total.

---

**Page 92**

[1]     We got called in the area to assist. We got
[2]   there, I put my dog on the ground, Corporal Mora
[3]   used his dog as well. He located the first
[4]   suspect. His dog apprehended him. A couple of
[5]   minutes later -- maybe thirty minutes later, I
[6]   apprehended the second suspect attempting to hide
[7]   and get away from me hiding in a bush.
[8] **Q.** Do you recall the name of the individual that was
[9]   bitten by Osko?
[10] **A.** I can't remember.
[11] **Q.** Was he subsequently convicted?
[12] **A.** That I don't know.
[13] **Q.** Okay. Did you ever have to go to court to testify?
[14] **A.** No.
[15] **Q.** What was the nature of the complaint?
[16] **A.** It was -- like I said, it was a burglary in
[17]   progress.
[18] **Q.** No. The complaint regarding the bite.
[19] **A.** He made allegations that the bite was unlawful.
[20] **Q.** What, if you know, specifically, did he say?
[21] **A.** I don't know exactly what he said.
[22] **Q.** Has a lawsuit been filed against you in that case?
[23] **A.** I haven't been served a lawsuit, no.

---

Chad Hogan v.
City of Montgomery, et al.

M. D. Gordon
February 9, 2006

---

Page 93

[1] **Q.** Okay. Do you write a statement, like you wrote in
[2] this case --
[3] **A.** Uh-huh.
[4] **Q.** -- for every arrest that's made?
[5] **A.** Correct.
[6] **Q.** Okay. But you did not make the arrest of Chad
[7] Hogan; is that correct?
[8] **A.** Correct.
[9] **Q.** Corporal Mora made the arrest?
[10] **A.** I wouldn't say that he did it either. I mean, I
[11] don't know who actually read him his Miranda rights.
[12] I don't -- I don't know.
[13] **Q.** Did anyone specifically ask you, before you had your
[14] conversation with Caulfield while you were taking
[15] the property to be accessioned at property --
[16] **A.** Uh-huh.
[17] **Q.** Did anyone, including Caulfield, specifically tell
[18] you to write a statement?
[19] **A.** I knew that was my job to do.
[20] **Q.** Okay. So you took it upon yourself to write a
[21] statement?
[22] **A.** Right.
[23] **Q.** Your training told you you're supposed to write a

---

Page 94

[1] statement.
[2] **A.** Correct.
[3] **Q.** Okay.
[4] **THE WITNESS:** Can we take a quick restroom
[5] break?
[6] **MR. NELMS:** Yeah.
[7] (Brief recess.)
[8] **MR. NELMS:** Okay. Back on the record.
[9] **Q.** You told me about going back and making an amendment
[10] to your statement. Did you make any other changes
[11] or amendments to the statement other than the one
[12] you've told me about?
[13] **A.** That's all I can remember. I mean, I don't know.
[14] I'd have to look back at my statements to see the
[15] difference.
[16] **Q.** Okay. So you wrote your statement the first time --
[17] **A.** Uh-huh.
[18] **Q.** -- went to property, came back, added the
[19] information that you've told me about. And other
[20] than that, you don't recall making any amendments to
[21] that statement otherwise?
[22] **A.** Correct.
[23] **Q.** Okay. I'm going to show you a four page -- excuse

---

Page 95

[1] me -- three-page document and ask you if you
[2] recognize this document, please, Mr. Gordon.
[3] **A.** Correct.
[4] (Brief recess.)
[5] **MR. NELMS:** Back on the record.
[6] **Q.** Before we -- I took my break, I handed you a
[7] document and asked you to review it. It is four
[8] pages, is it not?
[9] **A.** Yes.
[10] **Q.** All right. It includes an Alabama Uniform Incident
[11] Offense Report, an arrest report, and two memoranda
[12] to Caulfield from Gordon dated March 31, 2005?
[13] We were talking earlier about a statement that
[14] you drafted for Lieutenant Caulfield. Is this the
[15] statement we were referring to?
[16] **A.** Correct.
[17] (Plaintiff's Exhibit No. 1 was marked
[18] for identification.)
[19] **MR. NELMS:** I marked it as Plaintiff's
[20] Exhibit 1. And we'll submit it to the court
[21] reporter.
[22] **Q.** One of the memoranda is signed by you. The other is
[23] not; is that correct?

