DEPOSITION OF LEONARD PELHAM                October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


CHAD HOGAN,

     Plaintiff,

vs.                CIVIL ACTION AT LAW
                   CASE NO. 2:05CV687
CITY OF MONTGOMERY, et al.,

     Defendants.



* * * * * * * * * *

     DEPOSITION OF LEONARD KIRK PELHAM, taken

pursuant to stipulation and agreement before

Mallory N. McCutchin, Court Reporter and

Commissioner for the State of Alabama at Large,

in the Law Offices of Thomas, Mean, Gillis &

Seay, 3121 Zelda Court, Montgomery, Alabama, on

Monday, October 3, 2005, commencing at

approximately 1:09 p.m.

* * * * * * * * * *

DEPOSITION OF LEONARD PELHAM                    October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY

2 (Pages 2 to 5)

**Page 2**

```
 1              APPEARANCES
 2  FOR THE PLAINTIFF:
 3  Mr. Keith Anderson Nelms
    Mr. Jay Lewis
 4  LAW OFFICE OF JAY LEWIS
    Attorneys at Law
 5  P.O. Box 5059
    Montgomery, Alabama 36103
 6
    FOR THE DEFENDANTS:
 7
    Mr. Christopher K. Whitehead
 8  Mr. H. Lewis Gillis
    Ms. Ramadanah M. Salaam
 9  THOMAS, MEANS, GILLIS & SEAY
    Attorneys at Law
10  3121 Zelda Court
    Montgomery, Alabama 36103
11
    FOR THE DEFENDANTS:
12
    Ms. Kimberly O. Fehl
13  Mr. Michael Boyle
    Attorneys at Law
14  MONTGOMERY CITY ATTORNEY'S OFFICE
    P.O. Box 1111
15  Montgomery, Alabama 36101
16  FOR KIRK PELHAM:
17  Ms. Roianne Houlton Conner
    Attorney at Law
18  250 Winton Blount Loop
    P.O. Box 240458
19  Montgomery, Alabama 36124
20  ALSO PRESENT:
21  Mr. Chad Hogan
    Mr. Michael Briddell
22  Mr. Billy Caulfield
    Mr. Ronald Cook
23  Mr. Marquedric Gordon
```

**Page 3**

```
 1          EXAMINATION INDEX
 2
    LEONARD KIRK PELHAM
 3   BY MR. WHITEHEAD        5
     BY MS. FEHL           127
 4   BY MS. CONNER         145
     BY MS. FEHL           150
 5   BY MR. NELMS          152
 6
            EXHIBIT INDEX
 7
    DEFENDANT'S EXHIBIT NO.:
 8
    1  Verified Claim Against     74
 9     the City of Montgomery
10  2  3/31/05 Memorandum      84,88,126
11  3  Affidavit           84,113-115
12  4  3/31/05 Detective Daily    84
       Summary
13
    5  Complaint              113,114
14
    6  Warrant of Arrest       113,114
15
    7  E-mail to Mayor Bright     123
16     from Kirk Pelham
17  8  3/31/05 Memorandum    124,125,126
18
    PELHAM EXHIBIT NO:
19
    1  Employee Commendation Record  147
20
    2  City of Montgomery       147
21     Merit Increase
22
23        * * * * * * * * * *
```

**Page 4**

```
 1              STIPULATIONS
 2       It is hereby stipulated and agreed by
 3  and between counsel representing the parties that
 4  the deposition of LEONARD KIRK PELHAM is taken
 5  pursuant to the Federal Rules of Civil Procedure
 6  and that said deposition may be taken before
 7  Mallory N. McCutchin, Court Reporter and
 8  Commissioner for the State of Alabama at Large,
 9  without the formality of a commission; that
10  objections to questions other than objections as
11  to the form of the questions need not be made at
12  this time but may be reserved for a ruling at
13  such time as the deposition may be offered in
14  evidence or used for any other purpose as
15  provided for by the Federal Rules of Civil
16  Procedure.
17       It is further stipulated and agreed by
18  and between counsel representing the parties in
19  this case that said deposition may be introduced
20  at the trial of this case or used in any manner
21  by either party hereto provided for by the
22  Federal Rules of Civil Procedure.
23          * * * * * * * * * *
```

**Page 5**

```
 1          LEONARD KIRK PELHAM
 2       The witness, having first been sworn to
 3  speak the truth, the whole truth and nothing but
 4  the truth, testified as follows:
 5              EXAMINATION
 6  BY MR. WHITEHEAD:
 7  Q.  Mr. Pelham, let me get you to state your name
 8      for the record, please.
 9  A.  Leonard Kirk Pelham.
10      COURT REPORTER:  Since this is federal,
11      what about read and sign?
12      MR. NELMS:  Middle District rule says
13      you don't have to read and sign.
14      MR. WHITEHEAD:  Yeah, okay.
15  Q.  Okay.  Mr. Pelham, as I just told you, I'm --
16      my name is Chris Whitehead, and I'm
17      representing some of the defendants that have
18      been named in a lawsuit that has been filed
19      by a man named Chad Hogan.  And we're going
20      to take your deposition today just to ask you
21      a few questions about some of the allegations
22      that are made in this lawsuit.  It's my
23      understanding that you have some knowledge
```

DEPOSITION OF LEONARD PELHAM
CHAD HOGAN v. CITY OF MONTGOMERY

October 3, 2005

3 (Pages 6 to 9)

Page 6

1  about some of the allegations that he's
2  making. And that's what we're here today
3  for. Just a few preliminary things before we
4  get started. Let me ask you first, have you
5  ever given a deposition before?
6  A. No.
7  Q. Okay. Pretty straightforward. I'm just
8  going to be asking you some questions. Just
9  want you to give a verbal response to my
10  questions. Because we got a court reporter
11  and she's going to be taking it down, try to
12  avoid human nature of nodding your head when
13  an answer is yes or shaking your head when an
14  answer is no, just because she's got to get
15  it down on the record. And if you mess up a
16  couple of times -- and I'm sure you, like
17  everybody else, will, we'll try to remind you
18  as we go. Okay?
19  A. All right.
20  Q. Let me ask you, too, that if I ask a question
21  that you don't understand -- and I'm certain
22  that I probably will -- just ask me to repeat
23  it, ask me to re-clarify it. And I'll try to

Page 7

1  rephrase it as best I can so that you can
2  properly understand it. Okay?
3  A. Okay.
4  Q. A few more preliminaries. Let's see. Have
5  you taken any kind of medications in the last
6  24 hours that would affect your ability to
7  properly testify here today?
8  A. No.
9  Q. Okay. Have any problems reading or writing?
10  A. No.
11  Q. Okay. Report to anybody that you're feeling
12  sick today in any way?
13  A. No.
14  Q. Have any problems with your eye sight?
15  A. No.
16  Q. Any problems with your hearing?
17  A. No.
18  Q. Any reason you can think of that you wouldn't
19  be able to fully participate in this
20  deposition today?
21  A. No.
22  Q. Okay. Mr. Pelham, do you have a driver's
23  license?

Page 8

1  A. Yes.
2  Q. Do you know what your driver's license number
3  is?
4  A. 6478254.
5  Q. And that's Alabama?
6  A. Yes.
7  Q. Have you ever had a driver's license issued
8  in another state?
9  A. No.
10  Q. Okay. License ever been suspended or
11  revoked?
12  A. Yeah. They've been suspended several years
13  ago.
14  Q. Okay. Why was your license suspended seven
15  years ago?
16  A. Speeding ticket, I believe it was.
17  Q. Just too many points against you?
18  A. Uh-huh, yes. Yes.
19  Q. See, there we go already. Is that the only
20  time your license has been suspended?
21  A. Yes.
22  Q. Mr. Pelham, are you married right now?
23  A. Yes, I am.

Page 9

1  Q. Okay. Mr. Pelham, I'm about to ask you a
2  series of questions on some of your family
3  members that might live in the area. Let me
4  tell you why. In the event we've got to pick
5  a jury and you're a witness in the case, we
6  just need to make sure we're not putting your
7  cousin or your wife's cousin or your uncle on
8  the jury or something like that. So that's
9  why I'm going to ask you some of the
10  questions. Okay?
11  A. Okay.
12  Q. Tell me your wife's name, please.
13  A. Tiffany.
14  Q. Obviously Pelham. What was her maiden name?
15  A. Williams.
16  Q. How long have y'all been married?
17  A. A year and a few weeks.
18  Q. Is that the only time you've been married?
19  A. No. I was married once before.
20  Q. What was your former's wife name?
21  A. Porsche.
22  Q. Can you spell that for me?
23  A. P-O-R-S-C-H-E.

DEPOSITION OF LEONARD PELHAM                October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY

4 (Pages 10 to 13)

**Page 10**

1  Q. What was her maiden name?
2  A. Worrell, W-O-R-R-E-L-L.
3  Q. Is she remarried at this point?
4  A. I don't know.
5  Q. Okay. Do you know what name she's going by,
6     by any chance? Or last you heard, what last
7     name was she using?
8  A. Worrell.
9  Q. Have any children?
10 A. I have two stepchildren.
11 Q. Both of them under the age of 19?
12 A. Uh-huh, yes.
13 Q. Have any brothers or sisters?
14 A. Yes.
15 Q. Okay. Either of them live in the state of
16    Alabama?
17 A. Yes.
18 Q. Who's your brother?
19 A. Tyrone, T-Y-R-O-N-E, and Sonny, S-O-N-N-Y.
20 Q. So your brother is Tyrone, and your sister
21    is --
22 A. My younger brother, Sonny. Both brothers.
23 Q. Oh, okay. So you've got two brothers?

**Page 11**

1  A. Uh-huh, yes.
2  Q. I might have misunderstood you. I thought
3     you said you had brothers and sisters. Did
4     you just say you had a brother?
5  A. Just two brothers.
6  Q. Okay. I'm sorry. Where does Tyrone live?
7  A. Prattville.
8  Q. You know his exact address by any chance?
9  A. I don't.
10 Q. Your younger brother Sonny, where does he
11    live?
12 A. He lives in Auburn.
13 Q. Does your wife have any brothers or sisters?
14 A. No.
15 Q. Are both of your parents still living?
16 A. Yes.
17 Q. Where do they live?
18 A. Prattville.
19 Q. What's your dad and your mom's name?
20 A. Larry Pelham and Scottie, S-C-O-T-T-I-E.
21 Q. How about your wife's parents. Are they
22    still living?
23 A. Yes.

**Page 12**

1  Q. Where do they live?
2  A. Her dad lives in Montgomery. Her mother
3     lives in Gulf Shores.
4  Q. All right. Her dad, what's his name?
5  A. Jeff Williams.
6  Q. You have his address by any chance?
7  A. I do not.
8  Q. All right. And you said mom lives in Gulf
9     Shores?
10 A. Gulf Shores.
11 Q. What is Mom's name?
12 A. I couldn't tell you. She don't -- they
13    don't -- they don't talk.
14 Q. Okay. Her parents have been divorced for a
15    number of years?
16 A. Yeah.
17 Q. All right. Do you have any first cousins
18    that live in the state?
19 A. Yeah.
20 Q. How many cousins do you have?
21 A. Got a bunch of them.
22 Q. Oh, goody. They all live within a hundred
23    miles of here?

**Page 13**

1  A. Yeah.
2  Q. How many you got?
3  A. Probably 15.
4     MR. WHITEHEAD: Okay. Roianne, can we
5        have a gentleman-lady agreement
6        that you'll send me a letter,
7        listing all his cousins?
8     MS. CONNER: Yeah. A list. It would
9        be a whole lot easier.
10    MR. WHITEHEAD: Yeah. Yeah.
11 Q. How about your wife? Does she have any first
12    cousins in the area as well? And if so,
13    we'll do the same thing. We'll agree on the
14    record, do the same thing with a list.
15 A. She's got four.
16 Q. Go ahead and give me their names real quick.
17 A. I couldn't give you -- let's see. There's
18    Brittany Jones.
19 Q. Let me ask you this. Will you get with your
20    wife and get back with Roianne and let me
21    know?
22 A. I can, yeah.
23 Q. Is this your wife's first marriage?

**Page 14**

1  A. It's her second marriage.
2  Q. Is her former husband, does he still live in
3     the area?
4  A. Yes.
5  Q. What is his name?
6  A. Christopher Keith Bailey.
7  Q. Does he live in Montgomery?
8  A. Yes.
9  Q. Mr. Pelham, give me your current home
10    address, please, sir.
11 A. 3803 Adams Place, Millbrook, 36054.
12 Q. How long have you been at that address?
13 A. A little over a year.
14 Q. Anybody besides you and your wife and your
15    step-children live at that address?
16 A. No.
17 Q. As best you can, in the last ten years, give
18    me a list of all the addresses that you've
19    had.
20 A. 2025 Briarwood Street, Prattville, Alabama,
21    36067, I believe.
22 Q. How long did you live there?
23 A. Six months.

**Page 15**

1  Q. And that was immediately preceding this
2     current address?
3  A. Right.
4  Q. Where did you live before that?
5  A. 18 -- I'm sorry. 1537 Westminster Drive,
6     Montgomery, 36117.
7  Q. How long did you live there?
8  A. About two years.
9  Q. Remember what your address was before that?
10 A. 1830 Windsor Downs Court, Montgomery, 36117.
11 Q. Remember how long you were there?
12 A. About three years.
13 Q. Can you remember your address before that?
14 A. 7101 Fair Oaks Court, Montgomery, 36117. Was
15    there about five years.
16 Q. Okay. Mr. Pelham, are you currently working?
17 A. Yes.
18 Q. Okay. Where are you working?
19 A. Carquest Distribution Center.
20 Q. How long have you been working for Carquest?
21 A. Three months.
22 Q. Is that the first job you've had since you
23    left working for the police department?

**Page 16**

1  A. Yes.
2  Q. How long did you work for the police
3     department, Montgomery Police Department?
4  A. Two years.
5  Q. Now, were you a detective with them the whole
6     time you were with them, or did you start out
7     as patrol?
8  A. No. I -- I was on third shift patrol.
9  Q. Just as far as your employment history with
10    Montgomery, let's just go into that. Do you
11    remember the month of the year that you
12    started?
13 A. November 2000 -- 2002.
14 Q. Okay. Started at third-shift patrol?
15 A. Right.
16 Q. How long were you on third-shift patrol?
17 A. A year and a half, approximately.
18 Q. All right. And you were promoted to
19    detective from third-shift patrol?
20 A. Yes.
21 Q. Do you remember the month and year when you
22    were promoted to detective, or at least your
23    best estimate?

**Page 17**

1  A. I couldn't tell you.
2  Q. Sometime in '04, I guess, if my math is
3     remotely right.
4  A. Yeah.
5  Q. Had you worked as a police officer before you
6     came to Montgomery anywhere?
7  A. No. No.
8  Q. When you were on third-shift patrol, did you
9     receive any interim promotions while you were
10    on third shift patrol other than some pay
11    raise?
12 A. Just merit raises, that's it.
13 Q. How many merit raises did you receive while
14    you were on third-shift patrol?
15 A. Two, I believe.
16 Q. Were you subject to any disciplinary actions
17    or anything while you were on third-shift
18    patrol?
19 A. No.
20 Q. Were you ever subject to any disciplinary
21    actions when you were a detective?
22 A. No.
23 Q. Mr. Pelham, what's your date of birth?

DEPOSITION OF LEONARD PELHAM          October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY

6 (Pages 18 to 21)

Page 18

1  A. 12/28/79.
2  Q. So you're 26?
3  A. 25.
4  Q. 25. Yeah. Okay. What year did you finish
5     high school?
6  A. '97.
7  Q. Did you graduate from Prattville High?
8  A. No. I got my GED, actually, in '97 from
9     TSUM.
10 Q. All right. Where did you attend high
11    school?
12 A. Hooper Academy, Jeff Davis.
13 Q. Let me ask you this way. Where did you --
14    where did you go to the 9th grade?
15 A. Brewbaker.
16 Q. 10th grade?
17 A. Jeff Davis.
18 Q. Did you complete the 10th grade at Jeff
19    Davis?
20 A. I did.
21 Q. Okay. And did you go to Hooper Academy in
22    the 11th?
23 A. Actually, Hooper Academy was junior high.

Page 19

1  Q. Okay. Okay. So all of your high school that
2     you attended, you attended at Jeff Davis?
3  A. At Jeff Davis.
4  Q. What's the highest grade you completed at
5     Jeff Davis?
6  A. 10th, completed.
7  Q. Okay. So you began your 11th grade year at
8     Jeff Davis --
9  A. Right.
10 Q. But didn't complete it. All right. And then
11    you subsequently got your GED at Troy State?
12 A. Right.
13 Q. After getting your GED -- and I think you
14    said that was in '97 -- what was your first
15    job?
16 A. I believe it was Green Thumb Nursery off of
17    Troy Highway.
18 Q. How long did you work there?
19 A. A year and a half.
20 Q. What did you do there, just labor?
21 A. Landscape.
22 Q. And why did you leave Green Thumb Nursery?
23 A. Went to work at Montgomery Aviation out at

Page 20

1     Danley Field.
2  Q. So you already had the job lined up at
3     Montgomery Aviation when you left --
4  A. Right. Yeah.
5  Q. -- Green Thumb. How long did you work with
6     Montgomery Aviation?
7  A. Approximately two years.
8  Q. And why did you leave Montgomery Aviation?
9  A. Went to flight school in Ozark, Alabama,
10    George Wallace Community College.
11 Q. So you left Montgomery Aviation so you could
12    attend flight school?
13 A. Yes.
14 Q. And how long were you in flight school in
15    Ozark?
16 A. About a -- a year.
17 Q. Did you finish the school?
18 A. No, I did not.
19 Q. Okay. And why did you stop going to flight
20    school?
21 A. I joined the Army after flight school. Army
22    Reserve.
23 Q. What year are we at now?

