# In The Matter Of:

*Chad Hogan v.*
*City of Montgomery, et al.*

*Anthony Arnaud*
*February 20, 2006*

*Pruitt & Davis, L.L.C.*
*800 South McDonough Street, Suite 201*
*Montgomery, Alabama 36104*
*Phone 334-262-3376*
*Fax 334-262-3305*

Original File ARNAUD.txt, Pages 1-49

**Word Index included with this Min-U-Script®**

Chad Hogan v.  
City of Montgomery, et al.

Anthony Arnaud  
February 20, 2006

### Page 1

[1]          IN THE UNITED STATES DISTRICT COURT  
[2]          FOR THE MIDDLE DISTRICT OF ALABAMA  
[3]                    NORTHERN DIVISION  
[4]  
[5]  
[6] CHAD HOGAN,  
[7]           Plaintiff,  
[8] vs.                              CIVIL ACTION NO.  
[9]                                  2:05CV-687-F  
[10] CITY OF MONTGOMERY, et al.,  
[11]          Defendants.  
[12]  
[13]  
[14]                    * * * * *  
[15]  
[16]  
[17]        DEPOSITION OF ANTHONY ARNAUD,  
[18] taken pursuant to notice and stipulation on behalf of the  
[19] Plaintiff, in the Law Office of Anderson K. Nelms, 847 S.  
[20] McDonough Street, Montgomery, Alabama, before Angela  
[21] Fulmer, Certified Shorthand Reporter and Notary Public in  
[22] and for the State of Alabama at Large, on February 20,  
[23] 2006, commencing at 1 p.m.

### Page 2

[1]                    APPEARANCES  
[2]  
[3] FOR THE PLAINTIFF:  
[4]      ANDERSON K. NELMS, ESQUIRE  
         Attorney at Law  
[5]      847 S. McDonough Street  
         Montgomery, Alabama  36104  
[6]  
[7] FOR THE DEFENDANTS:  
[8]      H. LEWIS GILLIS, ESQUIRE  
         RAMADANAH SALAAM, ESQUIRE  
[9]      Thomas, Means, Gillis & Seay, P.C.  
         3121 Zelda Court  
[10]     Montgomery, Alabama  36106  
[11]  
         KIMBERLY O. FEHL, ESQUIRE  
[12]     Assistant City Attorney  
         103 No. Perry Street  
[13]     Montgomery, Alabama  36104  
[14]  
         JIM BODIN, ESQUIRE  
[15]     McPhillips Shinbaum, L.L.P.  
         516 S. Perry Street  
[16]     Montgomery, Alabama  36101  
[17]  
[18]  
[19]  
[20]  
[21]  
[22]  
[23]

### Page 3

[1]                    STIPULATIONS  
[2]        It is stipulated and agreed by and between  
[3] counsel representing the parties that the deposition of  
[4] ANTHONY ARNAUD may be taken before Angela Fulmer,  
[5] Certified Shorthand Reporter and Notary Public in and for  
[6] the State of Alabama at Large, without the formality of a  
[7] commission; and all formality with respect to other  
[8] procedural requirements is waived; that objections to  
[9] questions, other than objections as to the form of the  
[10] questions need not be made at this time, but may be  
[11] reserved for a ruling at such time as the deposition may  
[12] be offered in evidence or used for any other purpose by  
[13] either party as provided by the Federal Rules of Civil  
[14] Procedure.  
[15]        It is further stipulated and agreed by and  
[16] between the parties hereto and the witness, that the  
[17] signature of the witness to this deposition is hereby  
[18] waived  
[19]  
[20]  
[21]  
[22]  
[23]              * * * *

### Page 4

[1]                      INDEX  
[2]  
[3] EXAMINATION                                      PAGE  
[4]     BY MR. NELMS:                                 5  
[5]     BY MR. GILLIS:                                40  
[6]     BY MR. NELMS:                                 43  
[7]  
[8]  
[9]  
[10]  
[11]  
[12]  
[13]  
[14]  
[15]  
[16]  
[17]  
[18]  
[19]  
[20]  
[21]  
[22]  
[23]

Page 5

[1] ANTHONY ARNAUD, of lawful age,
[2] having been first duly sworn, testified as follows:
[3] **EXAMINATION**
[4] BY MR. NELMS:
[5]     MR. NELMS: Usual stipulations?
[6]     MR. BODIN: Yes.
[7] Q. State your name for the Record, please.
[8] A. My name is Anthony Mark Arnaud.
[9] Q. All right. Mr. Arnaud, do you own Arnaud's Fine
[10]    Meats?
[11] A. Yes, sir, I did.
[12] Q. Did?
[13] A. Yeah. Well -- I mean, in Montgomery. I'm in
[14]    Walsboro now.
[15] Q. Okay. And everything that we're going to talk about
[16]    today is generally going to be related to events
[17]    that occurred on March the 31st or April 1, 2005.
[18]    If I don't specify otherwise, that's the date that
[19]    we're generally talking about. If you have any
[20]    questions -- this is going to be a real short
[21]    deposition. But if you have any questions or if you
[22]    don't understand one of the questions that I ask,
[23]    you just stop and you tell me that don't

Page 6

[1] understand. You can stop at any time you want to to
[2] confer with your lawyer or to take a break. There's
[3] not a penalty against you for doing that. You're
[4] welcomed to do that if you wish.
[5] A. Yes.
[6] Q. Okay. And -- I'm sorry. The name of your business
[7]    is properly Arnaud's Quality Meats?
[8] A. Quality Meats, yes, sir.
[9] Q. Okay. And on the date in question, was it located
[10]   on or about the Eastern Boulevard --
[11] A. Yes, sir.
[12] Q. -- in Montgomery? And what's the proper address?
[13] A. It was 425 Northeast Boulevard.
[14] Q. Okay. And did you reside there near the business?
[15] A. Yes, sir. I lived in the trailer park.
[16] Q. Okay. And approximately how far away from the
[17]   business was your trailer?
[18] A. Approximately a hundred yards.
[19] Q. Okay. And do you recall the night of March 31,
[20]   2005?
[21] A. Yes -- yes, sir.
[22] Q. Okay. And do you recall what the weather was like
[23]   that night?

