**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DISTRICT

CHAD HOGAN,

    Plaintiff,

vs.                    CASE NO. 2:05CV687

CITY OF MONTGOMERY, et al.,

    Defendants.

The DEPOSITION OF CHAD HOGAN was taken pursuant to notice before Sharon Meehan, as Court Reporter and Notary Public in and for the State of Alabama at Large, on the 29th day of March, 2006, at the Law Offices of Thomas, Means, Gillis & Seay, P.C., located at 3121 Zelda Court, Montgomery Alabama, commencing at approximately 9:11 9:11

**Page 2**

APPEARANCES

FOR THE PLAINTIFF:

J. LEWIS, LLC
Attorney at Law
Post Office Box 5059
Montgomery, Alabama 36104

By: Andy Nelms, Esquire

FOR THE DEFENDANTS:

KIMBERLY O. FEHL
Assistant City Attorney
103 South Perry Street
Montgomery, Alabama 36104
By: Kimberly O. Fehl, Esquire
FOR THE DEFENDANTS:
THOMAS, MEANS, GILLIS & SEAY, P.C.
Attorneys at Law
3121 Zelda Court
Montgomery, Alabama 36103
By: Christopher K. Whitehead, Esquire
FOR THE DEFENDANTS:

**Page 3**

MCPHILLIPS, SHINBAUM & GILL, LLP
Attorneys at Law
Post Office Box 64
Montgomery, Alabama 36101

By: James G. Bodin, Esquire

INDEX        PAGE

STIPULATION . . . . . . . . . . . . . . .  5

EXAMINATION OF WITNESS

by Mr. Whitehead. . . . . . . . . . . .  6

by Mr. Bodin . . . . . . . . . . . . . 69

by Ms. Fehl . . . . . . . . . . . . . . 107

CERTIFICATE OF REPORTER . . . . . . . . . 118

**Page 4**

INDEX OF EXHIBITS MARKED FOR IDENTIFICATION

Defendant's 1 (Plaintiff's Answers to
    Interrogatories)

Defendant's 2 (Complaint)

Defendant's 3 (Plaintiff's Answers to Defendant's
    Discovery Request)

Defendant's 4 (State of Alabama Complaint)

Defendant's 5 (Affidavit of Complainant Arnaud)

Defendant's 6 (Photos of C. McBride)

Defendant's 7 (3/31/05 Memo from J.S. Dunn

Page 26

MR. NELMS: Object to the form.
Q. You can answer.
A. They was like -- I was standing up on the porch. And they was, like, trying to get in the house. I said, ain't no reason for you to go in the house; she ain't here.
     When they wrestled me down, I braced myself. And that's when they wrestled me down and sprayed with the mace.
Q. Did you refuse to let them enter the house?
A. Yeah.
Q. Is that why they grabbed you and tried to use physical force with you at that point?
A. Uh-huh (indicating in the affirmative).
Q. You said your wife called the police. What did she tell the police?
     Did she tell them that you had hit her or that you had threatened her? What did she tell them?
A. I don't know exactly what she told them.

Page 27

fire on the exact month. I'm just trying to get a general idea if it happened early in the year or late in the year.
A. Yeah, it happened early in the year.
Q. It happened after --
A. Yeah, it happened after the first harassment.
Q. And the first harassment was also in 2005, correct?
A. Yes.
Q. So both these incidents happened in 2005?
A. Uh-huh (indicating in the affirmative).
Q. And they both happened fairly early in the year; am I understanding you correctly?
A. Yes.
Q. The second incident, you said you and your wife got into a fight, correct?
A. Yes.

