# In The Matter Of:

*Chad Hogan v.*
*City of Montgomery, et al.*

*M. D. Gordon*
*February 9, 2006*

*Pruitt & Davis, L.L.C.*
*800 South McDonough Street, Suite 201*
*Montgomery, Alabama 36104*
*Phone 334-262-3376*
*Fax 334-262-3305*

Original File gordon.txt, Pages 1-109

**Word Index included with this Min-U-Script®**

Page 1

[1]            IN UNITED STATES DISTRICT COURT
[2]           FOR THE MIDDLE DISTRICT OF ALABAMA
[3]                     NORTHERN DIVISION
[4]
[5] CHAD HOGAN,
[6]            Plaintiff,
[7] vs.                              CIVIL ACTION NO.
[8]                                  2:05CV-687-F
[9] CITY OF MONTGOMERY, et al.,
[10]           Defendants.
[11]
[12]
[13]             *    *    *    *
[14]
[15]
[16]
[17]          DEPOSITION OF M. D. GORDON,
[18] taken pursuant to notice and stipulation on behalf of the
[19] Plaintiff, in the Law Offices of Thomas, Means, Gillis &
[20] Seay, P.C., 3121 Zelda Court, Montgomery, Alabama, before
[21] Angela Fulmer, Certified Shorthand Reporter and Notary
[22] Public in and for the State of Alabama at Large, on
[23] February 9, 2006, commencing at 9 a.m.

Page 2

[1]                    APPEARANCES
[2]
[3] FOR THE PLAINTIFF:
[4]
         ANDERSON K. NELMS, ESQUIRE
[5]      JAY LEWIS, ESQUIRE
         Law Offices of Jay Lewis, L.L.C.
[6]      847 S. McDonough Street
         Montgomery, Alabama  36104
[7]
[8] FOR THE DEFENDANTS:
[9]
         H. LEWIS GILLIS, ESQUIRE
[10]     CHRISTOPHER K. WHITEHEAD, ESQUIRE
         RAMADANAH M. SALAAM, ESQUIRE
[11]     Thomas, Means, Gillis & Seay, P.C.
         3121 Zelda Court
[12]     Montgomery, Alabama  36106
[13]
         MICHAEL D. BOYLE, ESQUIRE
[14]     City of Montgomery
         103 No. Perry Street
[15]     Montgomery, Alabama  36104
[16]
     ALSO PRESENT:
[17]
         Ron Cook
[18]     Billy Caulfield
         Chad Hogan
[19]
[20]
[21]
[22]
[23]

Page 3

[1]                    STIPULATIONS
[2]          It is stipulated and agreed by and between
[3] counsel representing the parties that the deposition of
[4] M. D. GORDON may be taken before Angela Fulmer, Certified
[5] Shorthand Reporter and Notary Public in and for the State
[6] of Alabama at Large, without the formality of a
[7] commission; and all formality with respect to other
[8] procedural requirements is waived; that objections to
[9] questions, other than objections as to the form of the
[10] questions need not be made at this time, but may be
[11] reserved for a ruling at such time as the deposition may
[12] be offered in evidence or used for any other purpose by
[13] either party as provided by the Federal Rules of Civil
[14] Procedure.
[15]          It is further stipulated and agreed by and
[16] between the parties hereto and the witness, that the
[17] signature of the witness to this deposition is hereby
[18] waived
[19]
[20]
[21]
[22]
[23]             *    *    *    *

Page 4

[1]                      INDEX
[2]
[3] EXAMINATION                                       PAGE
[4]     BY MR. NELMS:                                   5
[5]
[6] EXHIBITS                                          PAGE
[7] PX1 I&O, arrest report, statements                 95
[8] PX2 interrogatories                                98
[9] PX3 drawing                                       107
[10]
[11] CERTIFIED QUESTIONS                              PAGE
[12] Lines 19-21                                       85
[13] Lines 1-3                                        101
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]

Page 5

[1]        M. D. GORDON, of lawful age,
[2] having been first duly sworn, testified as follows:
[3]              EXAMINATION
[4] BY MR. NELMS:
[5]        MR. NELMS: Usual stipulations?
[6]        MR. WHITEHEAD: Yeah.
[7] Q. Okay, sir. By the way, I noted that the notice of
[8]    deposition said Jim Gordon.
[9] A. I think J. M. or something.
[10] Q. Yeah. I wanted to make sure I've got the right guy.
[11]    State your full name for the Record.
[12] A. Marquedric Dante Gordon.
[13] Q. And do you have -- and you're a member of the
[14]    Montgomery Police Department?
[15] A. Correct.
[16] Q. And were you a member of the Montgomery Police
[17]    Department in March of 2005?
[18] A. Correct.
[19] Q. And do you have a number assigned to you as an
[20]    officer?
[21] A. I do.
[22] Q. And what is your number?
[23] A. It's -- right now it's 149. But then it was 150.

Page 6

[1] Q. 150?
[2] A. Uh-huh.
[3] Q. Okay. And are you the officer that made the arrest
[4]    of Chad Hogan in --
[5] A. Yes, sir.
[6] Q. Okay. We had a J. M. Gordon and then I dictated to
[7]    the secretary and she put Jim Gordon and neither was
[8]    right. How about that?
[9] A. I don't even think we have a J. M. at the police
[10]    department.
[11] Q. All right. But you got served with the lawsuit?
[12] A. Right.
[13] Q. Okay. And you are the proper defendant?
[14] A. Right.
[15]        MR. GILLIS: Objection.
[16]        MR. NELMS: I'll agree with your
[17]    objection.
[18]        MR. WHITEHEAD: Yeah.
[19] Q. All right. How long have you been with the police
[20]    force?
[21] A. April 18, 2002 is my hire date.
[22] Q. Okay. And what's your date of birth?
[23] A. February 9, 1982 is my birth date.

