Case 2:05-cv-00687-WKW-VPM    Document 44-4    Filed 08/22/2006    Page 1 of 12

DEPOSITION OF KIRK PELHAM                                October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY, ET AL.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

CHAD HOGAN,

    Plaintiff,

vs.                  CIVIL ACTION AT LAW
                      CASE NO. 2:05CV687

CITY OF MONTGOMERY, et al.,

    Defendants.

\* \* \* \* \* \* \* \* \* \*

DEPOSITION OF LEONARD KIRK PELHAM, taken pursuant to stipulation and agreement before Mallory N. McCutchin, Court Reporter and Commissioner for the State of Alabama at Large, in the Law Offices of Thomas, Mean, Gillis & Seay, 3121 Zelda Court, Montgomery, Alabama, on Monday, October 3, 2005, commencing at approximately 1:09 p.m.

\* \* \* \* \* \* \* \* \* \*

ada3fa5b-f036-44b5-9924-911011aa0187

Case 2:05-cv-00687-WKW-VPM    Document 44-4    Filed 08/22/2006    Page 2 of 12

DEPOSITION OF KIRK PELHAM                                  October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY, ET AL.

Page 14

1  A. It's her second marriage.
2  Q. Is her former husband, does he still live in
3     the area?
4  A. Yes.
5  Q. What is his name?
6  A. Christopher Keith Bailey.
7  Q. Does he live in Montgomery?
8  A. Yes.
9  Q. Mr. Pelham, give me your current home
10    address, please, sir.
11 A. 3803 Adams Place, Millbrook, 36054.
12 Q. How long have you been at that address?
13 A. A little over a year.
14 Q. Anybody besides you and your wife and your
15    step-children live at that address?
16 A. No.
17 Q. As best you can, in the last ten years, give
18    me a list of all the addresses that you've
19    had.
20 A. 2025 Briarwood Street, Prattville, Alabama,
21    36067, I believe.
22 Q. How long did you live there?
23 A. Six months.

Page 15

1  Q. And that was immediately preceding this
2     current address?
3  A. Right.
4  Q. Where did you live before that?
5  A. 18 -- I'm sorry. 1537 Westminster Drive,
6     Montgomery, 36117.
7  Q. How long did you live there?
8  A. About two years.
9  Q. Remember what your address was before that?
10 A. 1830 Windsor Downs Court, Montgomery, 36117.
11 Q. Remember how long you were there?
12 A. About three years.
13 Q. Can you remember your address before that?
14 A. 7101 Fair Oaks Court, Montgomery, 36117. Was
15    there about five years.
16 Q. Okay. Mr. Pelham, are you currently working?
17 A. Yes.
18 Q. Okay. Where are you working?
19 A. Carquest Distribution Center.
20 Q. How long have you been working for Carquest?
21 A. Three months.
22 Q. Is that the first job you've had since you
23    left working for the police department?

Page 16

1  A. Yes.
2  Q. How long did you work for the police
3     department, Montgomery Police Department?
4  A. Two years.
5  Q. Now, were you a detective with them the whole
6     time you were with them, or did you start out
7     as patrol?
8  A. No. I -- I was on third shift patrol.
9  Q. Just as far as your employment history with
10    Montgomery, let's just go into that. Do you
11    remember the month of the year that you
12    started?
13 A. November 2000 -- 2002.
14 Q. Okay. Started at third-shift patrol?
15 A. Right.
16 Q. How long were you on third-shift patrol?
17 A. A year and a half, approximately.
18 Q. All right. And you were promoted to
19    detective from third-shift patrol?
20 A. Yes.
21 Q. Do you remember the month and year when you
22    were promoted to detective, or at least your
23    best estimate?

Page 17

1  A. I couldn't tell you.
2  Q. Sometime in '04, I guess, if my math is
3     remotely right.
4  A. Yeah.
5  Q. Had you worked as a police officer before you
6     came to Montgomery anywhere?
7  A. No. No.
8  Q. When you were on third-shift patrol, did you
9     receive any interim promotions while you were
10    on third shift patrol other than some pay
11    raise?
12 A. Just merit raises, that's it.
13 Q. How many merit raises did you receive while
14    you were on third-shift patrol?
15 A. Two, I believe.
16 Q. Were you subject to any disciplinary actions
17    or anything while you were on third-shift
18    patrol?
19 A. No.
20 Q. Were you ever subject to any disciplinary
21    actions when you were a detective?
22 A. No.
23 Q. Mr. Pelham, what's your date of birth?

DEPOSITION OF KIRK PELHAM                     October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY, ET AL.

Page 26

```
 1    regarding particular detail.  But it might be
 2    easier just to start out just by asking to
 3    recite as best you can, what your first
 4    memory is of that night and who you spoke to
 5    and how the night developed from the moment
 6    you first heard about the burglary call at
 7    Arnaud Meats that night.  And just if you
 8    would, just tell me everything you remember
 9    about it.
10 A. All right.  I was sitting at any computer
11    eating a taco.  The call went out -- or the
12    alarm went out to Arnaud's Quality Meats.  It
13    was storming real bad.  I didn't think
14    nothing of it.  The alarm had been going off
15    all night, other alarm.
16 Q. Keep talking.  I'm listening.  I'm just going
17    to close these blinds.
18 A. And a K-9 officer, Officer Gordon, got on the
19    radio, advised he was the first one -- or he
20    was the first one to respond to the scene.
21    Advised he saw a vehicle in the parking lot.
22    I can't remember what -- what kind of vehicle
23    it was -- with a few -- two or three black
```

