IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| CHAD HOGAN,<br>    Plaintiff, | *<br>*<br>* | |
| v. | * | Case No. 2:05-cv-687-WKW-VPM |
| CITY OF MONTGOMERY, et al.,<br>    Defendants. | *<br>*<br>* | |

**ORDER ON PRE-TRIAL HEARING**

A pretrial hearing was held in this case on September 22, 2006 wherein, or as a result of which, the following proceedings were held and action taken:

1. <u>Parties and Trial Counsel</u>:

    a. Plaintiff Chad Hogan will be represented at trial by Jay Lewis and Andy Nelms, Law Offices of Jay Lewis, LLC, of Montgomery, Alabama.

    b. Defendant Lieutenant Ronald Cook, Lieutenant William Caulfield, and Canine Officer M.D. Gordon will be represented at trial by H. Lewis Gillis, Christopher K. Whitehead, Camille L. Edwards and Ramadanah S. Jones; Thomas, Means, Gillis and Seay, P.C., Montgomery, Alabama.

    <u>Counsel Appearing at Pre-trial Hearing</u>: same as trial counsel.

2. <u>Jurisdiction and Venue</u>:  Jurisdiction and venue are admitted.  Plaintiff filed his Complaint under the Fourth and Fourteenth (Due Process) Amendments to the Constitution, 28 U.S.C. §1331, 28 U.S.C. §1343(a)(1), 28 U.S.C. §1983 to obtain compensatory and punitive damages as well as such equitable relief as may be

appropriate. Venue is proper in the United States District Court for the Middle District of Alabama, in that the events giving rise to these claims took place in the Northern Division of the Middle District of Alabama.

3. <u>Pleadings</u>: The following pleadings have been allowed: For Plaintiff, Complaint; For Defendant, Answer to Complaint and Motion for Summary Judgment.

4. <u>Contentions of the Parties</u>:

    a.    <u>Plaintiff's claims</u>:

On March 30, 2005, at approximately 10:30 p.m., Plaintiff was sitting in a car in a parking lot near Arnaud's Quality Meats in Montgomery, Alabama, waiting for the rain to subside. At approximately the same time, a security alarm went off at Arnaud's Quality Meats. According to the owner Anthony Arnaud, the alarm had falsely activated several times that night. The alarm triggered a call to the City of Montgomery Police Department. The defendant M.D. Gordon, a K-9 officer with the police department, was then dispatched to Arnaud's Quality Meats. Gordon arrived on the scene. He radioed dispatch that he was on the scene.

Gordon claimed that upon arrival he immediately saw a person, he later learned to be the plaintiff, walking from Arnaud's Quality Meats to the parked car. Gordon claimed he saw this person enter the car. He witnessed the car leave the scene. Gordon followed the car across the parking lot into a trailer park. Gordon reported his location and activities to dispatch via radio. Gordon did not radio report witnessing a person walking from Arnaud's Quality Meats. In fact, Gordon offers no description of any person walking between Arnaud's Quality Meats and the parked car until much later at police headquarters.

Gordon was operating an unmarked vehicle. Some time after following the car, Gordon

turned on his emergency lights. Gordon attempted to initiate a stop. The driver of the car refused to stop. A chase ensued. The car ultimately ran off the road and crashed. The occupants, including the plaintiff, ran from the scene of the crash. Gordon called for back up. Another K-9 officer, Mora, arrived on the scene. After a search, the plaintiff was arrested by K-9 Officer Mora. During the arrest the plaintiff was bitten by Mora's police dog. The plaintiff was arrested then taken to police headquarters.

At approximately the time the false alarm from Arnaud's Quality Meats was reported, Detective Kirk Pelham was sitting at his desk at police headquarters. Pelham was a property detective charged with investigating thefts of property. In response to the alleged burglary, Pelham left the police station. He traveled directly to Arnaud's Quality Meats where he met with the proprietor, Anthony Arnaud. Arnaud informed Pelham that the window to the store had been intentionally left open. Arnaud also informed Pelham that nothing in the store had been taken. It was continuing to rain outside yet there were no wet footprints within the store. Arnaud explained to Pelham that the motion detector in the store had caused several false alarms. Pelham further investigated the scene then radioed his supervisor Lieutenant Ron Cook. Pelham informed Cook that no burglary had occurred.