---

Page 96

[1] **A.** It is.
[2] **Q.** Okay. The one that is not, is that the first draft
[3] that you referred to?
[4] **A.** Correct.
[5] **Q.** The one that you made before you went down to
[6] property?
[7] **A.** Correct.
[8] **Q.** Okay. And the one that is signed by you --
[9] **A.** That's the official.
[10] **Q.** That's the official?
[11] **A.** Right.
[12] **Q.** You said official. But it's the one you turned in
[13] to Caulfield.
[14] **A.** Right.
[15] **Q.** Okay. It came to me attached to the I&O and the
[16] arrest report. Do you know of any reason why the
[17] memorandum from you to Caulfield should be attached
[18] to the I&O and the arrest report?
[19] **A.** Who sent it to you? How did you get it?
[20] **Q.** Well -- do you know of any reason why the memorandum
[21] would be attached to...
[22] **A.** No.
[23] **Q.** Okay. Is it standard procedure to attach such a

---

Chad Hogan v.
City of Montgomery, et al.

M. D. Gordon
February 9, 2006

Page 97

[1]    statement to an I&O or arrest report?
[2] **A.** I don't know. After I turn it in, I don't know what
[3]    happens to it. I don't know.
[4] **Q.** Okay. I don't know either. So I was just asking.
[5]    And I believe the -- the change that you made
[6]    is you added a couple of words. Can you tell me --
[7]    point to what you added in the signed memorandum
[8]    that you did not have in the original?
[9] **A.** The window is in there.
[10] **Q.** The window?
[11] **A.** Uh-huh.
[12] **Q.** So you state, observed a Lincoln Town Car parked on
[13]    the side of the business next to a side window.
[14] **A.** Uh-huh.
[15] **Q.** And observed a black male standing outside of the
[16]    vehicle -- excuse me. I can't read. Next to the
[17]    business where the alarm was received.
[18] **A.** Right.
[19] **Q.** Okay. And in the first you wrote --
[20] **A.** I just had he was standing outside of the vehicle.
[21] **Q.** But you didn't say where?
[22] **A.** Right.
[23] **Q.** Okay. Is it your testimony today that you only made

Page 98

[1]    one amendment to this statement?
[2] **A.** Right.
[3] **Q.** And this is the one and only amendment that you made
[4]    to this statement that you gave to Caulfield?
[5] **A.** Right. As far as I know, yes.
[6] **Q.** Okay. Did you make any draft or any statement for
[7]    submission to Caulfield, Cook, Pelham, or anyone
[8]    else, before you drafted Plaintiff's Exhibit No. 1
[9]    the signed memorandum?
[10] **A.** The one that's not signed.
[11] **Q.** Before that one, did you make any other written
[12]    statement?
[13] **A.** Not that I recall, no.
[14] **Q.** Not that you can recall?
[15] **A.** Right.
[16] **Q.** So there's a possibility that there was another
[17]    written statement?
[18]    **MR. WHITEHEAD:** Object to the form.
[19] **A.** Not that I can recall, no.
[20] **Q.** Okay.
[21]    (Plaintiff's Exhibit No. 2 was marked
[22]    for identification.)
[23] **Q.** I'm going to hand you a document that I've marked as

Page 99

[1]    Plaintiff's Exhibit No. 2. I ask you to look at
[2]    this document and tell me if you're familiar with
[3]    it.
[4] **A.** I'm not.
[5] **Q.** Okay. I ask you to turn to the next to the last
[6]    page.
[7] **A.** (Witness complies.)
[8] **Q.** It's a page that has a number of signatures on it --
[9] **A.** Right.
[10] **Q.** -- is it not?
[11] **A.** Right.
[12] **Q.** There's one line that says M. D. Gordon.
[13] **A.** Right.
[14] **Q.** And there's a signature above it. Is that your
[15]    signature?
[16] **A.** Correct.
[17] **Q.** Okay. Are these your answers and responses to
[18]    discovery that we propounded upon you?
[19] **A.** It is.
[20] **Q.** Okay. And are these answers accurate to the best of
[21]    your knowledge?
[22] **A.** They are, to the best of my knowledge.
[23] **Q.** Did you draft these answers?