Page 21

1  A. 2000. Can't be sure on that. Around 2000.
2  Q. And did joining the Army Reserve have
3     something to do with leaving flight school?
4  A. Not really. I left flight school; just
5     changed my mind altogether on what I wanted
6     to do.
7  Q. Okay.
8  A. Come back.
9  Q. But you joined the Army Reserve about the
10    same time you left flight school? Am I
11    understanding you?
12 A. Maybe two or three months after I left.
13 Q. All right. Once you got out of flight
14    school, did you have any of other job you
15    immediately left to go to?
16 A. I worked with my uncle off and on.
17 Q. Your uncle, where did he live?
18 A. In Montgomery. I don't know his address.
19 Q. What did you do for your uncle?
20 A. He owned a tire store, that labor -- labor --
21    just labor work, you know.
22 Q. Just working at a tire store?
23 A. Yeah.

Page 22

1   Q. All right. When you joined the Reserve, did
2      you join the Army Reserve?
3   A. Yes, I did.
4   Q. Did you have to leave and go do basic
5      training when you did that?
6   A. Yes.
7   Q. Where did you do your basic training?
8   A. Fort Leonard Wood, Missouri.
9   Q. And how long did it take you to complete your
10     basic training?
11  A. Nine weeks.
12  Q. Once you completed basic training, did you
13     have to go do some additional full time
14     training?
15  A. I was supposed to -- was supposed to. I
16     broke my knee and was discharged, medical
17     discharge from the Army.
18  Q. Okay. You did that during basic training?
19  A. Uh-huh, yes.
20  Q. Even though I tell you, I don't catch it
21     myself.
22        All right. So you were given a general
23     medical discharge from the military?

Page 23

1   A. Right, yes.
2   Q. All right. So you came back from Missouri,
3      and what did you do then?
4   A. I cut grass. Started lawn service. Cut
5      grass for about a year and a half.
6   Q. All right. Other than cutting grass, did you
7      have any other jobs between, before you
8      started with the Montgomery Police
9      Department?
10  A. No.
11  Q. All right. So you got out of basic, cut
12     lawns for about 18 months, and then started
13     with Montgomery Police Department?
14  A. Yes.
15  Q. All right. Mr. Pelham, are you a member of
16     any kind of civic, or social, fraternal
17     organizations, Rotary, Kiwanis Club, anything
18     like that?
19  A. No.
20  Q. Go to church?
21  A. Yes.
22  Q. Where do you go to church?
23  A. Forest Park Baptist Church, Frazier every now

Page 24

1      and then.
2   Q. In the last six years, have you attended any
3      other churches besides Forest Park or
4      Frazier?
5   A. In the last six years?
6   Q. Yeah.
7   A. I don't know. Maybe -- maybe Vaughn Road.
8   Q. Vaughn Road Church of Christ?
9   A. It's a Baptist church.
10  Q. Baptist Church.
11  A. I couldn't be sure.
12  Q. All right. Ever been arrested for any
13     reason?
14  A. I was arrested in high school for public
15     intoxication.
16  Q. All right. How old were you when that
17     happened?
18  A. 18.
19  Q. Did they handle that in juvenile court, city
20     court, district court?
21  A. City court.
22  Q. Do you remember how the charge was
23     adjudicated? Did you plead guilty, do

Page 25

1      pretrial to version, or do you remember?
2   A. I can't remember. I know I pled guilty.
3      Paid a fine. That was pretty much it.
4   Q. All right. Is that the only time you've ever
5      been arrested?
6   A. Yes.
7   Q. You ever filed for bankruptcy?
8   A. Yes.
9   Q. When did you file for bankruptcy?
10  A. Just a month ago.
11  Q. All right, sir. Filed Chapter 7 or Chapter
12     13?
13  A. 13.
14  Q. Do you know if your plan has been confirmed
15     yet?
16  A. No. It's a -- confirmation is on the 17th.
17  Q. 17th of October?
18  A. Yeah.
19  Q. All right. Mr. Pelham, the reason we're here
20     is to talk about an incident that happened
21     involving the arrest of a man named Chad
22     Hogan back on March 30th of 2005. I'm going
23     to ask you, obviously, some questions

Page 26

1   regarding particular detail. But it might be
2   easier just to start out just by asking to
3   recite as best you can, what your first
4   memory is of that night and who you spoke to
5   and how the night developed from the moment
6   you first heard about the burglary call at
7   Arnaud Meats that night. And just if you
8   would, just tell me everything you remember
9   about it.
10  A. All right. I was sitting at any computer
11  eating a taco. The call went out -- or the
12  alarm went out to Arnaud's Quality Meats. It
13  was storming real bad. I didn't think
14  nothing of it. The alarm had been going off
15  all night, other alarm.
16  Q. Keep talking. I'm listening. I'm just going
17  to close these blinds.
18  A. And a K-9 officer, Officer Gordon, got on the
19  radio, advised he was the first one -- or he
20  was the first one to respond to the scene.
21  Advised he saw a vehicle in the parking lot.
22  I can't remember what -- what kind of vehicle
23  it was -- with a few -- two or three black

Page 27

1   males inside. Stated he pulled into the
2   parking lot, and the vehicle drove off
3   down -- headed down Wares Ferry Road, I
4   believe, or they cut through the trailer park
5   behind the store, headed to Wares Ferry
6   Road. He -- he -- he then advised he was
7   following the car, and there were a couple of
8   other units that said that they were en route
9   to the store.
10      And I believe the next unit on the scene
11  was Officer Fike or Officer Forbus. I'm not
12  -- not to sure. And they advised that the
13  window on the right side of the business had
14  been busted out. At that time, Officer
15  Gordon gave his whereabouts and stated that I
16  believe he stated he was initiating a traffic
17  stop, and he got some other units with him to
18  assist him. At that time, the vehicle was on
19  Wares Ferry Road, refusing to stop. And that
20  ended up -- the vehicle he was pursuing ended
21  up, I believe, running into a fence or a tree
22  at Pelzer Avenue and Wareingwood Avenue.
23  Q. Yes, sir.

Page 28

1   A. While all this unfolded, I about that time --
2   well, when the officer said that the window
3   had been busted out, I had left the police
4   department, started in that direction.
5   Q. Let me stop you. You talked to either
6   Officer Fike or Forbus on the radio before
7   you got to the scene; is that correct?
8   A. No. I heard them on the channel one radio
9   saying that the window had been busted out.
10  Q. But you didn't speak with them at that point?
11  A. But I didn't speak with them at that point.
12  Q. I'm sorry. Continue.
13  A. Once I heard that, I got in my car. Started
14  that way. While I was on my way to the
15  business, that's when the -- the suspect
16  vehicle crashed into a -- a fence.
17      About that time -- not long after that,
18  I arrived at Arnaud's Quality Meat and made
19  contact with Officer Forbus and Fike. And I
20  pulled up, just so happened to pull up on the
21  right side in front of the window, and walked
22  around to the front of the business. Officer
23  Forbus and Fike had advised me that it didn't

Page 29

1   look like anything had been -- been tampered
2   with. Didn't look like anything had been
3   gone. And they had already -- they had
4   requested a key holder to come out. The
5   owner of the business to come out and verify
6   if -- if there had been anything missing or
7   if there had been a burglary. At that time
8   Anthony Arnaud, the owner of Arnaud's Quality
9   Meat, pulled up; and I made contact with him,
10  and asked him to go into his store and
11  inventory it. See if anything had been
12  missing. He went inside, come back out and
13  told me that he left the window open, because
14  the window wasn't broken. He left it broken
15  because the -- his air conditioner was broke
16  and he didn't want it to be real hot the next
17  morning. Had something going on early the
18  next morning. Some kind of breakfast or
19  something. Didn't want it to be real hot so
20  he left the window open. And nothing was
21  missing. He said he had some cash laying on
22  the counter, it was still there. He believed
23  nobody -- nobody had gotten in at that time.

DEPOSITION OF LEONARD PELHAM      October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY

9 (Pages 30 to 33)

Page 30

1  I got on my radio, made contact with Sergeant
2  Johnson, with my supervisor, Lieutenant Cook,
3  let him know that there wasn't a burglary and
4  that the owner had left the window up. And
5  he advised me to make contact with third-
6  shift sergeant, Sergeant Johnson, to let him
7  know that there was -- was no burglary. So I
8  then called my radio Sergeant Johnson and
9  let him know what the owner had told me, that
10  he had left the window open, and nothing was
11  missing, didn't think anybody got in.
12      At that time, Sergeant Johnson, he got
13  irate with me like I didn't want -- didn't
14  want to work the case. Like I was trying to
15  push it off and didn't want to work it.
16  Said, you mean to tell me we got a -- we got
17  a dog bite and no burglary? And I said,
18  Well, that's what the owner is advising me.
19  You know, he left the window open. And it's
20  raining, you know, raining real hard. If
21  anybody had got in, there would be foot
22  prints all over the place. Didn't hear
23  anything back from him at that time.

Page 31

1      I'd heard -- while all this was going
2  on, I was scanning channel one radio
3  traffic. I'd heard they had one or two
4  subjects in custody. I don't know if it was
5  three or four total, but one or two was in
6  the ditch, and the water level was real
7  high. He was in the ditch I guess swimming,
8  trying to get away from officers. At that
9  time, I had Mr. Arnaud secure his business
10  and follow me back to police headquarters.
11  At which time we went to -- we went to police
12  headquarters and Mr. Hogan and another --
13  another black male subject was transported to
14  headquarters, and I believe one or two other
15  ones got away.
16      Once I got to headquarters, I separated
17  the two, Mr. Hogan and another -- another guy
18  that was with him. And there might have been
19  three, I can't remember. Anyway, I separated
20  how many of them there was and began
21  questioning them, you know, as to what they
22  were doing in the parking lot, what went on.
23  Mr. Hogan was the first -- the first subject

Page 32

1  that I talked with. He said that him and his
2  buddies had been at the pool hall -- I
3  believe it's called The Break Room -- right
4  there at Lagoon Park Shopping Center. Said
5  they were playing pool. When they got --
6  when they left, they were heading over --
7  they were going to a friend's house. They
8  pulled -- he said they had pulled into the
9  parking lot of Arnaud's Quality Meats because
10  it was raining so hard. They couldn't see --
11  the driver couldn't see out of the
12  windshield. While they were there, one of
13  them lit a -- a joint or a blunt, or one of
14  the two. And they sat in the parking lot.
15  Q. Mr. Pelham, just to stop you for a second.
16  Just to make the record clear, when you say a
17  joint or blunt, you mean --
18  A. Marijuana.
19  Q. Marijuana.
20  A. Right.
21  Q. Go ahead. I'm sorry.
22  A. So they sat in the parking lot and were
23  smoking marijuana. And he then stated that

Page 33

1  one of his -- one of his buddies saw what he
2  believed to be a K-9 vehicle pull into the
3  parking lot, which was Officer Gordon. They
4  then -- they then left the parking lot. And
5  he said, you know, they were scared that they
6  were going to get caught with smoking the
7  marijuana. And he stated that's when they
8  left and ran from the K-9 officer and hit the
9  fence. That's how he ended up at
10  headquarters.
11      I then talked with the other subject,
12  and he stated the same thing. They were at
13  the pool hall and left and couldn't see. So
14  they pulled in the parking lot smoking
15  marijuana. Saw the K-9 officer and left.
16  That's how he ended up at headquarters. And
17  then -- I think there was a third one. I
18  can't be too sure.
19      Anyway, the stories panned out. I
20  even -- I even called The Break Room.. the
21  pool hall and talked with -- I believe it was
22  the -- the door -- the door manager or
23  whatever you want to call it. I guess

DEPOSITION OF LEONARD PELHAM                October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY

10 (Pages 34 to 37)

Page 34

1  somebody who checks your ID or something like
2  that. And he stated that they were in
3  there. They'd just left, you know, a little
4  while ago.
5  Q. When he said little while, do you remember
6  how he defined little while?
7  A. I can't remember that. He might not have
8  even said a little while ago. He -- he said
9  that they had recently left. They were
10  there.
11  Q. Did you write his name down on any reports
12  anywhere?
13  A. I'm sure it's in the case file.
14  Q. Go ahead. I'm sorry.
15  A. I then let my supervisor know, Lieutenant
16  Cook, that, you know, I didn't think we were
17  going to have a burglary. These guys'
18  stories panned out. I -- I -- after I talked
19  with the last subject, find -- find out his
20  side of the story, I then went to the Anthony
21  Arnaud again, you know, you know, you
22  sure there's, you know, nothing missing? At
23  that time, you know, he's in police

Page 35

1  headquarters. And he said no. He just
2  wanted to go home. He didn't want to put the
3  wrong guy in jail or put somebody in jail for
4  something they didn't do.
5     So I called my Lieutenant Ron Cook, and
6  he advised my to see -- wait -- wait to get a
7  statement from the officers. You know, to
8  see if they -- to see if they saw enough, you
9  know, to charge -- to charge these guys with
10  a burglary. You know, did they see them
11  coming out of the window or carrying
12  something that maybe Mr. Arnaud didn't notice
13  was missing.
14     So I waited -- waited for the officers
15  to get there. And Officer Gordon had typed
16  up a statement. I let him know that, you
17  know, the owner didn't -- didn't notice
18  anything was missing. The subjects that were
19  in custody --
20  Q. Let me to stop you. You said you let him
21  know. Who are you speaking of when you say
22  you let him know?
23  A. Officer Gordon.

Page 36

1  Q. Okay. Go head.
2  A. Let him know that the subject -- you know,
3  Mr. Arnaud didn't see anything missing. Said
4  he left the window open. His store wasn't
5  burglarized. And the subjects all were
6  separated and had a -- a similar story. I --
7  I told Officer Gordon that I needed -- I
8  would need a statement from him as to what he
9  saw when he pulled into the parking lot. So
10  he typed up a statement.
11  Q. Let me stop you, again. You're telling
12  Officer Gordon this at the police department
13  in person, this conversation you've just
14  described, or was this on the radio?
15  A. I don't remember. It could have been on --
16  he was on his way back to the police
17  department. At -- and it was either on the
18  radio or when he got back, I let him know it.
19  Q. All right. I'm sorry. Go ahead.
20  A. At that time he -- I believe he got on my
21  computer and typed up a -- a statement. And
22  when he was done, he gave it to me. And I
23  read it, and the elements -- the elements for

Page 37

1  burglary wasn't there. He said that he had
2  pulled into the -- well, the alarm call had
3  went out. He had pulled into the parking lot
4  and observed a -- the suspect's vehicle, one
5  of the door close -- one of the doors on the
6  vehicle closed, and drive away from the
7  business. Which, you know, the elements for
8  the burglary weren't there. At which time I
9  let my supervisor, Lieutenant Cook, know that
10  his statement wasn't sufficient.
11     At that time Lieutenant Cook called
12  Officer Gordon's supervisor, Lieutenant
13  Caulfield, K-9 supervisor, let him know his
14  officer's statement didn't have the elements
15  of burglary. And Lieutenant Caulfield told
16  Lieutenant Cook that he would -- he would
17  talk to his officer and get another
18  statement.
19  Q. Let me stop you right there. You said you
20  heard the conversation between Lieutenant
21  Caulfield and Lieutenant Cook?
22  A. That -- that conversation.
23  Q. Were they both in person talking to each

Page 38

1    other, or was this something over the walkie-
2    talkie or --
3  A. They were -- it was over the I-Link, the
4    radios you can --
5  Q. So you could hear the conversation that's
6    incoming?
7  A. Right. Kind of like a Nextel, you can --
8  Q. I gotcha. Okay. Go ahead.
9  A. At that time, Officer Gordon -- I mean, I'm
10   assuming Lieutenant Caulfield called Officer
11   Gordon because Officer Gordon said he was
12   going to do another statement. He then typed
13   another statement. Said that he had pulled
14   into the parking lot, observed a vehicle in
15   the parking lot, and a black male standing
16   next to the vehicle by the window, I believe.
17  Q. I'm going to stop you for a second. What did
18   the first statement say as opposed to the
19   second statement? What was the major
20   difference between the two?
21  A. The first statement said I pulled into the
22   parking lot, observed a vehicle which
23   passenger -- I observed a vehicle in the

Page 39

1    parking lot. The passenger's door then
2    closed and the vehicle drove off. The second
3    statement said, I pulled in the parking lot,
4    observed a vehicle, and a black male standing
5    outside the vehicle next to the window, which
6    was believed to be the point of entry. And
7    that was the only two things that changed.
8  Q. All right.
9  A. At that time, Officer Gordon gave me a
10   statement. I read the statement. And still,
11   the elements weren't there. It was a small
12   twist getting closer to -- to the elements.
13   But it -- it wouldn't -- wouldn't support
14   burglary.
15      So then I called Lieutenant Cook, let
16   him know the statement, you know, the
17   elements still weren't there. And -- and I'm
18   assuming he called Lieutenant Caulfield
19   then. I -- I didn't hear that conversation.
20   However, he said that Officer Gordon was --
21   was going to come back and fix it. So
22   Officer Gordon come back and did a third
23   statement. And the third statement, I had