Page 7

[1] A. Yes, sir.
[2] Q. Tell me, if you will.
[3] A. It was raining.
[4] Q. All right.
[5] A. Very -- I mean, not -- raining. Just raining like
[6]    this -- like today. Raining.
[7] Q. Okay. Any thunder and lightning?
[8] A. At times, yes, sir.
[9] Q. Okay. Did you have occasion to have -- check that.
[10]   Do you a burglar alarm on the business?
[11] A. Yes, sir. I sure did.
[12] Q. Okay. And is that maintained through a service?
[13] A. Yes, sir.
[14] Q. Which one?
[15] A. I haven't had them since probably --
[16]    MR. BODIN: If you remember.
[17] A. If I remember. But I don't remember really the --
[18]    It's not ADT, but it's -- I just can't remember the
[19]    name of the --
[20] Q. Okay. Did you -- but you paid a monthly service
[21]    fee?
[22] A. Yes, sir. I sure did.
[23] Q. Okay. And do you recall exactly what types of

Page 8

[1] services were provided related to that security
[2] service?
[3] A. Well, I had calls. And not all of them was, you
[4]    know, calls of -- but they'd call me up and say that
[5]    there was. And then I'd have to -- the city police
[6]    would come and inspect and leave a sheet of paper
[7]    and I'd get it from them. And then I'd go on home,
[8]    you know, that was the --
[9] Q. Okay. I didn't ask a very good question. My
[10]   experience has been, that with security companies,
[11]   there are different types of services that they
[12]   offer you. Do you recall what types of services
[13]   that you got from this?
[14] A. No, sir. All they would -- that this -- it's called
[15]   central control. When they -- anything that
[16]   pertained with the door or pertained with the place
[17]   where the alarm went off, they would call me.
[18] Q. Okay.
[19] A. And that way the city police would respond also.
[20] Q. Okay. Do you know whether or not it was central
[21]   control that contacted the police?
[22] A. Central control? Yes, sir. Without the -- central
[23]   control, they call me.

Page 9

[1] Q. Okay. But in regard to contacting the Montgomery
[2] Police Department, do you know who would contact the
[3] Montgomery Police Department?
[4] A. That I wouldn't know. I mean, I just know who would
[5] call me. But I know every time I was there they
[6] were there.
[7] Q. Okay. Was this a silent alarm, or did it have an
[8] audible alarm?
[9] A. It was an audible. It made noise.
[10] Q. Okay. What did it sound like?
[11] A. Real loud. It was like a big siren (indicating
[12] sound). Just real loud.
[13] Q. Okay. So it was a siren sound?
[14] A. Yes, sir.
[15] Q. Okay. Not a bell?
[16] A. No, sir.
[17] Q. Not a whistle?
[18] A. Huh-uh.
[19] Q. Okay. And describe for me how the security system
[20] worked inside your building there at Quality Meats?
[21] That is to say, were there infrared sensors,
[22] magnetic sensors, can you recall?
[23] A. The only one was sensors they had up in the corners

Page 10

[1] of each room. A sensor that would pick up, I guess,
[2] motion --
[3] Q. Okay.
[4] A. -- and would set it off or, you know -- movement,
[5] whatever, I don't know --
[6] Q. Okay.
[7] A. -- or recall other -- because I don't know exactly
[8] how it worked, but that's, you know...
[9] Q. Okay. Were there individual detection devices on
[10] the windows or doors?
[11] A. Yes, sir. They had some little modules, I guess, on
[12] the front door and the back door and the side door.
[13] Q. Okay. What about the windows?
[14] A. No, sir.
[15] Q. Okay. During the period of time around March 2005,
[16] did you have any or many occasions for there to be
[17] false alarms on that security system?
[18] A. I've had a few, yes, sir.
[19] Q. Okay. Let's just take March of 2005. If you can,
[20] to the best of your remembrance, how many false
[21] alarms did you have in March of 2005?
[22] A. That I couldn't really tell you, sir.
[23] Q. Okay. Were you charged a fee every time the alarm

Page 11

[1] went off?
[2] A. Now, I never got charged for any, no, sir.
[3] Q. Okay. Do you recall the bills that you received
[4] from this security service?
[5] A. Yes, sir.
[6] Q. Okay. Did they indicate -- that is, the bills --
[7] did they indicate every occurrence for your alarm to
[8] go off?
[9] A. I really can't remember about it. It's been so
[10] long, you know, since -- and I haven't did any
[11] business, because I don't have those people anymore.
[12] When I left and -- I don't have them anymore.
[13] Q. Okay. If you wanted to find out what security
[14] service you used in March 2005, how would you go
[15] about that?
[16] A. I really couldn't tell you.
[17] Q. Okay. Did you keep records?
[18] A. No, sir. I sure didn't.
[19] Q. Okay.
[20] A. I don't have any records of it.
[21] Q. Okay. Do you have an accountant?
[22] A. Yes, sir.
[23] Q. Okay. Did you in March of 2005?