Page 26

Q. Was the harassment charge in connection with your interaction with the police or your interaction with your wife?
A. With my interaction with the police.
Q. The next sentence says: I was charged with domestic violence this year in Montgomery County and attended an anger management class (reading).
     Is that a separate incident?
A. Yes.
Q. Tell me what happened on that.
A. Me and my wife, we got into it, got into a fight. And she called the police, and they arrested me. And -- no, she went down there and signed the warrant. And then they came and arrested me. And I was sent to anger management.
Q. This happened after the last incident we just spoke of; is that correct?
A. Yes.
Q. Do you remember what month that happened in, or can you estimate what month it happened in? I'm not holding your feet to the

Page 28

Q. Did you get into a physical fight or a verbal argument?
A. Physical.
Q. Were you alleged to have hit her?
A. Yes.
Q. Was she alleged to have hit you?
A. Yes.
Q. Were both of y'all charged or just you?
A. Just me.
Q. Did you have to serve any jail time as a result of that charge?
A. I served five days.
Q. Just so I can understand you, twice in 2005, you got to serve five days in jail?
A. Yes.
Q. Did you have to serve any probation after that?
A. No, just the anger management.
Q. Mr. Hogan, have you ever filed for

Page 29

bankruptcy before?
A. No.
Q. Mr. Hogan, I want to ask you now about basically just what happened the night -- I believe it was March 30th was the night that this whole incident happened that makes the basis of this lawsuit.
Before we begin, I want to clarify one thing. From what I understand, you were in the car that night with three other people; is that correct.
MR. NELMS: Object to the form.
A. Yes.
Q. One of them's name was Chris McBride; is that correct?
A. Yes.
Q. One of them's name is Courtney Smith; is that correct?
A. Correct.

Page 30

Q. Who was the other person?
A. Mario.
Q. What's Mario's last name?
A. I don't really know him.
Q. Mr. Hogan, I'm going to ask you some specific questions; but just in general, I want you to tell me in as much detail as you can everything you remember that happened that night beginning from the first time you ever saw either Chris McBride, Courtney Smith or Mario.
MR. NELMS: Object to the form.
Q. Okay.
A. I had just gotten in from work. I got a call from Chris McBride.
Q. What time was that roughly?
A. Somewhere around between ten thirty --
Q. At night?
A. Yes. And he asked if I wanted to shoot any pool. I told him yeah. So we met up around

Page 31

by Jackson Street and went over to The Break Room.
Q. Whose car were y'all in?
A. Mario's.
Q. Did you take your car out that night at all?
A. Yeah, I had my car parked at the drop where I keep my truck.
Q. And they came and picked you up there?
A. No. I drove over to Jackson Street.
Q. It was at somebody's house you left the car at Jackson Street?
A. I just left it on the side of the road in front of someone's house.
Q. Where is Jackson Street? I'm sorry, I don't know where it is.
A. Jackson Street is right off High Street.
Q. What area of Montgomery are we talking about? Is it fairly close to the pool hall or is it a ways off?
A. It's a ways off.
Q. That's good enough. Go ahead.
A. Okay. So we went over to the pool hall, shot pool.
Q. How long were y'all at the pool hall would you say?
A. We were there -- I guess I'd say about maybe -- I don't know the exact time.
Q. That's all right. I'm asking just for an estimate, best estimate, not holding you to anything.
A. Maybe an hour.
Q. And y'all all left Jackson Street in Mario's car, correct?
A. Yes.
Q. So after you left the pool hall, what did you do then?
A. It was raining pretty hard, so we had pulled the -- it's like a loan service, like

Page 32

Nationwide or something. We pulled over there in the parking lot. And we were sitting in the parking lot, waiting for the rain to slack up.

While we were sitting there in the parking lot, Mario had pull out a sack of weed and started rolling it. And we all had poured something to drink. So we were sitting there. They were smoking a weed. I was drinking some liquor.

And while we were sitting there, Arnaud had pulled up to the store. Well, I guess that was Arnaud.

Q. What kind of car was it?
A. It was an SUV.
Q. A black SUV?
A. Black or blue, something like that.
Q. Dark colored SUV?
A. Yes.
Q. All right.
A. So we were sitting there, waiting for the rain to slack up. And he had pulled up in front of the store, pulled up in front of the store and sat there a while. Then he backed out

Page 33

and went around to the back and stopped there. Then he went back around to the front, stopped, parked. He went in to the store. And he came back out and left. And by that time, we was getting ready -- after he left, we decided to leave.

So instead of Mario going out toward the street, he go toward the trailer park. And by that time, we was inside the trailer park, the K-9 unit had pulled up behind us. And so when the K-9 pulled up behind us, we were steady driving. Well, he was steady driving. We got back to almost the back of the trailer park and he hit his flasher lights. We was behind the trailer park then.