Page 7

[1] Q. Okay. And did you attend the police academy?
[2] A. Yes.
[3] Q. Which one?
[4] A. Montgomery Police Academy.
[5] Q. Okay. And did you graduate?
[6] A. I did.
[7] Q. All right. Are you post certified?
[8] A. I am.
[9] Q. Okay. And when did you graduate?
[10] A. August -- I want to say August 12, '02.
[11] Q. All right. And when did you receive your post
[12]    certification?
[13] A. August 12th. My graduation date.
[14] Q. All right. And during your post training, what
[15]    classes, generally, did you take?
[16] A. We took plenty.
[17] Q. Well, let me tell you -- are you aware that there is
[18]    a basic level, an advanced level, and an executive
[19]    level of training for post certification?
[20] A. Well, I -- I don't know what the Montgomery Police
[21]    standards would be. I don't know if it's basic or
[22]    advanced or what it would be. But whatever their
[23]    standards are, that's what I took. I'm not sure

Page 8

[1]    exactly what it is.
[2] Q. Okay. So is it fair to say you completed the basic?
[3] A. Correct.
[4] Q. Okay. Have you been back for any other training for
[5]    any further post certification?
[6] A. I take -- yeah. I take classes. We have classes
[7]    all the time that we go back and -- refresher
[8]    courses or -- just classes for just additional
[9]    training.
[10] Q. Are you maintain -- are you required to maintain
[11]    certain --
[12] A. Hours.
[13] Q. -- credit hours?
[14] A. Right.
[15] Q. On an annual basis?
[16] A. Correct.
[17] Q. Okay. I also note that you have on your lapel that
[18]    you're a K-9 officer.
[19] A. Correct.
[20] Q. Okay. Do you have any special training to be a --
[21] A. Correct.
[22] Q. Okay. Tell me about that special training.
[23] A. Well, when you transfer to the K-9 unit, you're

Page 13

[1]     Suburban?
[2] A.  No. I want to say a Chevy Blazer.
[3] Q.  Blue?
[4] A.  That's what I was driving that night, yeah.
[5] Q.  Okay. Do you know what year?
[6] A.  Ninety -- it was a ninety something. I don't know.
[7] Q.  Okay. Late nineties?
[8] A.  Late nineties, yeah.
[9] Q.  Okay. Do you know why it is that you're driving
[10]    basically an unmarked vehicle?
[11] A. That's just the vehicle --
[12]        MR. WHITEHEAD: Object to the form. Go
[13]    ahead.
[14] A. Those were the vehicles we were assigned.
[15] Q. Okay. Are all K-9 officers assigned unmarked
[16]    vehicles?
[17] A. Correct.
[18]        MR. WHITEHEAD: Object to the form.
[19] Q. Okay. As a matter of fact, there's a K-9 manual
[20]    that you're given as a K-9 officer, is there not?
[21] A. Correct.
[22] Q. And it indicates that K-9 officers are given
[23]    unmarked vehicles, does it not?

Page 14

[1] A.  Correct.
[2] Q.  Okay. So you considered the vehicle that you were
[3]     operating that night to be unmarked; is that
[4]     correct?
[5]         MR. WHITEHEAD: Object to the form.
[6] A.  It was unmarked, correct. But -- I mean, it had the
[7]     markings that I explained earlier on it.
[8] Q.  Okay.
[9] A.  The antennas and the tinted windows and the blue
[10]    lights.
[11] Q. All right. What are the typical duties of a K-9
[12]    officer working third shift?
[13] A. K-9, our main duties are to assist patrol in
[14]    apprehending. Our main goal is to apprehend
[15]    felonies -- felons and also assist patrols on
[16]    alarms.
[17] Q. Okay.
[18] A. And felonies would be robberies, burglaries,
[19]    anything like that.
[20] Q. Okay. And do you have a recollection of being
[21]    dispatched to Arnaud's Quality Meats on the Eastern
[22]    Boulevard on March 31, 2005?
[23] A. Correct.

Page 15

[1] Q.  Okay. And how did you get dispatched to Arnaud's
[2]     Quality Meats?
[3] A.  I was assisting patrol on a call. Which, initially,
[4]     dispatch patrol is always -- a K-9 unit is a back-up
[5]     unit to an alarm. I don't remember what unit it
[6]     was. But I was the back-up unit on that call.
[7] Q.  Okay. Back-up unit to whom?
[8] A.  Patrol.
[9] Q.  Okay. And anyone in particular on patrol?
[10] A. I was just on that side of town, so I assisted
[11]    patrol.
[12] Q. You were the closest?
[13] A. Correct.
[14] Q. Okay.
[15] A. I think I was assigned to east side that night.
[16] Q. Okay. During your post training, did you receive
[17]    training in radio operations and communications?
[18] A. Correct.
[19] Q. Okay. And is there a certain protocol that is to be
[20]    used by officers in and during their communications
[21]    over the radio?
[22]        MR. WHITEHEAD: Object to the form.
[23] A. It depends. What -- could you just ask the question

Page 16

[1]     another way. What do you mean by that?
[2] Q.  Sure. Is there a certain procedure that you're
[3]     taught when using radio communications with, say,
[4]     dispatch?
[5] A.  Correct.
[6] Q.  Okay. And are you, during your post training,
[7]     taught certain codes for different events or alleged
[8]     crimes?
[9] A.  Correct.
[10] Q. Okay. And are you taught to use those codes in your
[11]    communications with dispatch?
[12] A. Correct.
[13] Q. Okay. Did you receive from dispatch any code in
[14]    regard or reference to Arnaud's Meat that night?
[15] A. I did.
[16] Q. Okay. And, by the way, if I'm not specific as to
[17]    time and date, generally, I'm always going to be
[18]    referring to the events of March 31, 2005.
[19] A. Okay.
[20] Q. All right. And I know that it happened late at
[21]    night and maybe some of the events rolled over into
[22]    the next day, which would have been April the 1st I
[23]    believe --

Chad Logan v.
City of Montgomery, et al.
Case 2:05-cv-00687-WKW-VPM   Document 44-3   Filed 08/22/2006   Page 5 of 13
M. D. Gordon
February 9, 2006

Page 21

[1] you're in that area and then you respond to
[2] dispatch? Or does dispatch actually call you and
[3] say, you're there, I need you to go?
[4] A. Patrol, she would do that. But us, we just -- like
[5] I said, we back up units. If we're in area, we get
[6] en route to the call.
[7] Q. Okay. And what's the code for a burglary?
[8] A. It's an 11.
[9] Q. An 11. Okay. So when you get a call for, let's
[10] say, a burglary, and you're arriving at the address
[11] in question --
[12] A. Uh-huh.
[13] Q. -- what by way of radio protocol are you supposed to
[14] do once you get there?
[15] A. I can either press a button on my computer and it'll
[16] show me -- that I've arrived, or I can get on the
[17] radio and tell her that I'm 10-17. 10-17 is the
[18] code.
[19] Q. 10-17 means you've arrived on the scene?
[20] A. Correct.
[21] Q. Okay. How is -- and, again, back on March 31, 2005,
[22] how was Osko kept in your Blazer? Is he by your
[23] side? Is he in the back?