Page 27

```
 1    males inside.  Stated he pulled into the
 2    parking lot, and the vehicle drove off
 3    down -- headed down Wares Ferry Road, I
 4    believe, or they cut through the trailer park
 5    behind the store, headed to Wares Ferry
 6    Road.  He -- he -- he then advised he was
 7    following the car, and there were a couple of
 8    other units that said that they were en route
 9    to the store.
10          And I believe the next unit on the scene
11    was Officer Fike or Officer Forbus.  I'm not
12    -- not to sure.  And they advised that the
13    window on the right side of the business had
14    been busted out.  At that time, Officer
15    Gordon gave his whereabouts and stated that I
16    believe he stated he was initiating a traffic
17    stop, and he got some other units with him to
18    assist him.  At that time, the vehicle was on
19    Wares Ferry Road, refusing to stop.  And that
20    ended up -- the vehicle he was pursuing ended
21    up, I believe, running into a fence or a tree
22    at Pelzer Avenue and Wareingwood Avenue.
23 Q. Yes, sir.
```

Page 28

```
 1 A. While all this unfolded, I about that time --
 2    well, when the officer said that the window
 3    had been busted out, I had left the police
 4    department, started in that direction.
 5 Q. Let me stop you.  You talked to either
 6    Officer Fike or Forbus on the radio before
 7    you got to the scene; is that correct?
 8 A. No.  I heard them on the channel one radio
 9    saying that the window had been busted out.
10 Q. But you didn't speak with them at that point?
11 A. But I didn't speak with them at that point.
12 Q. I'm sorry.  Continue.
13 A. Once I heard that, I got in my car.  Started
14    that way.  While I was on my way to the
15    business, that's when the -- the suspect
16    vehicle crashed into a -- a fence.
17          About that time -- not long after that,
18    I arrived at Arnaud's Quality Meat and made
19    contact with Officer Forbus and Fike.  And I
20    pulled up, just so happened to pull up on the
21    right side in front of the window, and walked
22    around to the front of the business.  Officer
23    Forbus and Fike had advised me that it didn't
```

Page 29

```
 1    look like anything had been -- been tampered
 2    with.  Didn't look like anything had been
 3    gone.  And they had already -- they had
 4    requested a key holder to come out.  The
 5    owner of the business to come out and verify
 6    if -- if there had been anything missing or
 7    if there had been a burglary.  At that time
 8    Anthony Arnaud, the owner of Arnaud's Quality
 9    Meat, pulled up; and I made contact with him,
10    and asked him to go into his store and
11    inventory it.  See if anything had been
12    missing.  He went inside, come back out and
13    told me that he left the window open, because
14    the window wasn't broken.  He left it broken
15    because the -- his air conditioner was broke
16    and he didn't want it to be real hot the next
17    morning.  Had something going on early the
18    next morning.  Some kind of breakfast or
19    something.  Didn't want it to be real hot so
20    he left the window open.  And nothing was
21    missing.  He said he had some cash laying on
22    the counter, it was still there.  He believed
23    nobody -- nobody had gotten in at that time.
```

Case 2:05-cv-00687-WKW-VPM    Document 44-4    Filed 08/22/2006    Page 4 of 12

DEPOSITION OF KIRK PELHAM                              October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY, ET AL.

Page 30

1  I got on my radio, made contact with Sergeant
2  Johnson, with my supervisor, Lieutenant Cook,
3  let him know that there wasn't a burglary and
4  that the owner had left the window up. And
5  he advised me to make contact with third-
6  shift sergeant, Sergeant Johnson, to let him
7  know that there was -- was no burglary. So I
8  then called on my radio Sergeant Johnson and
9  let him know what the owner had told me, that
10 he had left the window open, and nothing was
11 missing, didn't think anybody got in.
12     At that time, Sergeant Johnson, he got
13 irate with me like I didn't want -- didn't
14 want to work the case. Like I was trying to
15 push it off and didn't want to work it.
16 Said, you mean to tell me we got a -- we got
17 a dog bite and no burglary? And I said,
18 Well, that's what the owner is advising me.
19 You know, he left the window open. And it's
20 raining, you know, raining real hard. If
21 anybody had got in, there would be foot
22 prints all over the place. Didn't hear
23 anything back from him at that time.

Page 31

1      I'd heard -- while all this was going
2  on, I was scanning channel one radio
3  traffic. I'd heard they had one or two
4  subjects in custody. I don't know if it was
5  three or four total, but one or two was in
6  the ditch, and the water level was real
7  high. He was in the ditch I guess swimming,
8  trying to get away from officers. At that
9  time, I had Mr. Arnaud secure his business
10 and follow me back to police headquarters.
11 At which time we went to -- we went to police
12 headquarters and Mr. Hogan and another --
13 another black male subject was transported to
14 headquarters, and I believe one or two other
15 ones got away.
16     Once I got to headquarters, I separated
17 the two, Mr. Hogan and another -- another guy
18 that was with him. And there might have been
19 three, I can't remember. Anyway, I separated
20 how many of them there was and began
21 questioning them, you know, as to what they
22 were doing in the parking lot, what went on.
23 Mr. Hogan was the first -- the first subject