Pelham instructed Arnaud to secure the property and come to police headquarters. Once at headquarters, Pelham learned that the plaintiff and another suspect were in custody.. Pelham interviewed Arnaud. He then separated the plaintiff from the other suspect then interviewed both suspects separately. Pelham noted that the two suspects had very similar stories. The plaintiff stated that he did not enter the store. The plaintiff claimed that he never exited the car near or around Arnaud's Quality Meats. Pelham called the Break Room pool hall and confirmed that in

fact the men had been there that night and had left a short time earlier. Pelham went to Lieutenant Ron Cook again explaining that he felt that no crime had been committed. Cook advised Pelham to wait and see what the other officers had to say.

Officer Gordon arrived at headquarters and typed a statement. Gordon's statement of the events at scene near Arnaud's Quality Meats was given to Pelham. Pelham noticed that elements necessary to show that the crime of burglary had been committed were not present in Gordon's statement. Pelham again went to Cook. Pelham explained to Cook that the statement did not have the elements necessary to support a claim of burglary. Lieutenant Cook called Officer Gordon's supervisor, Lieutenant Caulfield. Caulfield was the K-9 supervisor. Cook told Caulfield that the requisite elements of burglary were not present in Officer Gordon's statement. Caulfield explained that he would discuss the matter with Gordon and get a new statement. Gordon then wrote a new statement of the events.

Shortly after the original statement was written by Gordon, Pelham asked Gordon if he could identify the suspect at the scene near Arnaud's Quality Meats. Gordon stated to Pelham that he could not.

Gordon's first statement simply stated that Gordon pulled into the parking lot, saw a car with passengers, observed a passenger door close and then witnessed the car drive off. The second statement claimed that Gordon saw the vehicle in the parking lot, observed a black male standing outside the vehicle next to the window and noted that the vehicle was near the building of Arnaud's Quality Meats.

Pelham noted to Lieutenant Cook that he believed the second statement also lacked the elements necessary for a burglary charge. Pelham expressed concern that no burglary had taken

place and that Gordon was falsifying his statement. Cook later explained that Gordon would come back and fix the statement. Gordon did a third statement. The third statement claims that Gordon pulled into the parking lot, observed a vehicle a in the parking lot, observed a black male coming from the area of the window of the business and then witnessed the black male cross the parking lot to the waiting car.

After the third statement, Pelham called Cook again. He explained that under the circumstances, he did not feel comfortable with the statement. Cook stated he would again call Caulfield. Pelham later heard from Cook that Caulfield stated that Gordon was "having an articulation problem". Pelham was instructed to move ahead with the paperwork charging burglary.

Pelham asked Cook to explain which suspect should be charged. This was important to Pelham. Typically they would charge all suspects related to the crime. Cook again called Caulfield. According to Cook, Caulfield stated that the suspect that had been bitten by the dog should be charged. Pelham returned to his desk to finish the paperwork. Pelham claimed he received a lot of "heat" from K-9 and patrol officers to prosecute a case against the plaintiff. Apparently, some time earlier another dog handled directly by Officer Gordon had bitten a man near Alabama State University. There was an allegation that the bite at Alabama State University was unlawful. The event was a topic of some discussion among the police department. K-9 Officer Mora, who had actually physically arrested the plaintiff directly after the car chase, confronted Pelham explaining that they were police officers and that police officers should not stab each other in the back.