Page 100

[1] **A.** What was that?
[2] **Q.** Did you draft these answers?
[3] **A.** These are my answers, right.
[4] **Q.** My question was, did you draft these answers?
[5] **A.** Yeah. These are my answers, right.
[6]    **MR. WHITEHEAD:** Are you asking did he
[7]    draft the document?
[8] **A.** Did I create the document? Is that what you're
[9]    asking?
[10] **Q.** Let's go to No. 2 --
[11] **A.** Okay.
[12] **Q.** -- on Page 2.
[13] **A.** Okay.
[14] **Q.** The answer -- first of all, you object. Then you
[15]    state that you graduated from the academy and that
[16]    you've completed other training.
[17] **A.** Uh-huh.
[18] **Q.** The question asked for dates, places, certificates
[19]    of completion, etc. You do not provide those.
[20] **A.** Right.
[21] **Q.** Was that your choice not to provide the dates, the
[22]    places, and certificates of completion.
[23]    **MR. NELMS:** Object on the basis of

Chad Hogan v.
City of Montgomery, et al.

M. D. Gordon
February 9, 2006

---

Page 101

[1]     attorney/client privilege and word product and
[2]     I instruct you not to answer that question.
[3]     The answers speaks for itself.
[4]  Q.  Are you not going to answer the question?
[5]  A.  No.
[6]  Q.  My question is, was it your decision not to provide
[7]     the dates, places, and certificates of completion
[8]     for training that you've received? And you've
[9]     indicated that you're not going to answer that
[10]    question, because your lawyer has instructed you not
[11]    to because he claims it's attorney/client privilege;
[12]    is that correct?
[13] A.  That's correct.
[14]         MR. NELMS: I ask that the question be
[15]    certified.
[16]         MR. WHITEHEAD: Duly noted.
[17] Q.  Question No. 3. Do you see it?
[18] A.  Uh-huh.
[19] Q.  There's a Nextel number there. Do you see that?
[20] A.  I do.
[21] Q.  Is that a number and a phone that is assigned to you
[22]    by the Montgomery Police Department?
[23] A.  It's not.

---

Page 102

[1]  Q.  Is it your private number?
[2]  A.  It is.
[3]  Q.  Okay. Do you pay that phone bill yourself?
[4]  A.  I do.
[5]  Q.  Does the Montgomery Police Department contribute in
[6]     any way to the bill or payment of the bill for your
[7]     cell phone?
[8]  A.  I pay the bill myself.
[9]  Q.  Thank you. Do you see No. 5?
[10] A.  I do.
[11] Q.  I asked you to provide me with a narrative of the
[12]    events of March 31, 2005. And you've given me an
[13]    answer. And it states, the defendant states that it
[14]    his understanding that the plaintiff committed a
[15]    burglary at Arnaud's Meats. Is that your
[16]    understanding?
[17] A.  It is.
[18] Q.  Do you have any reason to believe that, in fact, the
[19]    plaintiff, Chad Hogan, did not commit a burglary at
[20]    Arnaud's Meats?
[21] A.  No.
[22] Q.  Is it your belief --
[23]         MR. WHITEHEAD: Object to the form.

---

Page 103

[1]  Q.  Is it your belief, as you sit here today, that, in
[2]     fact, Chad Hogan did commit a burglary at Arnaud's
[3]     Meats?
[4]  A.  I still believe what I believed March 31st, yes.
[5]  Q.  Thank you. You also state that there was a handgun,
[6]     ski mask, and flashlight found inside the vehicle;
[7]     is that correct?
[8]  A.  Yes.
[9]  Q.  Okay. What is the importance of noting that there
[10]    was a flashlight inside the vehicle?
[11] A.  That's just to let you know what I found in the
[12]    vehicle, also.
[13] Q.  Do you see Request for Production No. 2?
[14] A.  No. 2?
[15] Q.  Yes, sir.
[16] A.  Yeah.
[17] Q.  It asks for the entire investigative file related to
[18]    the arrest of Chad Hogan. Do you acknowledge that?
[19] A.  Yeah.
[20] Q.  And it says, see attached documents; correct?
[21] A.  Correct.
[22] Q.  Were both of the memoranda that we've discussed
[23]    today included in your response to No. 2?

---

Page 104

[1]  A.  I can't recall.
[2]  Q.  Thank you.
[3]  A.  I can't recall.
[4]  Q.  It says in No. 3, produce copies of any notes,
[5]     diaries, correspondence, memorandum, or reports of
[6]     any kind related to the incident and arrest of the
[7]     plaintiff, which occurred on or about March 31,
[8]     2005. Did you -- it says none; correct?
[9]  A.  Uh-huh.
[10] Q.  Are you aware of any notes, diaries, or other
[11]    correspondence -- memorandum of any kind related to
[12]    the arrest of Chad Hogan?
[13]         MR. WHITEHEAD: Other than what was
[14]    produced to you as part of the file?
[15] Q.  Other than what was produced.
[16] A.  Right. That would be the entire investigative file.
[17] Q.  Do you have any personal notes?
[18] A.  No.
[19] Q.  Any other diaries that you may be aware of?
[20] A.  No.
[21] Q.  Did you ever have an opportunity to talk to anyone
[22]    at the District Attorney's office related to the
[23]    arrest of Chad Hogan?