Page 40

1    pulled into the parking lot -- I had pulled
2    into the parking lot and observed a vehicle
3    in the parking lot with a black male coming
4    from the window -- coming from -- coming from
5    the window of the business, enter the vehicle
6    and drive off. That was the only thing that
7    was changed there. Still after the third
8    time, I read the statement. Elements weren't
9    there.
10  Q. Mr. Pelham, let me stop you again. I
11   apologize. Just so I can make sure I
12   understand this. Okay. You're saying that
13   Officer Gordon wrote three different
14   statements?
15  A. Typed three different statements.
16  Q. Okay. And tell me again just the transition,
17   what was in the first statement, just what
18   got changed in the second statement, what you
19   say got changed in the third statement. What
20   was the difference between the three
21   statements?
22  A. The first statement said he saw the vehicle
23   in the parking lot, a door closed, the

Page 41

1    vehicle the drove off. The second statement,
2    the difference was he saw the vehicle in the
3    parking lot, a black male standing outside
4    the vehicle next to the window, got into the
5    vehicle and the vehicle drove off. Third
6    statement, difference was, he pulled into the
7    parking lot, saw the vehicle in the parking
8    lot, black male subject coming from the
9    window of the business. Got into the vehicle
10   and the vehicle drove off.
11  Q. Okay. So you're saying the final statement
12   said that he actually saw the black male
13   coming from the window?
14  A. Coming from the window.
15  Q. I'm sorry. Keep going.
16  A. At that time I read it, elements weren't
17   there. I can't remember how it was worded
18   but it -- it wasn't coming out of the window,
19   you know.
20      Anyway the elements weren't there. So I
21   then let Lieutenant Cook know.
22  Q. Let me ask this too because this is as good a
23   place as any. Because you said a few times

DEPOSITION OF LEONARD PELHAM          October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY

12 (Pages 42 to 45)

Page 42

1  you didn't think the elements were there.  On
2  the third statement why did you think the
3  elements weren't there on that final
4  statement?
5  A. Well, the way it was -- the way it was
6  worded, observed a black male coming from the
7  window.  The way he had it worded was not
8  coming out of the window but coming from the
9  direction of the window.  You know, not
10 climbing out of the window but coming from
11 the window.  So that's, you know elements
12 aren't there.  And in the back of my mind
13 being the third statement.
14 Q. Okay.  And let me ask you this one thing.
15 I'm asking you as an officer what you would
16 think if in light of the fact that a burglar
17 alarm had sounded, that I believe was
18 signaled by a motion detector; is that
19 correct?
20 A. Yeah.
21 Q. And in light of the fact that they were --
22 I'm going to give you a hypothetical.  Had
23 you seen a vehicle in the area and you'd seen

Page 43

1  someone coming -- I'm going the use your
2  words -- from the window -- not necessarily
3  out of the window but from the window, you
4  then approached that vehicle and they take
5  off and don't stop, and then you subsequently
6  find a gun, a ski mask, and a flashlight in
7  the car, would that not altogether add up to
8  probable cause to believe that a burglary had
9  occurred?
10 A. Oh, yeah, yeah, it would.
11    MR. NELMS: Object to the form.
12 Q. We'll do that a few times.  You can still
13 answer.
14    MS. CONNER: You can answer.  But, you
15    know, just let them do their
16    thing.
17    THE WITNESS: Okay.
18    MS. CONNER: Okay.  You can answer.
19    THE WITNESS: Okay.
20    MS. CONNER: Do you remember the
21    question?
22 Q. I'll repeat it if you need to.
23 A. Had, in fact, it not been -- I mean, it was

Page 44

1  storming real, real -- I mean it was a
2  terrible storm.  The alarm had gone off once
3  before prior to this -- this incident.
4  Q. Do you remember what sensor had tripped the
5  alarm before?
6  A. The same motion.
7  Q. Is same motion sensor?
8  A. Right.  And -- and I fail to mention
9  Mr. Arnaud stated -- he does serve meat.  He
10 stated that he was embarrassed to say, but he
11 had big rats.  And goes out there all the
12 time because big rats set off his motion
13 detector.  However, we were answering alarm
14 calls at night due to the weather.
15    Now, as far as a vehicle leaving the
16 area and -- and, you know, having the gun and
17 a ski mask and all that, yes, you know,
18 that's -- looks like somebody's up to no
19 good.  But, you know, it takes three
20 statements to -- to even get remotely close
21 to coming from the window.  I mean, I knew,
22 you know, that was my job to -- are the
23 elements there?  You know, did this burglary

Page 45

1  happen?  And, you know, I had the owner
2  telling me nobody got in.  Nothing is
3  missing.  I left the window up, you know.
4  You know, they had they had a couple of black
5  males in the car with a gun, some dope, and a
6  ski mask.  There was no burglary.
7  Q. Weren't there some flower pots or something
8  on the windowsill that were knocked off?
9  A. There -- there were.  I failed to mention
10 that as well.
11    MR. NELMS: Object to the form.
12 A. There were some -- there were two or three
13 flower pots and like a -- some type of
14 figurine like a porcelain figurine.  When I
15 pulled up, they were laying on the ground up
16 under the window.  I asked when -- when
17 Officer Forbus and Officer Fike told me it
18 didn't look like anybody got in, I asked
19 them, I said, well, what is that right
20 there?  Did that -- did that come from
21 window?  And they said yeah, that was on the
22 windowsill.  We moved it to get in.  And it
23 wasn't broken laying on the ground.  It was

DEPOSITION OF LEONARD PELHAM                October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY

13 (Pages 46 to 49)

Page 46

1    picked up and placed on the ground.
2  Q. Are Officer Forbus and Officer Fike, are they
3    K-9 officers?
4  A. No, they're third-shift patrol officer.
5  Q. So they're just normal patrol?
6  A. Right
7  Q. Go ahead. I'm sorry.
8  A. They had said that it was moved to be put --
9    it was moved to get -- to get in so the
10   building could be cleared. So they could
11   clear the building, make sure nobody was in
12   there.
13 Q. So they told you that they took the thing
14   off, the plants off or the figurine?
15 A. I don't know if they -- it seems like Fike --
16   Fike told me that -- there was a lot of --
17   there was a lot of units there, due to the
18   pursuit and all. And it seems -- I want to
19   say that K-9 -- there was a K-9 officer that
20   was actually the first officer in the
21   business because they clear it with their dog
22   first. You know, they're not -- they don't
23   normally send an officer in there. If they

Page 47

1    got a dog, they'll send their dog in first.
2    And it seemed like he said they put it on the
3    ground and they sent the dog in. And they
4    followed behind him. I -- I don't know how
5    he worded that.
6  Q. Did he say he saw them -- that happen or he
7    was just assuming?
8  A. He was just assuming.
9  Q. You don't know what he based that statement
10   on?
11 A. I don't know. He just said that it was put
12   down on the ground so the building could be
13   cleared. The business could be cleared.
14 Q. But you didn't clarify with him about how he
15   obtained that information?
16 A. He was there. I'm assuming he saw it.
17 Q. Okay. But you didn't ask him if he saw it?
18 A. I can't remember if I did or not.
19 Q. Okay. I'm sorry. Go ahead.
20 A. After the third statement was written and I'd
21   read it, I'd called Lieutenant Cook. Let him
22   know, you know, this is the third statement.
23   You know, I don't feel comfortable with

Page 48

1    this. And the elements aren't there. I mean
2    probable cause is there. Your reasonable
3    suspicion is there. He then said, well, let
4    me call Caulfield. So he called Lieutenant
5    Caulfield and Caulfield told -- this is
6    coming from Lieutenant Cook. He told me that
7    Caulfield told him his officer was just
8    having an articulation problem. Having a
9    problem putting -- putting what he saw on
10   paper.
11     Said he was just having an articulation
12   problem putting down on paper what he saw.
13   At which time, he said just the -- you know,
14   the burden lies on K-9. You know just work
15   the burglary, and K-9 will be the ones that,
16   you know, testify to what they saw. You
17   know, the burden -- burden lies on them. And
18   I asked, well -- I asked Lieutenant Cook,
19   well -- who, you know, who do I charge with
20   burglary. And he calls Lieutenant Caulfield
21   and asks him, and he says, the one that's
22   been bitten. Usually, we charge, you know --
23 Q. Let me stop you again, too. Are we back on

Page 49

1    the Southern Link walkie-talkie again or how
2    is this conversation occurring between
3    between Caulfield and Cook?
4  A. I don't remember. I think he called him on
5    the telephone that time.
6  Q. Well, how do you know what Lieutenant
7    Caulfield said to Lieutenant Cook?
8  A. I was sitting in his office. You know, he --
9    he said, which one do we charge? And when he
10   got off the phone he said the one that's been
11   bitten.
12 Q. Lieutenant Cook said that?
13 A. Right.
14 Q. Okay. Are you saying that Lieutenant
15   Caulfield told Lieutenant Cook to charge the
16   one that's been bitten?
17 A. Right. He asked -- I asked Lieutenant Cook,
18   I said, which one do I charge with burglary.
19   He said, well, I don't know. Let me call
20   Caulfield. So he call Caulfield. Says, hey,
21   which one of these guys do we charge? Of
22   course, I didn't hear that. He hangs up the
23   phone. He says the one that's been bitten.

DEPOSITION OF LEONARD PELHAM                    October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY

14 (Pages 50 to 53)

**Page 50**

1  Q. Okay. But you didn't hear Lieutenant
2     Caulfield say the one that's been bitten in
3     that conversation?
4  A. No, I did not.
5  Q. Go ahead. I'm sorry.
6  A. At that time, I went -- I was on the way back
7     to my office to do the paperwork, you know,
8     finish the case file. And, of course, I'm
9     getting -- I'm getting a lot of heat from K-9
10    and -- and patrol officers. And there was
11    something that happened previously I
12    didn't -- I didn't have any knowledge about
13    where they had made a mistake or something.
14    I don't -- I don't know all of that. But
15    they -- they told me that, you know, they --
16    they needed to charge this guy to justify the
17    bite. They were already in hot water from
18    something that happened previously. And
19 Q. You said they told you. Who are you speaking
20    of when you say they?
21 A. There was a few of them.
22 Q. And as a matter of fact, Mr. Pelham, let me
23    put it this way. It might be easier just

**Page 51**

1     because there are different names involved in
2     this. As much as we can, let's try to avoid
3     pronouns. Rather than he and she and they,
4     let's try to call everybody out by name as
5     we're speaking. It will make the record a
6     lot more clear.
7  A. Okay. K-9 Officer Mora? I don't know how to
8     pronounce his name.
9  Q. Can you spell it?
10 A. M-O-R-A, I guess. M-O-R-A. Lieutenant
11    Caulfield made a comment about justifying the
12    dog bite. And we got to -- we got to charge
13    this guy.
14 Q. Where did that conversation occur between you
15    and Lieutenant Caulfield, your --
16 A. It was in the hallway of the detective
17    division by the copy machine.
18 Q. Did anybody else hear that conversation?
19 A. We were -- we were as a group. It was
20    being -- it was kind of -- it was myself,
21    Lieutenant Cook, Caulfield, Frank Koscho, who
22    is another detective, the K-9 officer Mora
23    and some other one. I can't -- I don't

**Page 52**

1     recall their names. I -- I don't believe I
2     knew their names, even when I was working
3     there. But it was kind of a -- I mean
4     everybody standing around in the same area
5     conversation type thing.
6  Q. But you're saying they would have heard
7     Lieutenant Caulfield tell you that you needed
8     a charge to justify the dog bite?
9  A. Oh, yeah.
10 Q. All right. Go ahead.
11 A. There was two other officers. I don't
12    know -- I know they were K-9 officers that
13    they kept bringing up how just previously
14    they -- they had -- one of their dogs had bit
15    somebody on Alabama State's Campus and they
16    were in trouble for it because they shouldn't
17    have put the dog on him or something like
18    that. And they needed to justify this bite,
19    so they wouldn't be in any deeper trouble
20    than they were in. I told -- and I didn't --
21    I wasn't talking -- I was talking to
22    everybody. You know, I said that I didn't
23    feel comfortable with it. And, you know, it

**Page 53**

1     wasn't there. This burglary didn't happen,
2     you know, they had air tight -- you know,
3     everything they said was -- was exactly the
4     same even after they were separated and --
5     the suspects when I say they.
6        Lieutenant Cook had told me, you know,
7     don't worry about it. The burden lies on
8     K-9. They're the ones that's got to testify.
9     I said, well, you know, I'm the case agent.
10    I got to go to court -- go to court on it. I
11    got to testify to being the case agent. He
12    was getting a lot of heat from Caulfield. So
13    he said go ahead, you know, do the case -- do
14    the case file.
15       So I go into my -- or my -- I go into
16    my -- one of my other supervisors' office
17    where Anthony Arnaud is sitting. And he
18    says, he's begging me to let him go home.
19    And I tell him, well just hang tight. I'll
20    be with you in just a minute, and we'll get
21    everything wrapped up. So I go to my
22    office. I do -- do a little paperwork. I
23    process Mr. Hogan, fingerprinted him,

DEPOSITION OF LEONARD PELHAM
CHAD HOGAN v. CITY OF MONTGOMERY

October 3, 2005

15 (Pages 54 to 57)

Page 54

1  photographed him. Got -- got some -- some
2  information on him as to address, where he
3  works, that type of thing. And then I went
4  back to Mr. Arnaud. I -- after I had
5  processed Mr. Hogan, I prepared the burglary
6  warrant. And was getting ready to take
7  Mr. Arnaud down to the warrant clerk's office
8  to secure the warrant against Mr. Hogan. And
9  at which time he said, listen. Just show me
10  where to -- where to go and -- so I can get
11  out of here. So I took him to the warrant
12  clerk's office. He secured the warrant
13  against Mr. Hogan for burglary.
14      And after the warrant was finished, I
15  went down to the warrant clerk's office, got
16  the warrant, executed it, transported
17  Mr. Hogan to the county jail, and did my
18  daily activity report. Whenever you arrest
19  somebody, just put the details of the -- what
20  happened and what you charged him where.
21  That's pretty much it.
22  Q. All right. You said earlier that Officer
23  Gordon typed out three separate statements.

Page 55

1  Do you allege that he said anything false in
2  the statements?
3  A. After the first one, yes.
4  Q. What do you say was false?
5  A. Well, on the -- and I have a copy of the
6  tape -- the tape, our dispatch tape. When he
7  pulled into the parking lot, you know, he
8  said just what he saw see. 150, I believe is
9  his unit number. 150, I'm pulling into the
10  parking lot. There's a vehicle in the
11  parking lot. Subject just closed the door of
12  the vehicle, drove off. That's just what he
13  saw.
14      And I knew then before I got to the
15  business, based on what he saw, we were
16  either going to have to get a confession out
17  of Mr. Hogan or his friends or some kind of
18  property missing from the business. Or, you
19  know, maybe an identifiable witness.
20  Q. On the tape transcript, did he say that's all
21  I saw or --
22  A. He said --
23  Q. -- did he simply say I saw someone getting in

Page 56

1  the car?
2  A. He said 150, I -- I'm pulling into the
3  parking lot of the business now. There's
4  a -- I observed a blue or a -- the vehicle.
5  I forgot the description. I observed the
6  passenger side door close and the vehicle is
7  now leaving heading towards wherever.
8      You know, had he said -- it could have
9  been a different story had he said 150, I'm
10  pulling into the parking lot; there's black
11  male subject coming from the window or, you
12  know, standing outside the vehicle.
13  Q. Is it possible that he could have seen that,
14  just not informed dispatch of it?
15      MR. NELMS: Object to the form.
16      MS. CONNER: You can answer.
17  A. I guess anything's possible.
18  Q. Okay. Go ahead.
19  A. I mean -- I mean, I could have -- I mean,
20  either way -- either way Mr. Hogan was
21  getting charged with burglary. I mean
22  that -- you know, I'm -- I'm a two-year
23  veteran of the police department. You know,

Page 57

1  the way -- the way the rank structure is, you
2  know, you do something you're not -- you do
3  something -- you don't do something you're
4  told to do, you know, you pretty much go find
5  you another job.
6  Q. Yes, sir. But let's just stick to the
7  statements right now, though, okay? I'm just
8  trying to figure out what, if anything, you
9  alleged was a false statement in the
10  complaints; and if so, what evidence you have
11  to support your claim that they're false.
12  That's all I'm trying to get into right now.
13  A. Okay.
14  Q. Other than the fact that he didn't state all
15  the details in his statement to dispatch. Do
16  you have any other evidence that the
17  statements he made in the allegations he made
18  in his statements were false?
19      MR. LEWIS: Object to the form.
20  A. He also didn't state them on paper. And his
21  written statement or his typed statement, not
22  only did he not state them the first time,
23  but he didn't state them the second time.