Page 12

[1] A. Yes, sir.
[2] Q. Okay. Does your accountant keep records of your
[3] business?
[4] A. Yes, sir.
[5] Q. Would your accountant have billing records from the
[6] security system that you used?
[7] A. He might. He might not. I don't know.
[8] Q. Okay. Who is your accountant?
[9] A. Tommy Bourque. Tommy Bourque.
[10] Q. Bork? B-O-R-K?
[11] A. B-O-U-R-K.
[12] Q. Okay.
[13] A. B-O-U-R-Q-U-E, Bourque.
[14]         MR. BODIN: Spell that again.
[15] A. B-O-U-Q -- wait. B-O-U-R-Q-U-E, Bourque.
[16] Q. Okay. And do you still use Mr. Bourque?
[17] A. No, sir.
[18] Q. Okay. But you did in March of 2000 --
[19] A. Yes, sir.
[20] Q. Okay. And did you have a checking account in March
[21] 2005 for your business?
[22] A. Yes, sir. I'm sure I did.
[23] Q. Okay. If you paid those security service bills,

Page 13

[1] would they have been paid through that checking
[2] account?
[3] A. Yes and no, because --
[4]    THE WITNESS: I need to talk to you for a
[5]    minute.
[6]    MR. BODIN: Okay.
[7]    MR. NELMS: Fine. We'll go off the
[8]    Record.
[9]    THE WITNESS: I need just about a five
[10]   minute break.
[11]   MR. NELMS: That's fine with me.
[12]      (Brief recess.)
[13]   MR. NELMS: Back on the Record.
[14] Q. (By Mr. Nelms) All right. I think I was asking
[15]   you -- really what I was looking for, Mr. Arnaud, is
[16]   how we can find out what the name of the security
[17]   service is. That's all.
[18] A. Okay. Well, like I said, I don't remember the
[19]   name. But the guy that had it -- I guess an
[20]   independent. Only he wasn't like ADT. It's just
[21]   another --
[22] Q. Brinks? Yeah.
[23] A. Yeah. And --

Page 14

[1]    MR. BODIN: What's his name?
[2]    THE WITNESS: It was just -- I just know
[3]    him by his name, Steve.
[4] A. And he wanted to trade, like -- see, I had my
[5]   business and he had his. And he just said, well,
[6]   when my employees or people come in to eat and
[7]   stuff, we'll just trade off for it -- for it. And
[8]   that's why I never got no -- that's why it kind of
[9]   puzzled me when you asked me about -- I couldn't
[10]   answer you, because I had didn't have no --
[11] Q. Okay. So --
[12] A. -- record on it because we traded. And he just left
[13]   it at that and never said I owed him anything except
[14]   for just signing that -- when one would come in to
[15]   eat, you know, sign him off.
[16] Q. Okay. Specifically referring to a percoid of time
[17]   between, say, January and April of 2005, you said
[18]   that there would be occasions when you would have
[19]   false alarms --
[20] A. Uh-huh.
[21] Q. -- on your burglar system -- or your security system
[22]   rather.
[23] A. Yes, sir.

Page 15

[1] Q. How frequent were false alarms?
[2] A. I guess -- maybe a couple a months. Three a month.
[3] Q. Three a month?
[4] A. Yes, sir.
[5] Q. Okay. And on the night in question, March 31, 2005,
[6]   on -- were there any false alarms that night?
[7] A. Yes, sir.
[8] Q. Okay. And you said it was raining?
[9] A. Uh-huh.
[10] Q. And I believe I asked you was it thundering and
[11]   lightning.
[12] A. Yes, sir.
[13] Q. And it was.
[14] A. Off and on.
[15] Q. Okay. And on how many -- let's just take the whole
[16]   twenty-four-hour period of March 31, 2005. In that
[17]   twenty-four-hour period, how many times did your
[18]   alarm system go off?
[19] A. Twice.
[20] Q. Twice?
[21] A. Yes, sir.
[22] Q. Okay. Does that include the time that brings us
[23]   here on this lawsuit today?

Page 16

[1] A. Yes, sir.
[2] Q. Okay. And so it had gone off once before. And what
[3]   time of day was it when it first went off on March
[4]   the 31st?
[5] A. It was at night. It was, like, 11 a.m. at night,
[6]   March 31st. I guess each call --
[7]    MR. BODIN: P.m.
[8]    THE WITNESS: Yeah. P.m.
[9] Q. Okay. And then -- and what did you do?
[10] A. Well, I --
[11] Q. When it first went off?
[12] A. I woke up my boy and asked him to ride with me up to
[13]   the store to check it out. So we went in -- rode
[14]   around the building, went to the front, and walked
[15]   in. We went in the kitchen, looked around, didn't
[16]   see nothing out of the ordinary. Went back, pushed
[17]   the alarm back off. Went in, locked up, went home.
[18] Q. You mean you turned it back on?
[19] A. Turned it back on, yes, sir.
[20] Q. Okay. And --
[21]      (Brief interruption.)
[22]   MR. NELMS: Back on the Record.
[23] Q. How old is your boy?