So Mario was, like, he had warrants and stuff; and he wasn't about to go to jail, so he pulled off. So while he pulled off, the K-9 unit was behind us. So we came out the trailer park,

Page 34

came onto Wares Ferry Road, went going toward the Atlanta Highway.

So while we was going toward the Atlanta Highway, I was, like, man, stop, man. Stop. He was, like, no, man, I can't go to jail. So he turned off on two streets, two or three streets and crashed the car.

By that time, I jumped out of the car. And we all fled on feet.

Q. Then what happened?
A. And I had -- on the side of the drainage ditch I was, like, in the bushes, hid and the K-9 dog came down. I came out the bushes with my hands up. And the K-9 -- somebody yelled something on the other side of the drainage ditch. I don't know what they said; but by the time they said that, the dude unleashed the dog.

So I started running, jumped the fence. Well, I jumped on the fence. The dog

Page 35

grabbed my leg. So I jumped over the fence. I tried to jump another fence. By that time, the dog grabbed me. And the police apprehended me.

Q. Then what happened?
A. Then we went down to answer questions.
Q. Who questioned you?
A. Detective Pelham.
Q. Did anybody else question you besides Detective Pelham?
A. I don't know who it was. Somebody else did.
Q. How many people questioned you that night?
A. Two as far as I can remember.
Q. One of them was Detective Pelham and another?
A. Yes.
Q. But you remember Detective Pelham's name, but you don't remember the other person's

Page 36

name?

MR. NELMS: Object to form.

A. No.

Q. What did Detective Pelham ask you?

A. He asked me what we were doing in the parking lot. I told him we had just left The Break Room and we was waiting for the rain to slack up; while we was waiting for the rain to slack up, that the other guys had something to smoke and we all had something to drink.

And he asked me who broke in the store -- who broke in the meat shop. I was, like, ain't nobody break in the meat shop. We all was in the car. We never did get out the car. He was, like, well, the K-9 unit, he -- he was filming the whole thing; and he got it all on tape. I said, well, if he was filming the whole thing and got it on tape, he would know that we didn't get out the car.

but my question is: You're telling me that when Detective Pelham asked why did the car flee, no matter who was driving or whose decision it was, why did the car flee, that you told him the car fled because Mario had warrants and it was Mario's decision?

A. Yes.

Q. That's what you told Detective Pelham?

A. Yes, he had warrants and we had -- well, they had been smoking weed.

Q. You said you were questioned by another detective as well, correct?

A. Yes.

Q. What did that detective ask you?

A. Pretty much all the same thing.

Q. Any different questions at all?

A. Not that I can recall.

Q. How many times did Detective Pelham come in and question you that evening?

A. Twice.

Page 37

And he was asking about the gun. He said whose gun. I was, like, what gun. Because at the time, I didn't know there was a gun in the car. And he was, like, there was a gun in the car. I said, I don't know; it ain't mine.

Q. Did he ask anything else?

A. He asked me why I ran from the police. I told him that Mario had warrants and that I was scared by the time we had wrecked the car.

Q. So your testimony is you told Detective Pelham that your reason for fleeing in the car was that Mario had warrants?

A. Well, I was in the back seat.

Q. I'm just asking what was told to Detective Pelham.

A. That's the reason Mario fled the scene. And after he had that wreck, I had that panic, I mean.

Q. I understand what you're saying there,

Page 38

Q. How long was he in there questioning you the first time?

A. I don't know the exact time.

Q. Roughly, more than fifteen minutes, more than five minutes? Was it between five and fifteen minutes? Is that fair to say?

A. It's possible.

Q. Was he in there longer the first time or the second time?

A. The first time.

Q. Did he separate all four of you?

A. Well, three of us got caught. Mario, he got away.

Q. Did they separate all three of you then?

A. Well, the only person at the time -- me and Chris McBride was down there; and Courtney Smith, he was in the drainage ditch. And last time I seen Chris McBride was when we got out the car. So I didn't ever get to see him at the police station. So he separated all of us.

Q. Back to when you were in the parking lot at -- in the parking lot between the pool