Page 22

[1] A. He's free roam in my truck. He can -- everywhere I
[2] go in my truck he can go.
[3] Q. Okay.
[4] A. He's not -- there's no divider or anything in it.
[5] He can -- I mean, he can go all around the truck if
[6] he wants to.
[7] Q. Okay. Is he kept on a leash at all times?
[8] A. Not in the truck, no.
[9] Q. Okay. When outside the truck, do you put him on a
[10] leash or...
[11] A. It depends on -- I mean, why he's out of the truck.
[12] It just depends.
[13] Q. Okay. On the night in question, were -- was anyone
[14] else with you in your vehicle?
[15] A. Myself and my partner.
[16] Q. Okay. And your partner is Osko?
[17] A. Correct.
[18] Q. Okay. And did you receive a call from dispatch
[19] regarding Arnaud's Meats?
[20] A. Correct.
[21] Q. All right.
[22] A. I assisted patrol on the call.
[23] Q. Okay. So the call didn't come directly to you?

Page 23

[1] A. No.
[2] Q. Okay. So was the call -- to whom?
[3] A. To patrol.
[4] Q. Okay. Just patrol generally?
[5] A. Right.
[6] Q. Okay. And you responded?
[7] A. Right.
[8] Q. Okay. And was it a Code 11?
[9] A. Right.
[10] Q. Okay. And tell me what you did in response to the
[11] dispatch call for Code 11.
[12] A. I got on the radio, used my unit number, 150, at the
[13] time. I told her that I would be en route. I don't
[14] know where I was coming from. I can't remember.
[15] And I got en route to the call. And I proceeded to
[16] the business.
[17] Q. Okay. And when you arrived at the business, what's
[18] the -- first of all, what was the weather like?
[19] A. It had been raining. During the time -- I don't
[20] know if it was raining when I was en route to the
[21] call or not. That night it had been raining all
[22] night. Just a wet night.
[23] Q. Okay. And when you arrived at the scene, what's the

Page 24

[1] -- when you arrived at Arnaud Meats, what's the
[2] first thing you saw?
[3] A. When I pulled into the business, my normal protocol
[4] would be, my training in the academy, you pull into
[5] an alarm, you turn your lights off. That way if
[6] suspects, or suspect, are there they can't see you
[7] coming in. I pulled off of the boulevard on to the
[8] service road. I don't know the exact name of the
[9] service -- it may be the Northern Boulevard. It's
[10] just a service road on the side. I turned my lights
[11] off. I noticed a vehicle parked in the parking lot
[12] and an unknown subject running back to the vehicle
[13] and get into the vehicle -- into the back seat of
[14] the vehicle. The vehicle pulled off. I continued
[15] to go to the building. I looked over, and I saw the
[16] window unsecured. At the time, I didn't know if it
[17] was busted or just raised or what it was. I
[18] immediately followed the car.
[19] Q. Okay. I'd asked you what was the first thing you
[20] saw. So the first --
[21] A. The car was the first thing I noticed.
[22] Q. You noticed the car --
[23] A. Correct.

Case 2:05-cv-00687-WKW-VPM   Document 44-3   Filed 08/22/2006   Page 6 of 13

Chad Hogan v.
City of Montgomery, et al.
M. D. Gordon
February 9, 2006

Page 25

[1] Q. -- before you noticed the window?
[2] A. Correct. Because I hadn't made it to the business.
[3] Q. Okay. And what kind of car was it?
[4] A. It was a -- don't get me wrong, it's been a while.
[5]    I want to say a Lincoln Town Car.
[6] Q. Do you know what year?
[7] A. No. I can't remember it.
[8] Q. Do you remember the color?
[9] A. I want to say white. I can't remember exactly,
[10]   though.
[11] Q. White?
[12] A. I want to say white. I can't remember.
[13] Q. Okay. Definitely a lighter color?
[14]      MR. WHITEHEAD: Object to the form.
[15] A. Correct.
[16] Q. Okay. You got a Code 11. Is there a specific code
[17]   for a business alarm going off?
[18] A. It's an 11 Bravo.
[19] Q. An 11 Bravo?
[20] A. Bravo.
[21] Q. Okay. And does that indicate whether or not it's a
[22]   silent or audible alarm?
[23] A. No.

Page 26

[1] Q. Okay. When you drove up, were you able to hear any
[2]   kind of alarm going off?
[3] A. Yes.
[4] Q. You were? Okay. And do you have any idea how long
[5]   that alarm had been going off?
[6] A. No. Dispatch didn't -- I mean, we -- we don't ever
[7]   know that.
[8] Q. Okay. From the time that you received the Code 11
[9]   from dispatch until you arrived at Arnaud's Meats,
[10]   how much time do you think lapsed?
[11] A. I want to say maybe three to five minutes at the
[12]   most.
[13] Q. Three to five minutes?
[14] A. It didn't take that long.
[15] Q. Okay. And you --
[16] A. But we'll just say no more than ten minutes. We'll
[17]   just put it that way for the Record.
[18] Q. Okay. That's fine. I mean, if you don't know, you
[19]   just don't know.
[20]      And you don't remember exactly where you were
[21]   when you -- when you received the call from
[22]   dispatch?
[23] A. I can't recall exactly where I was coming from, no.