Page 32

1  that I talked with. He said that him and his
2  buddies had been at the pool hall -- I
3  believe it's called The Break Room -- right
4  there at Lagoon Park Shopping Center. Said
5  they were playing pool. When they got --
6  when they left, they were heading over --
7  they were going to a friend's house. They
8  pulled -- he said they had pulled into the
9  parking lot of Arnaud's Quality Meats because
10 it was raining so hard. They couldn't see --
11 the driver couldn't see out of the
12 windshield. While they were there, one of
13 them lit a -- a joint or a blunt, or one of
14 the two. And they sat in the parking lot.
15 Q. Mr. Pelham, just to stop you for a second.
16    Just to make the record clear, when you say a
17    joint or blunt, you mean --
18 A. Marijuana.
19 Q. Marijuana.
20 A. Right.
21 Q. Go ahead. I'm sorry.
22 A. So they sat in the parking lot and were
23    smoking marijuana. And he then stated that

Page 33

1  one of his -- one of his buddies saw what he
2  believed to be a K-9 vehicle pull into the
3  parking lot, which was Officer Gordon. They
4  then -- they then left the parking lot. And
5  he said, you know, they were scared that they
6  were going to get caught with smoking the
7  marijuana. And he stated that's when they
8  left and ran from the K-9 officer and hit the
9  fence. That's how he ended up at
10 headquarters.
11     I then talked with the other subject,
12 and he stated the same thing. They were at
13 the pool hall and left and couldn't see. So
14 they pulled in the parking lot smoking
15 marijuana. Saw the K-9 officer and left.
16 That's how he ended up at headquarters. And
17 then -- I think there was a third one. I
18 can't be too sure.
19     Anyway, the stories panned out. I
20 even -- I even called The Break Room, the
21 pool hall and talked with -- I believe it was
22 the -- the door -- the door manager or
23 whatever you want to call it. I guess

Case 2:05-cv-00687-WKW-VPM    Document 44-4    Filed 08/22/2006    Page 5 of 12

DEPOSITION OF KIRK PELHAM                          October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY, ET AL.

Page 34

1  somebody who checks your ID or something like
2  that. And he stated that they were in
3  there. They'd just left, you know, a little
4  while ago.
5  Q. When he said little while, do you remember
6     how he defined little while?
7  A. I can't remember that. He might not have
8     even said a little while ago. He -- he said
9     that they had recently left. They were
10    there.
11 Q. Did you write his name down on any reports
12    anywhere?
13 A. I'm sure it's in the case file.
14 Q. Go ahead. I'm sorry.
15 A. I then let my supervisor know, Lieutenant
16    Cook, that, you know, I didn't think we were
17    going to have a burglary. These guys'
18    stories panned out. I -- I -- after I talked
19    with the last subject, find -- find out his
20    side of the story, I then went to the Anthony
21    Arnaud and asked him again, you know, you
22    sure there's, you know, nothing missing? At
23    that time, you know, he's in police

Page 35

1  headquarters. And he said no. He just
2  wanted to go home. He didn't want to put the
3  wrong guy in jail or put somebody in jail for
4  something they didn't do.
5      So I called my Lieutenant Ron Cook, and
6  he advised my to see -- wait -- wait to get a
7  statement from the officers. You know, to
8  see if they -- to see if they saw enough, you
9  know, to charge -- to charge these guys with
10 a burglary. You know, did they see them
11 coming out of the window or carrying
12 something that maybe Mr. Arnaud didn't notice
13 was missing.
14     So I waited -- waited for the officers
15 to get there. And Officer Gordon had typed
16 up a statement. I let him know that, you
17 know, the owner didn't -- didn't notice
18 anything was missing. The subjects that were
19 in custody --
20 Q. Let me to stop you. You said you let him
21    know. Who are you speaking of when you say
22    you let him know?
23 A. Officer Gordon.

Page 36

1  Q. Okay. Go head.
2  A. Let him know that the subject -- you know,
3     Mr. Arnaud didn't see anything missing. Said
4     he left the window open. His store wasn't
5     burglarized. And the subjects all were
6     separated and had a -- a similar story. I --
7     I told Officer Gordon that I needed -- I
8     would need a statement from him as to what he
9     saw when he pulled into the parking lot. So
10    he typed up a statement.
11 Q. Let me stop you, again. You're telling
12    Officer Gordon this at the police department
13    in person, this conversation you've just
14    described, or was this on the radio?
15 A. I don't remember. It could have been on --
16    he was on his way back to the police
17    department. At -- and it was either on the
18    radio or when he got back, I let him know it.
19 Q. All right. I'm sorry. Go ahead.
20 A. At that time he -- I believe he got on my
21    computer and typed up a -- a statement. And
22    when he was done, he gave it to me. And I
23    read it, and the elements -- the elements for

Page 37

1  burglary wasn't there. He said that he had
2  pulled into the -- well, the alarm call had
3  went out. He had pulled into the parking lot
4  and observed a -- the suspect's vehicle, one
5  of the door close -- one of the doors on the
6  vehicle closed, and drive away from the
7  business. Which, you know, the elements for
8  the burglary weren't there. At which time I
9  let my supervisor, Lieutenant Cook, know that
10 his statement wasn't sufficient.
11    At that time Lieutenant Cook called
12 Officer Gordon's supervisor, Lieutenant
13 Caulfield, K-9 supervisor, let him know his
14 officer's statement didn't have the elements
15 of burglary. And Lieutenant Caulfield told
16 Lieutenant Cook that he would -- he would
17 talk to his officer and get another
18 statement.
19 Q. Let me stop you right there. You said you
20    heard the conversation between Lieutenant
21    Caulfield and Lieutenant Cook?
22 A. That -- that conversation.
23 Q. Were they both in person talking to each

Case 2:05-cv-00687-WKW-VPM    Document 44-4    Filed 08/22/2006    Page 6 of 12

DEPOSITION OF KIRK PELHAM                          October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY, ET AL.