Pelham claims that Caulfield made a comment that the bite needed to be justified and that

the plaintiff needed to be charged. Caulfield explained to Pelham that after the Alabama State University incident they did not need to get into deeper trouble. Pelham continued to feel uncomfortable about the situation. He discussed the issue again with Cook. According to Pelham, Cook stated that it was not the investigator's problem that the burden of proof was with the K-9 officers. Pelham objected stating that he was the case agent. Pelham explained that he would ultimately have to be the person to testify at trial. Cook explained that he was getting a lot of heat from Caulfield to complete the warrant. Cook encouraged Pelham to move forward with the case. Pelham did finish the paperwork on the plaintiff. The plaintiff was booked for burglary and transported to the county jail.

Plaintiff has established a claim under 42 U.S.C. § 1983-False Arrest/False Imprisonment by showing Hogan was placed under arrest and imprisoned by the defendants without warrant and without probable cause that a crime had been committed and, in fact, with the knowledge that no crime had been committed. Gordon, at the direction and under the supervision of Cook and Caulfield, manufactured false evidence supporting probable cause or arguable probable cause for Hogan's arrest and prosecution. Hogan was falsely arrested and falsely imprisoned by the defendants. Hogan's arrest by the defendants initiated his prosecution for burglary in the third degree. There was no probable cause for Hogan's prosecution. The prosecution of Hogan was procured by fraud and perjury. Hogan's prosecution was malicious or was initiated under such circumstances, including lack of probable cause, as would imply malice. The proceedings were terminated in Hogan's favor. At all times material hereto it was clearly established in the law that an arrest in the absence of probable cause is unconstitutional. An arrest without probable cause violates the right to be free from an unreasonable seizure under the Fourth Amendment.

*Durruthy v. Pastor*, 351 F.3d 1080, 1088 (11th Cir. 2003); *Redd v. City of Enterprise*, 140 F.3d 1378, 1382 (11th Cir. 1998). At all times material hereto it was clearly established in the law that falsifying facts to establish probable cause is patently unconstitutional. *Riley v. City of Montgomery*, 104 F.3d 1247, 1253 (11th Cir. 1997). Hogan has been damaged thereby in that he has suffered monetary loss, embarrassment, humiliation, emotional distress and mental anguish.

Plaintiff has established a claim under 42 U.S.C. § 1983–Abuse of Process or, in the alternative, Malicious Prosecution by showing that Gordon, Caulfield, and Cook and each and all of them, initiated a criminal prosecution as against Hogan, to wit: they caused process to issue, which process was issued without probable cause and for an improper and ulterior purpose, to diminish potential civil liability against the City and the officers. At all times, the defendants were State actors and were acting under color of law. There was no probable cause for the issuance of the said process or for the prosecution of Hogan. The process was issued and the prosecution was initiated with malicious intent on the part of Gordon, Caulfield, and Cook, or the process was issued and the prosecution was initiated under such circumstances as to imply the existence of malice. The proceedings as against Hogan were terminated in favor of Hogan. See *The Kroger Company v. Puckett*, 351 So.2d 582, 586 (Ala. 1977) (one appropriate "termination of proceedings" for malicious prosecution purposes is "the refusal of a grand jury to indict.") Hogan has been injured and damaged as a result, in that he has suffered monetary loss, embarrassment, humiliation, emotional distress and mental anguish. Hogan is required to allege – and he does so allege – that he has stated the required elements of the common-law tort of malicious prosecution and a Fourth Amendment continuing seizure by virtue of the fact that he was out on bond following his release from jail and was subject to the continuing supervision of

the State.

    Plaintiff has established a claim under the common law for Malicious Prosecution or, in the alternative, Abuse of Process by showing that the defendants Gordon, Caulfield, and Cook initiated a judicial proceeding, a criminal prosecution, against Hogan. Defendants Gordon, Caulfield, and Cook caused process to be issued as against Hogan. Defendants Gordon, Caulfield, and Cook had an ulterior purpose in the issuance of the said process, the avoidance of civil liability. The said process was improperly used and used for an improper and ulterior purpose. Defendants Gordon, Caulfield, and Cook acted with malice. There was an absence of probable cause to believe that a crime had been committed or that Hogan had committed a crime. The criminal proceedings were terminated in Hogan's favor. Hogan has been injured and damaged as a result of the malicious prosecution and abuse of process.