---

Chad Hogan v.
City of Montgomery, et al.

M. D. Gordon
February 9, 2006

---

**Page 105**

[1]  **A.**  No.

[2]  **Q.**  Are you aware of the status of the Burglary 3 charge

[3]  against Chad Hogan at this time?

[4]  **A.**  No.

[5]  **Q.**  Do you know whether or not it's been prosecuted?

[6]  **A.**  No, I don't know.

[7]  **Q.**  Any investigator from the District Attorney's office

[8]  contact you in relation --

[9]  **A.**  I haven't talked to anyone from the DA's office.

[10]  **Q.**  Other than what we've talked about here today --

[11]  **A.**  Uh-huh.

[12]  **Q.**  -- do you have or know of any evidence that Chad

[13]  Hogan burglarized Arnaud's Meats?

[14]  **A.**  Not other than what we talked about today, no.

[15]  **Q.**  Were any fingerprints taken of the scene?

[16]  **A.**  I don't know.

[17]  **Q.**  Were any footprints found at the scene?

[18]  **A.**  I have no idea.

[19]  **Q.**  Was any property belonging to Arnaud's Meats found

[20]  on the person of Chad Hogan?

[21]  **A.**  Not to my knowledge.  I don't know.

[22]  **Q.**  When, to the best of your knowledge, did you see

[23]  Chad Hogan in person after he was arrested?

---

**Page 106**

[1]  **A.**  I did.  I saw him on the scene after he was

[2]  apprehended.

[3]  **Q.**  Was he injured in any way?

[4]  **A.**  He received a dog bite.

[5]  **Q.**  Where was the dog bite on his person?

[6]  **A.**  I want to say it was to his leg.  I can't remember.

[7]  **Q.**  Okay.  Can you describe the wound itself?

[8]  **A.**  No, I can't.

[9]  **Q.**  Do you know -- were there any puncture marks?

[10]  **A.**  I'm pretty sure there were.

[11]  **Q.**  Can you differentiate between whether there were

[12]  puncture marks or scratches?

[13]  **A.**  I mean, I don't know what I had.  I don't know what

[14]  he received.  My dog didn't bite him.

[15]  **Q.**  I understand.  I'm asking you what you know.  Did he

[16]  receive, Chad Hogan that is, any medical treatment

[17]  or first aid as a result?

[18]  **A.**  Everyone that's dog bitten receives some medical

[19]  attention.

[20]  **Q.**  Was Mr. Hogan taken to a hospital?

[21]  **A.**  I'm not sure.

[22]  **MR. NELMS:**  That's all I've got.

[23]

---

**Page 107**

[1]  (Plaintiff's Exhibit No. 3 was marked

[2]  for identification.)

[3]

[4]

[5]

[6]

[7]

[8]

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

---

**Page 108**

[1]  **REPORTER'S CERTIFICATE**

[2]

[3]  STATE OF ALABAMA

[4]  COUNTY OF MONTGOMERY

[5]

[6]  I, Angela Fulmer, Certified Shorthand Reporter

[7]  and Notary Public in and for the State of Alabama at

[8]  Large, do hereby certify that on February 9, 2006,

[9]  pursuant to notice and stipulation on behalf of the

[10]  Plaintiff, I reported the deposition of J. M. GORDON, who

[11]  was first duly sworn by me to speak the truth, the whole

[12]  truth, and nothing but the truth, in the matter of Civil

[13]  Action Number 2:05CV-687-F, now pending in the United

[14]  States District Court for the Middle District of Alabama,

[15]  Northern Division, that the foregoing 107 typewritten

[16]  pages contain a true and accurate transcription of the

[17]  examination of said witness by counsel for the parties

[18]  set out herein; that the reading and signing of said

[19]  deposition was waived by witness and counsel for the

[20]  parties.

[21]  I further certify that I am neither

[22]  of kin nor of counsel to the parties to said cause, nor

[23]  in any manner interested in the results thereof.

---