DEPOSITION OF LEONARD PELHAM                    October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY

16 (Pages 58 to 61)

Page 58

1       Also, I -- I even asked in he could
2    identify who he saw. He couldn't identify.
3    So, you know, we're charging this guy just
4    because he's got dog bites on him.
5  Q. When did you ask Officer Gordon if he could
6    identify the --
7  A. It was between one of the statements he had
8    wrote. I think it was after the second one
9    after I realized that the elements weren't
10   there.
11 Q. Okay. Tell me as best you can remember
12   specifically what you asked him regarding
13   identification of the person he saw coming
14   from the window?
15 A. I read a statement. I said, This is it?
16   That's all you saw? You know, what -- I
17   think I might have asked him, you know, what
18   he looked like, what was he wearing. He said
19   he didn't know, couldn't remember, something
20   like that. Then I just come out and said,
21   you know, can you identify him? Can you
22   identify the guy that came from -- from the
23   window. He said no. He just saw a black

Page 59

1    male coming from the window.
2  Q. Did you ask him if he could distinguish the
3    different clothing that the guys were
4    wearing?
5      MR. NELMS: Object to the form.
6  A. Yes.
7  Q. What did he say?
8  A. He said they were all wearing dark clothing,
9    I believe. Or it was dark, it was raining
10   real hard, something to that effect that he
11   couldn't -- he couldn't tell.
12 Q. Was Mr. Hogan wearing dark clothing?
13 A. I believe all of them were. I can't
14   remember.
15 Q. You said that Officer Gordon told you that he
16   could not identify the person coming from the
17   window. Did you ever have any further
18   discussions with Officer Gordon about that?
19     MR. NELMS: Object to the form.
20 A. I don't recall if I did or not.
21 Q. All right. Any other evidence that you have
22   that Officer Gordon fabricated some of the
23   allegations in his final statements?

Page 60

1      MR. LEWIS: Object.
2      MR. NELMS: Object to the form.
3  Q. And if I misunderstand you, I apologize. I
4    thought you said you were stating that he
5    fabricated some of the allegations in his
6    statements. Did you not say that?
7  A. Yeah.
8  Q. Okay.
9  A. Yeah. He was -- I mean, he was told by a
10   supervisor to change his statement, you know,
11   as to what he saw. So, you know, it didn't
12   come from him.
13 Q. I mean, you said a supervisor told him to
14   change his statement as to what he saw or to
15   articulate what he saw.
16 A. Maybe -- I mean, you know, articulation --
17 Q. Well, there's a --
18 A. -- is a broad statement. I mean --
19 Q. Would you agree there's a major difference
20   between with those two orders --
21     MR. NELMS: Object to the form.
22 Q. -- change what you saw and articulate what
23   you saw better?

Page 61

1      MR. NELMS: Object to the form.
2  Q. Would you agree there's a major difference
3    between those two orders?
4  A. Oh, yeah. There's a difference.
5  Q. Okay.
6  A. But, you know, how that conversation went
7    down, I don't know, because I didn't hear
8    it.
9  Q. Then how did you base the statement that an
10   officer told him -- a supervisor told him to
11   change his statement if you didn't hear the
12   that order given?
13 A. Well, change it and/or articulate it. And
14   after the second one was written, it still
15   wasn't good enough. So here comes a third
16   one and just -- it's like day and night, you
17   know. You saw something or you didn't. I
18   saw a black guy coming from the window or I
19   saw a white guy coming from the window. You
20   know, that was my job to investigate
21   something. Do we have a charge, or do we
22   not. You know, I determined we do.
23 Q. Okay. What happened after Officer Gordon

DEPOSITION OF LEONARD PELHAM
CHAD HOGAN v. CITY OF MONTGOMERY

October 3, 2005

17 (Pages 62 to 65)

Page 62

1  wrote his final statement? I believe you
2  said you helped draft a warrant and had to
3  take it down to the warrant clerk; is that
4  right?
5  A. Right.
6  Q. And then you transported Mr. Hogan to the
7  county --
8  A. Right.
9  Q. -- county jail?
10  A. Well, in -- in between there, I'd walked
11  around to Lieutenant Cook's office, showed
12  him the final statement and, you know, talked
13  about how I didn't feel comfortable with it.
14  And, you know, who do I charge. Like I said,
15  we normally charge -- we would, had it been a
16  normal case, we would have charged all of
17  them. However, the objective was to charge
18  the guy that was bitten?
19  Q. What happened the next day --
20      MR. NELMS: Object to the form.
21  Q. -- regarding this incident?
22  A. The -- of course, it was what they call late
23  car, so I was third shift -- late car, third

Page 63

1  shift detective. So the next day, when I --
2  when I got home about seven o'clock, I guess,
3  that morning, maybe a little later, maybe a
4  little earlier, I was in the bed. My -- one
5  my sergeants, Sergeant Tatum, calls me on the
6  phone. And I asked -- he said, why in the
7  hell didn't you charge all them guys with the
8  burglary? And he's jumping down my throat
9  about it because he had read my -- read my
10  daily activity report, you know, what
11  happened. And I told him, you know, exactly
12  what happened. And he said, Well, hang on
13  Kirk. This -- this is serious. Let me go
14  around to Randy Jones' office, which is
15  property lieutenant. So they -- he transfers
16  the call to Randy's office and they got me on
17  speaker phone. Sergeant Tatum says well,
18  tell me -- tell me exactly what happened,
19  now. And I told him, you know, what happened
20  the night before. And they said they would
21  take care of it. And I went back to bed.
22      MR. WHITEHEAD: Okay. Let's take a
23  short break just a second.

Page 64

1      (Brief recess)
2  Q. Mr. Pelham, I believe you testified earlier,
3  that there was a false alarm at Mr. Arnaud's
4  place earlier that evening; is that correct?
5  A. Yes.
6  Q. And you said that it had also been tripped by
7  the same motion detector; is that correct?
8  A. Yes.
9  Q. How did you verify that was caused by the
10  same motion detector?
11  A. I didn't verify it. That's what Mr. Arnaud
12  had told me.
13  Q. You asked Mr. Arnaud if that same motion
14  detector had set off the alarm earlier?
15  A. He had told me the same one.
16  Q. Mr. Pelham, how many times did you speak with
17  Officer Gordon that night?
18  A. Several times.
19  Q. Give me your best estimate how many
20  conversations you had with him?
21  A. Four or five.
22  Q. How many conversations did you have with
23  Officer Gordon after they had Chad Hogan in

Page 65

1  custody?
2  A. Three, maybe.
3  Q. Were they all in person or on the radio or --
4  A. I think they were all in person. One -- it's
5  possible one could have been on the radio.
6  If it was, I don't recall it.
7  Q. Were they all at the police station?
8  A. Yes.
9  Q. And forgive me because I'm not familiar with
10  exactly how the offices and the structure of
11  the department is laid out. Where in the
12  building were you when you had these
13  conversations with Officer Gordon?
14  A. One in Lieutenant Cook's office, once or
15  twice in the hallway.
16  Q. Where in the hallway? Just out -- right
17  outside Cook's office or somewhere else?
18  A. Once outside Lieutenant Cook's office, once
19  by the copy machine.
20  Q. Where is the copy machine?
21  A. When you get onto the second floor, it's at
22  the end of the hallway, or in the center of
23  the hallway. You got -- you take a left to

DEPOSITION OF LEONARD PELHAM                October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY

18 (Pages 66 to 69)

Page 66

1   go to the end. Once in the property
2   supervisor's office, in between the entrance
3   and the copy machine. And a couple of times
4   in the property office where my office was.
5   And once or twice in the conference room.
6   Q. Is there only one conference room?
7   A. Well, there -- yeah, there's only one
8   conference room.
9   Q. Now, you spoke with Anthony Arnaud the first
10   time out there on the scene, at Arnaud's
11   Meats, correct?
12   A. Yes.
13   Q. Once you got back to the police station, how
14   many conversations did you have with
15   Mr. Arnaud?
16   A. At least five.
17   Q. So at least five times you spoke with him,
18   left and came back?
19   A. Yes.
20   Q. The five times that you spoke with Mr. Arnaud
21   when you got back to the police department,
22   were there any witnesses to those
23   conversations. Was anybody else present when

Page 67

1   you were speaking with him?
2   A. Possibly Frank Koscho, another detective.
3   Q. On how many different occasions?
4   A. One, if any.
5   Q. That one conversation that Mr. Koscho was
6   present on, what was said during that
7   conversation?
8   A. Well -- and I'm not sure he was. But it
9   was -- if -- if it was, I want to say he was
10   in there when I -- I want to say he was in
11   there when I was trying to get Mr. Arnaud to
12   sign a denial of prosecution form. Meaning
13   he go home, Mr. Hogan go home, the whole
14   thing be done with.
15   Q. Did you -- is this a form you fill out? What
16   is the denial of prosecution form?
17   A. It's a form -- it's pretyped and you just,
18   you know, it says I -- there's a blank
19   spot you put your name -- am aware that this
20   such and such crime was committed and I don't
21   want to prosecute Chad Hogan, pretty much.
22   Q. And you filled one of those out and --
23   A. No, I did not. I think I had one, and Mr.

Page 68

1   Arnaud at that time -- I think we -- I read
2   it to him. And that's when he told me that
3   there had -- a crime of, you know, burglary
4   didn't happen. He didn't want to sign it
5   because it's -- it said something like -- I
6   can't remember how it's worded but I, Anthony
7   Arnaud, knowing that the crime of burglary
8   was committed at my business and this subject
9   is in custody. I do not wish to prosecute.
10   He said that there was no burglary. There's
11   no crime been committed. He just wanted to
12   go home.
13   Q. So he refused to sign the statement?
14   A. I didn't push it on him. He -- yeah, pretty
15   much, yeah.
16   Q. Mr. Pelham, do you contend that any of your
17   supervisors ever ordered you to secure a
18   warrant against Chad Hogan?
19   A. Yeah.
20   Q. Tell me which ones and tell me how so.
21   A. Well, I only have one that -- that when
22   Lieutenant Cook gave me an order to work the
23   case, which everything in working a case is

Page 69

1   securing a warrant, doing a case file. In
2   the hallway, Lieutenant Caulfield, you know,
3   said, Well, we need this warrant, you know,
4   to justify the bite. And he wouldn't --
5   Caulfield wouldn't actually be the one to --
6   you know, he's not -- not my supervisor,
7   technically. I mean he's a -- he's a
8   lieutenant, but he's not my direct -- my
9   direct supervisor that would -- that, you
10   know, normally gives me orders on a day-to-
11   day basis.
12   Q. Let me rephrase my question. I think when I
13   said secure a warrant, I invoked a whole lot
14   more of the process then I intended to. Do
15   you contend that anyone ordered you to
16   prepare any documents necessary to obtain a
17   warrant of arrest after you had expressed
18   reservations about the credibility of the
19   charge?
20   A. Yes.
21   Q. Okay. Tell me who.
22   A. Lieutenant Cook and Caulfield.
23   Q. Okay. Let's start with Lieutenant Cook.

DEPOSITION OF LEONARD PELHAM
CHAD HOGAN v. CITY OF MONTGOMERY

October 3, 2005

19 (Pages 70 to 73)

Page 70

1  Tell me to the best of your memory
2  specifically what Lieutenant Cook said to
3  order you to prepare a warrant despite your
4  objections about the credibility of the
5  charge?
6       MR. NELMS: Object to the form.
7  A. He said, Don't worry about it. The burden
8  lies on K-9. Work the burglary, and we'll
9  let K-9 -- K-9 is the one who's got to
10  testify to it in court.
11  Q. Anything else that he said?
12  A. There were several conversations that night
13  with the statements from Officer Gordon and
14  all.
15  Q. But as to ordering you to go and prepare the
16  documents necessary to prepare a warrant of
17  arrest or to effectuate a warrant of arrest,
18  that's -- my question is limited to that.
19  A. Well, after it was determined who we were
20  going to charge with -- with burglary, said
21  charge -- charge the one that's been bitten
22  with burglary. And --
23  Q. But that was in response to when you said who

Page 71

1  should I charge; is that correct?
2  A. Right. But again, I mean, all night, my
3  concerns were expressed as far as, you know,
4  I wasn't comfortable with it. The -- the
5  statements didn't -- didn't add up. They
6  were changed, you know, three times. He told
7  me to charge the guy with burglary.
8  Q. I mean, you're saying he told you to charge
9  the guy with burglary, but when? What did he
10  say, other than answering that question on
11  who do we charge? Charge the guy that got
12  bit is what you said. When did he order you
13  to go and charge Chad Hogan with burglary
14       MR. LEWIS: Object to the form.
15       MR. NELMS: Object to the form.
16  A. He's my -- he's my lieutenant. When I --
17  when I first found that the window hadn't
18  been busted out, you know, I told him I -- I
19  was coming back to headquarters. There is
20  no -- there is no burglary. When I said to let
21  Sergeant Johnson know. So I did. Sergeant
22  Johnson got -- got irate with me and said,
23  well, come on back --

Page 72

1  Q. I'm just talking about Lieutenant Cook right
2  now. Okay?
3  A. Right.
4  Q. And let me ask you this. --
5  A. Well, I'm telling you he --
6  Q. Oh, okay. I'm sorry.
7  A. -- he told me charge the guy with burglary.
8  That's answering your question. Simple as
9  that. Charge the guy with burglary. Work
10  the case. Don't worry about the
11  circumstances. K-9 will testify to it. The
12  burden will be on them. I can't answer your
13  question any more basic than that.
14  Q. Did Lieutenant Cook ever order you to sign or
15  prepare a warrant or did you interpret his
16  statements as an order?
17       MR. NELMS: Object to the form.
18  A. He told me to do something. That's an order.
19  Q. Okay. Lieutenant Caulfield, you said that he
20  ordered you to prepare a warrant as well?
21  A. He said something to the effect of we're
22  going to get this warrant. We're in hot
23  water or we're -- he didn't say that. We're

Page 73

1  going to get this warrant to justify the
2  bite. And you're going to get us that
3  warrant or something like that; telling --
4  you know, telling me I'm going -- I'm going
5  get the warrant. Now, Mora said, you're a
6  police officer. We're all police officers.
7  You're not going to stab another police
8  officer in the back. You're going to get us
9  that warrant.
10       And there were two other ones there --
11  and I don't know their names -- that were
12  expressing their feelings on -- on me getting
13  the warrant or me not getting the warrant. I
14  don't remember how that was said.
15  Q. Did you say Lieutenant Caulfield said we're
16  going the get this warrant?
17  A. Yes.
18  Q. Is how he passed that order to you?
19  A. Yes.
20  Q. And that Officer Mora basically said the same
21  thing, we're going the get this warrant?
22  A. Yes, and I wasn't going to stab another
23  police officer in the back. We're -- we're

DEPOSITION OF LEONARD PELHAM          October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY

20 (Pages 74 to 77)

Page 74

1　all police officers, you know. We're going
2　to help each other. Something to that
3　effect.
4　Q. Did Lieutenant Caulfield or Officer Mora make
5　any other statements that you interpreted as
6　an order to charge Chad Hogan with burglary?
7　A. I don't recall.
8　Q. All right. Mr. Pelham, have you ever
9　testified in court or the grand jury or any
10　kind of proceedings about these incidents
11　we've talked about today regarding your
12　arrest with Chad Hogan.
13　A. No. As far as I know the warrant was nol
14　prossed, but I'm not sure about that.
15　Q. Mr. Pelham, I'm going to hand you a document
16　we've marked as Defendant's Exhibit #1.
17　Mr. Pelham, this is a verified claim that you
18　had previously filed against the City of
19　Montgomery back in May of this year. Let me
20　ask you first if you recognize this
21　document.
22　A. I do.
23　Q. Okay. And on the next to the last page, let

Page 75

1　me ask you if that's your signature.
2　A. It is.
3　Q. All right. I'm going to direct your
4　attention first to paragraph two. You stated
5　in there the owner of the business, Anthony
6　Arnaud, went into the business and advised
7　that there had not been a burglary as he was
8　the one that had left the window open?
9　A. Yes.
10　Q. Would you agree that a burglary could still
11　occur even though he had left the window
12　open?
13　　　MR. NELMS: Object to the form.
14　A. Oh, yeah.
15　Q. Okay. Do you think that Mr. Arnaud knew the
16　definition of burglary, the legal definition
17　of burglary?
18　　　MR. NELMS: Object to the form.
19　A. I don't know the man.
20　Q. Okay. But did you explain to Mr. Arnaud that
21　it's possible for a burglary to occur without
22　a theft having actually taken place?
23　A. Oh, yeah.