**Page 17**

A. He -- at the time, he was -- let's see. He's fifteen. He was fourteen.

Q. Okay. So you went up for the false alarm, you didn't see that anything -- there had been no occurrence?

A. No, sir.

Q. Did the Montgomery Police Department show up?

A. At the time, no, sir. That -- not when I was there. You know what I'm saying? And I had already locked up and went home.

Q. Okay. And how long did it take you to get from your house up to the store?

A. Probably about five minutes -- three minutes.

Q. Okay. And how long did you stay in the store?

A. Probably five minutes.

Q. Okay.

A. Just enough to walk around and look at everything. And I went back up there and punched the alarm back on again.

Q. Okay. When the alarm goes off, other than the audible alarm that we hear that you said sounded like a siren, do you have any flashing lights or any lights that come on?

**Page 18**

A. Because -- there's no -- not that I really know of. Because when I walked in there, I just would hear it on and just go and just punch if off to make it quit, you know, the siren, whatever.

Q. Okay. Has your -- how long did you have that store there on the Eastern Boulevard?

A. Since 2001.

Q. Okay. And during that period of time from 2001 when you first opened the store until March of 2005, did you ever have any occurrence of break-ins?

A. No, sir.

Q. Okay. So it's fair to say that every time the alarm went off it was a false alarm?

    MR. BODIN: Object to the form.

A. Yeah. Well --

Q. Best that you know.

A. Yes, sir.

Q. Okay. Then did you have occasion to have the alarm go off a second time on March 31, 2005?

A. Yes, sir.

Q. Okay. And tell us what happened then.

A. This was approximately an hour after the first one. And when I got the call from central control, I

**Page 19**

said -- you know, kept hearing the phone go off. And I had just went back to sleep. I got up and grabbed it and they said, Mr. Arnaud, this is not a false alarm. The police are at your store. And that's when I hurried up and got up and, you know, got dressed. I tried to wake up my boy. This time he didn't feel like going again with me, so I just went on my own --

Q. Okay.

A. -- back to the store.

Q. So someone at central control told you, this time it's not a false alarm?

A. Right.

Q. Okay. Did they indicate how they knew it was not a false alarm?

A. Not really. They didn't really say in detail. They said that the cops was in -- was already at the place.

Q. Okay. And then you --

A. The police --

Q. -- went up to the store?

A. Yes, sir.

Q. Okay. And when you got to the store, were the

**Page 20**

police there?

A. Yes, sir.

Q. Okay. How many police officers were there?

A. It's been a while. Roughly, three that I remember. Three to four -- three.

Q. Okay. Were they all in uniform?

A. Yes, sir.

Q. Okay. And did you speak with them?

A. Briefly.

Q. Okay. Did you identify yourself as the owner of the store?

A. Yes, sir. Yes, sir.

Q. Okay.

A. Because I -- yes, sir.

Q. Okay. And any other conversation with the police officers?

A. Not really.

Q. Okay. Did they ask you anything?

A. They just more or less said that, you know, we got here, they was -- somebody was walking back to the car, it was parked against the outside window, and fled. And we took off after them, and this and that and --

**Page 21**

[1] Q. Okay.
[2] A. And then the alarm went -- was off. And this and
[3]    that. They said it was a -- possibly a break-in.
[4]    So...
[5] Q. Okay. Did they ask you --
[6] A. That was to the best of my knowledge.
[7] Q. Did they ask you to do an inspection of the store?
[8] A. Yes, sir. And I did.
[9] Q. Okay.
[10] A. Briefly -- I mean, I went in the kitchen, I went to
[11]    the register, and everything in the register was the
[12]    same.
[13] Q. Okay.
[14] A. I didn't have no money stolen.
[15] Q. Okay. Was anything missing from the store at all?
[16] A. Not to my knowledge.
[17] Q. Okay.
[18] A. That night for sure. And then the next day I was in
[19]    there I didn't notice anything.
[20] Q. I'm sorry. I didn't get your --
[21] A. I didn't notice anything.
[22] Q. Okay. Have you ever at all reported anything stolen
[23]    from your store as a result of the events of March

**Page 22**

[1]    31, 2005?
[2] A. No, sir.
[3] Q. Okay. Did you notice anything being disturbed in
[4]    the store? That is, objects out of place, anything
[5]    broken.
[6] A. The only thing, on the windowsill of the window that
[7]    was open, the flower pots was on the floor.
[8] Q. Okay.
[9] A. And that was it that I noticed.
[10] Q. Were they broken?
[11] A. Chipped. One of them was chipped. But not really
[12]    -- the others weren't broken. There're three of
[13]    them.
[14] Q. Three flower pots?
[15] A. Yes, sir.
[16] Q. And they were all three on the ground?
[17] A. Correct.
[18] Q. What are they made of?
[19] A. Well, a couple of them was sort of like this
[20]    plastic -- I mean, that hard plastic.
[21] Q. Okay. Were they full of dirt?
[22] A. Dirt and that -- not that real -- what do you call
[23]    it?

**Page 23**

[1]       MR. BODIN: Potting soil.
[2] A. Yeah. Potting soil. That was what it was.
[3] Q. Okay. So all three pots had potting soil in them?
[4] A. Yes, sir.
[5] Q. Okay. Was --
[6] A. To my knowledge.
[7] Q. Okay. Was there potting soil spilt or spread out on
[8]    the floor?
[9] A. Just right at the edge. Just where it fell.
[10] Q. Okay. Do you have any knowledge or reason to
[11]    believe why those pots were on the floor where you
[12]    saw them?
[13] A. No, sir. Unless somebody tried to get in or push
[14]    them over or something. They wouldn't have fell on
[15]    their own. I don't think so.
[16] Q. Okay. When you showed up at the store after the
[17]    second alarm, were the police officers inside the
[18]    building?
[19] A. Yes, sir.
[20] Q. Okay. Did you open the door for them to let them
[21]    in?
[22] A. Yes, sir.
[23] Q. You did?