Page 27

[1] Q. Okay. Which direction was the Town Car facing? Let
[2]   me -- we're talking about the parking lot next to
[3]   Arnaud's Meats; right?
[4] A. Yes, sir.
[5] Q. All right. As a matter of fact, why don't we draw
[6]   ourself a diagram.
[7] A. Okay.
[8] Q. Draw -- you know, and I understand everybody --
[9]   nobody's a perfect artist, but -- and nobody's going
[10]   to hold you to the art of scale. But, if you would,
[11]   just draw Arnaud's Meats for me --
[12] A. (Witness complies).
[13] Q. -- and where the window that was open or broken
[14]   was.
[15] A. The window would be on the side right there.
[16] Q. And then the Eastern Boulevard and the service
[17]   road.
[18] A. That would be the service road.
[19]      MR. WHITEHEAD: Yeah. Let's label this
[20]   stuff a little. Write Arnaud's up top and
[21]   window where the star is.
[22] Q. And Wares Ferry.
[23] A. (Witness complies).

Page 28

[1] Q. Okay. And -- I believe that's correct. And from
[2]   which direction did you come when you were
[3]   dispatched for the call?
[4] A. I was coming in off of this way turning in right
[5]   there.
[6] Q. Okay. So you were coming off of Wares Ferry?
[7] A. I was -- no. I was coming off the Eastern
[8]   Boulevard -- well, the Northern Boulevard. If
[9]   that's the way going back south, I was coming this
[10]   way.
[11] Q. So you --
[12] A. I was coming in that way. And I was getting over --
[13]   I was in the turning lane to turn into the business.
[14] Q. Yes, sir.
[15] A. And I turned in that way.
[16] Q. All right. And -- so you turned in on the side
[17]   nearest the window?
[18] A. Correct.
[19] Q. Okay. And where was -- I'm going to say Lincoln
[20]   Town Car. Even though I understand you weren't
[21]   absolutely sure it was a Lincoln Town Car.
[22] A. The car was parked, I would say, about right there
[23]   facing -- the arrow is pointing the way the car was

Page 29

[1] facing.
[2] Q. Okay. And where exactly was this suspect that you
[3] saw?
[4] A. Okay. When I was turning in, I'd say about maybe
[5] there.
[6] Q. Approximately halfway in between the car and Arnaud
[7] Meats?
[8] A. Right. Coming from that direction.
[9] Q. Do you want to label that suspect?
[10] A. (Witness complies).
[11] Q. Okay. And approximately where were you when you
[12] could first hear the alarm?
[13] A. Well, when I drove up to the business, when the car
[14] pulled off, that's when I heard the alarm. When I
[15] was coming up to the business.
[16] Q. Okay. Describe for me the individual that you saw
[17] walking away from the window.
[18] A. It was an unknown black male with dark pants and a
[19] -- it was either a gray or white T-shirt.
[20] Q. Okay. Was it this gentlemen here (indicating)?
[21] A. Correct.
[22] Q. And you're one hundred percent positive that it was
[23] this gentleman here?

Page 30

[1] A. Correct.
[2] Q. Okay.
[3]     MR. NELMS: And I'm pointing at
[4]     Mr. Hogan.
[5] Q. Can you tell me, then, what the suspect did?
[6] A. Okay. As I said earlier, he ran back to the vehicle
[7] and got into the back passenger side of the car.
[8] Q. Back right?
[9] A. Passenger, right. Back passenger side.
[10] Q. Okay. And did you have -- you said earlier that
[11] you're trained when you come upon a Code 11 you keep
[12] your lights off -- your emergency lights off?
[13] A. My headlights and everything.
[14] Q. Everything?
[15] A. Right.
[16] Q. Okay. Did there come a point in time when you
[17] turned your lights on?
[18] A. Right. When the car left the business, I turned my
[19] lights on then, because I knew I was going to try to
[20] stop the car.
[21] Q. Okay. What was the approximate distance for, let's
[22] say, the front bumper of this car and the side here
[23] on the northern end of Arnaud's Meat in feet, if you

Page 31

[1] can tell me?
[2] A. In feet?
[3]     MR. WHITEHEAD: Object to the form.
[4] A. Yeah. I don't know the exact -- I'm sorry.
[5] Q. Is there another unit of measurement that you prefer
[6] to use. Maybe --
[7] A. I'd say maybe from there to there (indicating) -- we
[8] can use a football field. I'd say maybe thirty
[9] yards, if that.
[10] Q. Okay.
[11] A. Twenty, thirty yards.
[12] Q. Okay. And you said you couldn't remember as you
[13] were driving to Arnaud's Meats what the weather was
[14] like. Can you remember what the weather was like as
[15] you were actually driving up into the parking lot at
[16] Arnaud's Meats?
[17] A. It -- I know it wasn't raining. It was wet.
[18] Q. Okay. And do you remember the time?
[19] A. No.
[20] Q. Okay. Can you recall whether or not it was before
[21] or after midnight?
[22] A. I don't recall.
[23] Q. Okay. Did you make any radio call back to dispatch

Page 32

[1] when you arrived on the scene?
[2] A. I don't recall that either. I don't -- I don't know
[3] if other units were on the radio. I don't know if I
[4] got -- I can't remember.
[5] Q. Okay. Did you maybe call 10-17?
[6] A. I don't know if I got it on the radio or if I did it
[7] on my computer.
[8] Q. Okay. Did you at any point in time indicate that
[9] you -- after you arrived on the scene, that you saw
[10] the car?
[11] A. I can't recall if I immediately said that, because I
[12] was trying to keep watch on the car. And -- I know
[13] when I -- when I attempted to stop the car after the
[14] car left the area, I did get on the radio because I
[15] called for more units to come assist me.
[16] Q. Okay. Do you recall when you first made a call to
[17] dispatch in reference to Arnaud's Meats or the
[18] suspect?
[19] A. I don't recall.
[20] Q. Okay. And did you make -- okay. So the first thing
[21] that you can recall doing as far as radio
[22] communications is calling for backup?
[23] A. Correct.

Page 33

**Q.** Okay. And what exactly did you say, if you recall?

**MR. WHITEHEAD:** Object to the form.

**A.** I don't know exactly what I said, but I advised them what I had. I told them I had a vehicle that left the business. I was approaching the vehicle and the vehicle fled. I asked for more units to come assist -- come and assist me. I don't know if I said it that way or not.