Page 38

1  other, or was this something over the walkie-
2  talkie or --
3  A. They were -- it was over the I-Link, the
4     radios you can --
5  Q. So you could hear the conversation that's
6     incoming?
7  A. Right. Kind of like a Nextel, you can --
8  Q. I gotcha. Okay. Go ahead.
9  A. At that time, Officer Gordon -- I mean, I'm
10    assuming Lieutenant Caulfield called Officer
11    Gordon because Officer Gordon said he was
12    going to do another statement. He then typed
13    another statement. Said that he had pulled
14    into the parking lot, observed a vehicle in
15    the parking lot, and a black male standing
16    next to the vehicle by the window, I believe.
17 Q. I'm going to stop you for a second. What did
18    the first statement say as opposed to the
19    second statement? What was the major
20    difference between the two?
21 A. The first statement said I pulled into the
22    parking lot, observed a vehicle which
23    passenger -- I observed a vehicle in the

Page 39

1  parking lot. The passenger's door then
2  closed and the vehicle drove off. The second
3  statement said, I pulled in the parking lot,
4  observed a vehicle, and a black male standing
5  outside the vehicle next to the window, which
6  was believed to be the point of entry. And
7  that was the only two things that changed.
8  Q. All right.
9  A. At that time, Officer Gordon gave me a
10    statement. I read the statement. And still,
11    the elements weren't there. It was a small
12    twist getting closer to -- to the elements.
13    But it -- it wouldn't -- wouldn't support
14    burglary.
15       So then I called Lieutenant Cook, let
16    him know the statement, you know, the
17    elements still weren't there. And -- and I'm
18    assuming he called Lieutenant Caulfield
19    then. I -- I didn't hear that conversation.
20    However, he said that Officer Gordon was --
21    was going to come back and fix it. So
22    Officer Gordon come back and did a third
23    statement. And the third statement, I had

Page 40

1  pulled into the parking lot -- I had pulled
2  into the parking lot and observed a vehicle
3  in the parking lot with a black male coming
4  from the window -- coming from -- coming from
5  the window of the business, enter the vehicle
6  and drive off. That was the only thing that
7  was changed there. Still after the third
8  time, I read the statement. Elements weren't
9  there.
10 Q. Mr. Pelham, let me stop you again. I
11    apologize. Just so I can make sure I
12    understand this. Okay. You're saying that
13    Officer Gordon wrote three different
14    statements?
15 A. Typed three different statements.
16 Q. Okay. And tell me again just the transition,
17    what was in the first statement, just what
18    got changed in the second statement, what you
19    say got changed in the third statement. What
20    was the difference between the three
21    statements?
22 A. The first statement said he saw the vehicle
23    in the parking lot, a door closed, the

Page 41

1  vehicle the drove off. The second statement,
2  the difference was he saw the vehicle in the
3  parking lot, a black male standing outside
4  the vehicle next to the window, got into the
5  vehicle and the vehicle drove off. Third
6  statement, difference was, he pulled into the
7  parking lot, saw the vehicle in the parking
8  lot, black male subject coming from the
9  window of the business. Got into the vehicle
10    and the vehicle drove off.
11 Q. Okay. So you're saying the final statement
12    said that he actually saw the black male
13    coming from the window?
14 A. Coming from the window.
15 Q. I'm sorry. Keep going.
16 A. At that time I read it, elements weren't
17    there. I can't remember how it was worded
18    but it -- it wasn't coming out of the window,
19    you know.
20       Anyway the elements weren't there. So I
21    then let Lieutenant Cook know.
22 Q. Let me ask this too because this is as good a
23    place as any. Because you said a few times

Case 2:05-cv-00687-WKW-VPM   Document 44-4   Filed 08/22/2006   Page 7 of 12

DEPOSITION OF KIRK PELHAM                     October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY, ET AL.

Page 42

1    you didn't think the elements were there. On
2    the third statement why did you think the
3    elements weren't there on that final
4    statement?
5  A. Well, the way it was -- the way it was
6    worded, observed a black male coming from the
7    window. The way he had it worded was not
8    coming out of the window but coming from the
9    direction of the window. You know, not
10   climbing out of the window but coming from
11   the window. So that's, you know elements
12   aren't there. And in the back of my mind
13   being the third statement.
14 Q. Okay. And let me ask you this one thing.
15   I'm asking you as an officer what you would
16   think if in light of the fact that a burglar
17   alarm had sounded, that I believe was
18   signaled by a motion detector; is that
19   correct?
20 A. Yeah.
21 Q. And in light of the fact that they were --
22   I'm going to give you a hypothetical. Had
23   you seen a vehicle in the area and you'd seen

Page 43

1    someone coming -- I'm going the use your
2    words -- from the window -- not necessarily
3    out of the window but from the window, you
4    then approached that vehicle and they take
5    off and don't stop, and then you subsequently
6    find a gun, a ski mask, and a flashlight in
7    the car, would that not altogether add up to
8    probable cause to believe that a burglary had
9    occurred?
10 A. Oh, yeah, yeah, it would.
11     MR. NELMS: Object to the form.
12 Q. We'll do that a few times. You can still
13   answer.
14     MS. CONNER: You can answer. But, you
15        know, just let them do their
16        thing.
17     THE WITNESS: Okay.
18     MS. CONNER: Okay. You can answer.
19     THE WITNESS: Okay.
20     MS. CONNER: Do you remember the
21        question?
22 Q. I'll repeat it if you need to.
23 A. Had, in fact, it not been -- I mean, it was