    Plaintiff is entitled to a declaratory judgment that the practices complained of herein are unlawful and violative of the Fourth Amendment to the United States Constitution, by and through 42 U.S.C. § 1983, and violative of State law. Plaintiff prays the Court will enjoin the defendants from imposing punishment as against Plaintiff and further violating his federally protected rights. Plaintiff is entitled to recover One Million Dollars in compensatory damages and further demands Three Million Dollars in punitive damages. In the alternative, Plaintiff is entitled to be granted nominal damages and equitable relief. Plaintiff is entitled to be awarded the costs incurred in connection with this litigation and reasonable attorneys' fees. Plaintiff prays the Court will grant to him such other, further and different relief as this Court may deem just and proper.

  b.  Defendant's claims:

At approximately 10:30 p.m. on March 30, 2005, the Plaintiff Chad Hogan ("Hogan") met with three (3) men, and proceeded to the Break Room Pool Hall located on Northern Boulevard in Montgomery, Alabama. Hogan named two (2) of the men as Chris McBride ("McBride") and Courtney Smith ("Smith"), but allegedly could only recall the first name of the third man as Mario ("Mario"). After remaining at the pool hall for approximately one (1) hour, Hogan and the men left the pool hall and got back into their car to leave. While allegedly waiting for the "rain to slack up," the four (4) men stopped in a nearby parking lot and proceeded to smoke marijuana and drink liquor. This parking lot was adjacent to Arnaud's Quality Meats, ("Arnaud's").

  Defendant M.D. Gordon ("Gordon") is a Canine officer with the Montgomery Police Department ("MPD"). Gordon was on patrol this same night and responded to a burglar alarm call that had occurred at Arnaud's. The alarm at Arnaud's was triggered at approximately 11:58 p.m. The alarm was triggered by a motion sensor inside Arnaud's. Pursuant to normal protocol, Gordon turned his lights off when he pulled into Arnaud's parking lot. As Gordon pulled into the parking lot, he noticed the vehicle that Hogan and his accomplices were in, which was parked approximately twenty (20) to thirty (30) yards from Arnaud's building. Gordon also saw a black male standing outside of the car approximately halfway between the car and a window on the side of Arnaud's. Gordon noted that the black male was wearing dark pants and a gray or white T-shirt. Gordon further noticed that the window was open. Gordon then witnessed the black male run back to the vehicle and get into the vehicle on the back passenger side. After Hogan got back into the vehicle, it drove away and pulled into a trailer park that was adjacent to the parking lot and immediately behind Arnaud's. Gordon followed the vehicle into the trailer park and initiated a stop by flashing

his emergency lights. The vehicle initially stopped at this point, and Gordon exited his unit and began walking toward the stopped vehicle. However, the vehicle took off and fled before Gordon reached the stopped vehicle.

Gordon got back into his unit and pursued the vehicle down Wares Ferry Road. Gordon further radioed dispatch and requested assistance from additional units. The vehicle then led Gordon on a high speed chase through a residential area for approximately five (5) to ten (10) minutes. Eventually, Hogan and his accomplices crashed the vehicle into a privacy fence in an individual's backyard. All four (4) suspects then jumped out of the car and fled on foot. Hogan was unable to exit from the passenger side of the vehicle, as that side was crashed into the fence. Gordon intentionally kept his eye on Hogan as he exited the vehicle, as Gordon remembered that Hogan was the one who got back into the vehicle at Arnaud's. Gordon observed Hogan exit from the driver side backseat. Gordon and his dog Osko ("Osko") then exited the vehicle and pursued Hogan and one of his accomplices to a fence. Another of Hogan's accomplices turned to the right, and ran in another direction. Gordon did not see the fourth accomplice. Hogan and an accomplice jumped the fence, and Gordon held his spot at the point where they cleared the fence and called for additional backup.