Page 76

1　Q. Okay. In paragraph two, you also state
2　that -- speaking of Mr. Arnaud -- also, he
3　advised that due to the stormy weather that
4　night, that he had already come to the
5　business earlier in the evening when the
6　alarm had gone off initially. Did Mr. Arnaud
7　specifically state to you that the stormy
8　weather had caused the alarm to go off
9　before?
10　A. I can't remember. I believe -- I believe he
11　did. And he said that he -- that's when he
12　had told me that he had also had rats. Said
13　he had big rats.
14　Q. Why didn't you mention anything about the
15　rats in your claim?
16　A. In this -- this paperwork here?
17　Q. Yes.
18　A. I probably forgot about it.
19　Q. In your experience as a police officer, have
20　you seen weather set off motion sensors on a
21　burglar alarm a lot?
22　　　MR. NELMS: Object to the form.
23　A. They -- lightning, vibration, set them off

Page 77

1　all night long.
2　Q. You've seen lightning set off motion
3　detectors a lot?
4　A. Oh, yeah.
5　Q. Okay.
6　A. Train going by a business will set off a
7　motion detector.
8　Q. Is there a train going by Arnaud's Meats
9　anywhere?
10　A. Not that I know of. There is a railroad
11　track right there by the Boulevard, but I --
12　I mean, I don't know.
13　Q. Were there any witnesses present when
14　Mr. Arnaud told you that he believed the
15　weather set the motion detector off?
16　A. Officer Fike and Officer Forbus.
17　Q. I'm going to direct your attention to the
18　next page on paragraph three. It states,
19　During the time that Detective Pelham was at
20　the business, he learned that the K-9 unit
21　had given chase to the automobile which was
22　earlier seen leaving the vicinity. And that
23　the automobile had wrecked at Pelzer and

DEPOSITION OF LEONARD PELHAM
CHAD HOGAN v. CITY OF MONTGOMERY

October 3, 2005

21 (Pages 78 to 81)

Page 78

1    Wareingwood drive. He also learned that the
2    K-9 dog had bitten one of the occupants of
3    the vehicle.
4        Had Chad Hogan already been bitten by
5    the dog at the time you stated developing
6    concerns about the credibility of a burglary
7    charge?
8 A. No. It was shortly after.
9 Q. Had you voiced your concerns to anyone in the
10    K-9 unit that was pursuing -- that were
11    pursuing the suspects at the time you'd been
12    bitten?
13 A. I think I got on channel one, the channel one
14    radio and advised that there was not a
15    burglary. I could be mistaken. I might
16    have. I could have done that and I might not
17    have. I want to say I did. And again, my
18    conversation with Sergeant Johnson, I had
19    called to let him know, hey, there's no
20    burglary. So, I mean, it all happened so
21    fast. And around about the same time I was
22    discovering -- you know, I waited on
23    Mr. Arnaud to get there. So --

Page 79

1 Q. Had Chad Hogan already been apprehended by
2    the time Mr. Arnaud got to the business?
3 A. I couldn't tell you. The car had already ran
4    into the fence. But then there was a foot
5    pursuit. I don't know.
6 Q. Okay. Let me rephrase my question, then.
7    Had the car already hit the fence at the time
8    Mr. Arnaud arrived at the business?
9 A. I believe so.
10 Q. And in paragraph four, you state Detective
11    Pelham advised his supervisors, Lieutenant
12    Cook and Sergeant Johnson from the scene,
13    that the owner stated that his business had
14    not been entered and that there had been no
15    crime committed at the location. Did
16    Mr. Arnaud specifically say that no crime had
17    been committed?
18 A. It was my way of saying, you know, yeah,
19    Mr. Arnaud stated that his window hadn't been
20    busted out. No property was taken. And it
21    didn't look like anything had been tampered
22    with. Nothing was missing. And that's per
23    what Mr. Arnaud had stated.

Page 80

1 Q. Do you remember him saying that a crime had
2    not been committed?
3 A. I mean, I'm sure that wasn't his exact
4    words. He told me, you know, nothing is
5    missing. The window was left open. If
6    somebody had been in here, you know, there
7    would be -- I can't remember what his exact
8    words were. I think I believe he said the
9    things on the windowsill would have been
10    broken or -- because he said they were right
11    up under or right up -- sitting right on the
12    windowsill.
13 Q. Do you remember where in the business the
14    motion detector was?
15 A. I don't remember where.
16 Q. Real briefly, give me a description of the
17    inside of this business. I've never been in
18    there before. Is it one open room or --
19 A. It's one open room except for, you walk in.
20    There's a little dining area. There's a bar-
21    type deal. And then there's a door you walk
22    into, and there's a kitchen back there.
23    That's one big room.

Page 81

1 Q. So it's mainly set off in the two big rooms?
2 A. Right. There's a bathroom, two bathrooms, I
3    think.
4 Q. The window that was open, was that --
5 A. In the dining area.
6 Q. The dining area.
7 A. When you walk in the front door on the
8    right. It's the only window on that side, I
9    believe.
10 Q. Was the motion detector that set the alarm
11    off in the same room?
12 A. I couldn't tell you for sure if it was or
13    not.
14 Q. Ask you hypothetical, and this is strictly a
15    hypothetical. Had that motion detector been
16    in that room, if someone stuck there head in
17    that door on the way in, could that have set
18    the alarm off before their foot ever hit the
19    floor?
20        MR. LEWIS: Object to the form.
21        MR. NELMS: Object on the form.
22 A. I guess. I don't know.
23 Q. Okay.

DEPOSITION OF LEONARD PELHAM                    October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY

22 (Pages 82 to 85)

Page 82

1  A. That window was too high off the ground to
2     stick your head in. Just to let you know.
3  Q. How high off the ground was it?
4  A. It wasn't too terribly high. But you would
5     have to -- you would have to reach up and
6     pull yourself through it. I mean, it's not
7     something you can walk up to and throw your
8     leg in.
9  Q. Give me your best estimate about how high up
10    it was.
11  A. Five -- five feet six. Between five and six
12    feet.
13  Q. Second sentence of paragraph four states that
14    at that time Lieutenant Caulfield, the K-9
15    supervisor advised that there had been an
16    incident at the business and that someone had
17    to be charged.
18         Was Lieutenant Caulfield on the scene?
19  A. Which scene?
20  Q. At the business.
21  A. At the business? Not while I was there, no.
22  Q. Where was Lieutenant Caulfield when he made
23    this statement that you're referring to in

Page 83

1     paragraph four?
2  A. I believe he was at the scene where the car
3     had wrecked, ran into the fence.
4  Q. Did you hear him make that statement that
5     you're referring to in paragraph four,
6     Lieutenant Caulfield?
7  A. That was a statement that was told to
8     Sergeant Johnson which was relayed to me.
9  Q. Where was Sergeant Johnson at that time?
10  A. He was at the scene of the wreck as well.
11  Q. What exactly did Sergeant Johnson say to you?
12  A. Hey, we got a dog bite. The alarm went --
13    you know, Kirk, we got a dog bite. The alarm
14    went off. Window is open. Billy -- which is
15    Caulfield. He said, Billy said we're
16    going -- we got to justify it or something --
17    something like that. We got to -- we got to
18    charge this guy or justify or charge this
19    guy, one of the two.
20  Q. Were you still at Arnaud's Meats or were you
21    back at the station at this point?
22  A. I was in my car, I'm sure. Either leaving
23    Arnaud's -- either in the parking lot of

Page 84

1     Arnaud's or on the way back to the police
2     department.
3  Q. Mr. Pelham, I'm going to hand you a document
4     that we're going to mark as Defendant's
5     Exhibit #2 and Exhibit #3. Let me ask you
6     first, do you recognize these documents?
7  A. I do.
8  Q. Mr. Pelham, I apologize. Hang on to those.
9     That's not what I want to give you. That's
10    what I want to give. I'm also going to hand
11    you a document we're going to mark as
12    Defendant's Exhibit #4. Speaking of Exhibit
13    #4, do you recognize that document?
14  A. I do.
15  Q. Did you prepare that document?
16  A. I did.
17  Q. What is this?
18  A. Daily Activity Report for the detective
19    division.
20  Q. Okay. The second incident listed on this
21    report says arrest of black male, Chad Lamar
22    Hogan. Fair to say this is a description of
23    the incident we've been talking about?

Page 85

1  A. Yes, it is.
2  Q. Okay. You were aware at the time you
3     prepared this document that they had found a
4     ski mask and a nine millimeter handgun in the
5     car that Chad Hogan fled in, correct?
6  A. Yeah.
7  Q. In paragraph five you state, Further, it was
8     learned that the subjects in the car refused
9     to stop for the K-9 unit because they had
10    marijuana in their possession. And I'm
11    sorry, I'm referring back to your verified
12    complaint.
13  A. Okay.
14  Q. I apologize.
15  A. Correct.
16  Q. Do you think it's possible they fled more
17    because they got a nine millimeter handgun, a
18    Mag flashlight, and a ski mask in the car as
19    opposed to --
20         MR. NELMS: I object to the form.
21  Q. -- some marijuana?
22         MR. NELMS: Object to the form.
23  A. I don't think -- not all subjects in the car

Page 86

```
 1    knew that there was a weapon in the car.  And
 2    I --
 3  Q. What do you base that on, that statement on?
 4  A. Based on separating them and -- and talking
 5     to them.  You know, what happened?  What were
 6     y'all doing?  Why did you run?  Matter of
 7     fact, I know not all of them knew as far as
 8     what I -- I found, not all of them knew that
 9     there was a weapon in the car.
10  Q. Do you think they would have admitted knowing
11     there was a weapon in the car?
12        MR. NELMS:  Object to the form.
13  A. One of them did admit to the weapon being in
14     the car.
15  Q. Do you think others just might have denied it
16     even though they did know?
17  A. It's a possibility.
18        MR. NELMS:  Object to the form.
19  Q. What about on the ski mask?  Is it possible
20     that they would have denied knowing about it
21     even if they had known?
22        MR. NELMS:  Object to the form.
23  A. It's possible.
```

Page 87

```
 1  Q. Did they know they were being investigated
 2     for burglary at the time you were questioning
 3     them?
 4  A. I'm sure they put two and two together.
 5  Q. You think they could have figured out that
 6     wouldn't have bode well for them if they said
 7     they knew a ski mask was in the car --
 8        MR. NELMS:  Object to the form.
 9  Q. -- in light of the fact that they were being
10     investigated for burglary?
11  A. It's a possibility
12  Q. You remember if it was cold that day?
13  A. I don't remember -- it was raining real hard.
14  Q. Do you remember if you had a jacket on
15     yourself?  It was March 30th, I believe, was
16     it not?
17  A. Correct.  If I did, I had this jacket on or
18     something similar to it.
19  Q. It wouldn't have been cold enough to justify
20     wearing a ski mask that day, would it have
21     been?
22        MR. NELMS:  Object to the form.
23  A. I don't recall.
```

Page 88

```
 1  Q. I'm going to refer you back to Exhibit #2.
 2     Ask you if you recognize that document.
 3  A. I do.
 4  Q. Was that the final statement that Officer
 5     Gordon prepared?  And take your time if you
 6     need to look over it.
 7  A. It wasn't the first one.  Second or third
 8     one.  I can't say for sure.
 9  Q. You don't know which, if it's second or
10     third?
11  A. If I saw the -- if I saw the other one, I
12     could tell you.  But it wasn't this first
13     one.
14  Q. From reading this statement, and let me
15     preference my question by saying I understand
16     that you had questions about the credibility
17     of the radio traffic and the statements from
18     Mr. Arnaud.  But as to the statement itself,
19     with no knowledge of any outside sources, do
20     you contend that this statement does not
21     establish the elements necessary for
22     burglary?
23  A. If I -- if I had no knowledge of anything
```

Page 89

```
 1     else, just looking at this statement?
 2  Q. Yes, sir.
 3  A. Okay.  What was your question again?
 4  Q. Would you agree that the statement
 5     establishes the elements of burglary?
 6  A. No, it does not.
 7  Q. Can you tell me why?
 8  A. It establishes reasonable suspicion, probable
 9     cause to -- you know, it's something that
10     needs to be investigated.
11  Q. You're right.  Let me rephrase my question.
12     Would you agree that the statement
13     establishes probable cause to believe that a
14     burglary has been committed by these suspects
15     at Arnaud's Meats.
16        MR. LEWIS:  Object to the form.
17        MR. NELMS:  Object to the form.
18  A. I would -- I would say reasonable suspicion
19     if I had to choose a word.  I would say
20     reasonable suspicion.
21  Q. Why would you distinguish between probable
22     cause and reasonable suspicion?
23  A. Well, reasonable suspicion, you know, this
```

DEPOSITION OF LEONARD PELHAM                    October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY

24 (Pages 90 to 93)

---

**Page 90**

1    sounds suspicious. You know, if there was a
2    burglary, somebody is mighty close to the
3    building. Probable cause, the way I was
4    taught is, you know, why are you following up
5    on this reasonable suspicion. Why are you
6    following up on this suspicious activity?
7  Q. Okay. Are you stating that the statement
8    would have needed to say that the suspect was
9    seen coming out of the window in order to
10   establish probable cause?
11      MR. NELMS: I'm going to object to the
12      form to the extent it's asking for
13      a legal conclusion.
14 Q. You used to be a police officer, and part of
15   your duties were to actually decide whether
16   or not probable cause existed and to charge
17   people with crimes, correct?
18 A. Right. Well, you would have to have the
19   elements, of course, to charge for the
20   crime.
21 Q. Would you agree you are qualified to answer
22   that question?
23 A. Yes.

---

**Page 91**

1  Q. Okay. And do you feel like this statement
2    would have had to have stated that somebody
3    was seen coming out of the window to
4    establish probable cause?
5  A. Probable cause to do what?
6  Q. To arrest him.
7  A. If he was coming out of the window?
8  Q. And charge him with burglary, yeah.
9  A. If the -- if the -- all the other elements
10   are there, yeah.
11 Q. But would that statement have been necessary
12   to establish the elements?
13 A. Yes, it would.
14 Q. If he was seen coming out of the window.
15   Okay. I'm going to refer to paragraph eight
16   back in your verified complaint. You state
17   in paragraph eight that Detective Pelham
18   talked with the owner of the business and
19   then learned that the owner had been talked
20   with by Lieutenant Caulfield. At this time
21   Mr. Arnaud was tired and wanted to go home
22   and just wanted to sign the warrant. The
23   warrant was signed and the subject was placed

---

**Page 92**

1    in the Montgomery County Detention Facility.
2    As to your first sentence that the owner of
3    the business was -- had been talked to by
4    Lieutenant Caulfield, how do you know that
5    Lieutenant Caulfield talked to Mr. Arnaud?
6  A. He had told me. When I was around in
7    Lieutenant Cook's office, when I had made my
8    way back around to Mr. Arnaud he had told
9    me -- he -- Mr. Arnaud was sitting in one of
10   the supervisor's office, and all the K-9
11   officers were -- there's two desks out in the
12   hallway and the chairs, and that's where they
13   kind of all hang around when they're
14   waiting. When I come back around from
15   Lieutenant Cook's office, they were all in
16   that area. And he said that he was talking
17   with -- he didn't know his name, I don't
18   think. But he said your lieutenant, which it
19   was Lieutenant Caulfield -- my direct
20   lieutenant was Cook, but he was speaking of
21   Lieutenant Caulfield.
22 Q. How do you know he was speaking of Lieutenant
23   Caulfield?

---

**Page 93**

1  A. When I come back around, he was walking out
2    and, you know --
3  Q. Lieutenant Caulfield was walking out?
4  A. Right.
5  Q. Did you see Lieutenant Caulfield speaking
6    with Mr. Arnaud?
7  A. Mr. Arnaud was the only one in the room. I
8    can't remember if I did or not.
9  Q. But Mr. Arnaud never mentioned Lieutenant
10   Caulfield by name?
11 A. I can't remember if he did or not.
12 Q. And you never specifically saw them talking?
13 A. I can't remember if I did.
14 Q. Paragraph nine of your verified complaint,
15   you state that you spoke with Major West and
16   that Major West warned you that if an
17   internal affairs investigation occurred, that
18   it would make him as well as the detective
19   division look bad?
20 A. Make me as well as the detective division
21   look bad.
22 Q. Okay. So you're speaking of yourself --
23 A. Right.