**Page 24**

[1] A. Yes, sir.
[2] Q. So they were not in the building when you first
[3]    arrived?
[4] A. No, sir.
[5] Q. Okay.
[6] A. They were in the building when I first -- well, no,
[7]    not when I first -- not the first alarm they wasn't
[8]    in there.
[9] Q. Now, I'm referring to the second alarm.
[10] A. Yes, sir.
[11] Q. The one that occurred an hour later.
[12] A. Uh-huh.
[13] Q. When you first arrived at the store, were the police
[14]    officers inside the building?
[15] A. Uh-huh.
[16] Q. That's a yes?
[17] A. Yes, sir.
[18]       MR. BODIN: You need to say yes or no so
[19]    she can take it down.
[20] A. Oh, yes. Yes, sir. Yes, sir.
[21] Q. Did they go through the front door?
[22] A. No, sir.
[23] Q. Did they go through any of the doors on the

Chad Hogan v.
City of Montgomery, et al.

Anthony Arnaud
February 20, 2006

Page 25

[1] building?
[2] A. No, sir.
[3] Q. How did they get inside the building?
[4] A. I wasn't there. Possibly -- I don't know. The only
[5]     way would be through the window I guess. I don't
[6]     know.
[7] Q. Okay.
[8] A. The door -- I had to unlock the door to get in.
[9] Q. Okay. Is there any way someone, to the best of your
[10]    knowledge, could come through the window without
[11]    removing the three pots that you've referred to?
[12]        MR. BODIN: Object to the form.
[13] Q. Do you understand the question?
[14] A. Ask that again.
[15] Q. The question was, you've described three pots that
[16]    were on the windowsill.
[17] A. Yes, sir.
[18] Q. And this is a window that you had left open?
[19] A. That I had left open?
[20]        MR. BODIN: Object to the form. He never
[21]    said that.
[22] A. No. I never said that I left it open. I said it
[23]    was open when I got there.

Page 26

[1] Q. Okay.
[2] A. That's the only thing that was open besides -- that
[3]    I had the unlock the door to get in.
[4] Q. Okay. Had you left that window open?
[5] A. Had I left it open?
[6] Q. Yes, sir.
[7] A. Not to my knowledge.
[8] Q. Okay.
[9] A. Unless, you know -- if I did, I don't recall doing
[10]   it. But I know when I got there and they told me
[11]   what they saw and what they did on the chase and
[12]   that -- and that's -- to my knowledge, that's
[13]   everything. That's all I know about it.
[14] Q. Okay. You testified that around eleven o'clock you
[15]   had gone up in response to an alarm call.
[16] A. (Nods head).
[17] Q. And you entered the building and you walked around
[18]   the inside of the building at that time; is that
[19]   correct?
[20] A. Yes.
[21] Q. Okay. Did you notice this window that had the three
[22]   pots on the windowsill?
[23] A. No, sir.

Page 27

[1] Q. You don't know whether it was opened or closed?
[2] A. That's right.
[3] Q. Okay. Did you ever indicate to any officers --
[4]    police officers that night, that you, in fact, had
[5]    left that window open?
[6] A. No, sir. I said it could have been maybe a
[7]    possibility. But at -- to my knowledge, I hadn't
[8]    left it open.
[9] Q. Okay.
[10] A. You know what I'm saying?
[11] Q. So as you sit here today giving your testimony at
[12]   deposition, you could have left the window open that
[13]   night?
[14] A. It could have been possible.
[15] Q. Okay. Do you know of any reason or cause as to why
[16]   you would leave the window open?
[17] A. What I think --
[18]        MR. BODIN: Object to the form.
[19] Q. Do you know of any reason or cause as to why you
[20]   would leave the window open that night?
[21] A. I really -- I don't remember that. Why I would
[22]   have. But it had a reason if I did.
[23] Q. Okay. Fair enough.

Page 28

[1]    So when you arrived at the store on the second
[2]    call --
[3] A. Yes, sir.
[4] Q. -- of the alarm going off, there were police
[5]    officers already occupying the inside of the
[6]    premises?
[7] A. Yes, sir.
[8] Q. Okay. And it's your belief that they went in
[9]    through the side window where the three pots had
[10]   been?
[11]        MR. BODIN: Object to the form.
[12] Q. Is that correct?
[13] A. Yes, sir.
[14] Q. Okay. And you don't recall any other conversations
[15]   that you had with the police officers that night?
[16] A. No, sir.
[17] Q. Okay. Now, did you have occasion to go to the
[18]   headquarters at the Montgomery Police Department?
[19] A. Yes, sir.
[20] Q. Okay. And how is it that you came to go to the
[21]   headquarters at the Montgomery Police Department?
[22] A. They just said if -- to press charges, I had to go
[23]   downtown.