**Q.** Okay. Well, let's talk about it for just a second. Now, you said that the vehicle fled. Using the little diagram that we've made here --

**A.** Okay.

**Q.** -- tell me --

**A.** Here's the trailer park. I just -- the trailer park is all this right here (indicating). The vehicle pulled out, and they pulled right about there. That's going to be my vehicle. I'll label it SV for suspect vehicle.

**Q.** Okay.

**A.** And PV for police vehicle.

**Q.** Okay.

**A.** About right there, that's where I stopped them. I exited my vehicle. I got about maybe right there to

Page 34

theirs. They immediately fled the area.

**Q.** Okay. So you pulled in along behind them. Did you initiate your emergency lights?

**A.** That's when I initiated my emergency lights, and they -- they pulled over and stopped.

**Q.** Okay. Did you, at this time -- is this still in the parking lot, or do you consider this still in the parking --

**A.** I ran out of room on the paper. No. It's -- it's in the trailer park behind the store. It's a trailer park behind the store. And whatever street that is in the -- I don't know. I think -- I want to say Barberry (phonetic) maybe. Barberry Street or Barberry Drive.

**Q.** Okay.

**A.** I'm not sure.

**Q.** Well -- I'm familiar with the parking lot. I assume you're familiar with the parking lot. It's a big parking lot.

**A.** Correct.

**Q.** I mean, like the type you would see in front of a Bruno's or something.

**A.** Yeah.

Page 35

**Q.** I mean, it's pretty expansive. That's my characterization.

So were you -- let's see. That would be to the west is where the trailer park is; right?

**A.** Right. West, yeah.

**Q.** If you can --

**A.** To the west of the boulevard, yeah. Right.

**Q.** If you can --

**A.** Uh-huh.

**Q.** -- considering that entire -- that entire parking lot -- and I'll guess it's several acres. How deep into the parking lot were you at this time when you attempted to initiate the stop?

**A.** I'm -- I want to say the street's Barberry.

**Q.** Yes, sir.

**A.** Wherever Barberry is in there. I don't know. Like I said, I was watching the car. I don't know how many streets I went over and up and all that stuff. I don't know.

**Q.** So you actually had left the parking lot and were on the surface streets in the trailer park when you initiated the stop?

**A.** We're in the trailer park, right.

Page 36

**Q.** Okay. Which direction are you headed once you're in the trailer park, and when you attempt to initiate the stop for the first time?

**A.** That's why I have the car facing that way.

**Q.** All right. So you were facing north?

**A.** Right.

**Q.** All right. So you had turned onto one of the streets inside the trailer park heading north when you attempted to stop them?

**A.** When they stopped.

**Q.** Okay. And they came to a stop?

**A.** Right.

**Q.** Okay. Were you able to have visual contact with any of the suspects at the time?

**A.** No. Like I said, I was approaching the vehicle. I never made it up to the vehicle when the vehicle fled.

**Q.** Were you able to count the number of people in the car?

**A.** Not at that time, no.

**Q.** Okay. Did you have any idea -- for instance, did you know there was more than one?

**A.** I knew it was more than one, right. Because the guy

Case 2:05-cv-00687-WKW-VPM    Document 44-3    Filed 08/22/2006    Page 9 of 13

Chad Hogan v.
City of Montgomery, et al.
M. D. Gordon
February 9, 2006

**Page 37**

[1] I saw get back in got in the back seat. So it had
[2] to be more than one.
[3] Q. Okay. And which direction did they go after --
[4] A. After that they -- it's another street that runs
[5] back up. They were coming back this way. Coming
[6] back towards the business. And they made that --
[7] that would be a left. And they came back out and we
[8] went around the business onto Wares Ferry Road.
[9] Q. All right. So they went back around, hit the
[10] service road --
[11] A. Yeah. Well, I -- I don't know -- I don't think we
[12] came all the way out to the service road. If you
[13] know the parking lot, the big lot goes all the way
[14] back out.
[15] Q. Yeah.
[16] A. So they went -- I know we did pass -- I'm sorry. We
[17] passed the business and went back around front and
[18] went back around and went out to Wares Ferry.
[19] Q. Okay. And when you hit Wares Ferry Road, which
[20] direction of travel did you take?
[21] A. We were going this way (indicating).
[22] Q. West. Which is towards town?
[23] A. Right.

**Page 38**

[1] Q. Okay. And tell me about any radio communications
[2] that you had that you were -- can recall from when
[3] you attempted to initiate the stop until you hit
[4] Wares Ferry Road?
[5] A. When I attempted to initiate the stop, I told her
[6] what I had. When they pulled off, that's when I --
[7] I know I got on radio. I told her I had a vehicle
[8] that just pulled off from me. I asked for more
[9] units to come and assist me. I knew right then they
[10] were -- they were going to refuse to stop. We got
[11] onto Wares Ferry Road, I asked for a unit. I gave
[12] her my location, and I told her the speed and where
[13] we were going. And, at that time, other units got
[14] on the radio and let her know that they were en
[15] route to back me up.
[16] Q. Okay. Regarding the -- you said there's two forms
[17] of communication that you can have. One is through
[18] dispatch on your radio, and the other is through
[19] your in-car computer system?
[20] A. Correct.
[21] Q. Okay. And you said you can reach down and press a
[22] button; right?
[23] A. Right.