Page 44

1    storming real, real -- I mean it was a
2    terrible storm. The alarm had gone off once
3    before prior to this -- this incident.
4  Q. Do you remember what sensor had tripped the
5    alarm before?
6  A. The same motion.
7  Q. Is same motion sensor?
8  A. Right. And -- and I fail to mention
9    Mr. Arnaud stated -- he does serve meat. He
10   stated that he was embarrassed to say, but he
11   had big rats. And goes out there all the
12   time because big rats set off his motion
13   detector. However, we were answering alarm
14   calls at night due to the weather.
15        Now, as far as a vehicle leaving the
16   area and -- and, you know, having the gun and
17   a ski mask and all that, yes, you know,
18   that's -- looks like somebody is up to no
19   good. But, you know, it takes three
20   statements to -- to even get remotely close
21   to coming from the window. I mean, I knew,
22   you know, that was my job to -- are the
23   elements there? You know, did this burglary

Page 45

1    happen? And, you know, I had the owner
2    telling me nobody got in. Nothing is
3    missing. I left the window up, you know.
4    You know, they had they had a couple of black
5    males in the car with a gun, some dope, and a
6    ski mask. There was no burglary.
7  Q. Weren't there some flower pots or something
8    on the windowsill that were knocked off?
9  A. There -- there were. I failed to mention
10   that as well.
11     MR. NELMS: Object to the form.
12 A. There were some -- there were two or three
13   flower pots and like a -- some type of
14   figurine like a porcelain figurine. When I
15   pulled up, they were laying on the ground up
16   under the window. I asked when -- when
17   Officer Forbus and Officer Fike told me it
18   didn't look like anybody got in, I asked
19   them, I said, well, what is that right
20   there? Did that -- did that come from the
21   window? And they said yeah, that was on the
22   windowsill. We moved it to get in. And it
23   wasn't broken laying on the ground. It was

Case 2:05-cv-00687-WKW-VPM     Document 44-4     Filed 08/22/2006     Page 8 of 12

DEPOSITION OF KIRK PELHAM                              October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY, ET AL.

Page 46

1  picked up and placed on the ground.
2  Q. Are Officer Forbus and Officer Fike, are they
3     K-9 officers?
4  A. No, they're third-shift patrol officer.
5  Q. So they're just normal patrol?
6  A. Right
7  Q. Go ahead. I'm sorry.
8  A. They had said that it was moved to be put --
9     it was moved to get -- to get in so the
10    building could be cleared. So they could
11    clear the building, make sure nobody was in
12    there.
13 Q. So they told you that they took the thing
14    off, the plants off or the figurine?
15 A. I don't know if they -- it seems like Fike --
16    Fike told me that -- there was a lot of --
17    there was a lot of units there, due to the
18    pursuit and all. And it seems -- I want to
19    say that K-9 -- there was a K-9 officer that
20    was actually the first officer in the
21    business because they clear it with their dog
22    first. You know, they're not -- they don't
23    normally send an officer in there. If they

Page 47

1  got a dog, they'll send their dog in first.
2  And it seemed like he said they put it on the
3  ground and they sent the dog in. And they
4  followed behind him. I -- I don't know how
5  he worded that.
6  Q. Did he say he saw them -- that happen or he
7     was just assuming?
8  A. He was just assuming.
9  Q. You don't know what he based that statement
10    on?
11 A. I don't know. He just said that it was put
12    down on the ground so the building could be
13    cleared. The business could be cleared.
14 Q. But you didn't clarify with him about how he
15    obtained that information?
16 A. He was there. I'm assuming he saw it.
17 Q. Okay. But you didn't ask him if he saw it?
18 A. I can't remember if I did or not.
19 Q. Okay. I'm sorry. Go ahead.
20 A. After the third statement was written and I'd
21    read it, I'd called Lieutenant Cook. Let him
22    know, you know, this is the third statement.
23    You know, I don't feel comfortable with

Page 48

1  this. And the elements aren't there. I mean
2  probable cause is there. Your reasonable
3  suspicion is there. He then said, well, let
4  me call Caulfield. So he called Lieutenant
5  Caulfield and Caulfield told -- this is
6  coming from Lieutenant Cook. He told me that
7  Caulfield told him his officer was just
8  having an articulation problem. Having a
9  problem putting -- putting what he saw on
10 paper.
11    Said he was just having an articulation
12 problem putting down on paper what he saw.
13 At which time, he said just the -- you know,
14 the burden lies on K-9. You know just work
15 the burglary, and K-9 will be the ones that,
16 you know, testify to what they saw. You
17 know, the burden -- burden lies on them. And
18 I asked, well -- I asked Lieutenant Cook,
19 well -- who, you know, who do I charge with
20 burglary. And he calls Lieutenant Caulfield
21 and asks him, and he says, the one that's
22 been bitten. Usually, we charge, you know --
23 Q. Let me stop you again, too. Are we back on

Page 49

1  the Southern Link walkie-talkie again or how
2  is this conversation occurring between
3  between Caulfield and Cook?
4  A. I don't remember. I think he called him on
5     the telephone that time.
6  Q. Well, how do you know what Lieutenant
7     Caulfield said to Lieutenant Cook?
8  A. I was sitting in his office. You know, he --
9     he said, which one do we charge? And when he
10    got off the phone he said the one that's been
11    bitten.
12 Q. Lieutenant Cook said that?
13 A. Right.
14 Q. Okay. Are you saying that Lieutenant
15    Caulfield told Lieutenant Cook to charge the
16    one that's been bitten?
17 A. Right. He asked -- I asked Lieutenant Cook,
18    I said, which one do I charge with burglary.
19    He said, well, I don't know. Let me call
20    Caulfield. So he call Caulfield. Says, hey,
21    which one of these guys do we charge? Of
22    course, I didn't hear that. He hangs up the
23    phone. He says the one that's been bitten.