An additional canine unit arrived on the scene, and the officers began to track Hogan and his accomplices from the point where Hogan cleared the fence. Shortly after, Hogan was apprehended by a canine unit dog in a nearby residential backyard. Contrary to Hogan's allegation in his Complaint that he was apprehended and bitten by Gordon's dog Osko, Hogan was actually apprehended by another dog under the supervision of Corporal Greg Mora ("Mora"). Eventually, McBride and Smith were also apprehended. The fourth accomplice that Hogan would only identify

10

as "Mario" got away, and was not apprehended. Hogan, McBride, and Smith were taken to the police station for further questioning. Subsequent to the apprehension, an inventory search of the suspects' vehicle was performed. During the inventory search, the following items were discovered in the car: a 9mm handgun, a ski mask, and a flashlight.

After Gordon had left in pursuit of Hogan and his accomplices, Officer Forbus ("Forbus") was the first to arrive on the scene at Arnaud's. When he arrived, Forbus noticed that the window on the side of the building was open, and that a flower pot had been knocked off the windowsill and had landed on the floor inside the building. Forbus further noticed that there were three (3) or four (4) other items on the windowsill that appeared to have been pushed off to one side to allow entry into the building, and that there was water on the floor inside the building.

Hogan was charged that night with Third Degree Burglary in violation of Ala. Code § 13A-7-7 (1975). The burglary warrant was prepared by Detective Kirk Pelham ("Pelham"). Pelham escorted Arnaud's owner, Anthony Arnaud ("Arnaud"), to the Warrant Clerk's office to secure the warrant against Hogan. Pelham then took the warrant, executed it, and transported Hogan to Montgomery County Jail.

Pelham was sitting at his desk on the night of these events when he heard a call about the burglar alarm over the radio. Pelham then heard further radio traffic from officers on the scene at Arnaud's, and then left the station and proceeded to Arnaud's. While in route to the scene, Pelham heard over the radio that the vehicle that Hogan was in had crashed into the fence. Pelham arrived on the scene at Arnaud's, and was informed by Forbus that Arnaud had been contacted and was on his way to the scene. According to Pelham, Arnaud arrived at the scene and informed Pelham that he had left the window open himself due to the air conditioner not working. Pelham further stated

that Arnaud could not find anything that appeared to be missing. Despite knowing all the facts regarding Hogan and his accomplices fleeing from the police after being seen in the immediate vicinity of a building where a burglar alarm had just been triggered, and without yet even knowing that a handgun, flashlight, and ski mask were found in the suspects' car, Pelham radioed his supervisor at this point and informed him that "no burglary had occurred" simply because the owner allegedly left the window open and couldn't find anything missing.

Despite the fact that Pelham was the person who prepared, secured, and executed the warrant against Hogan, Pelham now alleges that the prosecution of Hogan was improper. Gordon freely admitted that he did not fully articulate everything he saw when he initially drafted his statement and that he subsequently made changes to the statement. However, Pelham alleges that Gordon actually added elements to his statement submitted with the case file that Gordon did not actually see. Pelham alleges that Gordon drafted a series of statements, and that Gordon progressively added facts that he did not witness. Specifically, Pelham testified that Gordon submitted a statement that stated that Gordon saw a black male standing outside of the car coming from the window of the business. However, the final statement submitted as part of the case file simply says that Gordon saw a black male standing outside the vehicle next to the window. Contrary to Pelham's allegation, the statement never alleges that Gordon saw a black male coming from the window.

Pelham further alleged in his deposition that he believed that Arnaud was pressured by Lt. William Caulfield ("Caulfield") to sign an arrest warrant on Hogan. However, Arnaud completely refuted this allegation in his deposition. Specifically, Arnaud testified that he was simply told by the MPD on the scene that **if** he wanted to press charges, he would need to go downtown to the police station. Arnaud voluntarily chose to go downtown. Despite incessant, repeated questioning on the

subject by Plaintiff's counsel, Arnaud adamantly denied that he was ever pressured by anyone at the MPD to sign the warrant against Hogan.