Page 94

1  Q. -- when you say him right there?
2  A. Right.
3  Q. Okay. Mr. West, excuse me, Major West had
4     this conversation with you in person?
5  A. Yeah.
6  Q. Was anybody else present when this
7     conversation occurred?
8  A. Lieutenant Randy Jones and Sergeant Scott
9     Tatum.
10 Q. Where did the conversation take place?
11 A. In Major West's office.
12 Q. Did Major West discourage you from --
13 A. Yes, all three of them did.
14 Q. -- reporting this? And I understand you
15    stated in paragraph nine that, He stated that
16    it would make you as well as the detective
17    division look bad. Did he make any other
18    statements that you felt were discouraging
19    you from going forward with this?
20 A. He said that people would call me anti-police
21    and liberal and I mean there was all kind of
22    things said. I can't remember what -- what
23    exactly was said. But anti-police was the

Page 95

1     word that was thrown around more than once.
2  Q. So he told you about some of the negative
3     effects that could happen if you were to
4     pursue an internal affairs investigation?
5  A. Right.
6  Q. Did he ever tell you, you don't want to do
7     this, don't do this, you shouldn't do this;
8     or did he just simply tell you what negative
9     repercussions could come from such an
10    investigation?
11 A. I think he said he didn't think I was ready
12    for -- he said I don't think you're ready for
13    the repercussions -- repercussions that comes
14    along with something like this.
15 Q. Did he explain that?
16 A. He said people -- people are going to call
17    you anti-police. You're probably going to
18    get nasty letters. People ride by your
19    house, call your house, hang up, that kind of
20    thing. Nobody will want to work with you.
21 Q. Do you think that's all true?
22 A. It turned out to be true, yeah.
23 Q. Do you think he is discouraging you or trying

Page 96

1     to influence you not to pursue an internal
2     affairs investigation just by telling you the
3     truth?
4        MR. LEWIS: Object to the form.
5  A. He told me the negative -- negative aspect of
6     it. No positive aspect. You know, telling
7     the truth, you're doing the right thing.
8  Q. All right. Is it fair to say that Major West
9     never told you not to pursue the
10    investigation?
11 A. Is it fair -- is it -- say that again.
12 Q. Is it fair to say that Major West never told
13    you not to pursue this -- an internal affairs
14    investigation?
15       MR. NELMS: Object to the form.
16 A. He -- him as well as Randy Jones told me that
17    they would deal with it in their own way. We
18    didn't need -- you don't need to launch an
19    internal investigation or request one. How
20    about you let us deal with it in our own
21    way. I told them no.
22 Q. Anything else they said?
23 A. I mean, I was in there a little while. So

Page 97

1     I'm sure -- I don't recall what else was
2     said.
3  Q. Next paragraph in your verified complaint,
4     paragraph ten, you state: At the time they
5     leave Major West's office, Sergeant Tatum
6     takes Detective Pelham into his office and
7     goes off on him regarding the reporting of
8     the incident. Tell me what you mean by
9     Sergeant Tatum going off on you. What did
10    Sergeant Tatum say to you?
11 A. He told me I was stirring up trouble.
12    Stirring up shit was his words. Said that I
13    was by -- I was by myself. And then he
14    pushed real hard about -- wanted to know if I
15    had a tape recorder in my pocket, if I
16    recorded the meeting with him, Randy Jones,
17    and J.C. West.
18 Q. Did you?
19 A. I did not.
20 Q. Okay. I'm sorry.
21 A. Should have. And he said I was making --
22    making work hard on myself. Bringing --
23    putting a burden on my own shoulders. At

Page 98

1   that time, I walked out of his office. That
2   was all that was said.
3   Q. Was it just you and him in his office?
4   A. Yes.
5   Q. Anybody else ever tell you they overheard
6   that conversation in the hall or anything?
7   A. No.
8   Q. Paragraph 11 in your verified complaint
9   states: Later that day, Pelham gives his
10   statement to Mike Trotter and Pervis Fleming
11   of the internal affairs of division. It was
12   shortly thereafter that the harassment begins
13   in which he is cursed by Lieutenant Caulfield
14   as well as others in the detective division.
15   Starting with Lieutenant Caulfield, when do
16   you allege that Lieutenant Caulfield cursed
17   you about this incident?
18   A. It was the next day. I got to work that --
19   that evening around seven o'clock. It was a
20   little later. He called the detective
21   division or called on the radio and asked for
22   a phone number. I gave him my office
23   number. And asked if I had his handcuffs

Page 99

1   up there. I told him I didn't have them. I
2   didn't see them. And he said -- I said, do
3   you want a pair that, you know, will get you
4   through the night? And he said, No,
5   goddammit, I want my mother-fucking
6   handcuffs. I said, Well, I got a pair if you
7   want to borrow them to get you through the
8   night; or the back desk has got a pair, so I
9   know they've got a pair if you want a pair
10   from them. And he said, Mother-fucker, I
11   want my handcuffs -- or, No, mother-fucker, I
12   want my handcuffs. And then he hung up the
13   phone.
14   Q. Was the Chad Hogan incident mentioned at all
15   during that conversation?
16   A. No, it was not.
17   Q. Is that the only incident you're speaking of
18   in paragraph 11 of your verified complaint as
19   to Lieutenant Caulfield?
20   A. Yes, it is.
21   Q. You said as well as others in the detective
22   division. Who else are you speaking of?
23   A. Scott Seithalil. S-E-I-T-H-A-L-I-L.

Page 100

1   Q. Can describe the incident with Detective
2   Seithalil? He is a detective, correct?
3   A. Correct. Me -- me and Scott used to be -- we
4   were close. Hung out on the weekends, that
5   kind of thing, and worked together. After
6   all this, my supervisors would -- well, after
7   this situation, I was moved to first shift,
8   detective division where Scott works. And my
9   supervisors would assign me cases and -- or
10   him cases and ask that I go with him to help
11   him out on something, and he'd go with me to
12   help me out on something so we'd end up
13   together. And he -- Scott voiced his
14   opinion. He heard, you know, bits and pieces
15   of what happened and -- first he - he just
16   was kind of fishing, wanting to know exactly
17   what happened. Anyway, as he learned from
18   other people what happened, he started to
19   disagree with me, you know, speaking out
20   about it. And I -- I carried my digital
21   recorder in my shirt pocket, which a lot of
22   detectives do. And I always carried it in my
23   shirt pocket. And he wouldn't -- he'd kind

Page 101

1   of watch what he -- what he said around me,
2   you know, due to the recorder in my pocket.
3   He'd say, why don't you take that recorder
4   out of your pocket, you know, and blah blah.
5   He said, you know, everybody knows you're
6   recording people. And I told him I ain't
7   recording nobody. And, you know, you need to
8   watch your back. You done pissed a lot of
9   folks off. Billy Caulfield has been here I
10   think 18 years, something like that. And he
11   ain't just going the let this slide. And
12   that went on and on for several days after,
13   you know. Take -- why don't you take your
14   tape recorder out. Everybody knows you're
15   recording them and that kind of stuff.
16   Q. Anybody else ever cuss you?
17   A. No, not cuss me, no. Frank Koscho, I mean he
18   didn't -- he didn't say -- he didn't say a
19   whole lot. He let me know he -- he didn't
20   care too much for me. He was the other
21   detective that was working with me that
22   night. No.
23   There was a guy, another officer, a

DEPOSITION OF LEONARD PELHAM          October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY

27 (Pages 102 to 105)

Page 102

1   young officer I'd never seen before -- he
2   must have been just out of the academy --
3   made the comment the day before after all --
4   all this had gone on. He said, So you
5   charged him anyway, huh? And that was it.
6   Q. All right. Paragraph 12 of your verified
7   complaint states: Detective Pelham was told
8   that he needed to watch his back. Who told
9   you you needed to watch your back?
10  A. Scott Seithalil, Ben Harrison. I -- I don't
11  recall any of the other ones. I don't know
12  if there was anybody else or not.
13  Q. Was anybody present when Seithalil told you
14  to watch your back?
15  A. Chris Gruhn.
16  Q. Where were y'all when that conversation
17  occurred?
18  A. In -- after this -- after this incident, me,
19  Scott, and Chris were together a lot. It
20  happened to me at headquarters, in the car,
21  out on the scene. Happened just about
22  everywhere you could put us.
23  Q. What, people telling you to watch your back?

Page 103

1   A. Well, Scott -- Scott saying it. There was
2   even an incident where we were over off of
3   Wares Ferry Road. He pulls into -- pulls
4   into the woods, and we were -- Charlie
5   Brassel Road off of Wares Ferry, and pulls
6   the car -- there's a big pond back there.
7   Pulls the car right up to the pond. Makes a
8   comment like we're going -- we're going to
9   get out and leave you here, leave you
10  floating. You know, just little things like
11  that.
12  Q. Was he joking when he said that?
13      MR. LEWIS: Object to the form.
14  A. I don't know. I don't know.
15  Q. Did you take it as a serious threat?
16  A. I wasn't going to turn my back on him, just
17  because I didn't know. I was unsure.
18  Q. Okay. And who was that that stated that to
19  you?
20  A. Scott Seithalil.
21  Q. And you said the other officer was Harris
22  that told you to watch your back?
23  A. Ben Harrison.

Page 104

1   Q. Harrison.
2   A. Harrison.
3   Q. How many times did Ben Harrison tell you to
4   watch your back?
5   A. I think that was once. That was the only
6   time we talked.
7   Q. Was anybody else present when y'all had that
8   conversation?
9   A. Maybe Chris Gruhn.
10  Q. Where did that conversation occur?
11  A. In the property office.
12  Q. In paragraph 12 you also state that:
13  Further, the detective division supervisors
14  took his automobile away from him and then
15  assigned him a large number of cases to
16  attempt to work from police headquarters
17  without a vehicle. Tell me what you're
18  talking about right there.
19  A. When -- in the detective division your city
20  vehicle would be a Chevrolet Lumina or a
21  Malibu or Impala; I forget what it is. The
22  detective cars, you can take them home if --
23  if you live in the city limits. If you live

Page 105

1   outside of the city limits, you have to be on
2   call in order to take your city car home. I
3   live outside the city limits in Millbrook.
4   And the way -- the way that works is, I was
5   told by my sergeants, my daytime sergeants
6   that I could take my city car home like
7   almost all the other detectives were doing.
8   And if something happens, call them before
9   you call anybody else. They'll put you on
10  call. So I did that for several months.
11      After all this got out in the open,
12  the -- and I don't know how -- my -- Major
13  West came to me in the hallway and said --
14  or, no, Sergeant Billy Gordon came to me and
15  said we're -- they want me to take your car
16  away from you for a little while. He was
17  trying -- Billy was trying to make -- make
18  some peace out of the situation. And he
19  said, I'm sorry, man. He said, you know, I
20  just -- I do what they tell me to do. And I
21  know we're friends and, you know, don't be
22  mad at me about it. But they want me to take
23  your car away from you. So don't get caught

Page 106

1    in your car. I asked him, I said, Well, how
2    am I going to work my cases? He said, Well,
3    I don't know. Do what you can at -- at the
4    police department. If you need to, ride with
5    somebody else. And they took my car. Didn't
6    tell me how long they was going the have it.
7    Q. You didn't have another vehicle?
8    A. No.
9    Q. I mean, did they state why -- did they say
10   we're doing because you live outside the
11   police jurisdiction?
12   A. Right.
13   Q. Do you know if any other officers that lived
14   outside the police jurisdiction had their
15   cars taken away from them or -- not taken
16   away, but were discontinued from being
17   allowed to take their cars home at night or
18   while they weren't at work at the same time?
19        MR. NELMS: Object to the form.
20   Q. Let me start over again. That was a horrible
21   question.
22        MR. NELMS: I don't think you
23        understand what he said.

Page 107

1         MR. GILLIS: Well, now, you can't say
2         what he doesn't understand, not
3         unless you --
4    Q. Let me see if I can clarify. You're stating
5         that up until this incident, there's always
6         been a policy that says officers who live
7         outside the police jurisdiction aren't
8         allowed to take their vehicles home with them
9         while they're not at work unless they're on
10        call?
11   A. Right.
12   Q. And you're stating for months prior to this
13        incident you were always allowed to take your
14        vehicle home while you weren't at work, and
15        you were just told that if anybody -- that if
16        anything happened to the vehicle, make sure
17        you call your supervisors and they just iist
18        you as on-call --
19   A. Right.
20   Q. -- and everything will be okay.
21   A. Right.
22   Q. But once this incident occurred, you were
23        told you could no longer take your vehicle

Page 108

1         home with you while you weren't at work.
2    A. Right.
3    Q. My question is, do you know of any other
4         officers that that happened to at or around
5         the same time or lived outside the police
6         jurisdiction and had been allowed to take
7         their cars home but then were told don't do
8         that anymore?
9    A. No.
10   Q. Okay. Do you know of any officers who were
11        still allowed to take their cars home who
12        lived outside the police jurisdiction at the
13        time?
14   A. Yes.
15   Q. Who?
16   A. There was Scott Thompkins.
17   Q. Where does Scott live?
18   A. Tallassee.
19   Q. Let me see. For point of clarification, as
20        best you can remember, about when did Billy
21        Gordon tell you, you couldn't take your car
22        home anymore unless you were on call?
23   A. Like the day after or two days after all this

Page 109

1         happened.
2    Q. So early April?
3    A. Right.
4    Q. So even in April 20th, 2005, Scott Thompkins
5         was still taking his car home to Tallassee
6         even when he wasn't on call?
7    A. I think I left before April. No. I --
8    Q. This happened March 30th. I'm just going by
9         that.
10   A. Yeah. I mean, until -- until I think -- I
11        don't know. I think a lot of things changed
12        when Mike Briddell got a phone call. I think
13        there was a lot of running around, covering
14        things up. I mean I can't answer that
15        question.
16   Q. Okay.
17   A. I don't know.
18   Q. My question is let's just get back to Scott
19        Thompkins. Do you specifically recall Scott
20        Thompkins continued to take his vehicle --
21   A. As long as I was employed, yes.
22   Q. For the remainder of your employment, Scott
23        Thompkins was allowed to keep taking his car

Page 110

```
 1      home to Tallassee even when he wasn't on
 2      call?
 3   A. Right. Right.
 4   Q. Any other officers that you know of that live
 5      outside --
 6   A. Gene -- Gene Sisson, Kevin Byrd.
 7   Q. Where did Gene live?
 8   A. Gene lived in Bullock County. I think -- I
 9      think Bullock County.
10   Q. All right. Who else besides Gene Sisson?
11   A. Kevin Byrd. He lived down the street from
12      me.
13         MS. CONNER: Chris, I think you're
14            missing the point here. He had no
15            car at all to work his cases. He
16            had to catch a ride.
17         MR. NELMS: That's what I'm saying.
18         MS. CONNER: They took the car totally
19            away. Here's cases to work. You
20            work them out of headquarters --
21   Q. You weren't allowed to even while you were on
22      duty --
23         MR. NELMS: That's what he said.
```

Page 111

```
 1   A. Right.
 2   Q. Okay.
 3         MR. NELMS: No bicycle, no horse, no
 4            nothing.
 5   Q. Okay. You stated in paragraph 13 that you
 6      were warned that you needed to leave your
 7      locker as well as your personal vehicle
 8      locked, as someone would possibly put illegal
 9      drugs or contraband in your locker or
10      vehicle. Who told you that?
11   A. Scott Seithalil told me that.
12   Q. Was anybody around when Seithalil told you
13      that?
14   A. Chris Gruhn.
15   Q. Where were you when Seithalil told you that?
16   A. He told me that two or three times. We were
17      in Chris Gruhn's car one day, one day in the
18      property office. That's about all I can
19      remember as far as where.
20   Q. Chris Gruhn was present both times?
21   A. Yes.
22   Q. Paragraph 15 of your verified complaint you
23      state: Detective Pelham advised his
```

Page 112

```
 1      supervisors of the harassment as well as
 2      informing Mayor Bright in an e-mail of the
 3      same. This e-mail went unanswered by Mayor
 4      Bright. Detective Pelham contacted the
 5      mayor's officer and was given an appointment
 6      with Michael Briddell the mayor's
 7      administrative assistant some ten days after
 8      his request. What specifically did this
 9      e-mail say?
10   A. I started from the beginning with what
11      happened to Mr. Hogan.
12   Q. And I was going to ask you, do you have a
13      copy of -- go ahead. I'm sorry.
14   A. Of what happened with Mr. Hogan and basically
15      what I've told you. I just kind of -- it was
16      brief. More brief than that.
17   Q. Okay. Next question. Do you have a copy?
18         MS. CONNER: I need a copy. That's my
19            only copy.
20         MR. WHITEHEAD: Let's take a break for
21            a second, anyway. That's fine.
22            (Brief recess)
23   Q. All right. Mr. Pelham, I have already handed
```

Page 113

```
 1      you a document that's been marked as
 2      Defendant's Exhibit #3. And that, I believe,
 3      is the affidavit that was signed by
 4      Mr. Arnaud in connection with the arrest
 5      warrant. I've got two other documents that
 6      I'm going to mark as Defendant's Exhibit #5
 7      and Defendant's Exhibit #6. Ask you to look
 8      at those and see if you recognize those.
 9   A. Yes.
10   Q. Okay. Can you tell me what #5 and #6 are
11      real quick?
12   A. The warrant of arrest and the complaint that
13      goes along with the affidavit?
14   Q. Okay. As to Exhibits #3, #5, and #6, did you
15      prepare each of those documents?
16   A. Yes, I did.
17   Q. Okay. Are there any false statements in
18      those documents that you prepared?
19   A. Yes.
20   Q. Can you tell me what are false statements in
21      those documents?
22   A. The defendant did knowingly --
23   Q. Tell me which document you're referring to as
```

DEPOSITION OF LEONARD PELHAM                    October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY

30 (Pages 114 to 117)

Page 114

1   we go, too, please, sir.
2   A. Document #3.
3   Q. Okay. Which one is #3. I confuse myself.
4   A. Affidavit.
5       MS. CONNER: Affidavit.
6   Q. All right. On #3. I'm sorry. I was --
7   A. The details of offense.
8   Q. Okay. And just for the record, tell me
9       specifically what statement you're saying is
10      a false statement.
11  A. The defendant did knowingly enter or remain
12      unlawfully in the building of.
13  Q. Okay. Anything improper on Exhibit #5, or
14      are there any false statements on Exhibit #5?
15  A. Knowingly enter or remain in the building of
16      another, his name, with intent to commit a
17      crime therein, theft of property.
18  Q. Okay. Exhibit #6, warrant of arrest.
19  A. Fact that he was charged with the burglary.
20  Q. Well, he was charged with the burglary,
21      wasn't he?
22  A. Right. That's what I'm saying. The -- the
23      charge, I mean, the whole warrants.