Page 29

Q. Okay. And you indicated that you had discerned that nothing was missing from the store; is that correct?
A. Yes, sir.
Q. Okay. Was this before or after you were instructed to go downtown to file charges?
A. That I noticed nothing was taken?
Q. Yes, sir.
A. More or less -- at the time when I was in the store, just briefly and -- at the time I can't say there was nothing stolen.
Q. Okay.
A. That I really looked at.
Q. Okay. Do you recall which officer instructed you to come down to headquarters if you wished to file a claim?
A. No, sir.
Q. All right. Do you recall whether or not there was -- that police officer was uniformed or not uniformed?
A. They was all uniformed.
Q. Okay. And about what time did you arrive at headquarters?
A. About one thirty.

Page 30

Q. All right. So it was almost an hour and a half after you were called to your store for the second alarm?
A. Yes, sir.
Q. Okay. What happened in that intervening period of time, that hour and a half period of time. What did you do?
A. More or less at the time just hanging around and just looking around. And then he said, if you want to press charges, you've got to go downtown.
Q. Okay.
A. Then he said, do you know where it's at. And I said, yes, sir. And I went down, you know...
Q. Okay. Did you want to press charges?
    MR. BODIN: Object to the form.
    MR. NELMS: On what ground?
    MR. BODIN: I don't have to give a ground. Object to the form of the question.
    MR. NELMS: Actually, the Middle District rule says that I can ask.
    MR. BODIN: You can ask. I'm objecting to the form of the question.
Q. (By Mr. Nelms) Do you have an answer?

Page 31

A. No, sir.
Q. Okay. But you were of the impression at the time that nothing was taken --
    MR. BODIN: Object to the form.
    MR. GILLIS: Objection.
Q. -- from your building?
    MR. BODIN: He's already asked -- answered that question.
A. To my knowledge, there was nothing taken.
Q. Okay. But you did wish to press charges?
A. Well, if there was charges on him -- I mean, on the thing -- I mean, I was being called out to apparently a burglary. And when I get there, you know, police is in there and they've got people -- chasing people and this and that. You know, I didn't have no other way to think that -- and I'd want to press charges on anybody if I had the grounds to press charges.
Q. Okay. So, if you recall, who did you first see when you got to police headquarters?
A. You see so many detectives. At times I didn't -- I don't even know the first one I talked to it's been so long.

Page 32

Q. Okay. Do you remember a Detective Kirk Pelham?
A. Not that I recall.
Q. Okay. Do you remember meeting a Detective Cook?
A. No. Not that my -- that I recall. Because they had me -- I was just in a room by myself. In an office. And I -- I didn't talk to -- really, actually, I only --
    MR. BODIN: Just if you know these people.
A. Right. I didn't talk -- no, sir.
Q. Okay. If you can recall, even though you can't remember the name, did you have occasion to speak to any police officers while you were at headquarters?
A. Not really. Like I said, I walked in, they put me in a room, and I heard them -- a couple other -- but the guys they had chased -- got a couple of them. They'd came down the hall and they went in a room with them and closed the door. And the only thing I remember doing was going to sign the paperwork and leave. I left around four or four thirty that morning.
Q. Okay. So did you draft a statement to give to the police?
A. No, sir.

Page 33

[1] Q. Okay. Well, what did you sign?
[2] A. I guess a warrant.
[3] Q. Okay.
[4] A. That's all I recall if it's -- what I signed was a
[5]    warrant.
[6] Q. Okay. Did you read the warrant before you signed
[7]    it?
[8] A. More or less -- in a sense, yes, sir, I did.
[9] Q. Okay. Did you agree with what it said?
[10]        MR. BODIN: Object to the form. Do you
[11]    have it here, what he signed, where he can read
[12]    it before he answers any questions? You're
[13]    asking him to remember a document that he
[14]    looked at a year --
[15]        THE WITNESS: It's been a year ago or a
[16]    year and a half.
[17] Q. Are you going to answer the question?
[18] A. No, sir, I can't.
[19] Q. Okay. Do you recall what the warrant said?
[20] A. No, sir.
[21] Q. Okay. Do you recall having any conversations with
[22]    anyone at the Montgomery Police Department about the
[23]    language or substance of the words in the warrant?

Page 34

[1] A. No, sir.
[2] Q. Okay. In fact, was the document that you signed a
[3]    warrant?
[4]        MR. BODIN: Object to the form. If you
[5]    know.
[6] A. I don't know.
[7] Q. Do you recall what type of document it was?
[8] A. No, sir.
[9] Q. Okay.
[10] A. Like I said, I went in --
[11]        MR. BODIN: Just answer his question.
[12] A. That was it.
[13] Q. Okay.
[14] A. I don't remember nothing about it.
[15] Q. Do you remember what time it was when you left the
[16]    police department?
[17] A. I would say it was probably four o'clock in the
[18]    morning.
[19] Q. Okay.
[20] A. Got home about four thirty.
[21] Q. Okay. So you were there from about one thirty in
[22]    the morning until four o'clock in the morning?
[23] A. Yes, sir.