**Page 39**

[1] Q. Okay. If you know, if you made such a
[2] communication -- and, I believe, you said already
[3] you don't recall. That's right?
[4] A. Correct.
[5] Q. Is that communication through your in-car computer
[6] recorded in any way?
[7] A. I'm not sure.
[8] Q. Okay.
[9] A. It's not -- it's not an actual communication type
[10] deal. It's just I press a button and it will show
[11] me 10-17 or 10-08 or what -- I mean, it's not a
[12] conversation.
[13] Q. I understand.
[14] A. I can't -- I can't talk to the computer and tell it
[15] what I want it to tell the dispatcher, no.
[16] Q. But you press a function key?
[17] A. Right.
[18] Q. And that information, whatever --
[19] A. It's sent to her. And it will show her that I'm
[20] there, right.
[21] Q. At dispatch?
[22] A. Right.
[23] Q. Okay. Regarding this lawsuit, other than

**Page 40**

[1] conversations that you've had with your counsel,
[2] your legal counsel --
[3] A. Uh-huh.
[4] Q. -- since the night of the incident --
[5] A. Uh-huh.
[6] Q. -- have you talked to any other person about the
[7] facts surrounding the arrest of Chad Hogan?
[8] A. What do you mean, any other person? I mean, besides
[9] counsel? I've talked to internal affairs.
[10] MR. WHITEHEAD: Let me tell you this, too.
[11] Any conversation that you had with the other
[12] defendants while we were all here together --
[13] THE WITNESS: Right.
[14] MR. WHITEHEAD: Because I represent all of
[15] you. Don't even talk about anything about
[16] that.
[17] THE WITNESS: Right.
[18] A. Besides that, no. Besides with my counsel and the
[19] other defendants, no.
[20] Q. (By Mr. Nelms) Okay. And I believe you said that
[21] Lieutenant Caulfield is a supervisor?
[22] A. Correct.
[23] Q. He's also a defendant; correct?

Chad Hogan v.
City of Montgomery, et al.
Case 2:05-cv-00687-WKW-VPM   Document 44-3   Filed 08/22/2006   Page 10 of 13
D. Gordon
February 9, 2006

### Page 41

[1] **A.** Correct.
[2] **Q.** Okay. So have you had meetings with your lawyers
[3]     where Lieutenant Caulfield was present?
[4]     **MR. WHITEHEAD:** Object to the form. And
[5]     don't answer that. That's the -- anything that
[6]     we did is going to be privileged about
[7]     meetings we had or details that who was
[8]     present.
[9] **Q.** Without telling me the subject matter that was
[10]    discussed, have you had any meetings with your
[11]    counsel where Lieutenant Caulfield was present?
[12]    **MR. WHITEHEAD:** You can answer that.
[13] **A.** Yes.
[14] **Q.** How many?
[15] **A.** I don't know. I don't recall.
[16] **Q.** More than one?
[17] **A.** Yes.
[18] **Q.** Less than six?
[19] **A.** Probably less than six, yes, sir.
[20] **Q.** Okay.
[21] **A.** I don't recall. I mean, I don't know the exact
[22]    number.
[23] **Q.** Okay. Was Chief Baylor at any of those meetings?

### Page 42

[1] **A.** No.
[2]     **MR. WHITEHEAD:** Stop. This is -- how many
[3]     meetings I've had with my client is just as
[4]     privileged as what the substance of the
[5]     conversation was. If you disagree, so be it.
[6]     But I'm going to instruct him not to answer any
[7]     more questions about how many meetings we had,
[8]     or who was at the meetings, or anything like
[9]     that. It's privileged. I'm going to instruct
[10]    him not to answer any further questions on
[11]    that?
[12] **Q.** Are you going to answer the question?
[13] **A.** No.
[14] **Q.** Did you ever have any conversation with Lieutenant
[15]    Caulfield outside the presence of your counsel in
[16]    regard to any matters related to Chad Hogan?
[17] **A.** No. Not that I can recall, no.
[18] **Q.** Okay. Any conversations with Lieutenant Caulfield
[19]    on the night of March the 31st in regard to the
[20]    arrest of Chad Hogan?
[21] **A.** Correct. He's my supervisor.
[22] **Q.** So you did have a conversation with him that night?
[23] **A.** That night, yes.

### Page 43

[1] **Q.** Okay. Tell me about the substance of those -- that
[2]    conversation.
[3] **A.** I mean, I had to tell him what I had. I mean, he
[4]    knew -- he was listening to the radio. And I kept
[5]    him up to date on the circumstances of the arrest
[6]    and everything.
[7] **Q.** Okay. What would he have heard on the radio?
[8]    **MR. WHITEHEAD:** Object to the form.
[9] **A.** He would have heard the radio traffic. He's
[10]    assigned the same radio I am. So all radio traffic
[11]    that I can hear, he can hear, also.
[12] **Q.** Okay. Now, I believe you said that you turned on to
[13]    Wares Ferry Road and headed towards downtown, which
[14]    we believe is west; is that correct?
[15] **A.** Yes.
[16] **Q.** Okay. Pick up from there and tell me what
[17]    happened.
[18] **A.** As I said, I requested more units to come assist
[19]    me. I want to say the pursuit may have lasted maybe
[20]    five minutes. Ten minutes at the most.
[21] **Q.** Okay.
[22] **A.** I don't know the exact name of the streets they
[23]    turned on to. But the vehicle eventually wrecked.

### Page 44

[1] **Q.** Okay. What, were they traveling at a high rate of
[2]    speed?
[3] **A.** Yes, sir.
[4] **Q.** Okay. Did they run any stop signs?
[5] **A.** Yes, sir.
[6] **Q.** Okay.
[7] **A.** Well, there's no stop signs on Wares Ferry Road.
[8] **Q.** All right.
[9] **A.** In the neighborhood, I don't recall. I don't know
[10]    if they ran any stop signs or not.
[11] **Q.** Okay. On Wares Ferry Road did they run any traffic
[12]    lights?
[13] **A.** There's no traffic lights --
[14] **Q.** Okay.
[15] **A.** -- in the area that we were traveling.
[16] **Q.** All right. But they did travel at a high rate of
[17]    speed?
[18] **A.** Correct.
[19] **Q.** All right. Did they exceed the speed limit at any
[20]    time?
[21] **A.** Correct.
[22] **Q.** Okay. Did they cross over the center line at any
[23]    time?