Case 2:05-cv-00687-WKW-VPM   Document 44-4   Filed 08/22/2006   Page 9 of 12

DEPOSITION OF KIRK PELHAM                    October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY, ET AL.

Page 46

1    picked up and placed on the ground.
2  Q. Are Officer Forbus and Officer Fike, are they
3    K-9 officers?
4  A. No, they're third-shift patrol officer.
5  Q. So they're just normal patrol?
6  A. Right
7  Q. Go ahead. I'm sorry.
8  A. They had said that it was moved to be put --
9    it was moved to get -- to get in so the
10   building could be cleared. So they could
11   clear the building, make sure nobody was in
12   there.
13 Q. So they told you that they took the thing
14   off, the plants off or the figurine?
15 A. I don't know if they -- it seems like Fike --
16   Fike told me that -- there was a lot of --
17   there was a lot of units there, due to the
18   pursuit and all. And it seems -- I want to
19   say that K-9 -- there was a K-9 officer that
20   was actually the first officer in the
21   business because they clear it with their dog
22   first. You know, they're not -- they don't
23   normally send an officer in there. If they

Page 47

1    got a dog, they'll send their dog in first.
2    And it seemed like he said they put it on the
3    ground and they sent the dog in. And they
4    followed behind him. I -- I don't know how
5    he worded that.
6  Q. Did he say he saw them -- that happen or he
7    was just assuming?
8  A. He was just assuming.
9  Q. You don't know what he based that statement
10   on?
11 A. I don't know. He just said that it was put
12   down on the ground so the building could be
13   cleared. The business could be cleared.
14 Q. But you didn't clarify with him about how he
15   obtained that information?
16 A. He was there. I'm assuming he saw it.
17 Q. Okay. But you didn't ask him if he saw it?
18 A. I can't remember if I did or not.
19 Q. Okay. I'm sorry. Go ahead.
20 A. After the third statement was written and I'd
21   read it, I'd called Lieutenant Cook. Let him
22   know, you know, this is the third statement.
23   You know, I don't feel comfortable with

Page 48

1    this. And the elements aren't there. I mean
2    probable cause is there. Your reasonable
3    suspicion is there. He then said, well, let
4    me call Caulfield. So he called Lieutenant
5    Caulfield and Caulfield told -- this is
6    coming from Lieutenant Cook. He told me that
7    Caulfield told him his officer was just
8    having an articulation problem. Having a
9    problem putting -- putting what he saw on
10   paper.
11     Said he was just having an articulation
12   problem putting down on paper what he saw.
13   At which time, he said just the -- you know,
14   the burden lies on K-9. You know just work
15   the burglary, and K-9 will be the ones that,
16   you know, testify to what they saw. You
17   know, the burden -- burden lies on them. And
18   I asked, well -- I asked Lieutenant Cook,
19   well -- who, you know, who do I charge with
20   burglary. And he calls Lieutenant Caulfield
21   and asks him, and he says, the one that's
22   been bitten. Usually, we charge, you know --
23 Q. Let me stop you again, too. Are we back on

Page 49

1    the Southern Link walkie-talkie again or how
2    is this conversation occurring between
3    between Caulfield and Cook?
4  A. I don't remember. I think he called him on
5    the telephone that time.
6  Q. Well, how do you know what Lieutenant
7    Caulfield said to Lieutenant Cook?
8  A. I was sitting in his office. You know, he --
9    he said, which one do we charge? And when he
10   got off the phone he said the one that's been
11   bitten.
12 Q. Lieutenant Cook said that?
13 A. Right.
14 Q. Okay. Are you saying that Lieutenant
15   Caulfield told Lieutenant Cook to charge the
16   one that's been bitten?
17 A. Right. He asked -- I asked Lieutenant Cook,
18   I said, which one do I charge with burglary.
19   He said, well, I don't know. Let me call
20   Caulfield. So he call Caulfield. Says, hey,
21   which one of these guys do we charge? Of
22   course, I didn't hear that. He hangs up the
23   phone. He says the one that's been bitten.

Case 2:05-cv-00687-WKW-VPM   Document 44-4   Filed 08/22/2006   Page 10 of 12

DEPOSITION OF KIRK PELHAM                    October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY, ET AL.

Page 54

1  photographed him. Got -- got some -- some
2  information on him as to address, where he
3  works, that type of thing. And then I went
4  back to Mr. Arnaud. I -- after I had
5  processed Mr. Hogan, I prepared the burglary
6  warrant. And was getting ready to take
7  Mr. Arnaud down to the warrant clerk's office
8  to secure the warrant against Mr. Hogan. And
9  at which time he said, listen. Just show me
10 where to -- where to go and -- so I can get
11 out of here. So I took him to the warrant
12 clerk's office. He secured the warrant
13 against Mr. Hogan for burglary.
14     And after the warrant was finished, I
15 went down to the warrant clerk's office, got
16 the warrant, executed it, transported
17 Mr. Hogan to the county jail, and did my
18 daily activity report. Whenever you arrest
19 somebody, just put the details of the -- what
20 happened and what you charged him where.
21 That's pretty much it.
22 Q. All right. You said earlier that Officer
23    Gordon typed out three separate statements.