Pelham subsequently filed a complaint about this incident with his supervisor. Approximately one (1) month later, Pelham resigned from the MPD. Ten (10) days later, Pelham filed a verified claim against the City of Montgomery alleging "retaliation" in relation to the Hogan incident demanding the sum of $250,000.00 (two hundred and fifty thousand dollars). Pelham currently has a similar lawsuit pending in the Circuit Court of Montgomery County, Case No. CV-05-3116.

It was disclosed on January 19, 2006, that Pelham was represented initially by Hogan's current counsel "for a considerable time" in relation to this same matter. In fact, Hogan's attorney had previously objected to the Defendants' discovery requests regarding Hogan's sources of information and the content of conversations with Pelham on the basis of attorney-client privilege and work product. However, during Pelham's deposition three (3) months earlier, Pelham denied that he had any knowledge that any attorney that had represented him had communicated with Hogan, despite the fact that his former counsel was sitting at the table only a few feet away.

Hogan was convicted in 1998 of First Degree Robbery, and served nearly two (2) years in prison. Hogan and three (3) co-defendants were convicted of robbing a convenience store with a handgun. Hogan further admitted that a ski mask was worn during the commission of this crime. Hogan's accomplice, Smith, was also convicted of First Degree Robbery in 1995. Hogan's accomplice, McBride, is currently serving time in a federal prison in Mississippi on federal gun charges. It is unknown whether the mysterious accomplice known only as "Mario" has any felony convictions.

Defendants assert that both arrests were made in accordance with a warrant for arrest signed by an impartial magistrate. The arrest of Hogan was made with probable cause or at least arguable probable cause. Defendants assert the defense of qualified immunity and discretionary function immunity. Furthermore, Defendants assert that they are not guilty of the charges complained of in Hogan's complaint and demand strict proof thereof.

Defendants assert that Hogan's Complaints fail to state a claim upon which relief may be granted. Defendants also deny each and every material averment of Hogan's Complaint and demand strict proof thereof. Defendants deny that they were guilty of false arrest as is alleged in the Complaint, and demand strict proof thereof. Defendants deny that they were guilty of abuse of process as is alleged in the Complaint, and demand strict proof thereof. Defendants deny that they were guilty of malicious prosecution as is alleged in the Complaint, and demand strict proof thereof. Defendants aver that there was either probable cause or arguable probable cause for the arrest.

Defendants assert that they are entitled to the defense of qualified immunity to all claims asserted against them under 42 U.S.C. § 1983. Defendants assert that they are entitled to the defense of discretionary function immunity under Ala. Code § 6-5-338 (1975) as to Hogan's common law claims of abuse of process, false arrest/imprisonment, and malicious prosecution.

Defendants assert that Hogan's 42 U.S.C. § 1983 claim for malicious prosecution is based upon a continuing seizure theory and is therefore barred by Eleventh Circuit precedent.

Defendants aver that there is no causal relationship between the actions of these defendants and the injuries and damages referred to in the Complaint. Defendants deny that Hogan was injured to the nature and extent claimed and demand strict proof thereof.

To the extent that Hogan's Complaint can be read as seeking punitive damages, the

Defendants assert the follow defenses: Defendants aver that any award of punitive damages to the plaintiff in this case will be violative of the constitutional safeguards provided to these Defendants under the Constitution of the United States of America; Defendants aver that any award of punitive damages to the plaintiff in this case will be violative of the constitutional safeguards provided to these defendants under the Constitution of the State of Alabama; Defendants aver that any award of punitive damages to the plaintiff in this case will be violative of the constitutional safeguards provided to these defendants under the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States in that punitive damages are vague and are not rationally related to legitimate government interests; Defendants aver that any award of punitive damages to the plaintiff in this case will be violative of Article 1, Section 6 of the Constitution of the State of Alabama which provides that o person shall be deprived of life, liberty, or property except by due process of law, in that punitive damages are vague and are not rationally related to legitimate government interests; Defendants aver that any award of punitive damages to the plaintiff in this case will be violative of the procedural safeguards provided to these defendants under the Sixth Amendment to he Constitution of the United States in that punitive damages are penal in nature and, consequently, these Defendants are entitled to the same procedural safeguards accorded to criminal defendants; Defendants aver that it is violative of the self-incrimination clause of the Fifth Amendment to the Constitution of the United States of America to impose punitive damages against them, which are penal in nature, yet compels them to disclose potentially incriminating documents and evidence; Defendants aver that it is violative to the rights guaranteed by the Constitution of the United States of America and the Constitution of the State of Alabama to impose punitive damages against these Defendants which are penal in nature by requiring a burden of proof on the plaintiff