Page 115

1   Q. Okay. So you're saying that you knowingly
2       prepared documents to effectuate an arrest
3       that had false statements in them?
4   A. Well, the documents are already prepared.
5       They're pretyped. I just go in and click
6       burglary third, affidavit, put in Mr. Hogan's
7       information. Mr. Arnaud, that's when I take
8       him to the warrant clerk's office and he
9       secures a warrant.
10  Q. Okay. On Defendant's Exhibit #3, you said
11      the statement, The defendant did knowingly
12      enter or remain unlawfully in a building.
13      And you said that's a fault statement?
14  A. Right.
15  Q. You typed that statement on this form, did
16      you not?
17  A. No. It's pretyped. I put in 425 North
18      Eastern Boulevard, Montgomery, 36106,
19      Arnaud's Quality Meat.
20  Q. What else did you put in on this document?
21  A. That's it.
22  Q. You put in a charge on this document?
23  A. I put in 425 North Eastern Boulevard. Charge

Page 116

1   is already there. You double click it on the
2   computer, and it prints it out for you. You
3   put in Chad Lamar Hogan, 425 North Eastern
4   Boulevard, Montgomery, Alabama.
5   Q. Did you know what this document was going to
6       say before you had it printed out?
7   A. Yes, I did.
8   Q. And you printed it out with the purpose of
9       Mr. Arnaud signing it?
10  A. Yes, I did.
11  Q. Okay. Mr. Pelham, you stated earlier, I
12      believe that you had been a police officer
13      for -- you were a police officer for a little
14      over two years, is that correct?
15  A. Right. Yes.
16  Q. Did you ever have problems articulating full
17      detail in your reports?
18  A. No, I did not.
19  Q. You never had to go back and redo a report?
20  A. No, I did not.
21  Q. Ever seen anybody besides this incident where
22      somebody had to go back and redo a report
23      because they didn't put enough detail in it?

Page 117

1   A. Yes, I've seen affidavits where the warrant
2       clerk will ask like for harassment. For
3       example, an officer would put a subject
4       harassed me. Well, the warrant clerk would
5       want to know, well, what did he say. What
6       did he call you? What did he say to you?
7   Q. And then they had to go back and put that in
8       that --
9   A. And they had to go back and put that in the
10      affidavit.
11  Q. That doesn't necessarily mean they were
12      fabricating the statement?
13  A. No, but it wasn't the elements of the arrest
14      either. It was just what was said, you
15      know. A dark color shirt, what color was it.
16  Q. But, nonetheless, it was detail that was left
17      out to begin with and had to be put back in;
18      correct?
19  A. Right. Right.
20  Q. Have you seen that a lot?
21      MR. LEWIS: Object to the form.
22  A. I haven't, no.
23  Q. You're aware that it happens, though.

DEPOSITION OF LEONARD PELHAM                October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY

31 (Pages 118 to 121)

Page 118

1     correct?
2  A. Right, yes.
3  Q. It isn't necessarily evidence of fabrication
4     of evidence --
5        MR. NELMS: Object to the form.
6  Q. -- if somebody goes back and amends a
7     statement or report or an affidavit, is it?
8        MR. NELMS: Object to the form.
9  A. It -- I mean, I don't know.
10 Q. But it can be --
11 A. It happens. It happens every day. Yes and
12    no both -- both ways.
13 Q. It happens every day where people fabricate
14    evidence?
15 A. There's -- yeah. You'd be surprised.
16 Q. Well, what knowledge do you have that
17    evidence is being fabricated every day? What
18    do you base that statement on?
19 A. I heard, you know -- I hear other officers
20    talking about it. You know, you spend 30, 45
21    minutes trying to take somebody into
22    custody. And if you got to squeeze a word or
23    two in there to put the stamp of approval on

Page 119

1     it, I've seen that happen before.
2  Q. Have you ever done that?
3  A. I have not. This time here is the only time.
4  Q. And you said it happens every day when people
5     have to --
6  A. There's a lot --
7  Q. -- redo statements for innocent purposes as
8     well, correct?
9        MR. LEWIS: Object.
10       MR. NELMS: Object to the form.
11 A. I -- I wouldn't know. I mean I just -- I
12    know what I hear.
13 Q. I'm just asking you, did you earlier state
14    that it happens every day --
15 A. Yes.
16 Q. That people redo statements for purely
17    innocent reasons.
18       MR. LEWIS: Object.
19       MR. NELMS: Object to the form.
20 A. Not redo statements, but I'm sure -- I mean,
21    redo statements a lot. As far as, you know,
22    going to court and saying yes, I saw this
23    when they really didn't see it. Yeah, that

Page 120

1     happens a lot. Now, as far as redoing the
2     statement, I don't know how often that
3     happens. A lie ain't nothing to tell to the
4     Montgomery Police Department, put it that
5     way.
6  Q. These other incidents that you're speaking of
7     where people fabricated evidence in their
8     statements, did you report these incidents to
9     internal affairs or anybody else?
10 A. It was hearsay. It was hearsay. You weren't
11    allowed to talk about a -- about anything.
12    For this example, I wasn't allowed to talk
13    about this to anybody except internal
14    affairs.
15 Q. But you were still able to report this to
16    internal affairs, correct?
17 A. I wouldn't -- no. Never --
18 Q. I mean, you did report this to internal
19    affairs, did you not?
20 A. Yes, this I did.
21 Q. But these other allegations that you've made
22    where evidence gets fabricated every day at
23    Montgomery Police Department I believe were

Page 121

1     your words. Have you ever reported any of
2     those other incidents to the proper
3     authorities?
4  A. The people you'd report it to know about it.
5     They talk about. Who are you going to report
6     it to?
7  Q. But that didn't stop you this time, did it.
8  A. It didn't stop me this time because it's my
9     ass you're talking about.
10 Q. Okay.
11 A. You know.
12 Q. Mr. Pelham, have you communicated with Chad
13    Hogan in any way since March 30th, 2005.
14 A. No, I have not.
15 Q. Has anybody representing you communicated
16    with Chad Hogan in anyway since March 30th,
17    2005?
18 A. Not that I know of.
19 Q. Has anybody representing you, communicated
20    with Chad Hogan or anybody representing Chad
21    Hogan in any way since March 30th, 2005.
22       MR. LEWIS: Object to the form.
23 Q. In other words, do you know if your lawyer

DEPOSITION OF LEONARD PELHAM          October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY

32 (Pages 122 to 125)

---

**Page 122**

1   has talked to their lawyer -- to his lawyer?
2   A. I don't know. I don't know.
3   Q. You don't have any specific knowledge that
4     your lawyer has spoken to his lawyer?
5   A. No.
6   Q. Mr. Pelham, I believe you said earlier that
7     you had a copy of the tape of some of the
8     radio traffic that occurred that evening; is
9     that correct?
10  A. Correct.
11  Q. You didn't bring that with you?
12  A. No, I did not.
13  Q. Okay. Can you get your attorney a copy of
14    that, please?
15  A. I can.
16  Q. Do you have any other tape recordings which
17    you contend are evidence of the allegation
18    that you've made in your verified complaint?
19  A. No.
20  Q. Okay. Do you have any journals or diary
21    entries or any other documents which support
22    the --
23  A. I've got all the case file paperwork.

---

**Page 123**

1   Q. The case file paperwork that should be in
2     the --
3   A. Right.
4   Q. -- file at the police department?
5   A. Copies -- yeah, the copies of the affidavit,
6     the incident report, all that.
7   Q. Do you have any other type of documentation
8     outside of that which you feel would support
9     the allegations you've made in your verified
10    complaint?
11  A. No. I mean everything you've got, I got.
12       MS. CONNER: You also had the second
13         statement, and I gave him a copy
14         of that.
15       MR. WHITEHEAD: I'm going to get to
16         that in just a second. Right.
17  Q. All right. Mr. Pelham, I'm going to hand you
18    a document we're going to mark as Defendant's
19    Exhibit #7. You speak of an e-mail in your
20    verified complaint that you sent to the
21    mayor's office. Is this the e-mail that
22    you're speaking of in your verified
23    complaint?

---

**Page 124**

1   A. Yes.
2   Q. Okay. Did you send any other e-mails to the
3     City of Montgomery or the mayor's office
4     regarding your allegations?
5   A. I think this was the only one.
6   Q. Okay. Mr. Pelham, I've just handed you a
7     document that we have marked as Defendant's
8     Exhibit #8. Ask you first if you recognize
9     this document.
10  A. Yes, I do.
11  Q. Okay. You had stated earlier that Officer
12    Gordon prepared three different statements in
13    connection with the arrest of Chad Hogan; is
14    that correct?
15  A. Yes.
16  Q. Is this the second statement that he
17    prepared?
18  A. This is the first statement.
19  Q. This is the first statement. Where did you
20    get this statement?
21  A. Where did I get it?
22  Q. Yeah.
23  A. From Officer Gordon.

---

**Page 125**

1   Q. Okay. Is this the only statement that you
2     have in your possession?
3   A. This is a -- I got a copy of it at home, I
4     believe.
5   Q. Okay. This is the only -- do you have a copy
6     of Exhibit #8 at home?
7   A. Yes.
8   Q. Okay. You don't have a copy of any other
9     statements from Officer Gordon other than
10    Exhibit #8?
11  A. I have two statements. This one and the
12    other one I showed you.
13       MR. WHITEHEAD: I'm confused,
14         Roianne. This is the one you
15         just gave me.
16       MS. CONNER: Okay. There were three
17         statements made. We don't have
18         one of them, but we have this one
19         and this one. They're different,
20         if you read them. We have two of
21         the three statements.
22       MR. LEWIS: For the record, could you
23         identify the exhibit numbers on

DEPOSITION OF LEONARD PELHAM                October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY

Page 126

1    the two to which you're
2    referring?
3    MS. CONNER: Okay. Exhibit #2 is the
4    last statement I'm assuming that
5    was made, because this is the one
6    that was in the case file.
7    MR. WHITEHEAD: Okay.
8    THE WITNESS: That's the third one.
9    This is the second one.
10   MS. CONNER: And this is -- #8 is the
11   second one. I don't --
12   MR. WHITEHEAD: Okay. We said earlier
13   it was the first one?
14   THE WITNESS: That's my mistake. This
15   is the second one.
16   MS. CONNER: We don't have a copy of
17   statement one.
18   MR. WHITEHEAD: Okay. You've just got
19   a copy of -- for record purposes,
20   you have a copy of Exhibit #2 and
21   Exhibit #8.
22   MS. CONNER: Correct.
23   THE WITNESS: Correct.

Page 127

1    Q. You don't have any other statements, copies
2    of any other statements from Officer Gordon?
3    A. Correct.
4    Q. Okay.
5    MR. WHITEHEAD: Y'all, that's all I
6    have right now. Kim, do you want
7    to?
8    EXAMINATION
9    BY MS. FEHL:
10   Q. Mr. Pelham, my name is Kim Fehl, and I
11   represent the City in this case with Chad
12   Hogan. I just want to go over a few things.
13   I also represent Chief Baylor and Major
14   West.
15   You were referring to conversations you
16   had with Officer Gordon. And you said that
17   you had four or five. And I believe you said
18   you had one in Lieutenant Cook's office.
19   A. Correct.
20   Q. Was there anybody else present at that time?
21   A. Lieutenant Cook, Frank Koscho.
22   Q. Okay. Once or twice in the hallway, was
23   there anybody else present at that time?

Page 128

1    A. There was one time I know it was just me and
2    Officer Gordon. And I couldn't -- they were
3    brief conversations. I don't know if there
4    was anybody else around or not.
5    Q. Okay. So, is the one in the hallway by the
6    copy machine, is that the same one that -- I
7    mean when you said once or twice in the
8    hallway by copy machine, is that in the same
9    place in the hallway or were there two
10   conversations in the hallway?
11   A. With Officer Gordon? There was more than
12   one. Two or three, I -- I'm not sure.
13   Q. In the hallway?
14   A. In the hallway.
15   Q. Okay. Were they all by the copy machine?
16   A. No.
17   Q. Okay. Can you recall if anybody else was
18   around during any of those conversations in
19   the hallway with Officer Gordon?
20   A. Maybe Frank Koscho. Maybe Lieutenant
21   Caulfield.
22   Q. You also said there was one in the property
23   supervisor's office. Do you recall if

Page 129

1    anybody else was present at that time?
2    A. In the property supervisor's office was my --
3    was my conversation with Mr. Arnaud. In the
4    property office -- just the regular property
5    office was my conversations with Officer
6    Gordon. And I don't recall anybody being
7    present.
8    Q. You also said once or twice in the conference
9    room. Was anybody else present when you were
10   in the conference room?
11   A. Maybe Frank Koscho. I think Officer --
12   Officer Forbus was present.
13   Q. Approximately what was the time span from the
14   time that Mr. Hogan was brought in -- or
15   excuse me -- from the time you responded to
16   Arnaud's and returned back to headquarters,
17   until the warrant was secured for burglary?
18   How much type time elapsed in that period?
19   MS. CONNER: Kim, are you talking from
20   the initial call to the very end?
21   Is that what you're asking?
22   Q. Right. From the time you went to the
23   first -- you said you responded to Arnaud's.

DEPOSITION OF LEONARD PELHAM             October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY

34 (Pages 130 to 133)

Page 130

1    Okay. From that point until the time that
2    the warrant was secured.
3        MR. NELMS: Object to the form.
4  A. Probably five, six hours.
5  Q. Okay. And how many conversations did you
6    have with Chad Hogan during that time frame?
7  A. Three, four.
8  Q. Okay. And do you recall other suspects being
9    brought in, apprehended?
10 A. Yes.
11 Q. How many conversations did you have with
12   them?
13 A. About the same, three or four.
14 Q. Where was Chad Hogan and the other suspects
15   being detained or held at during this five or
16   six hour period?
17 A. Mr. Hogan was treated by the medics for his
18   dog bites. I spoke with him I think twice.
19   Once outside the parking lot. Once
20   downstairs.
21 Q. Downstairs where?
22 A. In the -- by the back desk of the police
23   department in the booking room. Once in my

Page 131

1    office up in the detective division. Once in
2    the holding cell. The other guy, I don't
3    even remember his name, talked with him
4    before he even got out of the police car in
5    the parking lot headquarters; again in my
6    office and again in the conference room.
7  Q. Okay. And the third one, when did you talk
8    to him?
9  A. I don't. I don't remember the third one all
10   that much. I don't -- I don't know.
11 Q. Do you know where they were being held during
12   this four or five-hour period?
13 A. One was being held in the auto theft office,
14   which is as soon as you walk into the
15   detective division, second door on the left.
16   One was being held in my office. And one was
17   being held in the holding cell that's in my
18   office.
19 Q. In your --
20 A. It's a -- it's a big office. Cubicles
21   really. There's a holding cell off of one
22   side. There's another little office off the
23   big room.

Page 132

1  Q. Okay. And let's just refer to them since you
2    can't recall their names. Mr. Hogan would
3    have been the first person apprehended; is
4    that correct?
5  A. Correct.
6  Q. And then where was he held until the warrant
7    was secured?
8  A. He was in the back of the police car. The
9    medics were tending to him.
10 Q. Until the warrant was secured?
11 A. No. After they treated him, myself and -- I
12   can't remember the officer that transported
13   him, but we walked him up to my cubicle and
14   handcuffed him to my desk.
15 Q. Okay. So did he sit at your desk the rest of
16   the night?
17 A. No.
18 Q. Okay. Where did you -- where was Mr. Hogan
19   held when he was not being interviewed?
20 A. In a holding cell.
21 Q. Which holding cell was it?
22 A. In the main conference room.
23 Q. Okay. And then suspect number two, where was

Page 133

1    he held?
2  A. In the auto -- auto -- one of them was in the
3    auto theft office.
4  Q. Okay. And number three?
5  A. Was in the holding cell in the main -- in the
6    general property office.
7  Q. And where is your office located?
8  A. In the general property office.
9  Q. Okay. Okay. You said you had several
10   conversations with suspect number two and
11   three, correct?
12 A. They are -- the -- other than Mr. Hogan?
13 Q. Right.
14 A. Yeah. Yes.
15 Q. You also said that, I believe if I recall,
16   that when you -- you heard the call come in
17   for Officer Gordon when he arrived at
18   Arnaud's. And, I believe, did you say you'd
19   read the transcript of that radio dispatch or
20   that radio report?
21 A. That -- that I have the tape, the audio.
22 Q. Okay. Okay. And you said that you knew at
23   that point you were going to need a

DEPOSITION OF LEONARD PELHAM
CHAD HOGAN v. CITY OF MONTGOMERY

October 3, 2005

35 (Pages 134 to 137)

## Page 134

1  confession or something based on what he had
2  said over the radio. You said that earlier
3  in your deposition?
4  A. I know that -- right. I know that I will
5  need either a confession from the suspects or
6  property in the suspects' car, or something
7  that would link them to going inside the
8  business.
9  Q. Okay. Exactly, if you can just tell me --
10  and I think Mr. Whitehead touched on this,
11  but just for my clarification, what elements
12  do you look for to secure a burglary warrant?
13  A. Number one, you've got to enter the business
14  or the house, you know, with -- with the
15  intent to take something.
16  Q. So you have to have a confession to have
17  probable cause that somebody intended to
18  enter?
19  A. No.
20  MR. NELMS: Object to the form
21  Q. Okay. What do you look for to secure a
22  burglary warrant? What actions?
23  A. Look for evidence that somebody burglarized

## Page 135

1  the business. Evidence that the -- that the
2  business was entered, you know. Don't have
3  to have anything stolen from the business to
4  have a burglary, but you do have to have some
5  kind of entry, prove there was entry made.
6  Q. Have you ever charged anybody with attempted
7  burglary?
8  A. I think once or twice.
9  Q. And what kind of evidence did you look for,
10  for that?
11  A. Same. You know, intent to -- I think there
12  was a time where somebody had kicked a door
13  in and an officer pulled up before the
14  burglary could happen. I don't know.
15  Burglary tools, evidence of pry marks on the
16  door.
17  Q. Okay.
18  A. Some type of evidence.
19  Q. Okay. Then you said that when you were
20  referring -- and I can't remember the exhibit
21  numbers. It was the warrant and affidavit.
22  I believe Mr. Whitehead was just asking you
23  what on those documents was false. And you

## Page 136

1  said to knowingly enter and remain. Is that
2  a correct --
3  A. It's -- it's a false that the defendant did.
4  Everything after that is false.
5  Q. How do you know that?
6  A. I'm a detective. That's -- that's why I was
7  working the case.
8  Q. But how do you know as you sit here today
9  that they did not go into that?
10  MR. LEWIS: Object to the form.
11  A. The window was left open, just like
12  Mr. Arnaud said. As much as it was raining,
13  there would -- well, the pots on the
14  windowsill, the figurine, I don't think -- I
15  don't think if somebody was breaking into a
16  business they would pick them up and gently
17  lay them on the ground, side by side. Cash
18  lay -- cash money laying on the counter in
19  plain view I could see from the window. I
20  think any burglar would take that money.
21  Q. But this is based on your assumptions, not on
22  your knowledge.
23  MR. LEWIS: Object to the form.