Page 35

[1] Q. Okay. And you do not recall for us the substance of
[2]    any conversations that you had with any members of
[3]    the police department?
[4] A. I'd stay in there for two and half, three hours
[5]    without seeing hardly -- with nobody. I ain't seen
[6]    nobody.
[7] Q. Okay. Anybody give you an explanation as to why
[8]    you --
[9] A. No. A couple of times they came and stuck their
[10]    head in and said it won't be that much longer. But
[11]    it went on for this long, long -- I wasn't talking
[12]    to anybody.
[13] Q. Okay. Do you recall the names of any individuals,
[14]    whether they're with the Montgomery Police
[15]    Department or associated with the Montgomery Police
[16]    Department, that you met that night while at police
[17]    headquarters?
[18] A. No, sir.
[19] Q. Okay. Can you give me a physical description of
[20]    anyone that you met between one thirty and four
[21]    o'clock in the morning at the Montgomery Police
[22]    Department?
[23] A. It's been so long ago. The only one I saw was the

Page 36

[1]    one that put me in the room. A white guy.
[2] Q. Okay. Describe this --
[3] A. A white policeman. About yea high (indicating)
[4]    maybe as tall as I am.
[5] Q. Okay. Young or old?
[6] A. Thirties to forties.
[7] Q. All right. Glasses?
[8] A. Not that I recall.
[9] Q. Facial hair?
[10] A. No, sir.
[11] Q. Fat or thin?
[12] A. I guess average.
[13] Q. Okay. Did anyone in any way, to the best of your
[14]    recollection, induce you or force you to sign any
[15]    documents?
[16] A. No, sir.
[17] Q. Okay. Anybody instruct you in any way that night on
[18]    how you should answer any questions or testify at
[19]    trial regarding anything that happened that night?
[20] A. No, sir.
[21] Q. Okay. Did anybody tell you that night that they had
[22]    made an arrest?
[23] A. That night?

Page 37

Q. Yes.
A. Yes, sir.
Q. Okay. Do you recall who?
A. No, sir. One of the officers.
Q. Okay. Was it the same officer that brought you into the room the first time?
A. No, sir. I'm talking about at the -- at the -- at my business.
Q. Okay.
A. I didn't talk with -- to nobody about that over there at the downtown.
Q. Okay. All right.
A. They -- the ones at the business said they had chased them and run them off down the highway and they took a ditch -- a drainage ditch.
Q. Okay.
A. And they caught one. And then after the other ones --
Q. All right. And do you recall the name of the officer that told you that?
A. No, sir.
Q. Can you describe him? Was he -- he was wearing a uniform.

Page 38

A. Right.
Q. White or black?
A. White.
Q. All right. Young or old?
A. I guess in his forties.
Q. All right. Fat or thin?
A. In shape.
Q. Okay.
    MR. NELMS: If you'll give me a minute, I think we're finished.
    THE WITNESS: Okay.
        (Off-the-Record discussion.)
Q. Did you ever tell anyone with the Montgomery Police Department on March the 31st or April -- the morning -- early morning of April the 1st that you did not wish to press charges?
A. No, sir.
Q. Did you tell anybody that you were in a hurry, you wanted to go home?
A. Huh-uh.
Q. Is that a no?
A. No, sir.
Q. Okay. And you -- I asked you earlier. Did anyone

Page 39

with the Montgomery Police Department pressure you to file a warrant?
A. No, sir.
Q. Nobody did at all?
A. All they said is that they had -- when they got there, there was a guy that was walking away from the building, got in a car, and took off. And they started chasing him. And when I got there, he said they had caught one and the other one was down the drainage canal and they had found a ski mask and a pistol in the car.
Q. Okay.
A. And that's the most I had a conversation to that -- of -- with any of them about that --
Q. All right.
A. -- about what happened.
Q. Okay. And other than that --
A. Nobody's -- no, sir.
Q. Nobody said anything to you about wanting you to press charges?
A. No. They just said to press charges, I had to go downtown.
Q. Okay. If you can recall, during that period of time

Page 40

that you were at the police station between one thirty and four o'clock in the morning, how many different police officers or detectives did you speak with that night?
A. It was just that one that put me in the room. The next thing I -- I did after that was go down to the place where I signed a warrant, and I was on my way home.
Q. Okay. Would that be the magistrate's office?
A. I guess.
Q. Okay.
A. That -- you know, like I said, that's -- that's the only time I had any ties with them at that time.
    MR. NELMS: Okay. That's it. I appreciate it.
    THE WITNESS: You're welcome, Mr. Nelms.
    MR. GILLIS: I think I might have just one or two.
        EXAMINATION
BY MR. GILLIS:
Q. Now, I think I heard you say that there was some flower pots that were on the floor on the inside of your building?

Chad Hogan v.  
City of Montgomery, et al.

Anthony Arnaud  
February 20, 2006

Page 41

[1] A. Yes, sir.
[2] Q. Okay. I don't remember hearing you say anything
[3]    about any bottle of water or anything like that in
[4]    the window -- on the edge of the window.
[5] A. Water?
[6] Q. Yeah.
[7] A. No, sir.
[8] Q. And I don't remember hearing you say anything
[9]    about -- you did say there was some soil that --
[10] A. Pots --
[11] Q. -- maybe was in the pots?
[12] A. Yes, sir.
[13] Q. Okay. But I don't remember you saying anything
[14]    about having to mop up. You sweep up soil.
[15] A. Right. Yes, sir.
[16] Q. You didn't have to do any mopping, did you?
[17] A. There's the rain that came from the weather from
[18]    inside, because there's no way to block the rain
[19]    when the windows are open.
[20] Q. I understand that. But you didn't have to do any
[21]    mopping?
[22] A. No. Any mopping with water, no, sir.
[23] Q. Okay. And when you -- when you came back to your