Page 45

[1] A. I can't recall that. I don't know.
[2] Q. Okay. Did they fail to use turn signals at any
[3]    time?
[4] A. Correct.
[5] Q. Okay. Do you recall exactly where the wreck
[6]    occurred?
[7] A. That's what I said. I can't remember the street
[8]    names.
[9] Q. Okay. If I told you the report said Warenwood,
[10]   would that refresh your recollection?
[11] A. If that's what my report says, yes, sir.
[12] Q. Okay. Well, not what your report says, but what do
[13]   you remember? Do you remember it being Warenwood?
[14] A. That's what I'm telling you. I can't remember the
[15]   street name.
[16] Q. Okay. That's fine. Well, tell me about the wreck.
[17]   I mean, exactly how it occurred, if you know.
[18] A. Well, the vehicle wrecked into someone's privacy
[19]   fence in their backyard. The passenger side of the
[20]   vehicle was up against the fence. And the occupants
[21]   of the vehicle immediately bailed from the vehicle.
[22]   Two exited the front driver's side, because they
[23]   couldn't get out of the passenger's side. And the

Page 46

[1]    one in the back seat, he exited the rear seat of the
[2]    vehicle -- rear driver's side door.
[3] Q. Okay. And did he -- was that Mr. Hogan?
[4] A. Correct.
[5] Q. Okay. So if I'm understanding you right, he
[6]    exited -- he was on the left rear side or the
[7]    driver's side in the rear of the vehicle. But he
[8]    exited on the passenger's side; is that correct?
[9] A. Say that again.
[10] Q. Mr. Hogan was in the back seat; is that correct?
[11] A. Right.
[12] Q. Okay. Did he exit from the driver's side or the
[13]   passenger's side?
[14] A. The driver's side.
[15] Q. He was able to --
[16] A. The back seat. He couldn't get out of the
[17]   passenger's side, because they wrecked into a fence.
[18] Q. Oh, okay. I'm sorry. I misunderstood you. I
[19]   thought it was the driver's side that was on the --
[20] A. No. The passenger's side.
[21] Q. Oh, I'm sorry. Okay.
[22]   How close behind the Lincoln Town Car were you
[23]   when it had the accident?

Page 47

[1] A. When it wrecked -- maybe thirty yards when it
[2]    wrecked.
[3] Q. Okay. And tell me, to the best of your
[4]    recollection, exactly what you did after the wreck.
[5] A. After the wreck, when they bailed -- the driver, the
[6]    passenger, and the rear occupant of the vehicle
[7]    bailed. I jumped out of the vehicle as well. And I
[8]    chased them by foot to a fence -- another fence in
[9]    the backyard.
[10] Q. Let me interrupt you. Where did you park or come to
[11]   rest?
[12] A. The car went in the backyard and hit the fence, and
[13]   I stayed on the street, whatever street it was.
[14] Q. Okay. And you jumped out of your car?
[15] A. Uh-huh.
[16] Q. Your vehicle?
[17] A. Uh-huh.
[18] Q. Osko went with you?
[19] A. Correct.
[20] Q. All right. Was he leashed or unleashed?
[21] A. He was unleashed.
[22] Q. Okay. And you proceeded to go after the fleeing
[23]   suspect?

Page 48

[1] A. Correct.
[2] Q. Okay. And pick up from there.
[3] A. Okay. I kept my eye on the back passenger, because
[4]    I knew he was the one that got in the vehicle. The
[5]    two font people exited first. The back guy, he was
[6]    the last one out. I chased him to the fence. The
[7]    front guy went over the fence first and he went down
[8]    into -- there was a drainage ditch over there. The
[9]    other guy, he went to the right. And the last guy
[10]   -- when we were running to the fence, before he can
[11]   get over -- myself and my partner, we were pretty
[12]   close to him. That's when he turned and he
[13]   screamed. I don't know if it was in fear or what it
[14]   was, but he turned -- turned and yelled (indicating
[15]   sound) and he proceeded over the fence and he went
[16]   to the left.
[17] Q. Okay. Which one of these individuals was Mr. Hogan?
[18] A. That -- the last one.
[19] Q. Okay. And just -- I'm going to ask you, please, if
[20]   you'll just use Mr. Hogan's name so we'll be able to
[21]   identify which --
[22] A. Okay. That's fine.
[23] Q. -- one we're talking about. And I'm really mostly

Page 49

[1] concerned about Mr. Hogan. The other suspects are
[2] not that important to me.
[3] **A.** That's fine.
[4] **Q.** But the other suspects left the area?
[5] **A.** All three attempted to leave the area, but all three
[6] went opposite directions.
[7] **Q.** All right.
[8] **A.** Right.
[9] **Q.** Now, were there four people total?
[10] **A.** I only saw three.
[11] **Q.** Okay.
[12] **A.** I only pursued three on foot.
[13] **Q.** Okay. And that includes Mr. Hogan?
[14] **A.** Correct.
[15] **Q.** So it was Mr. Hogan --
[16] **A.** Mr. Hogan was the third -- the last subject to get
[17] over the fence.
[18] **Q.** All right. And tell me about your pursuit of
[19] Mr. Hogan.
[20] **A.** Okay. When I got to the fence, as I stated,
[21] Mr. Hogan, he turned around and he yelled -- he
[22] yelled. Like I said, I don't know if it was at my
[23] dog or in fear. He went left. I immediately held

Page 50

[1] my spot, which I'm trained to do. And I called for
[2] other units to get in the area. Some more K-9 units
[3] got in the area. And the spot that I last saw the
[4] subject run is where we began to track.
[5] **Q.** Okay. Then that happened?
[6] **A.** The track started, and Mr. Hogan was apprehended in
[7] a backyard not far from where I last saw him.
[8] **Q.** Okay. Are you leaving anything out?
[9] **A.** No.
[10] **Q.** Okay. How is it that Mr. Hogan came to be
[11] apprehended?
[12] **A.** He was apprehended by a K-9 --
[13] **Q.** Okay.
[14] **A.** By a K-9 dog.
[15] **Q.** Osko got him?
[16] **A.** Not Osko. It was another dog --
[17] **Q.** Okay.
[18] **A.** -- that apprehended Mr. Hogan.
[19] **Q.** All right. Was there another K-9 unit in the area?
[20] **A.** That's what I said. I held my spot, and I called
[21] for another K-9 unit to come and assist on the
[22] track. Due to it been raining and due to multiple
[23] suspects, we used two dogs. We did a dual track