Page 55

1  Do you allege that he said anything false in
2  the statements?
3  A. After the first one, yes.
4  Q. What do you say was false?
5  A. Well, on the -- and I have a copy of the
6  tape -- the tape, our dispatch tape. When he
7  pulled into the parking lot, you know, he
8  said just what he saw see. 150, I believe is
9  his unit number. 150, I'm pulling into the
10 parking lot. There's a vehicle in the
11 parking lot. Subject just closed the door of
12 the vehicle, drove off. That's just what he
13 saw.
14     And I knew then before I got to the
15 business, based on what he saw, we were
16 either going to have to get a confession out
17 of Mr. Hogan or his friends or some kind of
18 property missing from the business. Or, you
19 know, maybe an identifiable witness.
20 Q. On the tape transcript, did he say that's all
21    I saw or --
22 A. He said --
23 Q. -- did he simply say I saw someone getting in

Page 56

1  the car?
2  A. He said 150, I -- I'm pulling into the
3  parking lot of the business now. There's
4  a -- I observed a blue or a -- the vehicle.
5  I forgot the description. I observed the
6  passenger side door close and the vehicle is
7  now leaving heading towards wherever.
8     You know, had he said -- it could have
9  been a different story had he said 150, I'm
10 pulling into the parking lot; there's black
11 male subject coming from the window or, you
12 know, standing outside the vehicle.
13 Q. Is it possible that he could have seen that,
14    just not informed dispatch of it?
15    MR. NELMS: Object to the form.
16    MS. CONNER: You can answer.
17 A. I guess anything's possible.
18 Q. Okay. Go ahead.
19 A. I mean -- I mean, I could have -- I mean,
20 either way -- either way Mr. Hogan was
21 getting charged with burglary. I mean
22 that -- you know, I'm -- I'm a two-year
23 veteran of the police department. You know,

Page 57

1  the way -- the way the rank structure is, you
2  know, you do something you're not -- you do
3  something -- you don't do something you're
4  told to do, you know, you pretty much go find
5  you another job.
6  Q. Yes, sir. But let's just stick to the
7  statements right now, though, okay? I'm just
8  trying to figure out what, if anything, you
9  alleged was a false statement in the
10 complaints; and if so, what evidence you have
11 to support your claim that they're false.
12 That's all I'm trying to get into right now.
13 A. Okay.
14 Q. Other than the fact that he didn't state all
15 the details in his statement to dispatch. Do
16 you have any other evidence that the
17 statements he made in the allegations he made
18 in his statements were false?
19    MR. LEWIS: Object to the form.
20 A. He also didn't state them on paper. And his
21 written statement or his typed statement, not
22 only did he not state them the first time,
23 but he didn't state them the second time.

Case 2:05-cv-00687-WKW-VPM   Document 44-4   Filed 08/22/2006   Page 11 of 12

DEPOSITION OF KIRK PELHAM                              October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY, ET AL.

### Page 62

1  wrote his final statement? I believe you
2  said you helped draft a warrant and had to
3  take it down to the warrant clerk; is that
4  right?
5  A. Right.
6  Q. And then you transported Mr. Hogan to the
7  county --
8  A. Right.
9  Q. -- county jail?
10 A. Well, in -- in between there, I'd walked
11 around to Lieutenant Cook's office, showed
12 him the final statement and, you know, talked
13 about how I didn't feel comfortable with it.
14 And, you know, who do I charge. Like I said,
15 we normally charge -- we would, had it been a
16 normal case, we would have charged all of
17 them. However, the objective was to charge
18 the guy that was bitten?
19 Q. What happened the next day --
20    MR. NELMS: Object to the form.
21 Q. -- regarding this incident?
22 A. The -- of course, it was what they call late
23 car, so I was third shift -- late car, third

### Page 63

1  shift detective. So the next day, when I --
2  when I got home about seven o'clock, I guess,
3  that morning, maybe a little later, maybe a
4  little earlier, I was in the bed. My -- one
5  my sergeants, Sergeant Tatum, calls me on the
6  phone. And I asked -- he said, why in the
7  hell didn't you charge all them guys with the
8  burglary? And he's jumping down my throat
9  about it because he had read my -- read my
10 daily activity report, you know, what
11 happened. And I told him, you know, exactly
12 what happened. And he said, Well, hang on
13 Kirk. This -- this is serious. Let me go
14 around to Randy Jones' office, which is
15 property lieutenant. So they -- he transfers
16 the call to Randy's office and they got me on
17 speaker phone. Sergeant Tatum says well,
18 tell me -- tell me exactly what happened,
19 now. And I told him, you know, what happened
20 the night before. And they said they would
21 take care of it. And I went back to bed.
22    MR. WHITEHEAD: Okay. Let's take a
23    short break just a second.