which is less than the "beyond a reasonable doubt" burden of proof required in criminal cases; Defendants aver that any award of punitive damages to the plaintiff in this case will be violative of the Eighth Amendment to the Constitution of the United States of America in that the damages would be an excessive fine in violation of the Excessive Fines Clause of the Eighth Amendment to the United States Constitution; Defendants aver that any award of punitive damages to the plaintiff in this case will be violative of Article 1, Section 15 of the Constitution of the State of Alabama 1901 in that the damages would be an excessive fine; Defendants aver that any and all claims for punitive damages in this action are limited in amount by the application of *Ala. Code* (19750, § 6-11-21).

    5.    <u>Stipulations of fact by and between the parties:</u>

        a.    A burglar alarm was triggered at Arnaud's Quality Meats at approximately 11:58 PM on March 30, 2005.

        b.    The arrest of the plaintiff occurred later that same night.

        c.    The plaintiff was a passenger in the vehicle which fled after Gordon made an attempt to stop and question the occupants of the vehicle.

        d.    The plaintiff and the other occupants of the vehicle fled on foot after the fleeing vehicle crashed into a fence.

        e.    After the occupants of the vehicle fled on foot, MPD utilized K-9 unit dogs to track the plaintiff and the other occupants of the vehicle.

        f.    Plaintiff was bitten by one of the K-9 unit dogs prior to his arrest.

        g.    Plaintiff was the only occupant of the vehicle charged with a crime.

        h.    Charges against the other occupants of the vehicle have not been prosecuted

      i.      Gordon does not contend that he saw any other occupant of the vehicle besides Hogan standing outside of the vehicle when he arrived on the scene at Arnaud's.

6.      <u>ORDER OF THE COURT</u>

It is ORDERED that:

1. The jury selection and trial of this cause, which is to last 1-2 days, is set for November 6, 2006, at 10:00 a.m. at the United States Courthouse, in a courtroom to be determined, in Montgomery, Alabama.

2. A trial docket will be mailed to counsel for each party approximately two weeks prior to the start of the trial term.

3. The parties shall file any requested voir dire questions, motions in limine fully briefed, and any proposed jury instructions and verdict forms with legal citations thereon, on or before October 23, 2006.

4. The parties are not required to file trial briefs, but if they choose to do so, the briefs shall be filed on or before October 30, 2006.

5. Each party shall submit at the time of trial, for use by the court (the judge, law clerk, and courtroom deputy), three copies of the witness list, exhibit list, and notebook of pre-marked exhibits.

6. Each party shall submit a sufficient number of copies of exhibits for each of the jurors and opposing counsel.

7. The parties shall review and comply with the Middle District of Alabama's Order on the E-Government Act.

8.  The parties shall notify Chambers of the undersigned on or before October 23, 2006, regarding any mediation efforts undertaken.

9.  All deadlines not otherwise affected by this order will remain as set forth in the Uniform Scheduling Order (Doc. # 12) entered by the Court on January 4, 2006.

10. The parties have indicated that there are no other disputes at this time.  All understandings, agreements, deadlines, and stipulations contained in this Order shall be binding on all parties unless modified by the Court.

DONE this the 29th day of September, 2006.

      /s/  W.  Keith Watkins
UNITED STATES DISTRICT JUDGE