## Page 137

1  MR. NELMS: Object to the form.
2  MR. LEWIS: So is the question.
3  Q. Well, were you present when this car pulled
4  up to Arnaud's?
5  A. No, I was not.
6  Q. Okay. So you can't say right here as you sit
7  today that that is a false statement?
8  MR. NELMS: Object to the form.
9  A. I can. I was the case agent on this case.
10  That's what I got paid to do. That was my
11  job. That's why patrol didn't investigate
12  cases. That's, you know --
13  Q. So you knew every case that you made was
14  going to be a conviction in court?
15  MR. LEWIS: Object to the form.
16  MR. NELMS: Object to the form.
17  A. Are you saying did I know every case I
18  prepared I wasn't going to lose?
19  Q. Yes.
20  A. No.
21  Q. Did you --
22  A. And I blame that on the judicial system. Not
23  on my case work.

DEPOSITION OF LEONARD PELHAM                October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY

36 (Pages 138 to 141)

Page 138

1   Q. Okay. So you think everybody that talked to
2       you told you the truth?
3           MR. NELMS: Object to the form.
4   A. When you got three guys that are separated
5       ever since you take them into custody. They
6       don't talk to each other the whole time, and
7       he tells me word for word the same thing this
8       guy tells me, he tells me word for word the
9       same thing this guy tells me, that's an
10      airtight alibi. When you check into it, you
11      call the business they say they were at, they
12      said they were there, and it checks out,
13      that's the only thing that any law
14      enforcement agency has got to go on.
15  Q. Is it possible they could have talked while
16      they were in the car fleeing from the
17      police?
18          MR. LEWIS: Object to the form.
19  A. Anything's possible.
20  Q. Okay. You said you had a conversation with
21      Major West and Lieutenant Jones and Sergeant
22      Tatum, was that the next day?
23  A. Yes, it was.

Page 139

1   Q. Okay. And that's when you were asking for an
2       internal affairs investigation?
3   A. Yes, it was.
4   Q. Do you recall when the internal affairs
5       investigation was opened?
6   A. That day. That night.
7   Q. Okay. Did you have any other
8       conversations -- and I'm just asking this and
9       I know you said you couldn't talk to anybody
10      about this. But did you have any other
11      conversations with Major West or Sergeant
12      Tatum or Lieutenant Jones or Arthur Baylor
13      about this after you asked for the internal
14      affairs investigation to be opened?
15  A. No, not that I recall.
16  Q. Okay. And you said earlier that you thought
17      things started happening after there was a
18      call to Michael Briddell's office. Did you
19      make the call to Michael Briddell's office?
20  A. Yes, I did.
21  Q. Okay. Do you have anything to support your
22      conclusion that things started to happen
23      after you called his office that you think

Page 140

1       that's what had something to do with it?
2   A. If you're talking about when I was hit with a
3       flashlight, I mean, as I was getting hit with
4       it, the words, you son of a bitch, you got
5       everybody pissed off at you. And you need to
6       take the recorder out of your pocket
7       recording people. Yeah, that --
8   Q. But nobody said, Michael Briddell said this
9       is for you?
10  A. I don't understand what you're asking me.
11  Q. I mean, do you assume that things started
12      happening like -- I think you said things
13      were covered up and all after you called
14      Michael Briddell's office?
15  A. Right. The -- the harassment and all -- all
16      the things that were being said to me were
17      after this incident with Mr. Hogan. The fact
18      that I called Mr. Briddell's office, I don't
19      think that supports me being harassed. I
20      think that's when -- when -- and I'll leave
21      it at that. Me calling his office didn't
22      have anything to do with being harassed or
23      getting hit. It was me requesting an

Page 141

1       internal investigation.
2   Q. And do you have anything to support that
3       assumption that you're making?
4   A. Yeah, I just told you. I was hit with a
5       flashlight. I was called a son of a bitch
6       for requesting an internal investigation.
7       And it was thought that I was going around
8       recording people that were involved in the
9       situation.
10  Q. But that's your own perception; is that
11      correct?
12  A. No, that's -- I mean, that's -- that's
13      fact. That's what happened.
14  Q. I know. But did somebody say that to you or
15      is there anything you have in evidence, a
16      piece of paper to support that assumption?
17          MR. LEWIS: Object to the form.
18  A. I don't think you understand what I'm
19      saying.
20  Q. I don't think you understand my question.
21          MR. NELMS: Object to the form.
22  A. I was hit -- hit with the flashlight. Okay.
23      He told me, you son of a bitch, you got

DEPOSITION OF LEONARD PELHAM                October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY

37 (Pages 142 to 145)

Page 142

1  everybody pissed off at you. You're going
2  around recording everybody, trying to bring
3  everybody down that's involved. Why don't
4  you take the recorder out of your pocket.
5  Q. Okay. Is it possible that could have been
6     from internal affair's statements being given
7     as opposed to a phone call to Michael
8     Briddell's office?
9  A. This has nothing to do with Michael
10    Briddell's office. I don't -- I don't
11    understand.
12 Q. That was your statement and that's what I was
13    trying to find out.
14 A. I mean, yeah, it just --
15    MS. CONNER: He's trying to give you --
16       he called Briddell's office, made
17       the appointment; and then before
18       he could talk to Briddell, the
19       attack occurred, Kim.
20 A. Right.
21    MS. CONNER: That's what he trying to
22       give you a time frame.
23 A. I wanted to see --

Page 143

1     MS. CONNER: He's not saying Briddell
2        caused the attack.
3  Q. What he said was things started happening
4     after I called Michael Briddell's office.
5  A. I'm giving you -- because I don't know the
6     date. I'm giving you a round-about time.
7     About the time that I called Mr. Briddell's
8     office, that's when -- that's when that
9     happened. I wanted to see him that day or
10    that week, but he made an appointment two
11    weeks down road.
12 Q. My question is was that an assumption or was
13    he just making it as a cause and effect kind
14    of link kind of thing? I see what you're
15    saying.
16 A. I mean I don't know. If it was a cause and
17    effect, I don't know.
18 Q. One other thing I was going to ask you. You
19    said earlier that you tried to get Mr. Arnaud
20    to sign a form not to prosecute?
21 A. Right.
22 Q. You also said that he said there was not a
23    crime not committed, but then you said that

Page 144

1     might not have been his words. Do you
2     remember exactly what his words were to you?
3  A. No, I don't.
4  Q. Okay. So the fact that there was not a crime
5     committed, was that your paraphrasing?
6  A. That's just -- that's the way I talked.
7     That's the way police officers talked. I
8     mean he could have said something like there
9     was no burglary committed or there was no,
10    you know, I don't know exactly what he said.
11 Q. Okay. When did you find out what was found
12    in the car?
13 A. Shortly after I made it back to
14    headquarters. When I left Arnaud's Quality
15    Meats. Sometime after midnight.
16 Q. So was that 30 minutes, an hour, do you
17    remember --
18 A. It was longer than 30 minutes.
19 Q. What's your best recollection?
20 A. Around an hour.
21 Q. Okay.
22    MS. FEHL: That's it.
23    MR. LEWIS: Praise the Lord.

Page 145

1     MR. WHITEHEAD: Okay. You got
2        anything?
3     MR. LEWIS: I haven't got anything.
4     MR. WHITEHEAD: Roianne?
5     MS. CONNER: Is it my turn?
6     MR. WHITEHEAD: Go ahead.
7        EXAMINATION
8  BY MS. CONNER:
9  Q. Kirk, do you recognize this commendation?
10 A. I do.
11 Q. When were you given that commendation?
12 A. March 3rd, 2005.
13 Q. Just what, 27 days prior to the incident?
14 A. Correct.
15 Q. And did this commendation -- who was it
16    signed by?
17 A. Myself and Lieutenant Cook.
18 Q. And Lieutenant Cook in that commendation said
19    that you've -- that he found you to be a
20    responsible person who does the right thing
21    when no one is watching. Is that what it
22    says?
23 A. Yes.

DEPOSITION OF LEONARD PELHAM                October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY

38 (Pages 146 to 149)

Page 146

1  Q. And he was giving you a commendation for your
2     honesty?
3  A. Yes.
4  Q. He also called you a resourceful officer who
5     is always striving to become a more
6     technically proficient investigator. This
7     was complimentary of you, was it not?
8  A. Yes.
9  Q. And of your work, was it not?
10 A. Yes.
11 Q. And he recommended you for the merit
12    increase, did he not?
13 A. Yes.
14 Q. Okay. And this is the confirmation of the
15    merit increase; is that correct?
16 A. Yes.
17 Q. And you received the merit increase, the
18    payable date was April 1, '05?
19 A. Correct?
20    MS. CONNER: Okay. I'd like to admit
21    these. Okay.
22    MR. LEWIS: Could we identify those on
23    the record?

Page 147

1     MR. WHITEHEAD: Yeah, let's do. I
2     don't really want to put it as
3     defendants.
4  MS. CONNER: I'm not a defendant.
5     MR. WHITEHEAD: Yeah, you're not a
6     party, so let's just --
7  MS. CONNER: Witness? How --
8     MR. WHITEHEAD: Yeah. Yeah. That's
9     fine.
10 MS. CONNER: Pelham #1 and #2.
11    MR. WHITEHEAD: All right. We're going
12    to mark the --
13 MS. CONNER: Commendation.
14    MR. WHITEHEAD: Commendation as Pelham
15    #1 and the confirmation of the
16    merit pay increase, correct, as
17    Pelham #2.
18 Q. Kirk, when you were -- when were you hit with
19    the flashlight?
20 A. It was a couple of weeks after -- after this
21    incident.
22 Q. Okay. And did it require you to seek medical
23    attention?

Page 148

1  A. Yes.
2  Q. And how did you get to seek medical
3     attention?
4  A. I had to drive my personal vehicle to
5     Pri-Med.
6  Q. Is that because they had taken away your City
7     car?
8  A. Yes.
9  Q. Who did you report the injury to?
10 A. Major J.C. West.
11 Q. And how soon after the attack did you report
12    the injury?
13 A. It was right after.
14 Q. Okay. Within 10 minutes, 15 minutes, how
15    soon?
16 A. I don't remember. Don't think it was any
17    more than a hour after.
18 Q. Okay. And what was the outcome of your
19    injury?
20 A. The -- my ankle swelled up. They gave me
21    some pain medicine, an anti-inflammatory.
22 Q. Okay. As result of the physical attack, what
23    did you do then?

Page 149

1     MS. FEHL: Object to the form on that.
2  A. I -- after I left the doctor, I talked with
3     Major West about it. And that's when I
4     resigned from the police department.
5  Q. Had you been asking for a transfer out of the
6     detective division due to the hostility?
7  A. Yes.
8  Q. Who all had you requested your transfer from?
9  A. Major West, Sergeant Tatum, Sergeant Gordon,
10    Lieutenant Jones.
11 Q. Okay. And had your request been denied?
12 A. Yes. Also I went to Art Baylor about it as
13    well.
14 Q. And what did Chief Baylor say to you?
15 A. He said that they would -- they would look
16    into it. Internal affairs would investigate
17    it and to determine whether there was any
18    wrongdoing.
19 Q. Have you ever heard of the outcome of the
20    investigation?
21 A. No, I have not.
22 Q. Was there ever any investigation, to your
23    knowledge, of your physical attack?

DEPOSITION OF LEONARD PELHAM
CHAD HOGAN v. CITY OF MONTGOMERY

October 3, 2005

39 (Pages 150 to 153)

Page 150

1  A. No.
2      MS. CONNER: Okay. Nothing further
3      MS. FEHL: Let me just follow up with a
4      few things on that.
5          EXAMINATION
6  BY MS. FEHL:
7  Q. Who hit you with the flashlight?
8  A. Scott Seithalil.
9  Q. Where did it happen?
10 A. In the stairwell at headquarters.
11 Q. Who else was with you?
12 A. Chris Gruhn.
13 Q. Where did you go -- I mean, did you go to
14     Major West's office right then and report it?
15 A. Mayor West was in Birmingham.
16 Q. Okay. How --
17 A. After.
18 Q. How did you report it to him then?
19 A. I called him on his cell phone or on the
20     radio.
21 Q. Okay. Did anybody call you back?
22 A. I got ahold of him.
23 Q. Okay. Were you told to treat it as a

Page 151

1      worker's comp injury?
2  A. I was -- yes, I was told to wait on
3      Lieutenant Phillips. He was -- he was
4      covering for Major West while he was in
5      Birmingham. And it -- it swelled up. I told
6      him I was on the way to Pri-Med.
7  Q. So did Lieutenant Phillips call you back
8      after you called Major West?
9  A. I didn't talk to Lieutenant Phillips till
10     seven o'clock that night.
11 Q. What time did you report it to Major West?
12 A. I don't recall.
13 Q. Okay.
14 A. Lieutenant Phillips called, wanted to take a
15     picture of it and that was around, that --
16     that was that evening.
17 Q. Did you let him take a picture of it?
18 A. No. I was at home. No.
19 Q. Okay. Were you moved at all during this
20     internal affairs investigation?
21 A. Was I moved?
22 Q. Yes. Did you stay on late car or third shift
23     the whole time after you reported it?

Page 152

1  A. No. I stayed in the detective division, but
2      I wasn't on late car.
3  Q. Okay. Did they move you to a different
4      shift?
5  A. Yes.
6  Q. Okay. Did you ever ask to be put back on the
7      shift that you were on?
8  A. No.
9      MS. FEHL: No further questions.
10     MR. NELMS: I've got a couple of
11     questions real quick.
12         EXAMINATION
13 BY MR. NELMS:
14 Q. To the best of your knowledge and experience,
15     Kirk, would Major West have had the authority
16     to stop the prosecution of Chad Hogan?
17 A. Yes.
18 Q. To the best of your knowledge and experience
19     as a police officer in the Montgomery Police
20     Department, would the chief of police have
21     had authority to stop the prosecution of the
22     Chad Hogan?
23 A. Yes.

Page 153

1  Q. To best of your knowledge, did either of them
2      stop the prosecution of Chad Hogan?
3  A. No, they didn't.
4      MR. NELMS: Thank you. Nothing
5      further.
6      (The deposition concluded
7          at 4:44 p.m.)
8      * * * * * * * * * * *
9      FURTHER DEPONENT SAITH NOT
10     * * * * * * * * * * *
11
12
13
14
15
16
17
18
19
20
21
22
23

DEPOSITION OF LEONARD PELHAM                October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY

40 (Page 154)

```
                                        Page 154
1        REPORTER'S CERTIFICATE
2   STATE OF ALABAMA
3   MONTGOMERY COUNTY
4      I, Mallory N. McCutchin, Court Reporter and
5   Commissioner for the State of Alabama at Large,
6   hereby certify that on Monday, October 3, 2005, I
7   reported the deposition of LEONARD KIRK PELHAM,
8   who was first duly sworn or affirmed to speak the
9   truth in the matter of the foregoing cause, and
10  that pages 5 through 153 contain a true and
11  accurate transcription of the examination of said
12  witness by counsel for the parties set out
13  herein.
14     I further certify that I am neither of kin
15  nor of counsel to any of the parties to said
16  cause, nor in any manner interested in the
17  results thereof.
18     This 26th day of October, 2005.
19
20     _____
       MALLORY N. MCCUTCHIN, COURT REPORTER
21     And Commissioner for the
       State of Alabama at Large
22
       MY COMMISSION EXPIRES: 2/24/09
23
```