Page 42

[1]    business later on the next day --
[2] A. Yes, sir.
[3] Q. -- did you have to go in there and do anything in
[4]    particular in your business?
[5] A. No, sir.
[6] Q. Okay.
[7]    MR. NELMS: Object to the form.
[8] Q. You said that this was a motion alarm?
[9] A. Yes, sir.
[10] Q. And when you say motion alarm, is it any kind of
[11]    motion in the room or what?
[12] A. Well, it's some sensors. And then -- plus, you have
[13]    some little sensors over the doors of every opening.
[14] Q. Okay.
[15] A. That -- it has doorways.
[16] Q. Okay.
[17] A. And when you -- if they come unaligned, it sets them
[18]    off.
[19] Q. Okay.
[20] A. Or something object -- or somebody walking in or
[21]    anything would set it off inside.
[22] Q. Okay. Do you know whether or not somebody trying to
[23]    get in through the window, whether or not that would

Page 43

[1]    set it off?
[2] A. Yes, sir.
[3] Q. It would?
[4] A. Yes, sir.
[5] Q. In any event, you do know and are you -- you do know
[6]    that you didn't have to mop up any water or anything
[7]    that night?
[8] A. No, not -- no, sir.
[9] Q. Okay.
[10]    MR. GILLIS: All right. That's all I
[11]    have.
[12]    EXAMINATION
[13] BY MR. NELMS:
[14] Q. You say that someone coming through the window might
[15]    set off the alarm; is that correct?
[16] A. Yes, sir. Anything to brake the plain, I -- you
[17]    know, inside motion, yeah, would set it off.
[18] Q. Okay. But you also said that on a number of other
[19]    occasions there were false alarms?
[20] A. Yes, sir. And that could be by pulling on the
[21]    doors.
[22] Q. Okay.
[23] A. And then getting these sensors -- because a lot of

Page 44

[1]    kids in the trailer park, they was always at night
[2]    walking around, that possibly could have done that.
[3] Q. Okay. But you said you've never had any problem --
[4] A. No, sir.
[5] Q. -- since you've been at that -- that location with
[6]    anybody breaking in to your place?
[7] A. No, sir.
[8] Q. No, sir, which? No, sir, you've never had a problem
[9]    with anybody braking into your --
[10] A. Never had nothing broken since -- before that --
[11]    that happened, no, sir. I'd never had nobody
[12]    break-in.
[13] Q. Okay. And is there any way for you to tell when the
[14]    alarm goes off from exactly what location within the
[15]    building that the alarm has been tripped and set
[16]    off?
[17]    MR. BODIN: Object to the form. You can
[18]    answer.
[19] A. The only thing it would tell you on the alarm system
[20]    is which door was messed with or whatever was
[21]    pulled. Whatever it showed the default before I set
[22]    the alarm back off.
[23] Q. Okay. And did you take an occasion to observe

**Page 45**

[1] which --
[2] A. Oh, yes. I had to go and reopen and close them and
[3] then set it off or it wouldn't go off. Unless you
[4] line it back up the way it was supposed to be, you
[5] could set the alarm off.
[6] Q. Okay. And after the alarm went off for the second
[7] time on March 31, 2005, did you take an occasion to
[8] determine which of the sensors set off the alarm?
[9] A. No, sir. Not that I remember.
[10] Q. Okay.
[11] A. I just went and set it back off like normal, you
[12] know --
[13] Q. Well, I guess my question is, you have your contact
[14] sensors that are on the doors and then you have
[15] motion sensors within the area of the building;
[16] right?
[17] A. Right. Yes, sir.
[18] Q. Okay. And that night when the second alarm went
[19] off, the one that brings us all here today, you
[20] don't know whether it was the motion detectors that
[21] set off the alarm or whether it was the contact?
[22] A. No, sir. I couldn't be sure.
[23] Q. And the window in question that we've talked about

**Page 46**

[1] today, the one that was left open, it does not have
[2] a --
[3]     MR. GILLIS: Object.
[4]     MR. BODIN: Object to the form.
[5] Q. There was a window that was open when you arrived at
[6] your business --
[7] A. Yes, sir.
[8] Q. -- that night; right?
[9] A. Yes, sir.
[10] Q. It's the window that you've described to me that had
[11] the three pots on the sill; right?
[12] A. Yes, sir.
[13] Q. And that window was open when you arrived that
[14] night, was it not?
[15] A. Yes, sir.
[16] Q. Okay. And the police officers were inside your
[17] building; right?
[18] A. Yes, sir.
[19] Q. That window, the one we're describing right now,
[20] right here --
[21] A. Yes, sir.
[22] Q. -- does it have a contact sensor on it?
[23] A. No, sir.

**Page 47**

[1]     MR. NELMS: Thank you.

**Page 48**

[1]     REPORTER'S CERTIFICATE
[2]
[3] STATE OF ALABAMA
[4] COUNTY OF MONTGOMERY
[5]
[6]     I, Angela Fulmer, Certified Shorthand Reporter
[7] and Notary Public in and for the State of Alabama at
[8] Large, do hereby certify that on February 20, 2006,
[9] pursuant to notice and stipulation on behalf of the
[10] Plaintiff, I reported the deposition of ANTHONY
[11] ARNAUD, who was first duly sworn by me to speak the
[12] truth, the whole truth, and nothing but the truth, in the
[13] matter of Civil Action Number 2:05CV-687-F, now pending
[14] in the United States District Court for the Middle
[15] District of Alabama, Northern Division, that the
[16] foregoing 47 typewritten pages contain a true and
[17] accurate transcription of the examination of said witness
[18] by counsel for the parties set out herein; that the
[19] reading and signing of said deposition was waived by
[20] witness and counsel for the parties.
[21]     I further certify that I am neither
[22] of kin nor of counsel to the parties to said cause, nor
[23] in any manner interested in the results thereof.