Page 51

[1] that night.
[2] **Q.** Okay.
[3] **A.** And he was apprehended by another dog. Greg is the
[4] one that apprehended Mr. Hogan.
[5] **Q.** The dog's name is Greg?
[6] **A.** Greg, right.
[7] **Q.** G-R-E-G?
[8] **A.** Right.
[9] **Q.** And who is the officer?
[10] **A.** Corporal Mora. M-O-R-A.
[11] **Q.** Okay. And do you know exactly where it is that
[12] Mr. Hogan was apprehended?
[13] **A.** No. Not exactly, no.
[14] **Q.** Okay. Do you have, at the time, a video camera in
[15] your unit?
[16] **A.** No.
[17] **Q.** Okay. At the time, did Corporal Mora have a video
[18] camera in his unit?
[19] **A.** No.
[20] **Q.** Do you know who Kirk Pelham is?
[21] **A.** He was a detective, yes, sir.
[22] **Q.** Do you have any idea as to whether or not Kirk
[23] Pelham had a video camera in his vehicle?

Page 52

[1] **A.** I don't know.
[2] **Q.** You don't know? Okay. Have you had an opportunity
[3] to see any videotape related in any way to the
[4] arrest of Chad Hogan?
[5] **A.** No.
[6] **Q.** Okay. Have you had an opportunity to listen to any
[7] audiotape of radio transmissions related to the
[8] arrest of Chad Hogan?
[9] **A.** No.
[10] **Q.** All right. Tell me about any radio transmissions
[11] that you recall that night after you called dispatch
[12] informing them that you had -- that there had been a
[13] wreck and that the suspects were on foot.
[14] **A.** I mean, there were several. Like I said, I called
[15] for more units to come in the area and assist me.
[16] We let them know that K-9 was on the ground so they
[17] can stay off and they won't accidentally get bit by
[18] one of our dogs. When the subject was in custody,
[19] I'd -- I wasn't the one that apprehended him, so I
[20] wasn't the one to say that he was in custody over
[21] the radio. I mean, I can't recall everything that I
[22] said on the radio that night.
[23] **Q.** I understand. I'm just asking you to tell me what

Page 89

[1] Q. Okay. Did Lieutenant Caulfield ever come up to
[2] headquarters while you were at headquarters on the
[3] night of the incident?
[4] A. I think he was there before I was there.
[5] Q. Okay. Did you ever have an opportunity to see him
[6] actually at headquarters?
[7] A. Yes, sir.
[8] Q. Okay. And this was while -- after the incident
[9] while you were at headquarters?
[10] A. Right.
[11] Q. Okay. And, obviously, before you turned in your
[12] report to him at the kennel.
[13] A. Right.
[14] Q. Okay. Did you have an opportunity to talk to him
[15] during that window of time where you were both at
[16] headquarters together?
[17] A. It was -- if so, it was a brief conversation. It
[18] would be a, that a boy, good job.
[19] Q. Okay. Any specifics you can remember about that
[20] conversation?
[21] A. No.
[22] Q. Okay. Do you remember there being an incident at
[23] Alabama State University involving a K-9 officer and

Page 90

[1] his dog?
[2] A. Correct.
[3] Q. Do you remember the date of that incident?
[4] A. I do not.
[5] Q. Do you recall whether or not it was before or after
[6] March 31, 2005?
[7] A. It was before.
[8] Q. Okay. Months, weeks, days? Can you tell me?
[9] A. I can't remember. Maybe weeks.
[10] Q. Okay.
[11] A. Maybe months. I don't know.
[12] Q. Okay. Do you know whether or not there was
[13] allegation that the bite at Alabama State University
[14] was unlawful?
[15] A. Yes.
[16] Q. Okay. And, in fact, was there an allegation that
[17] the bite at Alabama State University was unlawful?
[18] A. Yes.
[19] Q. Had there been discussion among the K-9 officers of
[20] the event at Alabama State University?
[21] A. What do you mean?
[22] Q. Did you ever talk to any of your fellow K-9 officers
[23] about the circumstances of the event regarding the

Page 91

[1] bite at Alabama State University?
[2] A. I mean, everybody -- after a bite, we all talk about
[3] it, you know, good jobs and everything like that.
[4] Q. Okay. Well, who did you talk to about the event at
[5] Alabama State University?
[6] A. I'm pretty sure I talked to everybody about it.
[7] Q. Did you talk to Lieutenant Caulfield about it?
[8] A. He's my supervisor.
[9] Q. Okay. Did you talk to Corporal Mora about it?
[10] A. Yes.
[11] Q. Okay. Who was the K-9 officer in charge of the dog
[12] that did the biting at ASU?
[13] A. It was myself.
[14] Q. Okay. And why don't you tell me the circumstances
[15] surrounding that event?
[16]     MR. WHITEHEAD: That's fine.
[17] A. I mean, we got called to assist ASU police. They
[18] had some subjects that were attempting to break-in
[19] to an ATM machine and a snack machine. The subjects
[20] fled and crossed Carter Hill Road onto another
[21] street, and they hid in the area. One subject
[22] supposedly had on handcuffs. I think it was three
[23] of them total.

Page 92

[1] We got called in the area to assist. We got
[2] there, I put my dog on the ground, Corporal Mora
[3] used his dog as well. He located the first
[4] suspect. His dog apprehended him. A couple of
[5] minutes later -- maybe thirty minutes later, I
[6] apprehended the second suspect attempting to hide
[7] and get away from me hiding in a bush.
[8] Q. Do you recall the name of the individual that was
[9] bitten by Osko?
[10] A. I can't remember.
[11] Q. Okay. Was he subsequently convicted?
[12] A. That I don't know.
[13] Q. Okay. Did you ever have to go to court to testify?
[14] A. No.
[15] Q. What was the nature of the complaint?
[16] A. It was -- like I said, it was a burglary in
[17] progress.
[18] Q. No. The complaint regarding the bite.
[19] A. He made allegations that the bite was unlawful.
[20] Q. What, if you know, specifically, did he say?
[21] A. I don't know exactly what he said.
[22] Q. Has a lawsuit been filed against you in that case?
[23] A. I haven't been served a lawsuit, no.