### Page 64

1    (Brief recess)
2  Q. Mr. Pelham, I believe you testified earlier,
3  that there was a false alarm at Mr. Arnaud's
4  place earlier that evening; is that correct?
5  A. Yes.
6  Q. And you said that it had also been tripped by
7  the same motion detector; is that correct?
8  A. Yes.
9  Q. How did you verify that was caused by the
10 same motion detector?
11 A. I didn't verify it. That's what Mr. Arnaud
12 had told me.
13 Q. You asked Mr. Arnaud if that same motion
14 detector had set off the alarm earlier?
15 A. He had told me the same one.
16 Q. Mr. Pelham, how many times did you speak with
17 Officer Gordon that night?
18 A. Several times.
19 Q. Give me your best estimate how many
20 conversations you had with him?
21 A. Four or five.
22 Q. How many conversations did you have with
23 Officer Gordon after they had Chad Hogan in

### Page 65

1  custody?
2  A. Three, maybe.
3  Q. Were they all in person or on the radio or --
4  A. I think they were all in person. One -- it's
5  possible one could have been on the radio.
6  If it was, I don't recall it.
7  Q. Were they all at the police station?
8  A. Yes.
9  Q. And forgive me because I'm not familiar with
10 exactly how the offices and the structure of
11 the department is laid out. Where in the
12 building were you when you had these
13 conversations with Officer Gordon?
14 A. One in Lieutenant Cook's office, once or
15 twice in the hallway.
16 Q. Where in the hallway? Just out -- right
17 outside Cook's office or somewhere else?
18 A. Once outside Lieutenant Cook's office, once
19 by the copy machine.
20 Q. Where is the copy machine?
21 A. When you get onto the second floor, it's at
22 the end of the hallway, or in the center of
23 the hallway. You got -- you take a left to

Case 2:05-cv-00687-WKW-VPM   Document 44-4   Filed 08/22/2006   Page 12 of 12

DEPOSITION OF KIRK PELHAM                                October 3, 2005
CHAD HOGAN v. CITY OF MONTGOMERY, ET AL.

### Page 70

1  Tell me to the best of your memory
2  specifically what Lieutenant Cook said to
3  order you to prepare a warrant despite your
4  objections about the credibility of the
5  charge?
6      MR. NELMS: Object to the form.
7  A. He said, Don't worry about it. The burden
8  lies on K-9. Work the burglary, and we'll
9  let K-9 -- K-9 is the one who's got to
10 testify to it in court.
11 Q. Anything else that he said?
12 A. There were several conversations that night
13 with the statements from Officer Gordon and
14 all.
15 Q. But as to ordering you to go and prepare the
16 documents necessary to prepare a warrant of
17 arrest or to effectuate a warrant of arrest,
18 that's -- my question is limited to that.
19 A. Well, after it was determined who we were
20 going to charge with -- with burglary, said
21 charge -- charge the one that's been bitten
22 with burglary. And --
23 Q. But that was in response to when you said who

### Page 71

1  should I charge; is that correct?
2  A. Right. But again, I mean, all night, my
3  concerns were expressed as far as, you know,
4  I wasn't comfortable with it. The -- the
5  statements didn't -- didn't add up. They
6  were changed, you know, three times. He told
7  me to charge the guy with burglary.
8  Q. I mean, you're saying he told you to charge
9  the guy with burglary, but when? What did he
10 say, other than answering that question on
11 who do we charge? Charge the guy that got
12 bit is what you said. When did he order you
13 to go and charge Chad Hogan with burglary
14     MR. LEWIS: Object to the form.
15     MR. NELMS: Object to the form.
16 A. He's my -- he's my lieutenant. When I --
17 when I first found that the window hadn't
18 been busted out, you know, I told him I -- I
19 was coming back to headquarters. There is
20 no -- there is no burglary. He said to let
21 Sergeant Johnson know. So I did. Sergeant
22 Johnson got -- got irate with me and said,
23 well, come on back --

### Page 72

1  Q. I'm just talking about Lieutenant Cook right
2  now. Okay?
3  A. Right.
4  Q. And let me ask you this.
5  A. Well, I'm telling you he --
6  Q. Oh, okay. I'm sorry.
7  A. -- he told me charge the guy with burglary.
8  That's answering your question. Simple as
9  that. Charge the guy with burglary. Work
10 the case. Don't worry about the
11 circumstances. K-9 will testify to it. The
12 burden will be on them. I can't answer your
13 question any more basic than that.
14 Q. Did Lieutenant Cook ever order you to sign or
15 prepare a warrant or did you interpret his
16 statements as an order?
17     MR. NELMS: Object to the form.
18 A. He told me to do something. That's an order.
19 Q. Okay. Lieutenant Caulfield, you said that he
20 ordered you to prepare a warrant as well?
21 A. He said something to the effect of we're
22 going to get this warrant. We're in hot
23 water or we're -- he didn't say that. We're

### Page 73

1  going to get this warrant to justify the
2  bite. And you're going to get us that
3  warrant or something like that; telling --
4  you know, telling me I'm going -- I'm going
5  get the warrant. Now, Mora said, you're a
6  police officer. We're all police officers.
7  You're not going to stab another police
8  officer in the back. You're going to get us
9  that warrant.
10     And there were two other ones there --
11 and I don't know their names -- that were
12 expressing their feelings on -- on me getting
13 the warrant or me not getting the warrant. I
14 don't remember how that was said.
15 Q. Did you say Lieutenant Caulfield said we're
16 going the get this warrant?
17 A. Yes.
18 Q. Is how he passed that order to you?
19 A. Yes.
20 Q. And that Officer Mora basically said the same
21 thing, we're going the get this warrant?
22 A. Yes, and I wasn't going to stab another
23 police officer in the back. We're -- we're